```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           13 Cr. 43 (LAP)

5    WILLIAM COSME,

6              Defendant.

7    ------------------------------x

8                                      New York, N.Y.
                                       March 15, 2017
9                                      10:00 a.m.

10
     Before:
11
                    HON. LORETTA A. PRESKA,
12
                                       District Judge
13                                     and a jury

14                       APPEARANCES

15   JOON H. KIM
          United States Attorney for the
16        Southern District of New York
     MARTIN BELL
17   NOAH SOLOWIEJCZYK
          Assistant United States Attorneys
18
     MARK S. DeMARCO
19        Attorney for Defendant

20
     ALSO PRESENT:  MELISSA BERESFORD, FBI
21                  RYAN REDEL, FBI
                    BIBI HAYAKAWA, Paralegal
22                  SAMUEL LACHOW, Paralegal

23

24

25
```

 1                (Trial resumed; jury not present)

 2                THE COURT:  We are still waiting on one juror who said

 3      there were train issues, but that should resolve itself

 4      relatively quickly.

 5                I have an e-mail from Mr. Cosme dated today, March 15,

 6      at 12:01 a.m.

 7                Mr. Cosme says that Mr. Solowiejczyk's parents were in

 8      the gallery making unusual derogatory remarks upon Mr. Cosme,

 9      provoking Mr. Cosme, and asking me to disallow their presence.

10                No. 1, I saw no evidence of any remarks or any

11      interaction by Mr. Solowiejczyk's parents with Mr. Cosme.

12                Second, the Sixth Amendment guarantees a right to a

13      public trial.  I will not disallow his parents.  What I did

14      hear, however, on Monday, was Mr. Cosme's interaction with

15      Mr. DeMarco saying out loud such items as, do you want to be a

16      fucking tough guy in court?  That needs to stop, particularly

17      in the hearing of the jurors.

18                Mr. Cosme asserts that Mr. DeMarco showed up two hours

19      late the day of trial.  It was not two hours.  Mr. DeMarco

20      called and said that there was an overturned tractor trailer on

21      the FDR Drive.

22                Mr. Cosme asserts that Mr. DeMarco "was verifiably

23      caught fraternizing with jurors in hallways."  As is reflected

24      in the record, Mr. DeMarco indicated that a juror asked him

25      where the restroom was in the hallway and he pointed to it.

1          Mr. Cosme asserts that Mr. DeMarco did reek of

2     alcohol.  I did not find that to be so.

3          Mr. Cosme indicates that Mr. DeMarco interviewed no

4     witnesses in the case, even when he was lead counsel prior to

5     now.  A lawyer's decision as to which witnesses to interview is

6     the lawyer's job and not the client's job.  And I note that the

7     first couple of witnesses called by the government were

8     witnesses who identified documents which, in any event,

9     probably would have been stipulated to had counsel been

10    representing Mr. Cosme at the time.

11         Mr. Cosme goes on to say that Mr. DeMarco's opening

12    statement was inconsistent with facts, records, witnesses, case

13    trial plan.  Mr. DeMarco failed to engage in trial based on

14    trial plan, facts.  Again, counsel's opening statement and

15    counsel's trial strategy are none of the Court's business, and

16    that is the decision of counsel and not of the client.

17         Mr. Cosme goes on to say:  "AUSA, CJA still disobey

18    the series of appellate court withdraw orders and failed to

19    recognize who the circuit declared as Mr. Cosme's counsel.  The

20    disrupter is not Mr. Cosme.  It is AUSA, CJA, retained counsel

21    ignoring appellate court orders."

22         As I noted on Monday, this is an issue that has been

23    decided and is not open for discussion now.

24         Mr. Cosme goes on to say:  "CJA DeMarco in court 2X

25    said "FU" to Mr. Cosme in front of jurors, gallery, in open

1   court."

2          It was not my observation or within my hearing that

3   that took place.  Mr. DeMarco will continue to represent

4   Mr. Cosme.  I reiterate my finding of Monday that based on

5   Mr. Cosme's conduct prior to Monday and certainly his conduct

6   Monday, he is likely to continue to be disruptive and not to

7   participate in the proceedings in a manner consistent with

8   representing himself.

9          I guess the witness is ready to take the stand as soon

10  as the jurors are here, right?

11         MR. BELL:  Yes, your Honor.  One procedural thing.  I

12  think that that version of Mr. Cosme's correspondence may be a

13  bit different than one that we received last night.  I wondered

14  as a procedural matter if you are going to mark that as a court

15  exhibit.

16         THE COURT:  We will mark this as Court Exhibit 1.

17         MR. BELL:  Thank you, your Honor.

18         THE DEFENDANT:  Your Honor, I wanted to speak in

19  regards to your findings on those e-mails.

20         As far as the counsel issue goes, it's my

21  understanding that the jurisdiction of the Second Circuit

22  trumps the district court's jurisdiction when it comes to

23  counsel withdraws pursuant to local Rule 4.1(a), Federal Rule

24  of Appellate Procedure.

25         THE COURT:  Mr. Cosme, as I have mentioned to you on

 1   numerous occasions, the counsel issue has been decided.  You

 2   say you have retained counsel who is not here.  That's between

 3   you and retained counsel.  So we are not going to discuss the

 4   counsel issue any further.

 5          THE DEFENDANT:  Your Honor, respectfully, the counsel

 6   is not here because the district court substituted the retained

 7   active counsel with the CJA.

 8          THE COURT:  Mr. Cosme, I have never forbidden your

 9   retained counsel from being here.

10          THE DEFENDANT:  When you substituted the active

11   retained counsel preappellate mandate, preremand with CJA

12   counsel, their excuse was, CJA counsel is counsel and we are

13   not obligated to represent you under those conditions, and that

14   was a discussion that counsel had with Martin Bell.

15          THE COURT:  Mr. Cosme, I never prevented retained

16   counsel from appearing.  I was not party to that conversation.

17   And your relations with retained counsel are between you and

18   counsel.  My only interest was that you were adequately

19   represented.  We have finished discussing this topic.

20          THE DEFENDANT:  Your Honor, for the record, I do not

21   consent to CJA counsel, as you know.  I invoke my right to

22   counsel of choice.

23          THE COURT:  We finished discussing counsel, sir.

24          THE DEFENDANT:  You have no objection to the

25   interlocutory appeal?

```
1              THE COURT:  It's not an appealable issue, sir, but of

2    course you may file any interlocutory appeal if you want.

3              THE DEFENDANT:  Your Honor, it's the same basis as the

4    original interlocutory appeal was filed.  The counsel of

5    choice --

6              THE COURT:  Without commenting on whether it is or it

7    is not, file any piece of paper you want, sir.

8              THE DEFENDANT:  Thank you, your Honor.

9              Your Honor, can I ask you another question?

10             THE COURT:  Sir.

11             THE DEFENDANT:  The indictments, both the superseding

12   indictment and the original indictment, they both have

13   forfeiture allegations.  The allegations I guess include, but

14   are not limited, to civil asset forfeiture statutes.  And CJA

15   DeMarco had indicated that he does not do civil litigation.

16   And there was an open issue on the asset forfeiture on the S1,

17   in addition to the underlying legal defects from the original

18   indictment as it pertains to the forfeiture allegations.  Are

19   you opposed to me representing myself on the civil side of

20   that?

21             THE COURT:  I don't think that's an issue during the

22   trial.  And you will recall, Mr. Cosme, that the government

23   agreed that the indictment that will be sent into the jury will

24   have the forfeiture allegations deleted.  Do you remember that?

25             THE DEFENDANT:  That's a problem.  That's one of the
```

1   problems.  The problem with that is, you have an indictment or

2   the charging document with an asset forfeiture in the charging

3   section of the indictment.  That being said and the fact that

4   there was a prerequisite preindictment illegal judicial civil

5   asset forfeiture and illegal seizure, warrantless seizure in

6   this particular case, the grand jury from the original

7   indictment and the S1 indictment and the trial jury is not

8   going to be made aware of the truth about that particular

9   issue.

10          THE COURT:  That issue is not before the jury.

11          I see the jurors are here.  May we bring them in,

12   please.  Let's get the witness.

13          (Jury present)

14          THE COURT:  Would someone find out where the witness

15   is, please.

16          We thought we were ready, but I was mistaken.

17          We continue, ladies and gentlemen, with the direct

18   examination of Dr. Penland.

19          Mr. Solowiejczyk.

20          MR. SOLOWIEJCZYK:  Thank you, your Honor.

21    THOMAS JAMES PENLAND, resumed.

22   DIRECT EXAMINATION (cont'd)

23   BY MR. SOLOWIEJCZYK:

24   Q.  Good morning, Dr. Penland.

25   A.  Good morning.

1   Q.  I am going to direct you to Government Exhibit 108, which

2   we were discussing when your testimony ended on Monday.  That

3   should be on the screen as well.

4           Dr. Penland, I am going to direct you to the first

5   page of this exhibit, Bates No. 1120.

6   A.  Yes, sir.

7   Q.  Do you recall reviewing this page prior to your meeting in

8   New York City with Mr. Cosme?

9   A.  Yes.

10  Q.  I want to direct you to the top center portion of the page.

11          Dr. Penland, focusing your attention on the top

12  center, what kind of company did you believe Cosmo Dabi

13  International was, based on your review of the website?

14  A.  A global asset management company.

15  Q.  And directing you to the second line there, Dabi, what did

16  you understand that to mean?

17  A.  Delivery above and beyond internationally.

18  Q.  Where did you believe Cosmo Dabi International was located,

19  based on your review of this website?

20  A.  In New York, Wall Street area.

21  Q.  I want to direct you to the bottom right portion of the

22  page where it says NAV, Cosmo Dabi.  What was your

23  understanding of the volume of assets that Cosmo Dabi managed,

24  based on your review of this website?

25  A.  He was managing billions of dollars, U.S. dollars, in

1    assets.

2    Q.  Directing you to what it says on the page --

3    A.  It says 11 billion.

4    Q.  Going into your meeting with Mr. Cosme, did you in fact

5    believe he managed billions in assets?

6    A.  Yes, sir.

7    Q.  Dr. Penland, in deciding ultimately whether to move forward

8    with Cosmo Dabi as a source of financing, was it significant to

9    your decision that you understood Cosmo Dabi managed billions

10   of dollars in assets?

11   A.  Very significant, yes.

12   Q.  I want to direct your attention now to the middle right

13   portion of the page where it says high-performance ROI.  If you

14   could just read that into the record for us, Dr. Penland.

15   A.  High-performance ROI, track record.  The family member ROI

16   for ultra low risk programs which are also 100 percent

17   principal protected have returned a consistent net 25 percent

18   plus per annum over the past 10 consecutive years.

19   Q.  Dr. Penland, based on your review of the Cosmo Dabi

20   website, did you believe Cosmo Dabi had an established track

21   record of strong return on investment?

22   A.  I did, and I believed my principal was protected as well.

23   Q.  In deciding whether your school was going to move forward

24   with Cosmo Dabi as a source of financing, was it significant to

25   your decision that you understood Cosmo Dabi had this

1   established track record?

2   A.  Yes, sir.

3   Q.  Can you elaborate on that?

4   A.  Yes, sir.  It was very important that he had a track record

5   and that this was an important piece for us.

6   Q.  I want to direct your attention to the center of this page

7   where it reads references.  Center bottom.  You see here it

8   says that Cosmo Dabi's client references include but are not

9   limited to family members and families of royalty.  Do you see

10  that?

11  A.  Yes, sir.

12  Q.  With respect to the type of clients that Cosmo Dabi had,

13  what, if anything, did you believe, based on your review of the

14  website?

15  A.  That he had -- he was a global player and powerful and was

16  dealing with families of royalty around the world.

17  Q.  What did you think of that?  How did that make you feel

18  about Cosmo Dabi?

19  A.  He was significant and he was a world player.

20  Q.  I am going to turn your attention to the next page, page 2.

21        MR. SOLOWIEJCZYK:  Mr. Lachow, if you could focus on

22  the center of the text there.

23  Q.  Dr. Penland, I am just going to ask you to read that into

24  the record.

25  A.  Cosmo Dabi International is primarily a family practice

1    with an internationally headquartered parent.  Our main focus

2    is private equity, family global private wealth, asset

3    management for our own family members.  SF and business

4    consulting.  Cosmo Dabi also engages the highest caliber

5    financial operatives within the U.S. and abroad to accomplish

6    desired family business objectives.  The U.S. office is located

7    on Wall Street, New York City.  Cosmo Dabi also possesses top

8    financial operatives and vast resources within Hong Kong,

9    Russia, London, Geneva, Zurich, Greece, Abu Dhabi, Korea,

10   Italy, and Monaco.  Cosmo Dabi and Companies manage 11 billion

11   plus assets under management of family U.S. and Swiss assets.

12   Q.  Dr. Penland, focusing you on the sentence that reads Cosmo

13   Dabi also possessed top financial operatives and vast resources

14   within, and then it lists a whole number of places, what did

15   you think when you saw this at the time you reviewed the

16   website?

17   A.  It was an international player, world player with asset

18   management.

19   Q.  Was the fact that he had international contacts relevant to

20   you?

21   A.  I thought he would maybe be interested in us and our school

22   since we are an international school.

23   Q.  Again, focusing you on the last sentence there, Cosmo Dabi

24   and Companies manage $11 billion in assets under management.

25   Was it your understanding that Cosmo Dabi had billions in

1   assets under management?

2   A.   Yes.

3   Q.   I am going to direct your attention to the third page.

4        MR. SOLOWIEJCZYK:   Mr. Lachow, if you could focus on

5   the section that reads maximum funding amounts.

6   Q.   Dr. Penland, it says here there is no cap for international

7   projects for qualified family members.  What was your

8   understanding of Cosmo Dabi's capability to fund your project

9   based on your review of this document?

10  A.   That he was very, very capable and that our project was

11  fairly insignificant.

12  Q.   Did you think that there would be any problem with him

13  loaning you $55 million, based on your review of the website?

14  A.   No, not on the review of the website.

15  Q.   Directing your attention to the section in the middle of

16  the page that says references, do you see there it says, to be

17  provided upon formal engagement.  Did you have any concerns

18  about the fact that Cosmo Dabi's references could only be

19  provided to you after you had entered into a formal engagement?

20  A.   Not really.

21  Q.   Can you explain why not, Dr. Penland?

22  A.   I assumed that was the practice and that we had -- the

23  referencing for Mr. Cosme had come from my business

24  administrator, who had a personal relative involved in the

25  company introducing us to Mr. Cosme.  So I just felt like this

1    was the regular process going on.  I wasn't concerned at that

2    time.

3    Q.  You mentioned a family contact.  Can you just explain what

4    that was, again?

5    A.  Yeah.  Mr. Thomas Hwang was my director of business in

6    GSIS.  And his brother-in-law, Mr. Jay Pak, was working with

7    the Omni Holdings Group and it was through Mr. Hwang that I was

8    introduced to Omni and the idea of asset management, and I

9    felt -- I trusted Thomas implicitly and I felt like because

10   this was a family member that this was a trusting situation.

11   Q.  So the family member would be the person at Omni who was

12   introducing you to --

13   A.  Mr. Jay Pak, yes.

14   Q.  I want to turn your attention to the portion in the middle

15   of the page that reads proof of available funds to lend.  It

16   says:  To be provided by Cosmo Dabi upon formal engagement.

17   Dr. Penland, did you have any concerns about the fact that the

18   proof of having the funds available to lend would only be

19   provided once you engaged in a formal -- once you entered a

20   formal engagement?

21   A.  No, I wasn't concerned at that point.

22   Q.  Was that for the reasons you just described earlier?

23   A.  Same reasons, yes, sir.

24        MR. SOLOWIEJCZYK:  Mr. Lachow, if you could turn to

25   page 5 of this document, Bates 1124.  If you could zoom in on

1   the middle of the page.

2   Q.  If you could just read that, Dr. Penland.

3   A.  Private funding for our family members can be provided for

4   almost any type of compelling project, qualifying party or

5   transaction, provided that the project and/or transaction to be

6   funded is compliant, noncriminal, possess strong management,

7   further qualifies, is family business and can clearly

8   demonstrate the ability to possess positive economic impact

9   i.e., job creation, philanthropy.

10  Q.  Directing you to that last line, possessing economic impact

11  i.e., job creation, did you have any understanding at this time

12  as to why Mr. Cosme might be interested in your school?

13  A.  I was told it was a finished --

14          MR. DeMARCO:  Objection to what he was told.

15          THE COURT:  Counsel.

16          MR. SOLOWIEJCZYK:  Your Honor, it's not actually being

17  offered for its truth.  It's just his state of mind going into

18  the meeting.

19          THE COURT:  Anything else on that, Mr. DeMarco?

20          MR. DeMARCO:  No, your Honor.

21          THE COURT:  Overruled.

22          You may answer, sir.  Do you have the question in mind

23  or do you need it again?

24          THE WITNESS:  I'd like the question again.

25          THE COURT:  Directing you to the last line, possessing

1    economic impact i.e., job creation, did you have any

2    understanding at this time as to why Mr. Cosme might be

3    interested in your school?  You started answering:  I was told

4    it was a finished --

5    A.   Philanthropic interest.

6    Q.   Dr. Penland, if you could turn to page 7 of the document,

7    Bates 1126.

8         MR. SOLOWIEJCZYK:  Mr. Lachow, if you could just focus

9    on the section that says bio.

10   Q.   Dr. Penland, do you recall reviewing this?

11   A.   Yes, sir.

12   Q.   And what type of information did this website contain, this

13   page of the website?

14   A.   It's a bio of Mr. Cosme.

15   Q.   When you reviewed this page, were you under the impression

16   this was Mr. Cosme's biography?

17   A.   Yes.

18   Q.   Based on your review of the page, what companies did you

19   understand that he had worked for in the past?

20   A.   Microsoft, SAP America, General Electric, Rolls-Royce.

21   Q.   What, if anything, did you think about Mr. Cosme after you

22   reviewed this page of the website?

23   A.   He was influential global player and was -- wow.  I was

24   impressed.

25   Q.   You were impressed by the fact that he had worked for all

1    these companies.  Is that fair to say?

2    A.  Sure.

3    Q.  Prior to the meeting in New York, did you visit this page,

4    this website overall, only on one occasion or did you visit it

5    multiple times?

6    A.  I visited it multiple times to this website.

7    Q.  Do you feel you've thoroughly reviewed this website before

8    the meeting?

9    A.  I did.  The first time I went to the link I went through

10   every page of the website, and then I went to different pages

11   when I referred back to it multiple times.

12   Q.  Overall, after you reviewed the website for Cosmo Dabi

13   International, what were your thoughts about whether your

14   school should move forward with Mr. Cosme's company as the

15   source of financing?

16   A.  It motivated me to pursue it and to see -- to go after it,

17   to see whether we could get an agreement.

18   Q.  Why did it motivate you?

19   A.  The information mainly on the website, the data provided,

20   the information provided on the website.

21   Q.  Why did that data motivate you?

22   A.  It motivated me because I thought this was a person that

23   was capable of providing the funding for our project.

24   Q.  Dr. Penland, I'd like to turn to the day of the meeting

25   with Mr. Cosme.  Approximately when was that meeting?  You can

```
 1   put that exhibit down.
 2   A.  That was in December 2010, around the 10th of December.
 3   Q.  Prior to the meeting with Mr. Cosme, were there any other
 4   meetings that day?
 5   A.  Yes.  We had a meeting late afternoon with the Omni
 6   Holdings Group party.
 7   Q.  Where did that meeting occur?
 8   A.  It was in the Wall Street area.  I believe it was on John
 9   Street.
10   Q.  What, if anything, do you recall about the interior of
11   Omni's offices?
12   A.  I was surprised.  I'm not familiar with Wall Street in New
13   York, but I felt like I was going into sort of an art storage
14   area.  There were a lot of artifacts around on shelves and
15   ledges and things.  It was interesting.  It didn't -- it was
16   just not what I exactly expected when I entered it.
17   Q.  The office was in the Wall Street area, is that right?
18   A.  That's correct.
19   Q.  Going into your meeting with Omni, what was your
20   understanding of what their role was going to be in this
21   transaction?
22   A.  The Omni Group were helping us to connect to Mr. Cosme to
23   get an agreement for the funding for our project.
24   Q.  Who from Omni was present at this meeting at your offices?
25   A.  Patricia Tsien, Thomas Cleveland, and Jay Pak.
```

1   Q.   Who from your school, TCIS, was present?

2   A.   I was present and Thomas Hwang was present.

3   Q.   You mentioned Patricia Tsien.  What was your sense of what

4   her role was specifically was going to be with respect to the

5   Cosmo Dabi deal?

6   A.   She was the lead person with Omni and would be the main

7   person we were communicating with.

8   Q.   What was the purpose of this meeting with Omni prior to the

9   meeting with Mr. Cosme?

10  A.   It was to assure me that they had worked out the details

11  about no prepaid penalty and to let us know about the interest

12  rate, but, more importantly, to prepare me for how to best

13  impress Mr. Cosme to make it happen, to get him to take our

14  project.

15  Q.   During the meeting was anybody giving you advice about what

16  you should tell Mr. Cosme?

17  A.   Ms. Tsien was.

18  Q.   By the way, Dr. Penland, at this time, what name did you

19  believe applied to the owner of Cosmo Dabi?

20  A.   William Cosmo.

21  Q.   You mentioned that you were given some advice.  What advice

22  specifically were you provided at the meeting about what you

23  should tell Mr. Cosmo?

24           MR. DeMARCO:  Objection, your Honor.  Hearsay.

25           MR. SOLOWIEJCZYK:  Your Honor, first of all, it's

1    again for effect on the listener.  Second of all, these are

2    statements of an agent at this point, Omni.  It falls under the

3    hearsay exception that we discussed earlier.

4          MR. DeMARCO:  Is the government saying this is a

5    statement in furtherance of a conspiracy?

6          MR. SOLOWIEJCZYK:  We are not offering it for that,

7    your Honor.  We are offering it under 801(d)(2)(C).

8          THE COURT:  This is the agency theory in that Omni was

9    found to be an agent of Mr. Cosme and of his company in

10   connection with this transaction.

11         You may answer.  Sir.  Do you need the question again?

12         THE WITNESS:  Yes, please.

13   Q.  What advice were you given by the Omni representatives

14   about what you should tell Mr. Cosmo during the meeting?

15   A.  Ms. Tsien said we should emphasize the school, our

16   Christian tradition, the mission of the school, the scholarship

17   program for missionary children, that we should emphasize the

18   IB program and the quality of education delivered by the

19   school, that we should emphasize, talk about the GSIS project,

20   success with that project, that we should talk about -- make

21   sure that we stay positive and didn't ask too many questions.

22   Q.  You mentioned the IB program.  What does that stand for?

23   A.  It's the international baccalaureate program.  It's an

24   international educational framework to deliver curriculum

25   internationally, United Nations school here in New York has the

1    same program.

2    Q.  Did Ms. Tsien give you any explanation as to why Mr. Cosmo

3    would care about the mission of your school, all of the topics

4    you just mentioned?

5    A.  Yes.  He was interested in looking at a philanthropic

6    endeavor and he had some interest in Asia and was interested in

7    doing something educationally, and we sort of fortunately fit

8    that criteria, so he had a real genuine interest in our school

9    and working together with us.

10   Q.  During the meeting, what, if anything, did Ms. Tsien tell

11   you regarding whether your project represented a small project

12   or a large project for Mr. Cosmo's company?

13   A.  Well, really from the very beginning we were -- they wanted

14   us to borrow 100 million and that was because he's a big player

15   and we didn't want to borrow that much money.  It eventually

16   got 55.  In that meeting she reiterated again that we were

17   really a small project and this was -- he could lose attention.

18   Just keep him focused.  And this was something that was not a

19   big business event but a big philanthropic opportunity for him.

20   Q.  During this meeting did Ms. Tsien tell you anything about

21   her own prior business dealings with Mr. Cosmo?

22   A.  Yes.

23   Q.  What did she tell you?

24   A.  She just said that he's a quick player, he's a big player,

25   and that he can be eccentric, to stay positive, to really sell

1   the school and the good work that we do at the school.

2          MR. DeMARCO:  Objection, your Honor.  Not responsive

3   to the question.  Move to strike.

4          THE COURT:  Mr. Solowiejczyk.

5          MR. SOLOWIEJCZYK:  I can rephrase the question.

6          THE COURT:  Stricken.

7          Ladies and gentlemen, the last answer is stricken from

8   the record and will play no part in your deliberations.

9          Dr. Penland, would you just listen to the question

10  counsel asks and answer that question, please.

11         THE WITNESS:  Sure.

12  Q.  Dr. Penland, what, if anything, did Mr. Tsien tell you

13  about her own prior business dealings with Mr. Cosmo?

14  A.  She had had prior business dealings with Mr. Cosmo and in

15  working with him he could be eccentric, and she was confident

16  that he really had a high interest in our school.

17  Q.  Dr. Penland, with respect to Mr. Cosmo's personality what,

18  if anything, did she tell you?

19  A.  To be careful, to not ask lots of questions, and to not --

20  not to provoke him or to turn it negative.  The big players

21  like him could be easily upset or sensitive about negative

22  things.

23  Q.  Based on the meeting at Omni's offices, did you have a

24  positive impression about going forward with Mr. Cosmo or a

25  negative impression?

1    A.  I was encouraged and very optimistic after the meeting in

2    the Omni office.

3    Q.  Approximately how long was the meeting in Omni's offices?

4    A.  It was an hour and a half plus.

5    Q.  After the meeting in Omni's offices, what happened next?

6    A.  We all went together to JFK Airport.

7    Q.  At JFK Airport, who did you meet with?

8    A.  Mr. Cosme.

9    Q.  Were you originally supposed to meet with Mr. Cosmo at JFK

10   Airport or were you supposed to meet somewhere else?

11   A.  The original plan that day was, we were going to have

12   dinner somewhere in the New York after meeting with the Omni

13   Group, but we were told he had travel plans and other concerns

14   and that the only way we could meet really was to meet at JFK

15   in the admiral lounge there.

16   Q.  You mentioned the admiral lounge.  Is that where you met

17   with in JFK Airport?

18   A.  That's correct.

19   Q.  What time of day did the meeting occur?

20   A.  It was 7:30, 8:00.

21   Q.  When you first arrived at JFK Airport, was Mr. Cosmo

22   already there or did you have to wait for him?

23   A.  When we first arrived we had to get some permission to get

24   to the admiral lounge because but we didn't have boarding

25   passes and to get through security back to get to the lounge.

1    We managed that.  When we got to the lounge, he was not there.

2    He came later.

3    Q.  While you were waiting for Mr. Cosmo, did you have any

4    additional discussion with Mr. Tsien about the upcoming meeting

5    with Mr. Cosmo?

6    A.  Yes.  She reminded me again to sell the philanthropic

7    nature of our school and the good work that we did and the

8    mission scholarships, and to not question him or be negative,

9    to stay positive with him.

10   Q.  Mr. Cosmo eventually arrived at the admiral lounge, is that

11   correct?

12   A.  He did.

13   Q.  Who was present at the meeting with Mr. Cosmo at the

14   admiral lounge at JFK Airport?

15   A.  Myself and Thomas Hwang, Ms. Patricia Tsien, Mr. Thomas

16   Cleveland, Mr. Jay Pak, and Mr. Cosmo.

17   Q.  Do you see Mr. Cosmo here in the courtroom today,

18   Dr. Penland?

19   A.  Yes.

20   Q.  Can you just describe where he's seated and an article of

21   clothing that he is wearing?

22   A.  Today?

23   Q.  Correct.

24   A.  He's seated right back there right next to the defense

25   attorney.  I can't see his clothing actually.  Blue suit.

1          THE COURT:  Thank you for standing up, Mr. Cosme.

2   Q.  That's the individual that you met with at JFK Airport?

3   A.  Sure.

4          MR. SOLOWIEJCZYK:  Let the record reflect that the

5   witness has identified the defendant.

6          THE COURT:  Has identified Mr. Cosme.

7          MR. SOLOWIEJCZYK:  Mr. Cosme.  Sorry.

8   Q.  At the admiral lounge how were you folks arranged for the

9   meeting?  Where were you seated?

10  A.  I was seated next to Mr. Cosme, and we were seated around a

11  circle table.  It was a circular table.

12  Q.  Were there any beverages provided?

13  A.  We had ordered some hors d'oeuvres and snacks and there was

14  beverage provided.  I had soft drinks.  I can't remember

15  exactly what the drinks were, but I know I had soft drinks that

16  evening.

17  Q.  There were beverages and hors d'oeuvres?

18  A.  Yes, sir.

19  Q.  Who did the majority of the talking during this meeting at

20  the admiral lounge?

21  A.  Patricia Tsien and myself, I'd say, would be the two most

22  conversant.

23  Q.  Did Mr. Cosme ask you questions in response to the things

24  you were saying?

25  A.  Some, yes.

1    Q.  During the meeting what information did you provide to

2    Mr. Cosme?

3    A.  I told him about our project, and I told him about our

4    school's tradition and history, and I told him about our

5    scholarship funds.  I told a little bit about the IB program

6    and the kind of college matriculation we had from the school,

7    the kind of reputation we had, and the kind of communities we

8    served, at both TCIS and GSIS.  We talked about both schools.

9    Q.  What, if anything, did Mr. Cosme say to you regarding why

10   he was interested in your project?

11   A.  He said that he was interested in doing something for

12   school and education, and that was something that he was

13   looking to do.

14   Q.  What, if anything, did Mr. Cosme say to you about what

15   Ms. Tsien and the Omni team's role would be in the transaction?

16   A.  He said Patricia would lead the way and to follow her and

17   to communicate with her, and she would be the lead person, and

18   he trusted her and that I should work with her fully.

19   Q.  During the meeting did you have some discussion about the

20   specific terms of the proposed loan?

21   A.  Yes.  We talked about the interest rate and the prepaid

22   penalty.

23   Q.  By the time the meeting happened, had you in fact already

24   received a draft agreement relating to the loan?

25   A.  Yes, I had.

1   Q.  Going into the meeting did you have some general sense of

2   what the parameters of the loan would be?

3   A.  I did.

4   Q.  I am going to direct you to Government Exhibit 109A, which

5   should be in front of you.  Do you see that, Dr. Penland?

6   A.  I see that.

7   Q.  Do you recognize that document?

8   A.  Can I look at it a second?

9   Q.  Yes, absolutely.

10          Do you recognize that document?

11  A.  Yes, I do.

12  Q.  What is that, generally speaking?

13  A.  This was a draft copy of the escrow trust agreement that he

14  was offering -- they were offering that evening, had offered

15  earlier and were offering that evening as the proposal.

16          MR. SOLOWIEJCZYK:  Your Honor the government offers

17  Government Exhibit 109A.

18          MR. DeMARCO:  No objection.

19          THE COURT:  Received.

20          (Government Exhibit 109A received in evidence)

21          MR. SOLOWIEJCZYK:  Mr. Lachow, could you just publish

22  the first page briefly.  If you could go to page 8 of the

23  document, Bates 1404.  If you could just zoom in on the text.

24  Maybe just zoom in on the top half.  It's a little hard to

25  read.

1  Q.  This is what you reviewed before the meeting, Dr. Penland?

2  A.  Yes.

3  Q.  This discusses a proposal for a $55 million construction

4  loan.  Going into the meeting was that your understanding of

5  what the loan would involve?

6  A.  That was my understanding.

7        MR. SOLOWIEJCZYK:  If you could go to the bottom half

8  of this, Mr. Lachow.

9  Q.  Your school would be the borrower, is that right?

10  A.  That's correct.

11  Q.  And the lender would be who?

12  A.  Cosmo Dabi, Inc.

13  Q.  Do you see participation deposit?

14  A.  Yes, sir.

15  Q.  What was that going to be?

16  A.  $5.5 million.

17  Q.  Dr. Penland, during the meeting did you discuss the topic

18  of a prepayment penalty with Mr. Cosmo?

19  A.  Yes, sir, we did.

20  Q.  What did you discuss?

21  A.  Well, I told him that we didn't really need the 55 million

22  necessarily and that I was concerned that I would like to

23  return that money earlier, and I wanted to make sure there was

24  no penalty for returning and repaying the loan early, and he

25  agreed with that.  That was part of this document.  We had

1    talked about that beforehand with the Omni Group.

2    Q.   Did you talk about the five and a half million dollar

3    deposit at all, Dr. Penland?

4    A.   Yes, we did.  That was a big conversation that evening

5    because I had told them that I couldn't approve that on my own.

6    I had to go back and get our board of trustees to approve that.

7    And we talked about security of that and that would be a big

8    deal for me to be able to convince my board.

9    Q.   When you say the security of that, what do you mean?

10   A.   That we couldn't lose it.

11   Q.   Based on the meeting, what was your understanding about

12   whether you could lose the five and a half million dollar

13   deposit?

14   A.   I thought we were secure about it.

15   Q.   Meaning you could not lose it?

16   A.   Correct, sir.

17   Q.   With respect to the five and a half million dollar deposit,

18   what, if anything, did Mr. Cosmo tell you about what he would

19   do with that deposit?

20   A.   Mr. Cosmo said that he would take care of our school and

21   make sure that he could provide the loan and that he would

22   ensure that he managed that fund appropriately, that he would

23   ensure that we were able to complete our project and that the

24   project would be successful.

25   Q.   Was there any discussion with Mr. Cosmo about the

1   possibility of him investing the five and a half million

2   dollars?

3   A.  There was a little bit of discussion about that.  That was

4   also understood in the whole agreement.

5   Q.  But the discussion was not very specific.  Is that fair to

6   say?

7   A.  Not that evening.  Not at that meeting.

8   Q.  Do you recall what interest rate Mr. Cosmo's company was

9   offering you?

10  A.  Yeah.  It was 4 percent per annum.

11  Q.  What was your view at the time of that interest rate?

12  A.  That was very helpful to us.  We could pay off the bank

13  loans.  The bank loan was a credit loan.  It was 7 percent.  So

14  this was a very competitive rate from what we were paying with

15  the construction company and with the bank.  And so this was

16  very competitive from our point of view in Korea and very

17  helpful to us.

18  Q.  What, if anything, did Mr. Cosmo tell you at the meeting

19  about why he was offering you that interest rate?

20  A.  He said it was because we were a school and a

21  not-for-profit, and he was interested in doing this as a

22  philanthropic project, not as a business project.

23  Q.  What, if anything, did you say to him in response to that?

24  A.  I thanked him.  I was really thankful that he was

25  interested in our school in that way.

1   Q.   During the meeting did Mr. Cosmo give you any sense of how

2   he viewed your construction project versus any other projects

3   he was working on?

4   A.   He considered our loan a very small business proposal

5   compared to what he normally did in his business.

6   Q.   Was there any discussion with Mr. Cosmo during the meeting

7   about when you could expect the first installment of the loan?

8   A.   I'm not sure if we -- we did discuss that we needed it in

9   late March, and that discussion was partly with Mr. Cosme, but

10  also with the Omni Group before he ever arrived in the room,

11  and at that meeting prior to that.

12  Q.   What was your understanding of what the school would need

13  to do in order to move forward with receiving a loan?

14  A.   In order to activate the agreement we had to get it

15  approved by our board and deposit the 5.5 million, to invest

16  that money.

17  Q.   What was your sense of how quickly you should move forward

18  with those steps based on the meeting?

19  A.   Throughout the meeting at Omni and the meeting at JFK,

20  there was a sense of urgency.  The quicker we moved, the

21  quicker we can perform, the quicker we can meet the scheduled

22  draw given, which was March 31 for the first draw.  So it was

23  get after it and we talked about going back to Korea and

24  getting after it.  And I told him that I thought our board

25  would approve this plan.

```
 1              MR. SOLOWIEJCZYK:  Mr. Lachow, you can take that
 2   document down, by the way.
 3   Q.  Approximately how long was the meeting with Mr. Cosmo as
 4   the JFK admiral lounge?
 5   A.  With him there personally, probably about an hour.
 6   Q.  Coming out of the meeting, what was your feeling overall
 7   about moving forward with Mr. Cosmo and his company?
 8   A.  I was encouraged.  We rode back together in the vehicle
 9   with the Omni Group, and we talked about getting after it and
10   how quickly we could get it approved and getting the financing
11   together to make the deposit.  And it was a very upbeat
12   optimistic positive return.
13   Q.  Did the Omni representatives tell you anything about how
14   they felt the meeting had gone?
15   A.  They thought it had gone well, that we had done really
16   well, and that he was motivated by our school and what we
17   represent.
18   Q.  Dr. Penland, shortly after the meeting, did you return to
19   South Korea?
20   A.  Yes.  The next day.  Yes.
21   Q.  Did there come a time when you reported to your board of
22   trustees at TCIS and the board of trustees at the other school,
23   GSIS, regarding your meeting in New York City with Mr. Cosmo?
24   A.  Yes, I did.
25   Q.  I want to direct your attention to what's in front of you
```

1   which has been marked as Government Exhibit 111.

2           Take a look at that and let me know if you recognize

3   that document.

4   A.  Yes, sir.

5   Q.  What is that?

6   A.  It's the headmaster's report to the board that I sent prior

7   to the board meeting.  It also had other documents attached.

8   Q.  Were you the headmaster of TCIS at this time?

9   A.  Yes.

10  Q.  Were you also the headmaster of GSIS at this time?

11  A.  Yes, I was.

12  Q.  Did you in fact draft this report?

13  A.  I wrote it, yes.

14  Q.  Was it your regular practice as the headmaster of TCIS and

15  GSIS to prepare a headmaster's report prior to a board of

16  trustees meeting?

17  A.  Every time.

18  Q.  Did you prepare this headmaster's report near the time that

19  the board of trustees meeting occurred?

20  A.  Yes, sir.

21  Q.  And directing your attention to Government Exhibits 111A

22  and 111B --

23          MR. DeMARCO:  I have no objection to the admission of

24  these documents into evidence, if that's what the government is

25  getting at.

1    Q.  Maybe Dr. Penland should say what 111A and 111B are.

2    A.  111A is the agenda for the board of trustees public meeting

3    of both schools, Gyeonggi Suwon and Taejon Christian, and the

4    second page is the agenda for the executive session of the TCIS

5    meeting.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  What's 111B?

2   A.  111B is the proposal for the agreement.

3           MR. SOLOWIEJCZYK:  Your Honor, the government offers

4   Government Exhibits 111, 111A and 111B.

5           MR. DeMARCO:  Still no objection.

6           THE COURT:  Received.

7           (Government's Exhibits 111, 111A and 111B received in

8   evidence)

9   Q.  Let's turn to Government Exhibit 111.  Dr. Penland, if I

10  could focus your attention at page 6 that document, which is

11  marked Penland 123.

12  A.  Yes, sir.

13  Q.  If I could focus you on the section --

14          Mr. Lachow, it might make sense to focus on half of

15  the paragraph underneath TCIS project refinancing.

16          Dr. Penland, it states here that you -- you wrote this

17  report, right?

18  A.  I did.

19  Q.  I'm just going to read a section to you and ask you a

20  question about it.

21          "Mr. Hwang reported to me that Omni was able to find

22  an investor and he was really drawn to us as a not-for-profit,

23  our GSIS project and our scholarship program, but that we

24  should really try to increase the amount of" --

25          THE COURT:  Slow down, counsel.

1          MR. SOLOWIEJCZYK:  My apologies.

2   Q.  -- "that we should really try to increase the amount of

3   borrowing to include the phase two project as the phase one

4   borrowing was too small for this type of investor."

5          Dr. Penland, what was the phase one borrowing versus

6   the phase 2 borrowing?

7   A.  The campus relocation project in Taejon had two phases.

8   The first phase was what we were under contract for, and the

9   second phase was we were not intending to build at that time

10  and have not built.

11  Q.  Mr. Lachow, if you could go down to the next part of the

12  page, the sentence that starts with "because."

13         Dr. Penland, it says here, "Because we are a

14  not-for-profit project, we would be charged only a four percent

15  simple interest on the amount of funds drawn.  We would have

16  two years initially free of repayment.  We could repay early

17  without penalty.  Therefore, if in a couple of years we did not

18  feel we could manage repayment of the entire amount, we could

19  simply not draw it or repay it without penalty."

20         Dr. Penland, at this time, did you believe TCIS, in

21  fact, was going to need the full $55 million?

22  A.  Not at all, sir.

23  Q.  And is this the prepayment penalty issue that you discussed

24  earlier in your testimony?

25  A.  That was my concern, yes.

1  Q.  Going a little further down, the sentence that starts "Of

2  course."

3       "Of course, I would like our lawyers to review the

4  proposed documents that Mr. Hwang will share with you at the

5  meeting on Thursday."

6       Dr. Penland, did a lawyer ever end up reviewing the

7  agreements that you ultimately entered into with Cosmo Dabi?

8  A.  Regrettably, no, sir.

9  Q.  Dr. Penland, can you just briefly explain why a lawyer

10  never reviewed these documents?

11  A.  We did have two CPAs review it, and basically I'll take the

12  blame for that, but I trusted Mr. Hwang and the family

13  relationship and thought that this was a secure deal.

14  Q.  At the time you were thinking about entering into the

15  transaction, what, if anything, did you believe were the time

16  constraints on entering into said transaction?

17  A.  We needed to move as soon as we could to get the money

18  together and get the money to New York.

19  Q.  By this time in December of 2010, had construction begun on

20  the project?

21  A.  Oh, sure.  It was well under way under construction.

22  Q.  So receiving the next --

23  A.  We were planning on finishing and moving that summer to the

24  new site.

25  Q.  So how important was it to you to receive an early draw on

1    the loan?

2    A.   To receive an on-time draw on the loan in March 31 was very

3    important.

4    Q.   Why?

5    A.   We were -- we pretty much knew at that point that the back

6    end of the financing, which was supposed to be the construction

7    company, was not going to come forward, and we were drawing

8    down on the capital fund and the bank loan, and we would have

9    to move into operational funds and we didn't want to do that,

10   and we didn't want to stop the project.

11   Q.   So after you -- one more part.  If you could turn to the

12   next page, Mr. Lachow, and zoom in on that part of the page.

13              "We have a personal family member of our employee who

14   has pledged to Thomas and me that this is a safe and very real

15   deal.  We believe that if we can put the escrow funds forward,

16   that we will have an agreement within a week and have funds

17   available in mid March."

18              Dr. Penland, at the time that you recommended going

19   forward with Cosmo Dabi, did you rely on the family connection

20   that existed there?

21   A.   That was very, very important to all of us at that point.

22   Q.   Did you believe this was a safe deal?

23   A.   We did.

24   Q.   You can bring that down, Mr. Lachow.

25              After you provided this headmaster report to the board

1   of trustees, did a board meeting of TCIS take place?

2   A.  Yes, it did.

3   Q.  Did a board meeting of the other school, GSIS, also take

4   place?

5   A.  Yes, it did.

6   Q.  During the meeting -- withdrawn.  During the TCIS board

7   meeting, did you provide a recommendation to the board about

8   whether they should go forward with seeking a loan from Cosmo

9   Dabi?

10  A.  Yes, we did -- yes, I did.

11  Q.  What recommendation did you provide?

12  A.  I recommended that we accept their proposal, and that we

13  move forward, and that we finance the -- invest the money to

14  get the financing from Cosmo Dabi.

15  Q.  I want to direct you to Government Exhibits 113 and 114

16  that should be in front of you.  Do you recognize those two

17  documents?

18  A.  Yes, sir.

19  Q.  What are they?

20  A.  They're minutes from the executive session of both the GSIS

21  board meeting on December 16, 2010 and the TCIS board meeting

22  on December 16, 2010.

23  Q.  Did you attend the meetings that are referenced in these

24  minutes?

25  A.  Yes, I did.

1              MR. SOLOWIEJCZYK:  Your Honor, we are offering

2     Government Exhibit 113 and 114.

3              MR. DeMARCO:  Without objection, your Honor.

4              THE COURT:  Received.

5              (Government's Exhibits 113 and 114 received in

6     evidence)

7     Q.  I want to direct your attention, Dr. Penland, to Government

8     Exhibit 114.

9              And, Mr. Lachow, if you could publish that.  If you

10    could zoom in, Mr. Lachow, on the middle of the page where it

11    says, "Dr. Penland."  That part.

12             It states here, "Dr. Penland gave a report on a new

13    source of loan money for the construction project."

14             Was that the Cosmo Dabi deal, Dr. Penland?

15    A.  Yes, sir, it says that there.

16    Q.  And that's the report you gave, right?

17    A.  Correct.

18    Q.  "Then 10-38 moved to approve the $49.5 million construction

19    loan for the new campus project from Cosmo Dabi, Inc., New York

20    City, New York."  Was a vote taken that day?

21    A.  It was.

22    Q.  Did the board, in fact, approve going forward with Cosmo

23    Dabi for a loan?

24    A.  Unanimously.

25    Q.  It says here $49.5 million, but previously we were talking

1    about a $55 million loan.  Can you briefly describe that

2    discrepancy?

3    A.  Well, the board, they were more comfortable, since we were

4    putting in the 5.5 million, instead of putting in their minutes

5    55 million loan, since our money was 5.5 of it, they wrote it

6    as a 49.5 million.  That's the way they wanted it in the

7    minutes.

8    Q.  You were putting forward 5 and a half?

9    A.  We were putting forward five and a half of our own funds.

10   Q.  Dr. Penland, I'm going to direct your attention to

11   Government Exhibit 115.  Do you recognize that document?

12   A.  Just one second.  Yes.

13   Q.  Do you recognize that document?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's an email trail between Patricia Tsien and some from

17   Mr. -- from Cosmo Dabi from Mr. Cosmo, and some with Thomas

18   Hwang and myself and others copied.

19   Q.  Were you a party to these emails?

20   A.  Yes, I was.

21   Q.  Do you recall receiving and sending the emails that are in

22   that document?

23   A.  I -- yeah -- yes, sir.

24        MR. SOLOWIEJCZYK:  The government offers Government

25   Exhibit 115, your Honor.

1          MR. DeMARCO:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 115 received in evidence)

4   Q.  Mr. Lachow, if you could publish page 8, Bates 140 of this

5   document.  Mr. Lachow, if I could ask you to zoom in on the

6   email right in the middle of the page from Thomas Hwang.

7          Do you recall this email from Mr. Hwang, Dr. Penland?

8   A.  Yes, I do.

9   Q.  "Pat, we just got it done.  They all voted yes.  Hooray!

10  My next step is finding a way to wire the money.  I'm talking

11  to Korea Bank itself, so I should get an answer soon."

12         When was this sent, Dr. Penland?

13  A.  It was sent on December 15, 2010.

14  Q.  At the time the board voted yes, were you excited about the

15  fact that you were moving forward with Cosmo Dabi?

16  A.  Yes, very excited.

17  Q.  Looking up at the chain of the next email, the one from

18  Patricia Tsien.

19  A.  Yes.

20  Q.  Who is this email to?

21  A.  To Thomas Hwang and copied to me and Thomas Cleveland and

22  Jay Pak and Cosmo Dabi, CEO.

23  Q.  So did Ms. Tsien add Mr. Cosmo to this email?

24  A.  She did.

25  Q.  And what did she say?

1    A.  "Congratulations!!!!"

2    Q.  So, following the approval of the board of the Cosmo Dabi

3    loan, what had to happen next?

4    A.  We had to get our financing together and get the funds

5    together to provide them with 5.5 million U.S. dollars and get

6    it wired from Korea to the account in the U.S.

7    Q.  So until you provided the $5 and a half million, were you

8    going to be able to move forward with the loan?

9    A.  No.

10   Q.  Who was primarily responsible for gathering the $5 and a

11   half million to provide to Cosmo Dabi?

12   A.  Thomas Hwang was leading the project at that point and the

13   financing of the project.

14   Q.  Did Mr. Hwang generally keep you apprised of what he was

15   doing?

16   A.  Yes, he did.

17   Q.  I'm going to direct you now to Government Exhibit 118.

18   Dr. Penland, do you recognize that document?

19   A.  Yes, sir.

20   Q.  What is it?

21   A.  It's another email chain about the getting the agreement

22   signed, the document signed for the loan.

23   Q.  Were you a party to that email chain?

24   A.  Yes, I was.

25   Q.  Do you recall receiving those emails?

```
 1   A.  I do, yes.

 2              MR. SOLOWIEJCZYK:  Your Honor, the government offers

 3   Government Exhibit 118.

 4              MR. DeMARCO:  No objection.

 5              THE COURT:  Received.

 6              (Government's Exhibit 118 received in evidence)

 7   Q.  Dr. Penland, directing you to the first page of the top of

 8   the email.

 9              If you could focus on that, Mr. Lachow.

10              Do you recall sending this email?

11   A.  Yes.  Yes, sir.

12   Q.  What were you sending in this email?

13   A.  I was sending in the signed agreements:  The Omni deposit

14   agreement and the engagement agreement with a copy of my

15   passport.

16   Q.  Directing you to what's in front of you as Government

17   Exhibit 118A and 118B.  Were those two documents the

18   attachments to the email that we just looked at?

19   A.  Yes, sir, those are the signed copies.

20   Q.  Those are the attachments?

21   A.  Yes, sir.

22              MR. SOLOWIEJCZYK:  Your Honor, the government offers

23   118A and 118B.

24              MR. DeMARCO:  No objection.

25              THE COURT:  Received.
```

1          (Government's Exhibits 118A and 118B received in

2     evidence)

3     Q.  Government Exhibit 118A and 118B, were these the final

4     agreements that you entered into with Cosmo Dabi or were these

5     just provisional agreements regarding moving forward?

6     A.  These were the preliminary agreements.  There was another

7     document as final agreement.

8     Q.  At the time you signed these documents on behalf of TCIS,

9     had TCIS yet provided the $5 and a half million deposit to

10    Cosmo Dabi?

11    A.  No, not yet.

12    Q.  I want to direct you back now to Government Exhibit 118,

13    Dr. Penland.

14          Mr. Lachow, if you could turn to the second page.  The

15    message that's in the middle of the page from Patricia Tsien.

16          I'm going to focus you, Dr. Penland, where it reads --

17    first of all, did you receive this email?

18    A.  Yes, I did.

19    Q.  I'm going to focus you down the page to where it says, "We

20    need to move quickly so that we can get the loan docs executed

21    by mid next week the latest.  We can't provide loan docs until

22    we receive funds into bank escrow."

23          What was your understanding of why TCIS needed to move

24    quickly at this juncture?

25    A.  Well, we wanted to get the first draw as quickly as

1    possible; and to trigger the event, the agreement in getting

2    everything closed, we needed to wire the money.

3    Q.  Do you recall whether you were told on multiple occasions

4    that it was very important to wire the $5 and a half million as

5    quickly as possible?

6    A.  Many, many times.

7    Q.  Who delivered that message?

8    A.  Patricia Tsien.

9    Q.  I want to look at Government Exhibit 118A.  If you could

10   just focus on the top paragraph, Mr. Lachow.

11        It says here, "To enable the funding of the

12   participation deposit (deposit) required by the proposed

13   funding structure, CDI has arranged with its bank, JP Morgan

14   and Co., and/or its corresponding bank in Korea to accept the

15   deposit into a bank account in Korea on behalf of CDI and to

16   hold and take full bank responsibility over the deposit funds

17   until such time as one of the following occurs."

18        Then if you could go down to the next part,

19   Mr. Lachow.

20        "CDI and TCIS agree on the terms of the private

21   funding, and the relevant documents have been executed, at

22   which time TCIS simultaneously in writing authorizes JPM to

23   release funds to CDI and via CDI initially, or CDI and TCIS do

24   not agree on the terms of the private funding documents, and

25   TCIS instructs JPM return the deposit to its own bank via

1   written communications to CDI initially, at which time JPM

2   immediately responds to the instruction."

3           Dr. Penland, ultimately did TCIS utilize the escrow

4   mechanism that's described here or did TCIS ultimately wire the

5   funds directly to Cosmo Dabi?

6   A.   We wired the funds directly to Cosmo Dabi.

7   Q.   Then directing you to Government Exhibit 128.

8   A.   128?

9   Q.   Do you recognize that document, sir?

10  A.   Yes, sir.

11  Q.   What is it?

12  A.   It's a copy of an email from -- email chain of Mr. Hwang

13  and Ms. Tsien.

14  Q.   Were you a party to the email?

15  A.   I was copied on it, yes, sir.

16          MR. SOLOWIEJCZYK:  Your Honor, the government offers

17  128.

18          MR. DeMARCO:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 128 received in evidence)

21  Q.   I want to direct your attention to the first email at the

22  top.  Who is this email from?

23  A.   This is from Thomas Hwang to Jay Pak.

24  Q.   What was Mr. Hwang providing in this email?

25  A.   Proof of the funds we had at KEB for transfer of the

1    monies.

2    Q.  Would that be the $5 and a half million?

3    A.  Yes, sir.

4    Q.  Was there an attachment to this email?

5    A.  Yes, there is.

6    Q.  I'm going to direct you to the last page of the document,

7    page 3.

8            If you could just zoom in on the top half, Mr. Lachow.

9    Further down.

10           So, what is this document, generally speaking?

11   A.  It's a certificate showing a balance in our account of this

12   amount in U.S. dollars.

13   Q.  What was the amount?

14   A.  $5,500,000.

15   Q.  What bank was it with?

16   A.  Korea Exchange Bank, KEB.

17   Q.  Was this one of the steps that was necessary before you

18   could move forward with the loan?

19   A.  Yes, sir.

20   Q.  I'm going to direct you now to Government Exhibit 135.  Do

21   you recognize that document, sir?

22   A.  Yes, sir.

23   Q.  What is it?

24   A.  It's an email chain about the updated loan documents.

25   Q.  Were you a party to this email chain?

```
 1    A.   Sure.   Yes, sir.

 2              MR. SOLOWIEJCZYK:   The government offers 135, your

 3    Honor.

 4              MR. DeMARCO:   No objection.

 5              THE COURT:   Received.

 6              (Government's Exhibit 135 received in evidence)

 7    Q.   I'm going to direct you to page 1, Dr. Penland, Bates

 8    stamped 1621.

 9              If you could focus on, Mr. Lachow, the email starting

10    at the middle of the page from Ms. Tsien.

11              I'm just going to walk through this with you,

12    Dr. Penland.   This is from Ms. Tsien.

13              "I just heard from Jay that there may be a concern

14    about Cosmo providing references.   Let me be clear there is

15    absolutely no hesitation to provide you with references."

16              Did you have any concerns about speaking to

17    Mr. Cosmo's references before you wired the money?

18    A.   I did have some.

19    Q.   Why did you want to speak with the references?

20    A.   Just --

21              MR. DeMARCO:   Objection, your Honor.

22              THE COURT:   Counsel?

23              MR. SOLOWIEJCZYK:   Just his reasoning as to why he

24    wanted to speak with the references.   I don't understand the

25    objection.
```

```
 1              MR. DeMARCO:  He didn't seek any references.

 2              THE COURT:  I'm sorry?

 3              MR. DeMARCO:  He never checked references, so why --

 4              THE COURT:  It's a relevance objection?

 5              MR. DeMARCO:  Yes.

 6              THE COURT:  Counsel.

 7              MR. SOLOWIEJCZYK:  It's relevant to the school's state

 8   of mind in going forward with the transaction speaking to the

 9   references or not, why they did or did not do so.

10              MR. DeMARCO:  I'll withdraw my objection then.

11              THE COURT:  You may answer, sir.  Do you need the

12   question again?

13              THE WITNESS:  Yes, please.

14              THE COURT:  "Q.  Why did you want to speak with the

15   references?"

16   A.  Just as a sort of process of going forward with the

17   agreement.

18   Q.  I'm going to read you the next paragraph.

19              "The issue we have is that we had expected the

20   contracts to be executed and the funds released for trading by

21   January 5, 2011, exactly 60 international business banking days

22   from then until March 31, 2011, just in time for the first

23   draw."

24              Do you see the reference there to the funds being

25   released for trading?
```

1   A.  Yes, sir.

2   Q.  Did you understand what that meant?

3   A.  Yes, sir.

4   Q.  What did it mean?

5   A.  That he was going to use the funds to trade them and invest

6   them and grow our money and provide us with the loan.

7   Q.  "As good business people we had allowed for some

8   contingencies so that even though we are delayed in receiving

9   the funds released into Cosmo's trading account, Cosmo has

10  reaffirmed earlier today that he could very likely make the

11  March 31 target as long as the funds are received by

12  January 19th or 20th the absolute latest.  That said, Cosmo's

13  contractual commitment would still be 60 international banking

14  days from receipt of funds into his trading account, which at

15  this point would be mid to late April.  (I have not counted out

16  the exact number of days yet.)"

17         Dr. Penland, based upon this email, what was your

18  understanding of when the school could hope to receive the

19  first draw?

20  A.  Well, we were still hopeful for March 31.

21  Q.  Was March 31 required or was it going to be a later date

22  that was the actual deadline?

23  A.  Well, according to this email from Patricia, the required

24  date would be later, mid to late April, but we had agreed in

25  the meeting in New York to try to do it by the end of March.

1    Q.  Now, Mr. Lachow, if you could focus on the bottom part of

2    the page.

3         "If TCIS wants to check references prior to releasing

4    the funds, the total added elapsed time could be as much as ten

5    more international business banking days (or more than two

6    calendar weeks) and here's why:  Set up a JPM escrow account

7    and agree on a three-party escrow agreement, or use one of

8    Cosmo Dabi's escrow accounts which would be similar to wiring

9    directly to Cosmo's trading account.

10        "Wire the funds into escrow."

11        Mr. Lachow continue the next page.

12        "Arrange a call with one of Cosmo's references, a

13   prince, king, sheik or CEO of a publicly traded corporation.

14   Release funds from escrow to Cosme's trading account, if

15   satisfied.

16        "This added time ensures that TCIS would not receive

17   its first draw by March 31, 2011."

18        Dr. Penland, how important was it to the school at

19   this point to receive the first draw as quickly as possible?

20   A.  It was very important.

21   Q.  What did you understand Ms. Tsien to be telling you about

22   what sort of delay would be entailed if you wanted to check

23   references?

24   A.  That it would delay it maybe a month or more.  It would be

25   a significant delay.

```
1   Q.  Did that concern you?

2   A.  Yes, it did.

3   Q.  I want to focus you on the top of this page.

4           "Arrange a call with one of Cosmo's references, a

5   prince, king, sheik or CEO of a publicly traded corporation."

6           At this time, did you believe Cosmo Dabi had clients

7   that included CEOs of publicly traded corporations and sheiks?

8   A.  Yes.

9   Q.  Going to the next few paragraphs, Mr. Lachow.

10          "One possibility could be for TCIS to release the

11  funds immediately to Cosmo's trading account upon executing the

12  private funding and security agreement and the promissory note.

13  Concurrent to trading being initiated, Cosmo would set up the

14  call with a reference.  In the unlikely event that you are

15  dissatisfied with the reference check, Cosmo would wire the

16  funds back immediately upon your demand, and we would provide

17  you with a guarantee letter to do so."

18          Dr. Penland, we previously talked about TCIS sending

19  funds into an escrow account.  Is that right?

20  A.  Yes.

21  Q.  What was Ms. Tsien proposing in this section of the email?

22  A.  To go ahead and wire the funds to Cosmo.

23  Q.  Directly to Cosmo Dabi?

24  A.  Yes.

25  Q.  To skip the escrow process?
```

```
 1   A.  Yes.

 2   Q.  What about with respect to reference checks, would those

 3   come before or after you wired the funds?

 4   A.  After.

 5   Q.  I want to take a look at page 1 of this email.  And just

 6   the top email from Mr. Hwang.

 7           "Dear Patricia:  Dr. Penland and I agree to send the

 8   fund directly to his trading account.  Please send us his

 9   reference via email when transaction is completed.  You can

10   update loan documents again to reflect above changes and send

11   it to us.  Thanks."

12           Who is that from?

13   A.  That's from Thomas Hwang.

14   Q.  What's the date of that email?

15   A.  Monday, the 17th, January 2011.

16   Q.  Did you in fact give approval to wire the funds directly

17   into the Cosmo Dabi trading account?

18   A.  I did.

19   Q.  Prior to approving that wire transfer, had you spoken to

20   any references for Cosmo Dabi?

21   A.  We had not -- I had not.

22   Q.  Dr. Penland, why were you comfortable going forward without

23   having gotten the references?

24   A.  My comfort level was with Mr. Hwang and the family member

25   Jay Pak and the association with them and his sort of
```

 1   guaranteeing that this was safe and this was good.

 2   Q.  Given that the school felt that it needed the first draw of

 3   the loan quickly, is it fair to say that also played a factor

 4   in your decision?

 5   A.  Absolutely.  We were wanting to move this as quickly as

 6   possible.  I didn't want to delay it.  That was another

 7   motivating factor.

 8   Q.  Dr. Penland, ultimately, after you sent this money, did you

 9   ever have a phone call with any references from Mr. Cosmo?

10   A.  I did not.

11   Q.  To your knowledge, did anybody at TCIS?

12   A.  Not to my knowledge.

13   Q.  Did you ever speak to any princes or sheiks that had worked

14   with Mr. Cosmo?

15   A.  No, sir.

16   Q.  Did you ever speak to any CEOs of public companies that

17   worked with Mr. Cosmo?

18   A.  No, sir.

19   Q.  If TCIS didn't receive the first draw by that March 31,

20   2011 date, what were going to be some of the immediate

21   consequences?

22   A.  If we didn't receive the draw?

23   Q.  Correct.

24   A.  That we would get our money back, that --

25   Q.  Pardon me.  Let me rephrase the question.  TCIS was hoping

1   to get the first draw by March 31, 2011.  Is that right?

2   A.  Yes.

3   Q.  If the school didn't receive that influx of money by then,

4   what were going to be the practical consequences to the

5   project?

6   A.  To our project and to the school?

7   Q.  Correct.

8   A.  We'd be moving into operational funding or have to stop the

9   project, and that was, as I said earlier, that was not good

10  either way.

11  Q.  Dr. Penland, I'm going to direct you to Government Exhibit

12  137.  Do you recognize that document?

13  A.  Yes, sir.

14  Q.  What is it?

15  A.  It's another email chain with Patricia Tsien and Thomas

16  Hwang primarily, and I'm copied on it along with others at

17  Omni.

18  Q.  Did that email contain various attachments, that top email?

19  A.  Yes, it did.

20  Q.  I'm going to direct you to Government Exhibit 137A through

21  137E.  If you could take a look at those quickly.  Do you

22  recognize those documents?

23  A.  Yes, sir.

24  Q.  Were those documents attached to the email Government

25  Exhibit 137?

1    A.  Yes, sir.

2            MR. SOLOWIEJCZYK:  The government offers Government

3    Exhibit 137 and Government Exhibit 137A through 137E, your

4    Honor.

5            MR. DeMARCO:  No objection.

6            THE COURT:  Received.

7            (Government's Exhibits 137, 137A through 137E received

8    in evidence)

9    Q.  Dr. Penland, if you could first look at Government Exhibit

10   137, the email, the top email.  If you could just read that

11   email for us, Dr. Penland?  Who is it from, first of all?  Let

12   me ask you that.

13   A.  That's from Patricia Tsien to Thomas Hwang.

14   Q.  Were you on this email?

15   A.  Yes, I was.

16   Q.  If you could read it for us?

17   A.  "Final set of docs with all names consistent.  I have also

18   attached a letter from Cosmo with the wiring instructions and

19   his commitment that the equity deposit will be refunded in the

20   unlikely event you are not satisfied with his reference check.

21   The sooner the funds are wired, the sooner we can get to work

22   on meeting your March 31 first draw date or as close as

23   possible to that date.  Last, I have attached the business

24   registration information from New York State for Cosmo Dabi

25   International Trading Group, Incorporated.  In the interest of

1   time, Cosmo offers that if KEB have any specific questions of

2   him, that they should not hesitate to email or contact him

3   directly."

4   Q.   What email address was provided?

5   A.   CEO@CosmoDabi.com.

6   Q.   Can you read the last line?

7   A.   "Please do what you can to move as quickly as possible."

8   Q.   And KEB is referenced in that email.  What's KEB again?

9   A.   It's Korea Exchange Bank.

10  Q.   Is that the bank the school was using to move the funds to

11  Cosmo Dabi?

12  A.   Yes, sir.

13  Q.   Directing you to Government Exhibit 137A.

14            If you could zoom in, Mr. Lachow, on the top.

15            What did you understand this document to be?

16  A.   This was a document showing that there was an entity or a

17  corporation in New York.

18  Q.   Mr. Lachow, if you could focus right below that.

19            Based on your review of this document, where did you

20  understand Cosmo Dabi to be located at this time?

21  A.   On Wall Street in New York City.

22  Q.   If you could look at 137B.

23            Mr. Lachow, if you could just focus first on the top

24  of the document.

25            Who is this letter from?

1   A.  The letter was from William Cosmo.

2   Q.  When was the letter dated?

3   A.  January 18, 2011.

4   Q.  It was addressed to you.  Is that right?

5   A.  Correct.

6   Q.  Mr. Lachow, if you could focus on the lower portion.

7         Sir, in this letter, did he provide wiring

8   instructions that went along with this letter?

9   A.  Yes, he did.

10  Q.  Looking at the second paragraph, "Upon receipt of the

11  funds, I shall promptly contact you to schedule a conference

12  call with one of my clients with whom you can confer about

13  Cosmo Dabi, Inc.  You will have ample opportunity to inquire of

14  my asset management performance."

15        Dr. Penland, after the funds were ultimately wired,

16  did Mr. Cosmo ever contact you to set up a reference call?

17  A.  No, sir.

18  Q.  To your knowledge, did he contact anyone at TCIS to set up

19  a reference call?

20  A.  Not to my knowledge.

21  Q.  Looking at the last paragraph, "I hereby re-confirm my

22  earlier commitment that if you are not completely satisfied

23  with my reference, upon your request, I shall immediately

24  refrain from initiating any matched buy/sell transactions and

25  return the $5.5 million equity deposit you have transferred

1   into Cosmo Dabi International Trading Group, Inc. bank account,

2   subject only to the requirement that any matched buy/sell

3   transactions that may be in process, the return of the

4   deposited amount shall be delayed until the transactions in

5   process has completed.  Any profits arising from such

6   transaction completed prior to the return of the deposited

7   amount shall remain with Cosmo Dabi, Inc."

8           Do you recall reading that portion of the letter,

9   Dr. Penland?

10  A.  Yes.

11  Q.  What was your understanding about whether you'd be entitled

12  to the return of the funds if you were not satisfied with the

13  reference check?

14  A.  I would be entitled to it.  It might be a slight delay due

15  to trading, but that I would be entitled to it.  If he made

16  money on it, he was entitled to that.

17  Q.  Dr. Penland, at the time you read this letter, did you

18  notice that in certain portions it mentions Cosmo Dabi, Inc.

19  and in other portions it mentions Cosmo Dabi International

20  Trading Group.  Is that something you noticed at the time?

21  A.  I didn't at that time.

22  Q.  Looking at Government Exhibit 137C, what was this document?

23  A.  This was the wiring instruction document.

24  Q.  This was the bank where you were supposed to send the

25  funds?

1    A.   Yes, sir.

2    Q.   Which bank was that?

3    A.   JP Morgan Chase Bank.

4    Q.   What was the account name on the account?

5    A.   Account name or title, Cosmo Dabi International Trading

6    Group, Inc.

7    Q.   Just looking briefly at Government Exhibit 137D.

8              If you could just zoom on the top half, Mr. Lachow.

9              Do you recall ultimately entering into a private

10   funding and security agreement with Cosmo Dabi?

11   A.   Yes, sir.

12   Q.   Looking at 137E, Mr. Lachow.  Do you recall entering into a

13   promissory note as well with Cosmo Dabi?

14   A.   Yes.

15   Q.   Directing you back to Government Exhibit 137 momentarily.

16   If you could turn to page 8 of that document, Bates 1661.  I

17   would ask -- the email from Mr. Hwang, do you recall receiving

18   this email?

19   A.   I did, yes.

20   Q.   Do you recall Mr. Hwang pointing out the discrepancy

21   between Cosmo Dabi International Trading Group and Cosmo Dabi,

22   Inc. in the documents?

23   A.   Yes, I do, at that time.

24   Q.   Ultimately, were your concerns about that assuaged?

25   A.   Yes, they were.

1   Q.  I want to turn you to page 7, the page before.  Do you

2   recall receiving this email?

3   A.  Yes, I did.

4   Q.  Turning back to page 8, Mr. Lachow.

5           Who is it from, by the way?

6   A.  The one on page 7?

7   Q.  Mmm-hmm.

8   A.  It's from Patricia Tsien.

9   Q.  Mr. Lachow, if you could go to the top of 8 and the

10  paragraph that starts "now" in all caps.

11          So this is Ms. Tsien in this email.  Is that correct?

12  A.  That's correct.

13  Q.  "Now, I have to explain a shortcut I took yesterday that

14  can cause us a problem with Cosmo unless handled carefully and

15  with your acceptance.  Tom and I have worked with Cosmo for

16  almost two years.  We know how to work with him and how to keep

17  him motivated.  He really likes both Thomas Hwang and Thomas

18  Penland and the TCIS project very much especially since this is

19  a small transaction for him."

20          THE COURT:  Counsel.

21          MR. SOLOWIEJCZYK:  Sorry, your Honor.  I talk too fast

22  in general.  I'm working on it.

23  Q.  "Cosmo has a trader's mentality and personality, which

24  means that he has a short attention span.  He also does not

25  like last minute questions that in his past experience have

1   sometimes turned out to be delaying tactics.  Your last minute

2   request yesterday evening for answers regarding his corporate

3   structure unfortunately could be misinterpreted as such.  I

4   have tried to protect TCIS and have made excuses that I know he

5   will accept."

6           Dr. Penland, at this time, what was your understanding

7   based on your prior discussions with Omni about what could

8   happen if you pressed Mr. Cosmo for certain answers?

9   A.  If we did that, it could become negative, and he would move

10  away from the deal, the agreement.

11  Q.  OK, continuing.  "The one excuse I made yesterday was that

12  KEB" -- that's Korea Exchange Bank.  Is that right?

13  A.  Correct.

14  Q.  -- "asked about the corporate documents that demonstrated

15  William R. Cosmo as the president and CEO of Cosmo Dabi

16  International Trading Group, Inc.  He would readily accept that

17  as a bank compliance question.

18          "So I will have a hard time going back to Cosmo to

19  explain that you need (as opposed to the bank) the corporate

20  documents before Dr. Penland signs the loan documents."

21          What advice, if any, did you believe Ms. Tsien was

22  giving you in this email?

23  A.  To not ask so many questions, and to slow down on our due

24  diligence, back off on it.

25  Q.  Looking at the last paragraph: "Is it acceptable to you to

1   execute the documents and then tell KEB that Cosmo has offered

2   his contact details for them to complete any compliance they

3   deem necessary before wiring the funds including getting a copy

4   of his corporate documents answering the specific question

5   regarding William R. Cosmo, the authorized signatory and CEO of

6   Cosmo Dabi International Trading Group. Cosmo, like all asset

7   managers we worked with, disseminate corporate information to

8   the client's bank and/or their attorneys. In that way you

9   should feel protected because it is commonplace for banks to

10  perform such due diligence."

11          Dr. Penland, at the time you read this, did this

12  explanation make sense to you?

13  A.  Yes.

14  Q.  And ultimately, did TCIS follow Ms. Tsien's advice?

15  A.  Yes, we did.

16  Q.  You went forward with the wire transfer?

17  A.  We did.

18  Q.  Did you feel that all of your questions had been answered

19  at that time?

20  A.  Yes.  Thomas Hwang and I agreed that we were willing to

21  move forward with the --

22  Q.  But all the questions Mr. Hwang had, had they all been

23  answered or had some of them --

24  A.  We -- no, they had not all been answered, but we decided to

25  move forward.

1   Q.  I want to direct you now to Government Exhibit 190.  If you

2   could just flip through the pages of that document and look up

3   once you've reviewed it.

4   A.  OK.

5   Q.  Dr. Penland, do you recognize those documents?

6   A.  Yes, sir.

7   Q.  Generally speaking, what are they?

8   A.  They're the signed agreements, the documents and the

9   documentation of executing the wiring of the funds.

10          MR. SOLOWIEJCZYK:  Your Honor, the government offers

11  Government Exhibit 190.

12          MR. DeMARCO:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 190 received in evidence)

15  Q.  Let's start with the private funding and security

16  agreement, page 1 of the document.  What was the date of the

17  agreement, Dr. Penland?

18          You could zoom in on the top part, Mr. Lachow?

19  A.  January 19, 2011.

20  Q.  What was the private funding amount?

21  A.  55 million U.S. dollars.

22  Q.  What was going to be the purpose of the private funding

23  proceeds?

24  A.  Construction funding.

25  Q.  Did that include, according to this document, both phase

1   one and phase two?

2   A.  Yes, sir.

3   Q.  So $35 million was needed for phase one, is that right,

4   approximately?

5   A.  Yes, sir.

6   Q.  Who was the borrower under this agreement?

7   A.  TCIS, Taejon Christian International School.

8   Q.  It's a little hard to see, but who was the funder?

9   A.  The Cosmo Dabi International Trading Group, Inc.

10  Q.  Turning your attention to page 2, towards the bottom, all

11  the way at the bottom, equity deposit.

12          Dr. Penland, this states, "Equity deposit.  The sum of

13  five million five hundred thousand and zero dollars, the equity

14  deposit, as demonstration of borrower's equity in the

15  construction project whereby borrower acknowledges that its

16  equity deposit shall be used by the funder to facilitate,

17  managed, matched, buy/sell/trade finance strategies using

18  private physical gold products, other commodities, automotive,

19  investment grade financial instruments and/or various other

20  types of transactions from which the proceeds shall be used to

21  generate the private funding amount."

22          Dr. Penland, the private funding amount, is that the

23  loan?

24  A.  Yes.

25  Q.  Based on this provision, what was your understanding about

1    what Cosmo Dabi was going to do with the $5 and a half million

2    equity deposit?

3    A.  He was going to invest it.

4    Q.  Does this provision describe certain types of investments

5    that will be made with the equity deposit?

6    A.  Yes, it does.

7    Q.  Dr. Penland, do you have much experience in the finance

8    industry?

9    A.  Not very much.

10   Q.  Did you understand all the different strategies that Cosmo

11   Dabi was potentially going to employ to invest the $5 and a

12   half million deposit?

13   A.  To some degree.

14   Q.  Did you fully understand it though?

15   A.  I'm not an expert in financial investment.

16   Q.  Going down under the heading, the same page just a few

17   lines down, "Article 2, management of equity deposit" in that

18   first paragraph below that.

19        "Borrower hereby appoints and retains funder as its

20   fund manager (manager) on the terms and conditions set forth

21   herein for the equity deposit.  Funder accepts such appointment

22   and assumes responsibility for the fund management on the

23   closing date and agrees to manage and direct the equity deposit

24   funds to generate the desired private funding amount guaranteed

25   upon all borrower qualifications and conditions being

1    satisfactory to the funder."

2         Who is the funder under this agreement?

3    A.   Mr. Cosme.

4    Q.   Cosmo Dabi?

5    A.   Yes, I -- that's what the agreement says, yes.

6    Q.   And per this provision, what is the funder supposed to do

7    with the $5 and a half million equity deposit?

8    A.   To manage it and to generate the desired amount for the

9    private funding amount.

10   Q.   Where it says, "Generate the desired funding amount, direct

11   the equity deposit amounts to generate the private funding

12   amount," what did you understand that to mean?

13   A.   That he was going to take our money and that he would grow

14   it, and we would get the loan from him according to the

15   schedule, and we were on our way.

16   Q.   The private funding amount, that's the $55 million loan?

17   A.   Yes, sir.

18   Q.   Was the school, in fact, appointing Cosmo Dabi to a certain

19   role in this agreement?

20   A.   Yes, he's the fund manager.

21   Q.   What's he managing?

22   A.   Our funds.

23   Q.   Is that the $5 and a half million equity deposit?

24   A.   Yes, sir, that.

25   Q.   Looking further down the page to the section that reads,

1    "Investments.  Manager shall enter into managed, matched,

2    buy/sell/trade finance strategies using private physical gold

3    products, other commodities, automotive and investment grade

4    financial instruments, and/or various other types of

5    transactions from which the proceeds shall be used to generate

6    the private funding amount."

7            Dr. Penland, generally speaking, what did you

8    understand this provision to say?

9    A.  That he was going to take our asset, the 5.5 million, and

10   he would find different strategies and ways to grow that to

11   provide the loan amount that we had agreed on.

12   Q.  Dr. Penland, I direct you to page 4 of the document:  If we

13   could just focus on the top portion, top half; one down from

14   that.

15   A.  Yes.

16   Q.  Dr. Penland, we already discussed the private funding

17   amount, the $55 million loan, correct?

18   A.  Yes, sir.

19   Q.  What's the repayment amount?

20   A.  $49,500,000.

21        (Continued on next page)

22

23

24

25

1   Q.  Five and a half million was already put forward by your

2   school?

3   A.  Yes.  Plus accrued interest on that.

4   Q.  What was going to be the term of the loan, repayment of the

5   loan?

6   A.  12 years.

7   Q.  And the interest rate, what was that supposed to be?

8   A.  4 percent annum.

9   Q.  Was that the interest rate that you had discussed with

10  Mr. Cosme during the meeting in New York?

11  A.  Yes.

12  Q.  Looking at repayment, months 1 through 24 of the defer

13  payment period.  Was the school expected to repay the loan in

14  the first 24 months?

15  A.  No, sir.  It was deferred.

16  Q.  When would repayment begin?

17  A.  After two years.

18  Q.  Was there going to be a prepayment penalty under this

19  agreement?

20  A.  No, sir, there would not be.

21  Q.  That was something you specifically discussed with

22  Mr. Cosme during the meeting in New York?

23  A.  Yes.

24  Q.  Let's turn to page 5.  Pardon me one second.

25          MR. SOLOWIEJCZYK:  Can we go back to page 3, Mr.

1    Lachow and the term closing date.

2    Q.  Under the terms of the agreement, what was the closing date

3    for the transaction?

4    A.  When the equity deposit was received into the bank account

5    of the funder per the wiring instructions from the funder.

6    Q.  Now let's turn to page 5.

7         MR. SOLOWIEJCZYK:  Mr. Lachow, if you could just focus

8    on the line above the box and then the box itself.

9    Q.  What was this provision, Dr. Penland?  Was this some type

10   of schedule?

11   A.  Yes.  This is the draw schedule for the first draw.

12   Q.  Looking at the left-hand column, what was the first draw of

13   the loan?  What was the amount going to be?

14   A.  15 million.

15   Q.  According to this, the first draw to be disbursed, 60

16   business days from the closing date, and the closing date is

17   what, Dr. Penland?

18   A.  March 31, 2011, or 60 business days from the --

19   Q.  The closing date.  We just talked about that.

20   A.  The closing date was on the date we wired the funds.

21   Q.  It would be 60 business days after you wired the funds, is

22   that right?

23   A.  Correct.  The first draw, yes.

24   Q.  It was currently estimated to be no later than March 31,

25   2011.  Do you recall that?

192 of 209

1  A.  Yes, sir.

2  Q.  Borrower understands that March 31, 2011 may be adjusted

3  based upon the closing date?

4  A.  Yes.

5  Q.  So it would depend on when you wired the funds?

6  A.  Yes.

7  Q.  60 business days after that you could expect the first

8  draw, is that right?

9  A.  Yes.

10  Q.  If the first draw is not disbursed by March 31, 2011, or is

11  it adjusted by the actual closing date, let's talk about what

12  would happen.  Would there be any type of grace period for

13  Cosmo Dabi?

14  A.  Yes.

15  Q.  According to this, what's the grace period?

16  A.  An additional 15 international banking days.

17  Q.  So Cosmo Dabi would have another 15 international banking

18  days to disburse the first draw, is that right?

19  A.  That's correct.

20  Q.  If Cosmo Dabi did not do that, was the school entitled to

21  the return of its equity deposit, the five and a half million

22  dollars?

23  A.  Yes, sir, it was.

24  Q.  Looking at item 3, when would that happen?

25  A.  Within seven business days thereafter.

1   Q.  If the school didn't receive the first draw, the first 15

2   million within 60 business days, the grace period elapsed, the

3   equity deposit was supposed to be returned, is that right?

4   A.  Yes.

5   Q.  In full, is that correct?

6   A.  That's correct.

7   Q.  Then looking at provision 4, unless funder and TCIS

8   mutually agree in writing to extend the first draw disbursement

9   date.

10  A.  Correct.

11  Q.  So there was an option to extend the deadline?

12  A.  There was.

13  Q.  Dr. Penland, the next line down mentions 3.3 million dollar

14  origination points.  Do you see that?

15  A.  Yes, I do.

16  Q.  What did you understand that to be?

17  A.  Origination or handling fee.

18  Q.  Was it your understanding that Cosmo Dabi would receive a

19  fee in connection with providing you a loan?

20  A.  Yes.

21  Q.  Was it your understanding that Cosmo Dabi would receive

22  such a fee in connection with originating a loan?

23  A.  Yes.

24  Q.  If Cosmo Dabi didn't provide the first draw and you asked

25  for your deposit back in full, did you believe Cosmo Dabi was

1   entitled to any fee?

2   A.  No, not a thing.

3   Q.  With respect to the equity deposit, Dr. Penland,

4   ultimately, just looking at the schedule, did TCIS ever receive

5   the first draw of the loan?

6   A.  No.

7   Q.  Did you ever receive the first 15 million?

8   A.  No.

9   Q.  Did the grace period elapse?

10  A.  Yes.

11  Q.  Did the school ultimately give additional extensions to

12  Cosmo Dabi?

13  A.  Yes.

14  Q.  At some point did the school formally demand its equity

15  deposit back in full according to --

16          MR. SOLOWIEJCZYK:  Mr. Lachow, if you could focus on

17  the schedule, the part we were just focused on before, Mr.

18  Lachow.

19  Q.  Under provision 3 here, did you ultimately ask for your

20  equity deposit back?

21  A.  We did.

22  Q.  Did you believe you were entitled to it back in full under

23  this agreement?

24  A.  Yes, we did.

25  Q.  Did you ever receive your equity deposit back?

1    A.  No, sir.

2    Q.  Did you ever receive a single dollar of your equity deposit

3    back?

4    A.  No, sir.

5    Q.  Directing you to page 17 of the agreement, is that your

6    signature on this agreement?

7    A.  Yes, it is.

8    Q.  You signed on behalf of TCIS?

9    A.  I did.

10   Q.  Looking below, did Mr. Cosmo also cosign the agreement?

11   A.  Yes, he did.

12   Q.  On behalf of who?

13   A.  Cosmo Dabi International Trading Group, Inc.

14   Q.  Looking at page 19, two pages back there is a draw,

15   schedule A, draw schedule, and use of funds.  Just looking at

16   the top portion, phase 1, under this schedule TCIS would get

17   the first draw after 60 business days, is that right?

18   A.  That's correct.

19   Q.  That would be 15 million, right?

20   A.  Yes, sir.

21   Q.  And then would there be additional draws after that?

22   A.  Yes, sir, as scheduled, end of April, end of May, end of

23   June, and end of September.

24   Q.  In what amounts?

25   A.  Five million each time.

1    Q.  That would complete phase 1, is that right?

2    A.  That's correct.

3    Q.  Looking at phase 2?

4    A.  Yes.  It goes on, December 2011 and then throughout 2012,

5    March, June, September, December 2012.

6    Q.  Starting on December 30, 2011 the second phase of the

7    borrowing would happen, is that right?

8    A.  That's correct.

9    Q.  According to this, when would the repayment begin?

10   A.  Begin on January 1, 2013.

11        MR. SOLOWIEJCZYK:  Mr. Lachow, if you could publish

12   page 21 of the document, two pages back, Dr. Penland.  The

13   document that says KEB on the top left.

14   Q.  Focusing on the top half of that page, Mr. Lachow, what did

15   this document show?

16   A.  This document is the evidence of the wire transfer

17   completed to Cosmo Dabi from the KEB account, Taejon -- TCIS

18   account.

19   Q.  What was the amount of the wire?

20   A.  $5,500,000.

21   Q.  Which bank did you end send it from?

22   A.  KEB USA International.

23   Q.  Which bank did it go to?

24   A.  JP Morgan Chase Bank.

25   Q.  According to this document, when were the funds sent?

1    A.   January 21, 2011.  4:53 in the afternoon, 16:53.

2    Q.   On January 21 then, when the funds were wired, around that

3    time would have been the closing date, right?

4    A.   That would have been the closing date, my understanding,

5    yes.

6    Q.   That would trigger all the other events that we just talked

7    about in this agreement, right?

8    A.   Correct.  We tried to meet that January 19, 20 date that

9    Patricia had recommended that we meet.

10   Q.   I am going to direct you to Government Exhibit 141.  Do you

11   recall this meeting exchange, Dr. Penland?

12   A.   Yes, I do.

13   Q.   Were you a party to these e-mails?

14   A.   Yes, I was.

15        MR. SOLOWIEJCZYK:  Your Honor the government offers

16   Government Exhibit 141.

17        MR. DeMARCO:  No objection.

18        THE COURT:  Received.

19        (Government Exhibit 141 received in evidence)

20        MR. SOLOWIEJCZYK:  Mr. Lachow, if you could publish

21   page 2 and just focus on the e-mail from Mr. Cleveland at the

22   bottom of the page.

23   Q.   Do you recall reading this e-mail, Dr. Penland?

24   A.   Yes, I do.

25   Q.   Can you just read that for us?

1  A.  Yes.  In case you are wondering why there is only 1,000 in

2  Cosmo's account, your money has been wired into a subaccount of

3  Cosmo's overall accounts.  As is custom and proper, Cosmo sets

4  up a subaccount for each transaction so that the funds

5  associated with each transaction are segregated.  Cosmo seeded

6  the subaccount for TCIS transaction with $1,000 to open up the

7  subaccount.

8  Q.  Did you have any concerns when you learned that the account

9  you were sending the money to only had a thousand dollars in

10  it?

11  A.  No, not really.

12  Q.  Why not?

13  A.  I just assumed this was their way of handling their

14  business, and I wasn't concerned about it.

15  Q.  Looking at page 7, Bates 1712, the middle of the page, the

16  e-mail from Thomas Hwang, were you a recipient of this e-mail

17  from Mr. Hwang?

18  A.  I was.

19  Q.  Who else was on the e-mail?

20  A.  Thomas Cleveland, CEO at Cosmo Dabi; Patricia Tsien;

21  Thomas' other e-mail account; myself; and Jay Pak.

22  Q.  Looking at the first line, this looks like a confirmation

23  that we completed our end of the deal for now.  Now let it

24  multiply.  What was your understanding about the phrase let it

25  multiply in this e-mail?

1    A.  It was our understanding that he was going to take our

2    money and he would begin to grow it immediately.

3    Q.  And looking at the fifth paragraph down it starts:

4    William.  William, TCIS seed money is now in your hand and

5    please help the school through the new campus relocation

6    project.  By the way, thanks for loaning us at an incredible

7    low interest rate.  It's really pleasure to doing business with

8    you.

9         Dr. Penland, did you share Mr. Hwang's sentiments that

10   you had been given a low interest rate?

11   A.  Yes, sir.

12   Q.  And did you feel like you had entrusted Mr. Cosmo with

13   something that was important to the school?

14   A.  Really important, yes, sir.

15   Q.  What was that?

16   A.  The funding of the project and our funds that we had wired

17   to get that funding.  All of it was important.

18   Q.  Looking up at the next page, page 6, 1711, page 6 of the

19   document.

20   A.  Yes.

21        MR. SOLOWIEJCZYK:  If you could zoom in on the bottom

22   of the page, Mr. Lachow.

23   Q.  Who is this e-mail from?

24   A.  This is from Cosmo Dabi CEO@Cosmo Dabi.com.

25   Q.  Was this in response to Mr. Hwang's e-mail that we just

1    went over?

2    A.   Yes.

3    Q.   Can you read that into the record.

4    A.   Hello, Tom.  This is to Thomas Hwang.  Hello, Tom.  Yes,

5    sir.  It appears that you have done all that you had stated you

6    would do and all that was required on your side thus far, which

7    admirable and awesome.  When funds are clear, I will notify you

8    ASAP via Omni and start the exponentials, etc.  Now get some of

9    that rest.

10   Q.   Do you recall receiving this e-mail?

11   A.   Yes, sir.

12   Q.   What did you believe Mr. Cosmo was referring to with the

13   exponentials?

14   A.   That was the multiplying of our fund, the growing of the

15   fund.

16   Q.   Looking at the last page of the exhibit, do you recall

17   seeing this document in conjunction with this e-mail?

18   A.   Yes, I did.

19   Q.   Was this in fact attached to the e-mail exchange?

20   A.   Yes.

21   Q.   What does this show?

22   A.   It shows the bank transfer credit of $5,500,000, in

23   incoming wire transfer from Seoul, Korea from TCIS.

24   Q.   This shows an incoming transfer.  Was this a depiction of

25   Cosmo Dabi's bank account, as far as you understood?

 1    A.    For our account, yes.

 2    Q.    Showing him that you had sent him a wire, right?

 3    A.    Yes.  Showing us our money had arrived in his account.

 4    Q.    According to this, what were the last four digits of the

 5    account number?

 6    A.    6625.

 7    Q.    Dr. Penland, at this point TCIS had wired the funds to

 8    Cosmo Dabi, is that correct?

 9    A.    That's correct.

10    Q.    What did you expect was going to happen next?

11    A.    I expected that he was going to go to work for us and

12    manage our funds and grow them and that we were on our way to

13    having funding for our project and was feeling very, very

14    thankful and optimistic about our school and the project.

15    Q.    Under the terms of your agreement when were you expecting

16    Cosmo Dabi would provide the first draw of the loan, the first

17    $15 million?

18    A.    We were hoping and wishing for end of March, and that was

19    what we expected and that was the goal everyone was working

20    toward.

21    Q.    But under the agreement when was it required that he give

22    you --

23    A.    60 business days after the closing January 21 or

24    thereabouts.

25    Q.    Did TCIS in fact receive the first installment of the loan

1   60 business days after the wire transfer?

2   A.  No, sir.

3   Q.  I am going to direct your attention to Government Exhibit

4   154.  Do you recognize that document?

5   A.  Yes, sir.

6   Q.  What is it?

7   A.  It's an e-mail from Thomas Hwang to Mr. Sa, his assistant,

8   copied to me.

9            MR. SOLOWIEJCZYK:  The government offers Government

10  Exhibit 154.

11           MR. DeMARCO:  No objection.

12           THE COURT:  Received.

13           (Government Exhibit 154 received in evidence)

14  Q.  Were there attachments to this e-mail, Dr. Penland?

15  A.  There was.

16  Q.  I direct you to 154A and 154B.  Do you recognize those

17  documents?

18  A.  Yes, sir.

19  Q.  Just briefly, what's 154A and what's 154B?

20  A.  154A was a check written by Mr. William Cosme to Morgan

21  Stanley for $406,000.

22           MR. SOLOWIEJCZYK:  Your Honor, I would offer 154A and

23  154B.

24           MR. DeMARCO:  No objection.

25           THE COURT:  Received.

1          (Government Exhibits 154A and 154B received in

2    evidence)

3    Q.  Dr. Penland, what was 154A?

4          MR. SOLOWIEJCZYK:  If you could publish that briefly,

5    Mr. Lachow.

6    A.  Again, it was a check written to Morgan Stanley from

7    Mr. Cosmo for $406,000.

8    Q.  Let's look at 154B.  As part of the due diligence that TCIS

9    needed to conduct for the project, had TCIS requested these

10   documents?

11   A.  No.  Actually, the bank was requesting it.  When we

12   offshore funds, we had to give a certain amount of evidence of

13   where those funds were going, that they weren't personally

14   going to someone at the school or something like that.  The

15   bank wanted us to give them this information.

16   Q.  As part of the due diligence your school had to do for your

17   bank, to satisfy your bank, did you request these documents?

18   A.  Yes.

19   Q.  Ultimately were these documents provided to TCIS?

20   A.  Yes.

21   Q.  Do you remember looking at Government Exhibit 154B?

22   A.  Yes, I did.

23   Q.  And I just want to focus you at the top portion to start.

24         MR. SOLOWIEJCZYK:  The top half, Mr. Lachow.

25   Q.  What did you understand this document to be?

```
 1   A.  This was a document showing William Cosmo as the owner and

 2   chief stakeholder of Cosmo Dabi --

 3   Q.  I'm sorry.  What is the document, generally speaking?

 4   A.  Demonstration of an incorporation and registration of a

 5   business.

 6   Q.  Is it a resolution adopted by a director of a company?

 7   A.  Yes, it is.

 8   Q.  What company is that?

 9   A.  Cosmo Dabi International Trading Group, Inc.

10   Q.  I'm going to direct you to paragraph 3 of the resolution.

11           MR. SOLOWIEJCZYK:  Mr. Lachow, if you could focus on

12   that and the text underneath.

13   Q.  What did you understand this portion of the resolution

14   contained?

15   A.  The officers in the corporation.  Mr. Cosmo was sole

16   director.  He was the president.  Another person,

17   vice-president; another person, secretary; another person,

18   treasurer.

19   Q.  Based on your review of this document, did you believe that

20   Cosmo Dabi had additional officers beyond Mr. Cosmo?

21   A.  In his corporation or this group, yes.

22   Q.  There was a vice-president and a secretary and a treasurer,

23   right?

24   A.  That's correct.

25           MR. SOLOWIEJCZYK:  One moment, your Honor.
```

 1    Q.  Dr. Penland, I would ask that you turn to what's been

 2    marked as Government Exhibit 206.  If you could take a look at

 3    that and let me know once you have read it.  Do you recognize

 4    that document, sir?

 5    A.  Yes, sir.

 6    Q.  What is it?

 7    A.  It's an e-mail chain and it's from me to Patricia Tsien and

 8    Thomas Hwang and answers back through Thomas Hwang.

 9    Q.  Do you recall receiving e-mails depicted in the document?

10    A.  Yes, sir.

11          MR. SOLOWIEJCZYK:  The government offers Government

12    Exhibit 206.

13          MR. DeMARCO:  No objection.

14          THE COURT:  Received.

15          (Government Exhibit 206 received in evidence)

16    Q.  Dr. Penland, looking at page 1, the e-mail that starts at

17    the bottom of the page from Ms. Tsien, I am going to read these

18    first through paragraphs to you.  What's the date on this

19    e-mail, by the way?

20    A.  This was April 6.

21    Q.  And when were you expecting to receive the first

22    installment of the loan?

23    A.  Hoping March 31 or 60 business days after January 21.

24    Q.  So this would be around the time that your school was

25    hoping to get that first draw, correct?

 1   A.   That's correct.

 2   Q.   Cosmo told us a couple of weeks ago that the crisis in

 3   Japan had caused a slowdown in the international pipeline of

 4   transactions, but he was still hopeful on meeting the April 15

 5   target.   As such, I chose not to share that information at that

 6   time.

 7        Yesterday he said there is likely to be a small

 8   impact, but he would let us know as soon as possible the

 9   impact.   The slowdown on pipeline affects the quantity and

10   quality of transactions so that he can generate the necessary

11   returns.

12        Based on this e-mail, what was your understanding of

13   why Mr. Cosmo might not be able to provide the draw in the time

14   frame that had been promised?

15   A.   Because of the earthquake and tsunami in Japan and its

16   effect on international markets.

17   Q.   When you saw that, what were you thinking at the time?

18   A.   I didn't -- I was -- it raised some questions in my mind.

19   Q.   Why did you think a tsunami in Japan might affect the

20   ability to provide the first draw of the loan?

21   A.   I understood that it was a serious event that occurred in

22   Japan.   I live in Korea.   I was very aware of that event, but I

23   knew business was going on in Korea and Asia, and I just

24   didn't -- it wasn't a red flag, but it was a yellow flag at

25   that point to say, wow, really?

1   Q.  Looking at the last paragraph on that first page, as you

2   know, April 15 was a very tight as target date anyway and is

3   well below the 60 international banking day commitment to fund

4   the first draw, but Cosmo had wanted to try to get as close to

5   what he knew was the goal of March 31 as possible, so he pushed

6   himself.

7         Look at the next page.  I will let you know as soon as

8   I know what the new target will be but which should still be

9   less than 60 international banking days.

10        Under your agreement with Mr. Cosmo, wasn't it your

11  understanding that he was required to provide the first draw 60

12  business days from the closing date?

13  A.  Yes.

14  Q.  Did you notice at the time Ms. Tsien was referring to

15  international banking days all of a sudden?

16  A.  I was getting confused at that time because the language

17  kept changing.

18  Q.  Were you surprised to hear that Cosmo could not provide the

19  first draw in the time frame that he had promised?

20  A.  Yes.

21  Q.  Why were you surprised?

22  A.  I thought it was a sure thing.  I thought it was going to

23  happen.

24  Q.  Did you think he had significant resources at his disposal,

25  based on what you heard about him and read about him?

1  A.  Up to that point, yes, I did.

2  Q.  Let me direct you to Government Exhibit 155.  Do you

3  recognize this document?

4  A.  Yes, sir.

5  Q.  What is it?

6  A.  It's an e-mail from Thomas Hwang to me.

7          MR. SOLOWIEJCZYK:  Your Honor, the government offers

8  Government Exhibit 155.

9          MR. DeMARCO:  No objection.

10          THE COURT:  Received.

11          (Government Exhibit 155 received in evidence)

12  Q.  What's the date of this e-mail?

13  A.  This is April 19, 2011.

14  Q.  Do you recall receiving this e-mail?

15  A.  Yes.

16  Q.  Could you read the text of the e-mail to us.

17  A.  Dear Dr. Penland, as I have informed you earlier, Omni

18  couldn't make a first draw on schedule by April 15 due to

19  mainly the following two reasons.  Our escrow was cleared on

20  January 27 to Omni and its associate missing the target date by

21  about 15 banking days.  Japan earthquake and tsunami halted

22  finance pipeline between Omni associates all over the world and

23  caused the trading to be on hold.  Our contract with Omni says

24  first draw after 60 banking days, and this normally equates to

25  about 15 normal weeks, they didn't have enough time to mature

1    the fund.  I'm actively in contact with Omni to renegotiate

2    first draw schedule and/or partial draw and will update on

3    this.

4    Q.  First of all, Dr. Penland, Mr. Hwang refers to Omni

5    repeatedly in this e-mail.  Who did you understand was actually

6    going to be lending you the money?

7    A.  Mr. Cosmo.

8    Q.  Cosmo Dabi?

9    A.  Yes, sir.

10   Q.  Did you and Mr. Hwang sometimes use the word Omni as

11   shorthand for the deal?

12   A.  Yes.

13   Q.  Is that because you primarily were interfacing with Omni as

14   the go-between?

15   A.  Very much.

16   Q.  Is it fair to say that you understood him to be talking

17   about the Cosmo Dabi loan in this e-mail?

18   A.  Absolutely.

19   Q.  Now, it says here:  Our contract with Omni says first draw

20   after 60 banking days.  This normally equates to about 15

21   normal weeks.  Didn't your contract say 60 business days?

22   A.  Yes.

23   Q.  At that time were you confused by the sudden change?

24   A.  I was.  We were having conversations about that.

25           THE COURT:  Mr. Solowiejczyk, how much longer with

 1   this witness?

 2           MR. SOLOWIEJCZYK:  Significantly longer.

 3           THE COURT:  Let me know when it's a convenient time.

 4   I think the jurors have been sitting here a while and probably

 5   need a break.

 6           MR. SOLOWIEJCZYK:  Yes, your Honor.

 7   Q.  So, again, there is a reference here to the Japan

 8   earthquake and tsunami halted financing pipelines between Omni

 9   associates all over the world and caused the trade to be on

10   hold.

11           What did you think of that at the time you saw it?

12   A.  As I said, I had some questions about whether that was

13   really a problem, that significant of a problem financially.

14           MR. SOLOWIEJCZYK:  Your Honor, this would be a good as

15   time as any.

16           THE COURT:  Ladies and gentlemen, let's take the lunch

17   break now.  Would you please remember not to discuss the case

18   among yourselves or with anyone else.

19           You know what I am going to yell at you about, no

20   research on the case.  And would you return, please, at 1:35.

21   Have a pleasant lunch.  I'll look to you for a weather report

22   when you come back in.  If you are using a notebook, please

23   leave it in the jury box.  Have a pleasant lunch.  Do not

24   freeze.

25           (Jury not present)

1          THE COURT:  Anything else on the record?

2          MR. DeMARCO:  No, your Honor.

3          THE COURT:  Thank you, counsel.  See you after lunch.

4          (Luncheon recess)

```
 1                          AFTERNOON SESSION

 2                              1:35 p.m.

 3              THE COURT:  May we bring the jurors in, folks.   Thank

 4   you.

 5              (Jury present)

 6              THE COURT:  We continue with the direct examination of

 7   Dr. Penland.

 8              Mr. Solowiejczyk.

 9   BY MR. SOLOWIEJCZYK:

10   Q.  Dr. Penland, I direct your attention to Government Exhibit

11   156.  Do you recognize that document, Dr. Penland?

12   A.  Yes, sir.

13   Q.  What is it?

14   A.  It's an e-mail between Thomas Hwang and myself.

15   Q.  And directing you to Government Exhibit 156A, do you

16   recognize that document?

17   A.  Yes, I do.

18   Q.  What is that?

19   A.  It's a letter from William Cosmo to me.

20   Q.  Do you recall receiving the each and the attachment?

21   A.  Yes, I do.

22              MR. SOLOWIEJCZYK:  Your Honor, the government offers

23   Government Exhibit 156 and 156A.

24              MR. DeMARCO:  No objection.

25              THE COURT:  Received.
```

1           (Government Exhibits 156 and 156A received in

2    evidence)

3    Q.   Dr. Penland, let's turn to Government Exhibit 156 first.

4    This was an e-mail from Thomas Hwang, is that right?

5    A.   Yes, sir.  It was an e-mail to me to Thomas and then a

6    response back.

7    Q.   The top e-mail is an e-mail from Thomas Hwang to you,

8    correct?

9    A.   Yes.

10   Q.   Looking at the last line in that e-mail it states:  Please

11   find the letter from Cosmo and let me know if you have any

12   questions.

13           He was sending you a letter from Mr. Cosmo, is that

14   correct?

15   A.   Yes.

16   Q.   Let's turn to 156A.  And this is a letter to you, is that

17   correct?

18   A.   To myself and Mr. Thomas Hwang.

19   Q.   What is the topic of the letter?

20           MR. SOLOWIEJCZYK:  If you could zoom in on the top,

21   Mr. Lachow.

22   A.   Funding status per your request.

23   Q.   Now, the letter says it's dated May 10 of 2010?

24   A.   Correct.

25   Q.   Do you think that date was accurate?

1   A.   I think it's probably a typo.  It was 2011.

2   Q.   Have you ever had any contact with Mr. Cosmo in May of

3   2010?

4   A.   No.

5   Q.   And the e-mail that we just looked at, was that dated in

6   May of 2011 as well?

7   A.   Yes, sir.

8           MR. SOLOWIEJCZYK:  Mr. Lachow, if you could focus on

9   the first two paragraphs of the letter.

10  Q.   By May of 2011, what was your understanding of whether TCIS

11  would have been entitled to the first $15 million draw on the

12  loan?

13  A.   Could you repeat that question.

14  Q.   By May of 2011, did you believe TCIS was entitled to the

15  first draw on the loan under the agreement that we discussed

16  earlier?

17  A.   Certainly, yes.

18  Q.   Because the 60 business days had passed, is that correct?

19  A.   That's correct.

20  Q.   So looking at this paragraph here:  As you may know, there

21  may have been some recent, major events, particularly in Japan,

22  that have severely delayed financial transaction pipelines on a

23  global basis, including some portions of Cosmo Dabi pipelines.

24  At this time I am experiencing some recoverable business delays

25  as most are from the Japan events but remain fully optimistic

1   and do expect our transactional pipelines to revert to normal

2   at fully stabilized levels shortly.

3           Dr. Penland, based on what Mr. Cosmo said in this

4   paragraph of the e-mail, what was your understanding of how the

5   tsunami in Japan had impacted his business?

6   A.  It had slowed everything down, appeared like delayed

7   financial transactions.

8   Q.  At the time you read that paragraph of the letter, what did

9   you think?

10  A.  As I said before, the Japan sort of thing didn't ring real

11  to me or true to me.  It raised more questions than gave

12  answers.

13          MR. SOLOWIEJCZYK:  Let's turn to the next paragraph.

14  Just focus on that paragraph, Mr. Lachow.

15  Q.  That said, the first draw will not occur within the 60

16  international banking days set out in the private funding and

17  security agreement executed January 19, 2011, whereby the IBD

18  account commenced with the date Cosmo Dabi received your equity

19  deposit, has cleared funds on January 27, 2011.  However, I do

20  expect the first draw funding will occur on or before the end

21  of the 15 IBD grace period of 17 June 2011 and will provide a

22  confirmed date as soon as I am certain that all key performance

23  indicators will allow me to do so.

24          Dr. Penland, that portion of the paragraph, what was

25  your understanding of when Mr. Cosmo was telling you he would

1    be able to get you the first draw by?

2    A.  Well, including his grace days, he was saying June 17,

3    2011.

4    Q.  Did it make sense to you that June 17, 2011 would

5    constitute the grace period or did you have some questions

6    about that?

7    A.  I had some questions about international banking days and

8    what that really meant and how we were calculating them.  Yes,

9    I had questions.

10   Q.  Leaving your questions aside, by June 17, at the latest,

11   you thought you would get the first draw.  Is that fair to say?

12   A.  It's a confirmed date.

13   Q.  Let's look at the next sentence:  I have attached a copy of

14   the bank account balance printed as of this morning.  The only

15   change made to the printout is my red pen.

16       Dr. Penland, what bank account balance did you believe

17   Mr. Cosmo was referring to in this letter?

18   A.  Our account balance.

19   Q.  What funds specifically?

20   A.  The funding from our 5.5 demonstrating that it had grown to

21   this amount.

22       MR. SOLOWIEJCZYK:  Mr. Lachow, if you can put up the

23   screen shot that's in the letter.

24   Q.  This screen shot was pasted into this letter, correct, put

25   in this letter?

1    A.   Yes.

2    Q.   What's the date of the screen shot?

3    A.   5/10/2011.

4    Q.   And the number that's circled, what was that number?

5    A.   $12,594,563.52.

6    Q.   Based on what Mr. Cosmo had said in the letter, what did

7    you believe that number represented?

8    A.   I assumed it represented the growth for our private funding

9    account with them, the growth in it.

10   Q.   You believe the money had grown to this amount?

11   A.   Yes.

12   Q.   Approximately $12.5 million?

13   A.   Yes.

14   Q.   Dr. Penland, once you saw this letter showing what you

15   believe to be growth of your funds to $12.5 million, what, if

16   anything, did that do to assuage any concerns that you had?

17   A.   It didn't totally do away with them because I was starting

18   to have concerns, but it was helpful.  It encouraged me to see

19   what appeared to look like our fund was growing.  He actually

20   had a fund and it was growing.

21   Q.   Did you still believe that he may fund the first draw of

22   the loan based on this?

23   A.   I was hopeful.

24   Q.   Dr. Penland, if it had turned out that the number that's

25   circled in this document was not actually your account balance,

1    what steps, if any, would you have taken?

2              MR. DeMARCO:  Objection.  Calls for speculation, your

3    Honor.

4              THE COURT:  Counsel.

5              MR. SOLOWIEJCZYK:  Your Honor, materiality is going to

6    be relevant when it comes to one of the counts, materiality of

7    the representations.

8              THE COURT:  Mr. DeMarco.

9              MR. DeMARCO:  I continue my objection, your Honor.

10             THE COURT:  I'll permit it.

11             You may answer, sir.  Do you need the question again?

12             THE WITNESS:  Please.

13             THE COURT:  Dr. Penland, if it turned out that the

14   number that's circled in this document was not actually your

15   account balance, what steps, if any, would you have taken?

16             THE WITNESS:  Demanded my money back immediately,

17   maybe go to the FBI or police.

18   Q.  Since you saw the money had grown to $12.5 million,

19   according to the document, did you continue to wait for the

20   first draw?

21   A.  I did.

22   Q.  Now, this letter said that by June 17, 2011, TCIS could

23   expect the first installment of the loan, is that correct?

24   A.  Yes, sir.

25   Q.  Did TCIS in fact receive the first installment of the loan

```
 1  by June 17, 2011?

 2  A.  No, sir.

 3  Q.  Looking at the last page of the letter, please coordinate a

 4  convenient time for you through Jay Pak or Pat Tsien at

 5  646-515-0108 for us to speak and for you to ask any questions

 6  you may have.

 7        Dr. Penland, did any such phone call ever take place,

 8  to your knowledge?

 9  A.  I did not, no.

10  Q.  Why didn't you ask for a phone call?

11  A.  I believed that he was going to pay at that point.  I was

12  hoping that.  And I was not trying to blow up the thing or push

13  back on him, so I was hesitant.

14  Q.  Dr. Penland, directing your attention to Government Exhibit

15  309, do you recognize that document?

16  A.  Yes, sir.

17  Q.  What is it?

18  A.  It's an e-mail to -- from Patricia Tsien to me and an

19  e-mail from me to Patricia Tsien.

20        MR. SOLOWIEJCZYK:  Your Honor, the government offers

21  Government Exhibit 309.

22        MR. DeMARCO:  No objection.

23        THE COURT:  Received.

24        (Government Exhibit 309 received in evidence)

25  Q.  Dr. Penland, looking at the top of the first page?
```

1    A.  Yes, sir.

2    Q.  This is from Patricia Tsien and you were on this e-mail, I

3    believe?

4    A.  Yes.

5    Q.  Please see our response to Dr. Linton's request for clarity

6    on our next steps.  I'm available for a telephone conference

7    call, as you refer.  Who is Dr. Linton?

8    A.  Dr. Linton was one of our board members.

9    Q.  Was there an attachment to this e-mail?

10   A.  Yes, there was.

11   Q.  Now, this e-mail from Patricia Tsien is dated what?

12   A.  June 26.

13   Q.  Looking at the middle of the first page, was this e-mail

14   from Patricia Tsien in response to anything you had written?

15   A.  It's a response to my e-mail on June 21 to Mr. Cosmo and to

16   the Omni Group.

17            MR. SOLOWIEJCZYK:  If you could focus on that, Mr.

18   Lachow.  Maybe we could do the first half of the page first.

19   Q.  Directing you to that first paragraph, I understand --

20   first of all, the letter is addressed to William Cosmo among

21   others, is that right?

22   A.  Yes.

23   Q.  I understand and believe that Omni, TCIS, and Mr. Cosmos

24   now agree that our mutual contract has been officially violated

25   as of June 17, 2011.  Therefore, the following should occur per

1    the said contract.  Funder shall have an additional 15

2    international banking days IBD grace to disburse the first

3    draw.  IBD grace days have already passed.

4          What made you say that the grace days had passed, Dr.

5    Penland?

6    A.   That's what he had said in his letter.

7    Q.   So you thought June 17 was when the grace days expired?

8    A.   He had already agreed on that.

9    Q.   Looking at the second paragraph, after which the private

10   funding agreement automatically terminates until mutually

11   agreed upon, to be discussed.

12         That is your commentary, I take it?

13   A.   Yes.

14   Q.   Looking at the third paragraph:  Further, funder agrees to

15   return the participation deposit in full within seven business

16   days thereafter.  Are these notes in parenthesis in caps your

17   commentary?

18   A.   It is.

19   Q.   It is expected by TCIS for the funder to comply without

20   exception.  What were you asking for at this point, Dr.

21   Penland?

22   A.   Return of our deposit in full, participation deposit in

23   full or equity deposit.

24   Q.   Looking at the fourth paragraph, unless funder and TCIS

25   mutually agree in writing to extend the first draw disbursement

1    date, and then your commentary:  We have notified you

2    repeatedly, through Mr. Hwang, that no agreement is possible

3    for a first draw extension.  At the least, we immediately need

4    the complete return of our participation deposit fund.

5    Following that we can discuss receiving further funding loans

6    from a new contractual agreement.

7              What were you saying there, Dr. Penland?

8    A.  We needed our money back.  I thought he had $12,000 in an

9    account.

10   Q.  12,000?

11   A.  12 million.  I'm sorry.  We needed the five million back.

12   If he would send that back, if he wanted to pick up the phone

13   and we want to have a talk then about whether we want to go any

14   further or not, that's something we could talk about and create

15   a new contract to do that.  But this was -- it was time to get

16   things straight.

17   Q.  Go to the second page.

18             MR. SOLOWIEJCZYK:  Can you just focus on the second

19   and third paragraph, Mr. Lachow.

20   Q.  What were you asking for in this e-mail, in this section of

21   it, Dr. Penland?

22   A.  That he fund the amount in full, $5,500,000 as defined in

23   the contract, and to wire it to Korea, and to confirm that with

24   our personnel in Korea by June 28, 2011 at 5 p.m.

25   Q.  Ms. Tsien responded to this e-mail in the e-mail at the top

1   of the first page, is that right?

2   A.   Yes.

3   Q.   And then there was letter attached to her e-mail?

4   A.   Yes.

5          MR. SOLOWIEJCZYK:   If we can turn to the letter, Mr.

6   Lachow.

7   Q.   This was a letter from Cosmo Dabi, is that right?

8   A.   Yes, sir.

9   Q.   What was the date of the letter?

10  A.   June 26.

11  Q.   I then direct you to the second paragraph of the letter.

12  Currently, we are highly confident that we will meet a first

13  draw on July 11, 2011, subject to completion of an audit of the

14  project which is standard practice before each draw.

15          The reference to the audit in this letter, Dr.

16  Penland, prior to receiving this letter, had Mr. Cosmo or

17  anyone from Omni ever told you that an audit would be required

18  before your school could receive the first draw?

19  A.   No, sir.

20  Q.   And the first time that this audit was brought up with you,

21  was that after you had sent your e-mail demanding the deposit

22  back?

23  A.   That's correct.

24  Q.   What did you think when you read that an audit was now

25  going to be necessary?

1   A.   This is crazy.

2   Q.   Did you wonder why no one had brought up the audit with you

3   earlier?

4   A.   Sure.

5   Q.   Let's keep going through this paragraph.  As this first

6   draw, we would like to start the audit as soon as possible

7   because it will take longer to develop the baseline for this

8   draw than subsequent ones.  Did you understand that what meant?

9   A.   Yes.

10  Q.   What did you think it meant?

11  A.   He was trying to help us get it done as quickly as possible

12  and we are going to be -- somehow we were being inspected -- we

13  had given him money, but he was now inspecting us and he had

14  not given us any money.  I can understand if he's not going to

15  give us -- if he doesn't want to give us any loans, but this is

16  crazy when we are asking for our deposit back.

17  Q.   Then the last sentence of this paragraph:  We want to

18  reiterate that these are highly unusual times and that Cosmo

19  Dabi had taken every effort and extraordinary steps to mitigate

20  the effect of the current economic and business climate while

21  still performing within the confines of our agreement.

22        What were your thoughts when you read that at the

23  time?

24  A.   Honestly, just give me my money back.  I don't know what

25  your problems are and I'm sorry for your business, but I need

1    my money back to do my business.

2    Q.  Did you actually think that these were such extraordinary

3    times, based on what you were seeing in Asia?

4    A.  No.

5    Q.  Overall, after you read this letter, what was your

6    takeaway?  What did you think Mr. Cosmo was trying to do?

7    A.  Keep our money, not give it back, and keep finding new ways

8    to figure out ways to delay that first draw.

9    Q.  I am going to direct you to Government Exhibit 161.  Do you

10   recognize this document?

11   A.  Yes, I do.

12   Q.  What is it?

13   A.  It's another e-mail chain from Patricia Tsien to me and

14   Cosmo Dabi to Patricia and myself back to Patricia.

15   Q.  You were a party to this e-mail exchange?

16   A.  All of it, yes.

17        MR. SOLOWIEJCZYK:  Your Honor, the government offers

18   Government Exhibit 161.

19        MR. DeMARCO:  No objection.

20        THE COURT:  Received.

21        (Government Exhibit 161 received in evidence)

22        MR. SOLOWIEJCZYK:  Looking at the top of the first

23   page, Mr. Lachow.

24   Q.  Who was this e-mail from?

25   A.  This e-mail was from Patricia Tsien.

1    Q.  When was it sent?

2    A.  June 29, 2011.

3    Q.  I am going to ask you to look at paragraph 1.  Can you read

4    that, Dr. Penland.

5    A.  This e-mail contains two highly --

6    Q.  The paragraph numbered No. 1.

7    A.  No. 1:  Unless I receive a rescission of your e-mail with

8    subject official response to breach of contract, I will be

9    forced to forward that e-mail onto Cosmo Dabi which will set in

10   motion the termination of the funding agreement.  The deposit

11   cannot be returned without such termination.  In addition for

12   us to continue, which we want to do, I need an explicit

13   acknowledgement that you are extending the time frame for the

14   first draw.

15   Q.  So, if you ask for your deposit back, what was going to

16   happen, according to Ms. Tsien?

17   A.  The funding agreement was going to be terminated.

18   Q.  Did Ms. Tsien want to continue with trying to provide your

19   school a loan, according to this?

20   A.  She was asking whether or not I wanted to actually -- her

21   to move this forward to Cosmo Dabi.  She was questioning

22   whether I really wanted to do that, terminate the agreement.

23   Q.  Looking at paragraph No. 2, every time you telegraph your

24   doubts and possible desire for the return of the deposit, which

25   requires termination, Cosmo Dabi is required to slow down and

1    eventually suspend trading to be prepared for your decision to

2    terminate.  This slowdown, compounded by world events, has

3    been, unintelligible, delays.  As such, we need your decision

4    ASAP on how to proceed since TCIS is losing valuable time in

5    achieving its goal of funding as soon as possible.

6              Cosmo recounts the impact of your actions in this

7    regard since April and has e-mailed below.  In that same e-mail

8    he also confirms that he is prepared to do his very best on

9    behalf of TCIS.

10             Based on this portion of the e-mail, the paragraphs we

11   just read, what was Ms. Tsien telling you was the impact of

12   your requesting a refund of the five and a half million

13   dollars?

14   A.   That we were going to again slow him down from growing our

15   money.

16   Q.   And then if you can look at page 2, Ms. Tsien referenced

17   that Cosmo recounted something in the e-mail below, is that

18   correct?

19   A.   Yes.

20   Q.   Looking at page 2, that top e-mail there, who is this

21   e-mail between?

22   A.   Cosmo Dabi, CEO@Cosmo Dabi.com and Patricia Tsien.

23   Q.   Did Ms. Tsien forward this e-mail to you?

24   A.   Yes.  This is what she was referring to in her other

25   e-mail.

1   Q.  Taking a look at the first paragraph, we have had

2   serious -- when was this e-mail from?

3   A.  June 28, associated with an April 7 e-mail.

4   Q.  But this e-mail is June 28?

5   A.  Yes, it is.

6   Q.  We have had serious discussions about the TCIS refund on

7   and prior to April 7.  The net was that they did not want it.

8           Did you understand what this was referring to, Dr.

9   Penland?

10  A.  Can you say that again, sir.

11  Q.  Do you recall TCIS actually asking for a refund on April 7,

12  Dr. Penland?

13  A.  No, sir.

14  Q.  Did that make any sense to you?

15  A.  No, it did not.

16  Q.  That occasion took trading time away.  This occasion

17  regarding refund, etc., takes trading time away, in addition to

18  the global events and upcoming audit requirements.  The second

19  folks start talking refund or becoming unstable, I cease

20  activity as it should be.  In this case, some of the perceived

21  delays, based on projected timelines, were caused by their own

22  actions.  Stop and go flow of the dollars retards velocity,

23  especially when large trades or investments are teed up and

24  ready to go.

25          Dr. Penland, what did you understand Mr. Cosmo to be

1  saying in this e-mail regarding the effect of your school

2  demanding a refund?

3  A.   That we were -- he was implying that we were to blame for

4  the money not growing the way it should because we were

5  hesitating or pulling out or withdrawing, and he had things

6  teed up and ready to go.

7  Q.   Under the contract that you signed, did you believe you

8  were entitled to a refund at this point?

9  A.   Absolutely.

10 Q.   And these transactions that are referred to that large

11 trades or investments are teed up and ready to go.  Did you

12 have any understanding what those might be?

13 A.   Well, a few months earlier I would have thought maybe he's

14 doing something with it, but I wasn't sure at all at this

15 point.  I just wanted our funds back, honestly, sir.

16 Q.   Looking at the next paragraph, they for sure caused a

17 stop-and-go scenario and delay on getting back to us on what

18 they wanted to do.

19        Dr. Penland, before June of 2011, had you ever asked

20 for a refund?

21 A.   No, sir.

22 Q.   As well as the account in question, changing an answer from

23 when we started, causing a delay in the audit start.  Had you

24 been told about the audit, Dr. Penland, from the get-go?

25 A.   No, sir.  I had been told before that, June 21 letter or 26

1    letter.

2    Q.   Can you take a look at Government Exhibit 316.   Do you

3    recognize that document?

4    A.   I do.

5    Q.   Is this an e-mail exchange that you're a party to?

6    A.   Yes.   This was a letter I sent to Mr. Cosmo and the Omni

7    Group.

8             MR. SOLOWIEJCZYK:   The government offers 316.

9             MR. DeMARCO:   No objection.

10            (Government Exhibit 316 received in evidence)

11   Q.   Dr. Penland, looking at the first page, this was July 5, is

12   that correct?

13   A.   Yes.

14   Q.   I have edited the letter response and have placed it on

15   TCIS school letterhead.   I trust that with this response we

16   have a way forward to July 11, 2011, and we can reach some

17   resolution of the matters of concerns to all parties in one way

18   or another on that date.

19            Dr. Penland, turning to the letter, do you recall

20   drafting this?

21   A.   Yes, sir.

22   Q.   And who is it addressed to?

23   A.   Mr. William Cosmo, Cosmo Dabi International Trading Group,

24   Inc. and Mr. Thomas Cleveland, Mr. Jay Pak, Ms. Patricia Tsien,

25   and Omni Holdings Group.

1          MR. SOLOWIEJCZYK:  Looking at the second page, the

2    last page Mr. Lachow.

3    Q.  In this letter, Dr. Penland, generally did you lay out your

4    views as to TCIS's position as to the loan?

5    A.  Yes, sir.

6          MR. SOLOWIEJCZYK:  The upshot of the letter, if you

7    can go to those numbered paragraphs, Mr. Lachow.

8    Q.  What were you offering at this point with respect to

9    receiving the loan, Dr. Penland?

10   A.  We were offering additional grace days until July 11, per

11   his request.

12   Q.  Dr. Penland, the decision to grant additional grace days,

13   was that your decision or whose decision was it?

14   A.  It was the board of trustees decision.  I did not support

15   that.

16   Q.  Ultimately, do you answer to the board of trustees?

17   A.  I do.

18   Q.  If they tell you you have to do something, do you have to

19   do it?

20   A.  I should.

21   Q.  Looking at the second paragraph, what were you agreeing to

22   there?

23   A.  Accept compliance with the first drawn is a good-faith

24   action that implies you intend to abide by the contract, and we

25   will await the next draw as defined in the contract.

 1   Q.  If they weren't going to provide the first draw by July 11,

 2   what were you asking for in the third paragraph?

 3   A.  Except the return of our original participation deposit

 4   funds by July 11, 2011, and interpreted, as a mutual agreement,

 5   that the contract has been terminated.

 6   Q.  And past July 11, was your school willing to entertain any

 7   further delays, according to this letter?

 8   A.  They were not at that time.  We were not.

 9   Q.  You could look at Government Exhibit 214.  Do you recognize

10   that document?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's an e-mail exchange again between Patricia Tsien and I

14   and Cosmo Dabi.

15           MR. SOLOWIEJCZYK:  Your Honor, the government offers

16   Government Exhibit 214.

17           MR. DeMARCO:  No objection.

18           THE COURT:  Received.

19           (Government Exhibit 214 received in evidence)

20           MR. SOLOWIEJCZYK:  Mr. Lachow, if we can publish the

21   first page and focus on the paragraph at the bottom that says

22   third, the overall.

23   Q.  Was this in response to the letter that you had sent to

24   them, this e-mail?

25   A.  Yes.

1   Q.  Just looking at the second sentence:  Asking us to move to

2   a position of forthrightness and integrity, and deliver as

3   promised in our agreement the first draw, is an inappropriate

4   description of our actions, the most important being that the

5   agreements targeted or projected funding dates not promised or

6   guaranteed any funding dates.

7         Dr. Penland, based on your review of what the

8   agreement said, did you think that that draw schedule were just

9   projections or were those hard and fast dates?

10  A.  Those were agreed-upon days.

11  Q.  We can also accept that what CDI does can appear

12  mysterious, but that does not mean that we have not been

13  forthright.  While retail banking customers have not been

14  impacted, commercial and investment banking customers certainly

15  have been.

16        Dr. Penland, based on this statement, did you have any

17  sense of what types of investments Cosmo Dabi was making with

18  the five and a half million dollars?

19  A.  Yes.  Honestly, I didn't believe anything at this point,

20  sir, but they were inferring or implying that he was doing

21  something with it outside of the traditional banking process,

22  totally off the boat at this point.

23  Q.  A few sentences down:  CDI's ability to meet the projected

24  dates is directly impacted by the slowdown in the transaction

25  pipeline.  Did you have any idea what the transaction pipeline

1    was at this point?

2    A.  I assumed that it was referring back to the financial

3    pipeline and to buys, trade, sell and all those things.

4    Q.  Did anything in this paragraph make much sense to you?

5    A.  Not in terms of where we were at at that point, not to me.

6    Q.  Looking at Government Exhibit 166 --

7              MR. SOLOWIEJCZYK:  One moment, your Honor.

8    Q.  Dr. Penland, is 166 in front of you?

9    A.  No, sir.

10             MR. SOLOWIEJCZYK:  Your Honor, may we approach with

11   the exhibit.

12             THE COURT:  Yes, sir.

13   Q.  Dr. Penland, do you recognize this document?

14   A.  Yes, sir.

15   Q.  What is it?

16   A.  It's an e-mail exchange between myself and Patricia Tsien

17   and others.

18   Q.  Was there an attachment to this e-mail?

19   A.  Yes, there was.

20   Q.  What was that?

21   A.  It was a July 7 letter that I was asked to send on behalf

22   of our board.

23             MR. SOLOWIEJCZYK:  Your Honor, the government offers

24   Government Exhibit 166.

25             MR. DeMARCO:  No objection.

1          THE COURT:  Received.

2          (Government Exhibit 166 received in evidence)

3   Q.  Dr. Penland, looking at the top e-mail, 166.  I have an

4   attached an updated letter from TCIS officially approving the

5   new July 11, 2011 first draw, per the request from you and

6   Mr. Cosmo.  We truly hope that you can assist us with going

7   forward with our agreements on this date.

8          Dr. Penland, were you directed to do this by your

9   board of directors?

10  A.  I was.

11  Q.  Looking at the letter at the last page --

12         MR. SOLOWIEJCZYK:  If you could just zoom in.

13  Q.  -- who is the letter to?

14  A.  To William Cosme and to the others at the OmniHolding

15  Group, Thomas Cleveland, Jay Pak, Patricia Tsien.

16  Q.  This letter is much shorter than your last letter, is that

17  fair to say?

18  A.  Correct.

19  Q.  Is there any reason for that?

20  A.  I was told word for word what to write here.

21  Q.  We, Dr. Penland, and the TCIS BOT -- is that the board?

22  A.  That's correct.

23  Q.  -- have reviewed your request to have the date extended to

24  July 11, 2011 for the agreed-upon first draw date for the

25  funding for the Taejon Christian International School project.

```
 1                Dr. Penland, pausing there, if your school had not
 2     agreed to this extension, what was supposed to happen under the
 3     agreement?
 4     A.   We should have had our full deposit returned.
 5     Q.   Five and a half million?
 6     A.   That's correct.
 7     Q.   Your school was agreeing to another extension, is that fair
 8     to say?
 9     A.   We were.
10     Q.   We look forward to the good-faith completion of all
11     agreements by all parties.  In summary, we inform you today of
12     the following actions:  Grant additional grace days until July
13     11, 2011 per your request; accept compliance with the first
14     draw on July 11, 2011.
15                Giving them, in sum, another extension, is that right?
16     A.   That's correct.
17     Q.   Dr. Penland, if I could direct you to Government Exhibit
18     354, do you recognize that document?
19     A.   I do.
20     Q.   What is it?
21     A.   It's an e-mail from Patricia Tsien to me and from me to
22     Patricia Tsien.
23     Q.   Do you recall receiving these e-mails?
24     A.   I do.
25                MR. SOLOWIEJCZYK:  Your Honor, the government offers
```

Government Exhibit 354.

1                 MR. DeMARCO:  No objection.

2                 THE COURT:  Received.

3                 (Government Exhibit 354 received in evidence)

4    Q.  Dr. Penland, let's look at the e-mail at the bottom of the

5    first page.  This is from you, is that correct?

6    A.  That's correct.

7    Q.  When is this from?

8    A.  This is August 13, 2011, Saturday.

9    Q.  Thank you for your update to Mr. Thomas Hwang last

10   Thursday.  On behalf of our BOT and myself from your e-mail

11   below, can you now guarantee for our BOT and school community

12   that Mr. Cosmo and the auditors will be on site next week and

13   that a first draw would be forthcoming immediately, after their

14   visit, by the end of the week.  We are now approaching 60 days

15   past the June 17 date and must consider all options as our

16   school is at great risk.

17                 Dr. Penland, it's already August.  Has your school

18   asked for the money back yet?  Because your letter had said a

19   different date, correct?

20   A.  We had asked for him to comply on July 11.

21   Q.  He still hadn't complied, is that right?

22   A.  That's correct.

23   Q.  What were you told was going to be the last step before he

24   could comply?

1  A.  Say that again, sir.

2  Q.  What were you told was still going to be necessary before

3  he could provide the draw?

4  A.  Now he wanted an audit completed.

5  Q.  At this point had the school had to take any steps with

6  respect to the construction project?

7  A.  It had stopped.

8  Q.  It had to halt construction?

9  A.  Yes, sir.

10  Q.  Looking at the top e-mail, who is this from?

11  A.  Patricia Tsien.

12  Q.  Who is it to?

13  A.  To me.

14  Q.  Dr. Penland, Mr. Cosmo's team will definitely be on site

15  this coming week, as we said, and we will fund the first draw

16  immediately upon the successful completion of the audit.  But

17  we cannot guarantee that the first draw will be unconditionally

18  disbursed to TCIS by the end of the week, rather remains

19  dependent upon the actual completion of the audit.  The benefit

20  of the preaudit work conducted in NY is to ensure that the

21  onsite audit will move quickly along and so far no

22  insurmountable issues have been identified.

23       Ms. Tsien references some preaudit work that was being

24  done?

25  A.  Yes, sir.

1   Q.   Did you have any knowledge of what that referred to?

2   A.   I knew that Thomas Hwang was providing documents to them

3   and giving them information all along in late July and early

4   August, preparing for the audit.

5   Q.   Based on what Ms. Tsien is saying here, what sense did you

6   have about whether that was going poorly or well?

7   A.   Seemed to be going well.

8   Q.   Did you expect, based on this e-mail, that there would be

9   any issues?  No insurmountable issues have been identified.

10  A.   Based on the e-mail, no.  My own feelings, very skeptical

11  at this point, sir.

12  Q.   What were you skeptical?

13  A.   Because of the delays repeatedly on and on and all the

14  stuff.  We were getting scammed, from my point of view, at this

15  point.

16  Q.   But the decision was made to go forward with the audit, is

17  that correct?

18  A.   That's correct.

19  Q.   Sounds like you weren't necessarily the one recommending

20  that.  Is that fair?

21  A.   I recommended that we come to New York and meet with the

22  FBI and confront this situation.  I recommended that the last

23  week of June, sir.

24  Q.   Did you also recommend taking formal steps to return the

25  deposit.

1  A.  Of course, yes, sir.

2  Q.  Seeking the return.

3  A.  I had written that, yes, sir.

4  Q.  Who had primary responsibility for dealing with this audit?

5  A.  Mr. Thomas Hwang.

6  Q.  Did you have primary responsible for it?

7  A.  No, sir.

8  Q.  Did you have much in the way of contact with the audit

9  process?

10  A.  No, sir.  I met the auditor one time on the site for maybe

11  20 minutes.  Went out a second time on the site because I was

12  on the site and thought she would be there, but she wasn't

13  present at that time.  That's the only time I met with the

14  auditor.  And Thomas Hwang, he just kept telling me, we were

15  doing fine, the audit was going OK.

16  Q.  You mentioned you met the auditor.  How long did you meet

17  that person?

18  A.  About 20 minutes, maybe 15 or to 20 minutes.  Not long.

19  Q.  I am going to direct you to Government Exhibit 177.  Let me

20  know if you recognize that document.

21  A.  I do.

22  Q.  What is it?

23  A.  It's an e-mail from Thomas Hwang to the board and to me,

24  and it includes audit status report and there is an e-mail from

25  Joe Lovell to the board and me and Mr. Hwang.

1           MR. SOLOWIEJCZYK:  Your Honor, the government offers

2    Government Exhibit 177.

3           MR. DeMARCO:  No objection.

4           THE COURT:  Received.

5           (Government Exhibit 177 received in evidence)

6    Q.  Included with this e-mail, was there a letter from Cosmo

7    Dabi?

8    A.  Yes, sir.

9    Q.  Who is that letter addressed to?

10   A.  To me.

11   Q.  Did this letter overall pertain to the audit that was

12   conducted?

13   A.  Yes, it does.

14   Q.  Generally speaking, what did Mr. Cosmo tell you about the

15   audit?

16   A.  There were some things additionally that he needed.

17   Q.  Dr. Penland, had TCIS been subject to prior audits before

18   this?

19   A.  External financial audits were done for 20 years by

20   exemplary companies in Korea.

21   Q.  Who was TCIS's auditor at this time?

22   A.  Most recently that would have been KPMG at that time.

23   Q.  What, if any, had KPMG identified with respect to how TCIS

24   kept its record, its recordkeeping?

25   A.  Well, KPMG made certain recommendations to us regarding the

1    management of our business office and we followed up on those.

2    Our accounts were always in good shape and we passed audit

3    every time.  They did have management issues.  But their

4    biggest concern in 2010 was the funding of the project.

5    Q.  Did KPMG ever identify any serious issues with the method

6    in which TCIS was keeping records?

7    A.  Our business practice was excellent.

8    Q.  I am going to direct you to 179.  Do you recognize that

9    document, sir?

10   A.  Yes, sir.

11   Q.  What is that?

12   A.  This was what he called an audit cure report that was sent

13   to me, attachment from an e-mail from Patricia Tsien to our

14   board, copied to me and Mr. Hwang.

15           MR. SOLOWIEJCZYK:  Your Honor the government offers

16   Government Exhibit 179.

17           MR. DeMARCO:  No objection.

18           THE COURT:  Received.

19           (Government Exhibit 179 received in evidence)

20   A.  August 31.

21   Q.  Take a look at the first paragraph.  Attached as the cure

22   report prepared by Cosmo Dabi audit team which reports the

23   facts and highlights errors, omissions and deficiencies in the

24   way TCIS has been managing and controlling the new campus

25   construction.

1          Dr. Penland, at this point, when you received this
2   e-mail, did you believe Mr. Cosmo had identified real
3   deficiencies or did you believe something else?
4   A.   I believe that he had identified that we had a financial
5   need and a financial crisis at our school.  I don't think he
6   identified mismanagement or inappropriate business practice at
7   our school.
8   Q.   Why did the school find itself in a financial need?
9   A.   Because the loan or investor plan, the loan agreement had
10  failed to materialize, and we did not have the funding for the
11  project, and the project had stopped and we had spent
12  operational funds to keep that going because we believed there
13  would be a draw or a funding of the project.
14  Q.   The five and a half million dollars, did you have that
15  money back at this point?
16  A.   No, sir.
17  Q.   So you were out five and a half million at the moment?
18  A.   Yes, sir.
19  Q.   Looking at this letter that was attached, what was the
20  upshot of the letter?  Had you passed audit or had you failed
21  the audit?
22  A.   We had many things that needed to be cured or addressed in
23  order for him to be able to loan the money or fulfill his part
24  of the agreement.
25  Q.   Directing you to page 3 of the attached audit cure report.

1          MR. SOLOWIEJCZYK:  Mr. Lachow, if you could focus on

2     the paragraph that says remember.

3     Q.  Directing you to where it says:  Dr. Penland stated

4     emphatically and to us in December 2010 in New York that the

5     project was 85 percent complete and TCIS only required 35

6     million to complete phase I, including payback of existing

7     lenders.  Under Dr. Penland's management, he has twice stopped

8     the funding process by threatening to report Cosmo Dabi to U.S.

9     authorities for misconduct, etc., a completely baseless

10    allegation, and based on our agreements, he is required to

11    follow proper protocols upon any disagreements and which he has

12    completely ignored.

13         Dr. Penland, this portion of the report states that

14    you believed you only needed 35 million for phase I of the

15    project and somehow that was a misrepresentation.  Did you

16    believe that there was only 35 million needed for phase I?

17    A.  I actually thought it was less than that, between 20 and 30

18    million, more closer to 20.

19    Q.  Overall, that highlighted paragraph that's on the screen,

20    did you agree with any of the characterization of your actions

21    in that paragraph?

22    A.  No, sir.

23    Q.  Once you received this letter from Cosmo Dabi and from

24    Mr. Cosmo, what did you recommend to the board to be the

25    school's next step?

1   A.   Same as I had been recommending all along, that we proceed

2   with legally doing whatever we needed to do to try to address

3   the issue and hopefully get our funding back.

4   Q.   Did that include formally demanding the five and a half

5   million dollar deposit back?

6   A.   Sure.

7             (Continued on next page)

1    Q.  You could take a look at Government Exhibit 360.  Do you

2    recognize that document?

3    A.  Yes, I do.

4    Q.  What is it?

5    A.  It's an email from Patricia Tsien to me copied to Thomas

6    Hwang and to the board of trustees at TCIS and to CEO Cosmo

7    Dabi.

8            MR. SOLOWIEJCZYK:  Your Honor, the government offers

9    360.

10           MR. DeMARCO:  No objection.

11           THE COURT:  Received.

12           (Government's Exhibit 360 received in evidence)

13   Q.  So, focusing on the bottom half of the email.

14   A.  This include in here an email from Cosmo Dabi to Patricia

15   Tsien and sent to me.

16   Q.  Right, but let's look at the bottom email.

17   A.  That's the one I'm talking about.

18   Q.  Right.  So this was from Cosmo Dabi?

19   A.  Yes, it was.

20   Q.  This was then forwarded to you?

21   A.  Yes.

22   Q.  So this email reads, "Dear Dr. Penland/TCIS:  Please be

23   advised that you are in default of your obligations as per the

24   terms and conditions of the private funding and security

25   agreement dated January 19, 2011.  A certified hard copy has

1    been sent to you.  This default determination is based on the

2    audit results and is in effect as of 29 August 2011."

3            Dr. Penland, did Mr. Cosmo claim you were in default

4    in conjunction with receiving the audit findings?

5    A.  I assumed that's what it was connected to.

6    Q.  Now, at this point, once you got this email, what did you

7    expect to be the next natural step under your agreement?

8    A.  That he would return the funds and -- well, at this point--

9    Q.  Which funds?

10   A.  The private -- the equity deposit or the participation

11   deposit.

12   Q.  The five and a half million?

13   A.  $5.5 million.

14   Q.  Let's take a look at Government Exhibit 181.  Do you

15   recognize that document?

16   A.  I do.

17   Q.  What is it?

18   A.  It's minutes of an extraordinary board meeting for parents

19   to come in and address their concerns about the financial

20   condition at TCIS.

21   Q.  Were you present at this meeting?

22   A.  I was.

23   Q.  Is this document minutes of that meeting?

24   A.  It is.

25   Q.  Were those minutes kept in the regularly conducted activity

```
 1   of the school?
 2   A.  Sure.
 3           MR. SOLOWIEJCZYK:  Your Honor, the government offers
 4   181.
 5           MR. DeMARCO:  No objection.
 6           THE COURT:  Received.
 7           (Government's Exhibit 181 received in evidence)
 8   Q.  Dr. Penland, directing you towards the line towards the
 9   middle at the bottom that states "11 - 17."
10           The bottom part, Mr. Lachow.
11           "Voted to request the return of the deposit of
12   $5.5 million from Cosmo Dabi, Inc., New York City, New York
13   with the funds recovered paid to GSIS to help repay the TCIS
14   loan to GSIS."
15           So was a formal vote taken at that point?
16   A.  There was.
17   Q.  What did they vote?
18   A.  They voted unanimously to send a letter to Mr. Cosmo asking
19   for the participation deposit back.
20   Q.  That's the $5 and a half million deposit?
21   A.  It is.
22           MR. SOLOWIEJCZYK:  You can take that down, Mr. Lachow.
23
24   Q.  Can you take a look at 183, Dr. Penland?  Do you recognize
25   that document?
```

1    A.   183.  Yes, sir.

2    Q.   What is it?

3    A.   It's an email chain, all of it about the deposit return

4    request and the urgency of it and official letter from me

5    requesting the return.

6    Q.   You were a party to this email chain?

7    A.   Sure.  Yes.

8              MR. SOLOWIEJCZYK:  Your Honor, the government offers

9    183.

10             MR. DeMARCO:  No objection.

11             THE COURT:  Received.

12             (Government's Exhibit 183 received in evidence)

13   Q.   Looking at the top email, Dr. Penland.  This was from

14   Thomas Hwang.  What's the date of this email?

15   A.   September 1.

16   Q.   It reads, "Please deliver this request to Cosmo Dabi ASAP.

17   We would like the deposit to returned by the specified date in

18   the letter or ASAP."

19             Was there an attachment to this email?

20   A.   There was.

21   Q.   Looking at the last page of the document, who is this

22   letter from?

23   A.   This is from me.

24   Q.   Who is it to?

25   A.   To Cosmo Dabi, Inc., William Cosmo.

1   Q.  If you could focus on the first paragraph, Mr. Lachow.

2           So, "I, Dr. Thomas J. Penland, headmaster of TCIS,

3   hereby request the return of $5.5 million by September 21,

4   2011, which was deposited to JP Morgan Chase Bank N.A. on the

5   date of January 21, 2011 as specified in the attachment."

6           First of all, Dr. Penland, this was the formal request

7   for the return of the deposit.  Is that correct?

8   A.  Yes, this was authorized by the board of trustees, and I

9   was instructed by them and the parent group there to send it.

10  Q.  Why was a delay provided until September 21, 2011?

11  A.  That date was the date that Thomas Hwang negotiated with

12  them on a sort of agreed-upon date, September 21.

13  Q.  Then below this paragraph, is this just the information

14  about where the $5 and a half million deposit should be

15  returned?

16  A.  It gives our banking account, the KEB account.

17  Q.  Then looking at that last paragraph, "Although I am very

18  disappointed about funding delays since April of 2011, the

19  board has instructed me not to raise any legal issues against

20  Omni or Cosmo Dabi, Inc. about our funding agreement in the

21  future if you return our deposit by September 21, 2011."

22          Dr. Penland, is that consistent with what the board

23  has instructed you?

24  A.  That's correct.

25  Q.  Just seek the equity deposit back?

1   A.  Just try to get the money back.

2   Q.  So, if you could go back to the first page of the document,

3   the bottom half.  Was this Ms. Tsien's response to your letter?

4   A.  Yes, it was.

5   Q.  Looking at the second sentence, was it your understanding

6   that Omni would abide by the school's wishes?

7   A.  That is what she said.

8   Q.  Meaning what?  What did you understand that to mean?

9   A.  That they would abide by our wishes and return our funds.

10  Q.  And then the next paragraph said, "That said, Cosmo

11  suggests an exit meeting to provide concrete feedback and

12  recommendations that might be helpful to you as you move

13  forward with getting control over the project and completing

14  the development."

15       Did you ever have an exit meeting with Mr. Cosmo?

16  A.  No.

17  Q.  If you can take a look at 185.  Do you recognize that

18  document, sir?

19  A.  Yes.

20  Q.  What is it?

21  A.  It's an email from CEO Cosmo Dabi to Thomas Hwang copied to

22  me and others, some of our parents, our two parent leaders and

23  our board chair.

24       MR. SOLOWIEJCZYK:  The government offers 185, your

25  Honor.

```
 1              MR. DeMARCO:  No objection.

 2              THE COURT:  Received.

 3              (Government's Exhibit 185 received in evidence)

 4   Q.  When was this email sent, Dr. Penland?

 5   A.  September 3.

 6   Q.  And the letter you sent formally demanding back the equity

 7   deposit, was that sent a few days earlier?

 8   A.  September 1, it was an August 31 date on the letter, but

 9   the email date was September 1, Korea time.

10   Q.  In this email, Mr. Cosmo was writing to you, it appears, or

11   is it to Mr. Hwang?

12   A.  No, it's to Mr. Hwang.

13   Q.  If you could just read that for us?

14   A.  "Hello Thomas:  I will certainly address your deposit

15   within the time lines you all set within Dr. P's letter post

16   TCIS default.  Please forward this to Dr. P as well.  But no

17   more weekends after this one."

18   Q.  If you could turn to 186, Dr. Penland.  Do you recognize

19   that document?

20   A.  I do.

21   Q.  What is it?

22   A.  It's an email from CEO Cosmo Dabi to our board and to me

23   and Thomas Hwang copied to Patricia Tsien and Tom Cleveland.

24              MR. SOLOWIEJCZYK:  Your Honor, the government offers

25   186.
```

1            MR. DeMARCO:  No objection.

2            THE COURT:  Received.

3            (Government's Exhibit 186 received in evidence)

4   Q.  When was this email sent, Dr. Penland?

5   A.  This was on September 7.

6   Q.  What was the subject of this email?

7   A.  It was a discussion about the equity deposit, equity

8   deposit refund demand or request.

9   Q.  If we could look at the bolded paragraph about three

10  paragraphs down, Mr. Lachow.

11          "Please review the below facts which will hopefully

12  better aid you in understanding the situation as it currently

13  stands and how they have added layers of complexities to the

14  magnitude of the most challenging business issues you are

15  currently facing, all of which were created by TCIS."

16          Dr. Penland, at this time, did you believe that the

17  issues with respect to the funding of the loan had been created

18  by TCIS as Mr. Cosmo claims in this letter?

19  A.  No, sir.

20  Q.  What did you believe had created the issues, if anything?

21  A.  His inability to perform anything, to return anything.

22  Q.  Or to fund the loan, right?

23  A.  That's what I'm saying.  Even fund enough of the first draw

24  that we'd cover our original deposit.

25  Q.  Let's look at the paragraph numbered paragraph one.

1          "TCIS is aware and has acknowledged slipping into default

2     as clearly defined by the terms, conditions and definitions of

3     the private funding and security agreement executed on

4     January 19, 2011."

5          Dr. Penland, had TCIS acknowledged slipping into

6     default as Mr. Cosmo claims here?

7     A.  No one that I know, my board nor myself, had ever

8     acknowledged that.

9     Q.  Did you believe that TCIS had taken any actions that would

10    put it in default?

11    A.  No, sir.

12    Q.  And who did you think, if anybody, had defaulted on the

13    agreement by this point?

14    A.  Mr. Cosmo.

15    Q.  Take a look at paragraph two.

16         "TCIS has failed audit 1 of 4 required customary

17    financial and technical audits and has not permitted Cosmo Dabi

18    to perform any further required audits/due diligence after the

19    TCIS failure of audit 1."

20         Dr. Penland, in your view, at this point, was

21    discussion of any further audits relevant?

22    A.  Why am I getting audited?  I gave him $5 and a half

23    million.

24         MR. DeMARCO:  Objection, your Honor.

25    A.  And I just want the money back.

1          THE COURT:  Sir, would you be kind enough --

2          THE WITNESS:  I'm trying to be kind ma'am.

3          THE COURT:  I know that.  Would you listen to

4    counsel's question?

5          THE WITNESS: Yes, ma'am.

6          THE COURT:  And then answer that question?

7          THE WITNESS: Yes, ma'am.

8          MR. SOLOWIEJCZYK:  I'm going to rephrase the question,

9    your Honor.

10         THE COURT:  Go ahead, sir.

11   BY MR. SOLOWIEJCZYK:

12   Q.  Dr. Penland, in your view, given at this point TCIS had

13   decided not to move forward with the loan but instead was

14   requesting a return of their deposit, was the audit relevant at

15   that point?

16   A.  No, sir, I could not understand why we needed to be audited

17   to get our funds back.

18   Q.  Was an audit in your view only relevant if you were

19   continuing to seek a loan?

20   A.  That I could understand.

21   Q.  But if you were just seeking your deposit back, would an

22   audit be relevant?

23   A.  Not at all in my opinion.

24   Q.  Take a look at paragraph three.

25             "TCIS has not offered to and has declined to discuss

1    the cure to the failed audit."

2          Dr. Penland, once the school was told by Mr. Cosmo he

3    believed it had failed the audit, what did it ask for?

4    A.   We asked for our deposit back.

5    Q.   Take a look at paragraph four.

6          "Refund request.  By end of day September 9, 2011,

7    Cosmo Dabi will calculate the loss, expenses, etc. for Cosmo

8    Dabi as permitted in our agreements upon default, etc. ... and

9    assuming there is a true balance due TCIS, I would immediately

10   work to refund deposit monies ASAP."

11         Dr. Penland, at this point, when Mr. Cosmo said that

12   assuming "there is a true balance due," did that make any sense

13   to you?

14   A.   No, sir.  A full deposit return was what I understood was

15   the agreement.

16   Q.   Under the terms of that agreement we went over, did you

17   believe that if the first draw wasn't funded, that you were

18   entitled to your equity deposit back in full?

19   A.   Absolutely.

20   Q.   So this discussion of whether there was a true balance due,

21   did you believe that was consistent or inconsistent with your

22   agreement?

23   A.   Inconsistent.

24   Q.   If you could turn to paragraph 6.

25         "The current contract executed has been diminished in

1    value to a zero street value due to TCIS's default.  TCIS based

2    on material breach of contract, default and apparent false

3    statements made by your headmaster in our face-to-face meetings

4    with TCIS here in NYC prior to and after the execution of our

5    agreements, and the lack of transparency associated with the

6    November KPMG management letter.  It is customary for banks and

7    other private lenders to either sell the mortgage payments due

8    to them or, minimally, to retain the value of the future stream

9    of mortgage payment due them on the lender's balance sheet."

10         By the way, Dr. Penland, this first part of the

11   paragraph talks about false representations being made in New

12   York and the like.  Did you agree with that description of what

13   happened at the meeting?

14   A.  I did not.

15   Q.  Did you believe that you had been forthright during the

16   meeting?

17   A.  I had been forthright.

18   Q.  Let's continue.

19         "Given the doubtful ability of TCIS as of this time to

20   repay the loan, it would be dishonest for me to sell your

21   mortgage in the secondary market, and I certainly cannot place

22   it on my company's balance sheet.  Again, it is unfortunate

23   that Dr. Penland did not disclose TCIS's true status when we

24   met, as we would likely have been able to structure the

25   transaction to accommodate TCIS's situation."

1          Dr. Penland, I have a few questions about this.  First

2    of all, at this point, had any loan been provided?

3    A.  No, sir.

4    Q.  So was there any loan to resell in a secondary market?

5    A.  No, sir.

6    Q.  At this juncture, was TCIS even seeking a loan any more?

7    A.  No, sir.

8    Q.  What were you seeking?

9    A.  Our return of our deposit.

10   Q.  Mr. Cosmo's reference to a mortgage, was TCIS obtaining a

11   mortgage from Mr. Cosmo to your knowledge?

12   A.  No, sir.

13   Q.  If TCIS was no longer seeking a loan from Cosmo Dabi and

14   solely wanted its deposit back, did you have any understanding

15   of what Mr. Cosmo was referring to with respect to the stream

16   of mortgage payments he would be seeking to resell in a

17   secondary market?  Did that make any sense to you?

18   A.  None at all.

19   Q.  Looking at paragraph seven.

20          "If you wish to engage in some form of workout, I am

21   willing to consider such, but I cannot do anything that will

22   further compromise my position."

23          Dr. Penland, at this point, am I correct that

24   Mr. Cosmo's company still had your $5 and a half million?

25   A.  That's correct.

1    Q.  So when he referred to compromising his position, did you

2    have any understanding of what that meant?

3    A.  No, sir.

4    Q.  Moving to the next page, page 2., the top paragraph.

5            "The circumstances" -- if you could just focus on the

6    top paragraph, Mr. Lachow.

7            "The circumstances are unfortunate and exclusively due

8    to the challenges brought upon me by TCIS.  This is not a

9    failure of Cosmo Dabi to perform nor is it a crime committed by

10   Cosmo Dabi as some of you had indicated.  It is simply TCIS not

11   yet performing to the levels required to enable a $55 million

12   funding based on what all parties had contractually agreed

13   upon."

14           Dr. Penland, at this point, again, was TCIS asking for

15   a loan?

16   A.  No, sir.

17   Q.  You just wanted the deposit back.  Is that correct?

18   A.  That's correct.

19   Q.  Under your agreement, if the first draw wasn't paid by a

20   certain deadline, what were you entitled to?

21   A.  Full refund of our deposit.

22   Q.  And this last paragraph of the email, Mr. Cosmo offered to

23   have face-to-face meetings here in NYC, conference calls and/or

24   email exchanges if they will be productive."

25           Did you ever take Mr. Cosmo up on that offer?

```
 1   A.  I was told never to communicate again with him by our board

 2   of trustees.

 3   Q.  I am going to direct you to Government Exhibit 187,

 4   Dr. Penland.  Let me know once you've reviewed that document.

 5   Do you recognize that document, sir?

 6   A.  Yes, sir.

 7   Q.  What is it?

 8   A.  It's an exchange of email between CEO Cosmo Dabi and

 9   myself.

10          MR. SOLOWIEJCZYK:  Your Honor, the government offers

11   be Government Exhibit 187.

12          MR. DeMARCO:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 187 received in evidence)

15   Q.  Let's start with the email at the top from

16   CEO@CosmoDabi.com?

17          When did you receive this email

18   A.  September 7.

19   Q.  Do you recall receiving it?

20   A.  Yes, I do.

21   Q.  In this email of Mr. Cosmo -- CEO at Cosmo Dabi states, "In

22   expedited efforts to further address your request for refund

23   and meet your desired time lines, I will need from you a

24   current list of all TCIS assets, status and proofs of all the

25   assets before I can perform any more tasks related to the
```

1    refund request as they are related.  As per the terms of our

2    agreements, you do have obligations to properly address all

3    reasonable required requests which are due upon demand.  This

4    information has been requested in the past but never provided.

5    Call me any time to discuss."

6              Dr. Penland, given that at this point TCIS was seeking

7    a refund from Mr. Cosmo and not a loan, what did you think

8    about his request for your assets and proof of assets?

9    A.  Ludicrous, irrelevant.  We were well past that point.

10   Q.  Because if you're not seeking any loan from him, why would

11   he need any of that?

12   A.  Why would he.

13   Q.  Is that correct?

14   A.  That's correct.

15   Q.  At this point, had the school in fact actually started

16   looking for a loan from someone else?

17   A.  Oh, yes, sir.

18   Q.  Let's go to page 2 of this email exchange.  If you could

19   just focus on the first paragraph to start.  Sorry, the next

20   paragraph.  Starting with "I get the sense."  It's in the

21   middle of the paragraph, Mr. Lachow.

22             "I get the sense that you may have overlooked some of

23   the irrefutable facts surrounding this investment opportunity

24   for Cosmo Dabi in addition to your not addressing some of your

25   cure obligations, I tend to consider client default situations

1  very seriously and have also been very patient and flexible

2  with TCIS as well."

3          Dr. Penland, at this point did you think addressing

4  the cure obligations was relevant under the agreement?

5  A.  No, sir.

6  Q.  Because you weren't seeking a loan?

7  A.  I was not.  We were not.

8  Q.  Your school was not seeking a loan?

9  A.  We were not.

10 Q.  If we could look at paragraph number one on the bottom.

11         "Investment – the investment opportunity and ROI for

12 Cosmo Dabi is at a complete loss due to TCIS actions, inactions

13 and/or oversights."

14         Did that make any sense to you, Dr. Penland?

15 A.  No, sir.

16 Q.  Take a look at paragraph two.

17         "Default – TCIS is in legitimate default due to its

18 own actions, clear misrepresentations and/or oversights."

19         Dr. Penland, did you believe TCIS had defaulted?

20 A.  No, sir.

21 Q.  Under your agreement, what were you entitled to if you

22 didn't get the first draw?

23 A.  The full deposit back.

24 Q.  Looking at paragraph three.

25         "Refunds – I will be ready this week to have an open

1   discussion regarding your desires for refund.  Please

2   understand that the clear terms and conditions within our

3   executed agreements allow any and all of my expenses, costs,

4   cures, etc., be at your expense."

5           Dr. Penland, at this point, to your knowledge had

6   Cosmo Dabi incurred any significant expenses with regard to

7   providing you a loan?

8   A.  To my knowledge, no.

9   Q.  Was there a loan provided even?

10  A.  There was no loan provided.

11  Q.  At this point, in terms of the balance, you're minus

12  5.5 million and Cosmo Dabi is up 5.5 million, correct, to your

13  knowledge?

14  A.  Yes.  Yes.

15  Q.  What did you think when you read that paragraph?

16  A.  Yeah, it was unbelievable.

17  Q.  Then again if we look at paragraphs five and six on the

18  next page.  Again, Mr. Cosmo refers to here "cure and assets

19  list."

20          Dr. Penland, we've already discussed this, but at this

21  juncture, did you think that was relevant to receiving a

22  refund?

23  A.  I did not.

24          MR. SOLOWIEJCZYK:  One moment, your Honor.

25          THE COURT:  Yes, sir.

1    Q.  Dr. Penland, just a few last questions for you.

2    A.  OK.

3    Q.  Did TCIS ever receive any of the $5 and a half million of

4    its deposit back from Cosmo Dabi?

5    A.  We did not.

6    Q.  From William Cosmo?

7    A.  Nothing.

8    Q.  From any entities associated with William Cosmo?

9    A.  Nothing.

10   Q.  Is the school still out $5 and a half million as of this

11   day?

12   A.  We are.

13   Q.  Now, Dr. Penland, did the school ultimately successfully

14   complete the project?

15   A.  We did.

16   Q.  Did you find another source of financing?

17   A.  We found other Korean Christian leaders investors who came

18   in and invested.  They wanted to see the Christian tradition

19   and the natural education --

20          MR. DeMARCO:  Objection, your Honor.  Relevance.

21          MR. SOLOWIEJCZYK:  Your Honor, I can rephrase the

22   question.

23   Q.  My question is, did any other investors ultimately come in?

24   A.  Yes, they did.

25   Q.  Did they provide the funding necessary to complete the

1   project?

2   A.  We had multiple investors.  We chose the best investor for

3   us, and they did totally fund all that we needed to complete

4   the project, yes, sir.

5   Q.  In connection with providing you with funding, did those

6   investors conduct audits of your school?

7            MR. DeMARCO:  Objection.

8            MR. SOLOWIEJCZYK:  Your Honor, it's certainly

9   relevant.

10           MR. DeMARCO:  It's not relevant.

11           MR. SOLOWIEJCZYK:  It's relevant given that one of the

12  claims is that they failed an audit, the fact that they passed

13  a separate audit around this time.

14           THE COURT:  I'll permit it.  You may answer, sir.  Do

15  you have the question in mind?

16           THE WITNESS:  Yes.

17           THE COURT:  Go ahead.

18  A.  Yes, we were audited by all the investors that were looking

19  at our school, and we passed their audits, and we chose the

20  best choice for our school, the parents chose.

21  Q.  Now, this $5 and a half million, would you say that that's

22  a lot of money to your school?

23           MR. DeMARCO:  Objection.

24           THE COURT:  Mr. Solowiejczyk.

25           MR. SOLOWIEJCZYK:  Just the impact to the school --

```
 1                 THE COURT:  Relevance?

 2                 MR. SOLOWIEJCZYK:  Relevance is sort of how -- what

 3     steps they had to take as a result of all of this.  I can

 4     withdraw the question, your Honor.

 5                 THE COURT:  Yes.

 6     BY MR. SOLOWIEJCZYK:

 7     Q.  Last question, Dr. Penland.  Has your school ever received

 8     a loan from Cosmo Dabi or Mr. Cosmo?

 9     A.  No, sir, we have not.

10                 MR. SOLOWIEJCZYK:  Thank you.  No further questions.

11                 THE COURT:  All right.  Let's take a five minute

12     break, ladies and gentlemen, before we start cross-examination.

13     See you in five.

14                 (Recess)

15                 THE COURT:  Anything on the record, counsel?

16                 MR. DeMARCO:  No.  Thank you, your Honor.

17                 MR. BELL:  Nothing from the government.

18                 THE COURT:  Off the record.

19                 (Jury present)

20                 THE COURT:  We continue now with the cross-examination

21     of Dr. Penland.  Mr. DeMarco.

22                 MR. DeMARCO:  Thank you, your Honor.  May I inquire?

23                 THE COURT:  Yes, sir.

24

25
```

1    CROSS-EXAMINATION

2    BY MR. DeMARCO:

3    Q.  Good afternoon, Doctor.

4    A.  Good afternoon, sir.

5    Q.  I'm going to make a promise to you.  My promise is, I

6    really won't be as long as Mr. Solowiejczyk, OK?

7    A.  OK, sir.

8    Q.  But I want you to make a promise back to me.  If you don't

9    understand anything I ask, whether it be my Bronx accent or the

10   form of my question, ask me to rephrase it, OK?

11   A.  Yes, sir.

12   Q.  OK.  Now, you testified for just under a day, right?

13   A.  Yes, sir.

14   Q.  Give or take.

15   A.  Yes.

16   Q.  And it seems to me -- I'm going to ask if you agree with

17   this:  The quest to fund this new construction project at TCIS

18   and GSIS was shrouded by a cloud of urgency.  Would you agree

19   with that?

20   A.  Yes.

21   Q.  OK.  There was an urgency to get funding, correct?

22   A.  Yes.

23   Q.  Because in December of 2010, the goal of TCIS and you was

24   to have the construction completed by the fall of 2011,

25   correct?

1    A.   Yes.

2    Q.   OK.  So you had less than a year to work with, right?

3    A.   Correct.

4    Q.   Now, you also described your dealings with Omni, Thomas

5    Hwang -- am I pronouncing that correctly, Thomas Hwang or

6    Hwang?

7    A.   Hwang.

8    Q.   And ultimately with Cosmo Dabi, as I believe the term you

9    used was a trusting situation, correct?

10   A.   I --

11   Q.   At the beginning.

12   A.   I believe the trusting was referring to Thomas Hwang having

13   a family member in the organization.

14   Q.   OK.  We'll get to that.

15   A.   Yes, sir.

16   Q.   Now, I want to ask you a few questions about your

17   background, OK?

18   A.   Yes, sir.

19   Q.   You have been the headmaster at TCIS since 1996, correct?

20   A.   That's correct.

21   Q.   So, in December of 2010, you were the headmaster for

22   approximately 14 years at TCIS, correct?

23   A.   Correct.

24   Q.   It was a school accredited by United States Educational

25   Departments, correct?

 1   A.  Correct.

 2   Q.  It had over 400 students, correct?

 3   A.  Correct.

 4   Q.  From pre-K to twelfth grade, correct?

 5   A.  Correct.

 6   Q.  But your experience or your work at TCIS wasn't your first

 7   work as an educator, correct?

 8   A.  That's correct.

 9   Q.  Prior to TCIS, you were a principal at Grimsley Senior High

10   School in North Carolina, correct?

11   A.  Correct.

12   Q.  And that's the largest and oldest school in Gilbert County,

13   North Carolina, correct?

14   A.  Correct.

15   Q.  And while you were the principal there, it rose to become

16   one of the most prominent high schools in the entire state of

17   North Carolina, correct?

18   A.  It was already prominent.  I don't want to say that it rose

19   to that during my stay.  I was only there three years, but we

20   had a good three years there.

21   Q.  You had a good three years.  In fact, in 1995, you got the

22   principal of the year award, correct?

23   A.  That's correct.

24   Q.  Now, you also were the headmaster at a school in Malaysia,

25   correct?

 1   A.  That's correct.

 2   Q.  Was that before North Carolina or after North Carolina?

 3   A.  Before North Carolina.

 4   Q.  So before North Carolina, you were the headmaster at a

 5   school in Malaysia, correct?

 6   A.  That's correct.

 7   Q.  Did well there, right?

 8   A.  Yeah, I don't know what you mean by well, but was

 9   successful there, yes.

10   Q.  You were successful.  And from Malaysia, you went to North

11   Carolina correct?

12   A.  Correct.

13   Q.  And from North Carolina you went to South Korea, correct?

14   A.  Correct.

15   Q.  TCIS, right?

16   A.  Correct.

17   Q.  And you've been there since, right?

18   A.  Yes.

19   Q.  Now, you've also served as an adjunct professor at, at

20   least, two United States universities, correct?

21   A.  That's correct.

22   Q.  Your education, you went through with the government with

23   Mr. Solowiejczyk.  Do you remember that?

24   A.  Yes.

25   Q.  You have a master's degree from University of Georgia,

1    right?

2    A.   Correct.

3    Q.   In Athens, Georgia, right?

4    A.   That's correct.

5    Q.   And you got your doctorate from UNC Greensboro, correct?

6    A.   That's correct.

7    Q.   I want to ask you a few questions about your

8    responsibilities as the headmaster at TCIS, OK?

9    A.   OK.

10   Q.   As the headmaster at TCIS, you managed the school

11   operations, correct?

12   A.   That's correct.

13   Q.   You're in charge of hiring, correct?

14   A.   That's correct.

15   Q.   You are responsible for business management, correct?

16   A.   Correct.

17   Q.   You are responsible for the salary structure, correct?

18   A.   Correct.

19   Q.   You manage a fairly substantial school budget, correct?

20   A.   Correct.

21   Q.   Employee benefits, right?

22   A.   Yes, sir.

23   Q.   Health plans, stuff like that?  You manage that, correct?

24   A.   Not directly, but I oversee people responsible for that,

25   yes.

```
 1   Q.  You oversee that?

 2   A.  Yes, sir.

 3   Q.  Now, in 2004, you were at TCIS for about eight years at

 4   that time, correct, give or take?

 5   A.  Yes.

 6   Q.  The school was performing so well that the Korean

 7   government asked you to open up the sister school, correct?

 8   A.  That's correct.

 9   Q.  And the sister school is -- you're going to have to help me

10   with this.  GSIS, the G stands for what, Doctor?

11   A.  Gyeonggi.

12   Q.  The Gyeonggi Suwon International School, correct?

13   A.  That's correct.

14   Q.  Was opened at the behest of the Korean government, correct?

15   A.  Correct.

16   Q.  To provide a similar program that you've been providing at

17   TCIS, correct?

18   A.  That's correct.

19   Q.  The Korean government provides the land for the school,

20   correct?

21   A.  Yes.

22   Q.  And in or about 2006, GSIS opens its doors, correct?

23   A.  That's correct.

24   Q.  And it becomes the sister school of TCIS, correct?

25   A.  Correct.
```

1   Q.  And your title is the founder and headmaster of GSIS,

2   correct?

3   A.  GSIS, yes.

4   Q.  And within a year, the school performs so well, it gets

5   accredited by the United States Department of Education,

6   correct?

7   A.  That's correct.

8   Q.  Now, your responsibilities as the headmaster at GSIS are

9   similar to the responsibilities that you had as headmaster at

10  TCIS, correct?

11  A.  That's correct.

12  Q.  Business management, right?

13  A.  Yes, sir.

14  Q.  Hiring, correct?

15  A.  Yes, sir.

16  Q.  Finances, correct?

17  A.  Yes, sir.

18  Q.  Salary structure, right?

19  A.  Again, not directly managing them, but overseeing it.

20  Q.  You participated in the salary structure, correct?  You

21  oversaw it.  Is that your testimony?

22  A.  Yeah -- I don't directly do the H.R. department, but I

23  oversee the director of business, and in that way I would

24  oversee H.R.

25  Q.  You had to manage a substantial budget there as you did

 1   with the budget at TCIS, correct?

 2   A.  That's correct.

 3   Q.  The money, right?  You oversaw the money at both schools,

 4   correct?

 5   A.  Yes.  Not directly but oversaw it, yes.

 6   Q.  You were the headmaster.  You were the guy in charge,

 7   right?

 8   A.  Yes, sir.

 9   Q.  Now, the development of GSIS was incredibly rapid and

10   successful, correct?

11   A.  Correct, it was successful.

12   Q.  In fact, it was so successful, that it was unrivaled in all

13   of Korea, East Asia and perhaps the entire world.  Isn't that

14   correct?

15   A.  I wouldn't know that, sir.  It was successful.

16   Q.  Incredibly successful, correct?

17   A.  It was very successful.

18   Q.  OK.  You recruited quality administrators, correct?

19   A.  I tried to.

20   Q.  Quality faculty, correct?

21   A.  Correct.

22   Q.  And within a short time span from its opening, GSIS was

23   operating with a strong financial existence, correct?

24   A.  That's correct.

25   Q.  And you were the headmaster from its opening until 2011,

 1    correct?

 2    A.   That's correct.

 3    Q.   Now, there comes a time -- I'm going to now ask you some

 4    questions about the construction project for TCIS, OK?

 5    A.   Yes, sir.

 6    Q.   There comes a time in or about 2010 that -- withdrawn.

 7              TCIS was situated physically on land that had been

 8    owned by a church mission, correct?

 9    A.   That's correct.  It was owned by a church mission, yes,

10    sir.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   Q.  And since its existence until it moved in 2011, it was

 2   located on that land, correct?

 3   A.  Yes.  From 1958 until.

 4   Q.  2011?

 5   A.  Yes, sir.

 6   Q.  Over 50 years, correct?

 7   A.  Yes, sir.

 8   Q.  And there came a time that TCIS was -- I don't want to say

 9   evicted, but asked to leave that location, correct?

10   A.  There was a dispute about the land, yes, sir.

11   Q.  And some agreement was worked out whereby the adjacent

12   university to TCIS would give you some money, correct?

13   A.  There was a mediation process, yes, sir.

14   Q.  And you would receive eight and a half million dollars from

15   the university that you shared the land with, correct?

16   A.  That's correct.

17   Q.  And TCIS would have to find a new location and the location

18   sought -- the location found was in the Techno Valley region of

19   Suwon, correct?

20   A.  Taejon.

21   Q.  Taejon.  I'm sorry.  The Techno Valley section or region of

22   Taejon, correct?

23   A.  That's correct, sir.

24   Q.  Now, at that time Thomas Hwang was the business

25   administrator of GSIS, correct?

```
 1   A.  That's correct.

 2   Q.  And he had been in that position since roughly 2009, right?

 3   A.  I think so, sir.  I can't be sure.  I have not recalled

 4   that in a few years.  I would say that's ballpark close.

 5   Q.  Now, money was needed to fund this new construction,

 6   correct?

 7   A.  Yes, sir.

 8   Q.  Eight and a half million dollars wasn't going to do it,

 9   right?

10   A.  No, sir.

11   Q.  You testified on direct examination that you borrowed money

12   from a Korean financial institution.  Did you say that?

13   A.  Yes, sir.

14   Q.  How much did you borrow in U.S. dollars from that Korean

15   institution?

16   A.  Almost 10 million.

17   Q.  This was $10 million -- 10 million United States dollars

18   borrowed from a Korean bank.  Is that fair to say?

19   A.  KB, Kookmin Bank.

20   Q.  Would you consider that one of the larger banks in Korea?

21   A.  Yes.

22   Q.  Eight and a half million is given to you by the university,

23   correct?

24   A.  Yes, sir.

25   Q.  A good chunk of money is loaned to you by the bank,
```

1    correct?

2    A.   That's correct.

3    Q.   But you still need some more money, right?

4    A.   That's correct.

5    Q.   You need, in your estimation, at least $20 million to

6    complete that new construction in the Techno Valley, correct?

7    A.   Correct.  We had some cash reserves at that time that we

8    had designated for capital as well.

9    Q.   Now, at that time you knew Thomas Hwang for about 10 years,

10   correct, more or less?

11   A.   More or less, yes.

12   Q.   And he became aware that this additional money was needed

13   to fund the project, correct?

14   A.   Yes.

15   Q.   And you trusted Mr. Hwang, correct?

16   A.   I did.

17   Q.   And at the time the school was experiencing some financial

18   difficulties.  Would you agree with that?

19   A.   We were stretched with the project.  Other than that, we

20   were financially fine.

21   Q.   It's your testimony now that in or about December 2010 TCIS

22   wasn't experiencing financial difficulties, Doctor?

23   A.   We were aware at that point that part of our contractual

24   agreement for the construction of the new campus with the

25   construction company was funded -- was to be funded by the

1   construction company, and they had failed to at that point be

2   able to deliver anything towards that funding and so we

3   recognized that that was now doubtful and we needed to go and

4   get another way to fund the project.

5   Q.  To boil that down to two words, financial difficulties,

6   correct?

7   A.  With the project, yes, sir.

8   Q.  Now, you had the money given to you by the university,

9   correct?

10  A.  That's correct.

11  Q.  You had money loaned to you by a prominent reputable Korean

12  bank, correct?

13  A.  That's correct.

14  Q.  You needed more money to complete the project, correct?

15  A.  Yes.

16  Q.  But you didn't seek out traditional financing, did you?

17  A.  No, sir.

18  Q.  You didn't go to another prominent or reputable bank in

19  South Korea or anywhere else, did you?

20  A.  No, sir.  The loan was a credit loan and that was the

21  maximum that we could get with a credit loan.

22  Q.  From that bank, correct?

23  A.  We were not going to get one from another bank either.

24  Q.  That's not my question.  My question to you is, did you go

25  to any other bank seeking the additional funds for that

1   construction?

2   A.   Yes.   We had discussions with banks about funding, but that

3   wasn't possible.

4   Q.   Why wasn't it possible, Dr. Penland?

5   A.   We did not have collateral.

6   Q.   The reason you didn't go to any other banks or the

7   reason -- you did go to some other banks, correct?

8   A.   We talked with other banks.   We had limited collateral.

9   Q.   So you spoke to other banks about funding the balance of

10  the project, correct?

11  A.   Yes.

12  Q.   And you learned during those discussions that TCIS didn't

13  have the necessary collateral to qualify for the money needed

14  to finish out the project, correct?

15  A.   That's correct.

16  Q.   Traditional lending institutions such as banks were now out

17  of the question, correct?

18  A.   That's correct.

19  Q.   What about brokerage houses, the big brokerage houses, like

20  Morgan Stanley, things like that, did you go try that route?

21  A.   We did not.

22  Q.   Why didn't you?

23  A.   Because Mr. Hwang came with this plan really first in

24  September, October.

25  Q.   When you learned from other banks that you couldn't get the

1  money from them, Thomas Hwang approached you with an idea,

2  correct?

3  A.  Early October, yes.

4  Q.  An idea in late 2010 on how to obtain the money needed to

5  fund the balance of the project?

6  A.  That's correct.

7  Q.  Thomas Hwang had a relative on the board of trustees,

8  correct?

9  A.  Not at that time, but in the past his wife had served on

10  our board of trustees.

11  Q.  Thomas Hwang's wife had served on TCIS's board of trustees.

12  Is that your testimony?

13  A.  As a parent representative, yes, sir.

14  Q.  Do you recall the time frame when she was on the board?

15  A.  I can't recall off the top of my head, sir.  I am going to

16  guess mid 2000s, 6, 7, somewhere in there.

17  Q.  If his wife was on as a parent on the board, would it be

18  fair to say that Mr. and Mrs. Hwang had a child who went to the

19  school?

20  A.  To TCIS?

21  Q.  Yes.

22  A.  Yes.  And then went to GSIS when they were in that school.

23  Q.  So you need this additional money to expand, correct?

24  A.  That's correct, sir.

25  Q.  Thomas Hwang was aware that you needed this money to

1    expand, correct?

2    A.   That's correct.

3    Q.   You had brought this to his attention or you learned about

4    it from some other means, if you know?

5    A.   Restate that.

6    Q.   How did Thomas Hwang come to know that you needed more

7    money?

8    A.   Thomas Hwang came to know we needed more money from me and

9    from others that we are talking about in both communities that

10   we needed funding for the project.

11   Q.   It was common knowledge --

12   A.   Among the leadership team.

13   Q.   You have to let me finish.

14   A.   I'm sorry.  Fair enough.

15   Q.   Would it be fair to say it was common knowledge in the TCIS

16   and GSIS communities that additional monies were needed to fund

17   the project?

18   A.   It was common knowledge among our board members and among

19   our leadership team for sure.

20   Q.   And would you consider Mr. Hwang to be a member of the

21   leadership team?

22   A.   He was a member of our leadership team at GSIS at that

23   time, yes, sir.

24   Q.   Now, did you consider Thomas Hwang a friend?

25   A.   Sure.

1   Q.  So not only was he a business associate or a colleague, he

2   was also your friend, correct?

3   A.  He was a friend, sure.

4   Q.  And you trusted him, correct?

5   A.  I trusted him.

6   Q.  And that's why when you testified on direct examination

7   that this was a trusting situation, this is kind of what you

8   were referring to, correct?

9   A.  Yes.

10  Q.  You trusted Mr. Hwang and you trusted that he wouldn't lead

11  you knowingly in the wrong direction.  Is that fair?

12  A.  Fair.

13  Q.  Now, in discussing this financing with Mr. Hwang you

14  learned of a man by the name of Jay Pak, correct?

15  A.  That's correct.

16  Q.  And you learned that Jay Pak was Mr. Hwang's

17  brother-in-law, correct?

18  A.  That's what I was told, yes.

19  Q.  Was Jay Pak the brother of Mr. Hwang's wife who served on

20  the board?  Do you know?

21  A.  I don't know.

22  Q.  But you did learn during the course of these discussions

23  that Jay Pak was Mr. Hwang's brother-in-law, correct?

24  A.  Yes.

25  Q.  And you also learned of a man by the name of William Cosme

1   or Cosmo, correct?

2   A.  I did.  It was Cosmo.

3   Q.  You learned of the company by the name of Omni, correct?

4   A.  I did.

5   Q.  You learned that Jay Pak worked for Omni, correct?

6   A.  You are correct.

7   Q.  OmniHoldings.  Was that the proper name?

8   A.  OmniHoldings group I think was the name.

9   Q.  I'm going to refer to them as Omni.  OK, Doctor?

10  A.  OK.

11  Q.  You learned that Jay Pak worked for Omni, correct?

12  A.  Yes.

13  Q.  A financial company or investment company located in New

14  York City, correct?

15  A.  That's correct.

16  Q.  And there came a time, as far as you know, that Thomas

17  Hwang informed his brother-in-law, Jay Pak, that you guys were

18  looking for some financing, correct?

19  A.  I assume that's correct, yes, sir.  That's correct.

20  Q.  And through Thomas Hwang you learned of an opportunity to

21  borrow the money needed to complete the project, correct?

22  A.  Potentially, yes.

23  Q.  And you didn't need 55 million, correct?

24  A.  No, sir.

25  Q.  But was it Mr. Hwang or Mr. Pak who recommended the $55

 1   million loan amount?

 2   A.  Mr. Hwang told me that Omni and the investor wanted the

 3   loan to be 100 million, and I told him that was impossible.  I

 4   would not get that approved.  It came down to 70 million and

 5   then it came down to 55 million.  My conversations were with

 6   Mr. Hwang.  I never had a conversation with Mr. Pak about any

 7   of that.

 8   Q.  You agreed upon the $55 million as the number that you

 9   would seek to borrow from the people or persons that Omni put

10   you in contact with in New York City, is that correct?

11   A.  That's correct.

12   Q.  Omni would serve as the intermediary in this deal, correct?

13   A.  Yes, sir.

14   Q.  And the person at the point of Omni who you dealt with was

15   Patricia Tsien, correct?

16   A.  Most of the time, yes, sir.

17   Q.  In fact, would you agree that most of the correspondence,

18   whether it be by e-mail, letter, face-to-face conversations,

19   was between you and Ms. Tsien of OmniHoldings with respect to

20   this deal?

21   A.  With my interfacing with him?

22   Q.  Yeah.

23   A.  Me or all the other communications going on?

24   Q.  You.  You dealt primarily and the majority of the times

25   with Ms. Tsien, as evidenced in all the e-mails we saw today?

1   A.  Exactly.  I would say with e-mails particularly and digital

2   communication, it was through Ms. Tsien to either Thomas or to

3   me directly and back and forth to Thomas or through me

4   directly.

5   Q.  And only very few, if any, direct correspondence that you

6   had with Mr. Cosmo or Cosme, correct?

7   A.  Direct correspondence with him was much less than

8   Ms. Tsien.

9   Q.  Significantly less, right, Doctor?

10  A.  It was much less.

11  Q.  I'm assuming that Mr. Hwang was excited by the prospects of

12  finding someone who could give you this loan, correct?

13  A.  Sure.

14  Q.  Because getting this loan meant that the project could

15  continue and be completed, correct?

16  A.  Correct.

17  Q.  And everyone associated with TCIS and GSIS were anxious to

18  get this project funded and completed, correct?

19  A.  That's correct.

20  Q.  It was an important step in the growth of TCIS.  Would you

21  agree with that?

22  A.  I would agree, yes.

23  Q.  Now, all that would be needed from TCIS to obtain this $55

24  million loan was a 10 percent deposit, correct?

25  A.  5.5 million participation deposit.

1  Q.  You taught math.  Do you remember that, Doctor?

2  A.  Yes, I did.

3  Q.  10 percent of 55 million would be that 5.5 million,

4  correct?

5  A.  There you go.  Middle school math, junior high.

6  Q.  That's OK.  That's as far as I go.

7       This was beautiful.  This was a great deal for your

8  school, correct?

9  A.  We were happy.

10  Q.  You were going to get a $55 million loan, correct?

11  A.  That's direct.

12  Q.  By only putting down 10 percent, correct, right?

13  A.  Correct.

14  Q.  And the interest rate would only be 4 percent on that loan,

15  correct?

16  A.  Correct.

17  Q.  What interest rate was that Korean bank charging you on the

18  money that they had loaned you for this project?

19  A.  It was a credit loan and it was 7 percent.

20  Q.  We are talking a lot of money when we are talking about

21  that sum of money, correct?

22  A.  Correct.

23  Q.  You also learned through Mr. Hwang that Cosmo or Cosme had

24  invested in South Korea prior to this, correct?

25  A.  That's correct.

1  Q.  In fact, Thomas Hwang showed you a newspaper article where

2  Cosmo invested in Kunsang, Korea, correct?

3  A.  Kunsang.

4  Q.  I'm from the Bronx.

5  A.  That's OK.  It was also -- there was information about

6  investment in the Lotte Group on the website.

7          THE COURT:  Mr. DeMarco, may I ask you to spell that,

8  despite being from the Bronx, for the reporter.

9  Q.  Kunsang.  Correct me if I am wrong, Doctor, K-u-n-s-a-n-g?

10 A.  That's close enough.

11         THE COURT:  Thank you.

12 Q.  Also, you learned about Cosmo through Thomas Hwang and his

13 brother-in-law, Jay Pak, correct?

14 A.  Yes, sir.

15 Q.  And you learned through Thomas Hwang and from others that

16 Cosmo or Cosmo Dabi worked with investors around the world,

17 correct?

18 A.  Correct.

19 Q.  It was located in New York City, correct, Cosmo Dabi?

20 A.  The information I had and where I went, yes, new York City.

21 Q.  The information that you had was that this company that

22 went by the name Cosmo Dabi was located on Wall Street,

23 correct?

24 A.  That's correct.

25 Q.  In the heart of the financial center in New York, correct?

 1   A.   That's correct.

 2   Q.   And that this company not only invested in projects in

 3   South Korea but throughout the world, correct?

 4   A.   That's correct.

 5   Q.   That Cosmo Dabi was an influential global player.  That's

 6   what you said on direct examination, correct?

 7   A.   That's what the website said.

 8   Q.   And that's what you believed, correct?

 9   A.   That's correct.

10   Q.   Now, since you couldn't get the loan from traditional

11   lenders, correct, it was time to be creative, right?

12   A.   We were looking for lots of different ways to try to find

13   an investor to help us with the project.

14   Q.   The bank route was exhausted, correct?

15   A.   That was not going to happen.

16   Q.   The money from the university that was given, that was all

17   you were going to get, correct?

18   A.   Yeah.

19   Q.   It was time for TCIS, Dr. Penland and the board of trustees

20   of that school to come up with a creative strategy to borrow

21   the money needed to complete that project, correct?

22   A.   That's correct.

23   Q.   And Thomas Hwang, who you trusted, and his brother-in-law,

24   Jay Pak, who worked for Omni in New York City, came up with

25   just a creative plan that you were looking for, right?

1    A.  Yes, sir.

2    Q.  A low-interest loan with 10 percent down, correct?  Right,

3    Doctor?

4    A.  Yes, that's correct.

5    Q.  And it was your understanding that within 90 days after you

6    deposited that 10 percent or $5.5 million, you would get your

7    first draw on that $5 million loan, correct?

8    A.  60.  60 business days.

9    Q.  And given this air of urgency that was surrounding this

10   project, this was a great deal, correct?

11   A.  It looked that way to us, yes, sir.

12   Q.  And you were anxious to make it happen, right?

13   A.  We were very interested.

14   Q.  Would you consider yourself to be desperate?

15   A.  We needed to find a lender.  I would concede that or else

16   we were going to have to stop the project, and that had

17   negative ramifications as well.

18   Q.  You needed to find a lender and you needed to find one

19   fast, is that correct?

20   A.  Correct.

21   Q.  Otherwise you would suffer the consequences, correct?

22   A.  We would have to stop the project.

23   Q.  You would stop the project and you said negative

24   implications?

25   A.  Yeah, sure.

1   Q.  Because you just wanted to finish by the fall of 2011,

2   correct?

3   A.  We needed to relocate our campus in the best interests of

4   the school.

5   Q.  When you heard about this opportunity with Cosmo Dabi and

6   OmniHoldings acting as the intermediary to borrow $55 million

7   at a 4 percent interest rate with only $5.5 million down, you

8   brought this plan to the board of trustees?

9   A.  Eventually, yes, we did.

10  Q.  You presented it to the board of trustees, which is

11  comprised of five independent people, correct?

12  A.  No, sir.

13  Q.  What is incorrect about that?

14  A.  There would be nine members on the board of trustees along

15  with two parents from Suwon, when the Suwon board met, and two

16  parents from Taejon, when the Taejon board met.  The nine

17  members were mission appointed and they served on both boards.

18  Q.  I apologize.

19  A.  No problem.

20  Q.  So you presented this plan to the board of trustees and you

21  were given the go-ahead to pursue it, correct?  Is that fair?

22  A.  They approved the agreement and moving forward with it.

23  Q.  You brought it to the board of trustees before you traveled

24  to New York City in December of 2010, right?

25  A.  No, sir.

1    Q.   That was after?

2    A.   They knew about it.  I had informed the board that we had

3    the possibility.  They knew I was going to New York that

4    weekend of the 10th.  We knew we had a board meeting on

5    December 16 scheduled, and I would come back and make some kind

6    of recommendation.  The New York trip was sort of verifying

7    this was the real thing.

8    Q.   So it would be fair to say that before you traveled to New

9    York in December 2010 to meet with OmniHoldings, you ran this

10   by the board of trustees, correct?

11   A.   They knew that we were talking with an asset investor and

12   about doing a loan, yes.

13   Q.   And they knew because you told them, right?

14   A.   That's correct.

15   Q.   So you ran it by them, right?

16   A.   That's correct.  I didn't have the details of the agreement

17   at that point.

18   Q.   I'm not saying that you did.

19   A.   But they knew I was searching for a loan and searching in

20   New York --

21   Q.   They knew that in December 2010, when you were coming to

22   New York and meeting on John Street with OmniHoldings, they

23   knew why you were coming?

24   A.   Absolutely.

25   Q.   They knew you were pursuing this possibility of obtaining a

1   loan at 4 percent interest, correct?

2   A.   They were missionaries.  They were praying for it.

3   Q.   And after meeting with OmniHoldings and Mr. Cosmo, it was

4   your belief that your prayers have been answered, right?

5   A.   I came back and encouraged the board to approve the deal.

6   Q.   In your mind, your prayers had been answered, right?

7   A.   Yes, sir.

8   Q.   Let's talk about December 2010.  Let's first talk about the

9   meeting with OmniHoldings.

10          Now, would it be fair to say that the meeting with the

11  folks from Omni and with Mr. Cosmo at JFK, they occurred on the

12  same day?

13  A.   That's correct.

14  Q.   You first meet with the folks from OmniHoldings at their

15  office on John Street, correct?

16  A.   Yes.  I believe it was John Street.

17  Q.   And for the first time you meet Jay Pak, correct?

18  A.   That's correct.  I had met him at the hotel in Teaneck, New

19  Jersey the day before.  The hotel over there we had met in the

20  lobby for just like 10 minutes and had been introduced.

21  Q.   And Jay Pak is part of OmniHoldings, correct?

22  A.   That's correct.

23  Q.   You would agree that for the first time at the OmniHoldings

24  conference room you meet Patricia Tsien and Tom Cleveland for

25  the first time, correct?

```
 1    A.   That's correct.

 2    Q.   You go into this impressive building on John Street in New

 3    York City, correct?

 4    A.   Not so impressive.

 5    Q.   I'll bet you the rents were impressive.

 6    A.   I don't know.

 7    Q.   You meet in a conference room with people from

 8    OmniHoldings, correct?

 9    A.   That's correct.

10    Q.   And would it be fair to say that it's a conference room in

11    an office building, correct?

12    A.   No, sir.

13    Q.   You said something about art storage going on there.  Do

14    you remember that?

15    A.   Yes.

16    Q.   It was a conference room, right?

17    A.   Sort of.

18    Q.   What do you mean sort of?  Was there a table?

19    A.   There was a table, there were chairs around, but it was a

20    unique environment there.  I don't know how to describe it.

21    But not as fancy as this courtroom.

22    Q.   Unique in what respect, Doctor?  Was there a table and

23    chairs?

24    A.   Absolutely.

25    Q.   Was it heated?
```

```
 1   A.  Yes, sir.

 2   Q.  Was there a carpet on the floor?

 3   A.  Yes.

 4   Q.  Was there a door?

 5   A.  Yes.

 6   Q.  Did you get up there by an elevator?

 7   A.  No, sir.  We climbed stairs.

 8   Q.  But you have a meeting in that conference room with

 9   OmniHolding, correct?

10   A.  With those people.

11   Q.  Tsien?

12   A.  Ms. Tsien.

13   Q.  Cleveland, right?

14   A.  Mr. Cleveland.

15   Q.  Mr. Pak?

16   A.  Mr. Pak.

17   Q.  And also present are yourself?

18   A.  Myself.

19   Q.  Thomas Hwang?

20   A.  That's correct.

21   Q.  Anyone else?

22   A.  No, sir.  There was a clerk that came in and out some.

23   Q.  Was it like a busy office?

24   A.  No, sir.

25   Q.  Now, you would agree that from the very moment you met
```

1    Ms. Tsien she was the person in charge?

2    A.  At the meeting?

3    Q.  At the meeting and every point thereafter.

4    A.  Yes, sir.

5    Q.  She did most of the talking, right?

6    A.  At that meeting, yes, sir.

7    Q.  At that meeting you discussed your project in Taejon,

8    correct?

9    A.  We did.

10   Q.  You talked about the need for investors to provide you with

11   the funding to complete the project, correct?

12   A.  That's correct.

13   Q.  And Ms. Tsien at that meeting spoke about a Mr. Cosmo,

14   correct?

15   A.  That's correct.

16   Q.  You learned at that meeting that Mr. Cosmo invested in

17   Asian projects, correct?

18   A.  That's correct.

19   Q.  You also learned in your conversations with Ms. Tsien that

20   Mr. Cosmo was an investor, right?

21   A.  Yes.

22   Q.  He was someone who dealt with currency, correct?

23   A.  Yes.

24   Q.  He dealt with jewels, correct?

25   A.  Correct.

1   Q.   He also dealt with minerals, correct?

2   A.   Yes.

3   Q.   And you also learned, most importantly, that Mr. Cosme was

4   interested in giving you a loan to complete the construction

5   project, correct?

6   A.   That's correct.

7   Q.   That's why you were there, right, Doctor?

8   A.   That's why we went there.

9   Q.   Now, that meeting at Omni's offices lasts one to two hours.

10  Is that fair?

11  A.   Yes.  Closer to two, probably.

12  Q.   You learn about Mr. Cosmo at that meeting, correct?

13  A.   I learned more about him, yes.

14  Q.   You talk about your needs in order to complete the project,

15  correct?

16  A.   Correct.

17  Q.   You talk about the goals and the mission of TCIS, correct?

18  A.   Some.  More at the other meeting.

19  Q.   That was an important part of it, correct?

20  A.   Yes.

21  Q.   Now, you also, and correct me if I'm wrong, when you were

22  talking with Ms. Tsien, she was concerned about the risks of

23  investing in that project, correct?

24  A.   I don't recall that.

25  Q.   There came a time where she suggested Mr. Cosmo, correct?

 1    A.   Can you repeat that again.

 2    Q.   There came a time when she suggested Mr. Cosmo, correct?

 3    A.   Correct.

 4    Q.   There came a time when you met with Mr. Cosme, correct?

 5    A.   That's correct.

 6    Q.   Was it December 16 you said Dr. Penland, 2010, when that

 7    you had that meeting.  Do you recall?

 8    A.   The board meeting?

 9    Q.   No.  The meeting at OmniHoldings.

10    A.   No.  It was around December 10.  The board meeting was

11    December 16.

12    Q.   Instead of going to Cosmo Dabi's offices on Wall Street,

13    you go to the departure lounge at JFK Airport after that

14    meeting, correct?

15    A.   Yeah.  It wasn't a departure lounge.  It was premier member

16    lounge.

17    Q.   Call it what you want.  It's where people wait before they

18    depart on flights, correct?

19    A.   Not everyone can go there.  It's a private club.

20    Q.   Within the airport, correct?

21    A.   Yes.  American Airlines admiral lounge area.

22    Q.   You don't meet in an office building, correct?

23    A.   No, sir.

24    Q.   You don't meet in a conference room in a walk-up anywhere,

25    correct?

```
1    A.  No, sir.

2    Q.  You meet in the executive lounge at the American Airlines

3    terminal at JFK, correct?

4    A.  That's correct.

5    Q.  When you met with the Korean bank that loaned you the

6    money, did you meet with them in the executive lounge of an

7    airport?

8    A.  No, sir.

9    Q.  Where did you meet the bank reps?  Kookmin Bank, was that

10   the name of the bank?

11   A.  Kookmin Bank.

12   Q.  Where did you meet with them when you discussed financing

13   the construction project?

14   A.  In my office, in my conference room.

15   Q.  In your conference room, right.

16          Now, you arrive at the American Airlines terminal at

17   JFK, correct?

18   A.  Yeah.  It was a terminal at JFK that served American

19   Airlines.

20   Q.  And I believe it was your testimony on direct examination

21   you have to talk your way into this executive lounge?

22   A.  They had gotten preclearance for us because we didn't have

23   boarding passes and to get back into that area you needed

24   preclearance.  So Ms. Tsien or someone had arranged for us to

25   get back there, so we had to go through security that way.
```

```
1    Q.  So you ultimately find your way into that lounge, correct?

2    A.  That's correct.

3    Q.  You order your hors d'oeuvres, correct?

4    A.  Someone did.

5    Q.  You get a couple of sodas, right?

6    A.  That's correct.

7    Q.  There comes a time when Mr. Cosmo shows up?

8    A.  He does.

9    Q.  How long are you waiting in that lounge before he shows up?

10   A.  20 to 30 minutes.

11   Q.  Once he arrives, it's Mr. Cosmo, right, you, correct?

12   A.  That's correct.

13   Q.  Ms. Tsien is still there, correct?

14   A.  Correct.

15   Q.  Mr. Pak?

16   A.  Yes.

17   Q.  Mr. Cleveland?

18   A.  Yes.

19   Q.  And who am I leaving out?

20   A.  Mr. Hwang.

21   Q.  You have this meeting in the lounge, correct?

22   A.  Yes.

23   Q.  And you discuss the project, correct?

24   A.  That's correct.

25   Q.  Now, the purpose of that meeting, in your mind, was to meet
```

1    this Cosmo guy, right?

2    A.   That's correct.

3    Q.   And to see if he actually existed.  Is that a fair

4    statement?

5    A.   That was one of the objectives, yes, sir.

6    Q.   And the final and most important objective, if he existed,

7    was to convince him to invest in your project, right?

8    A.   That was an objective, yes, sir.

9    Q.   Now, you would have been given a pep talk by Ms. Tsien and

10   Mr. Cleveland about dealing with Mr. Cosme, right?

11   A.   I had.

12   Q.   Remain positive, right?

13   A.   That's correct.

14   Q.   And your testimony was to sell your philanthropic work.  Do

15   you remember saying that on your direct examination?

16   A.   Highlight it, sell it.

17   Q.   In fact, that's what you did.  You remained positive,

18   right?

19   A.   I did.

20   Q.   And you sold the TCIS school for its philanthropic and

21   other work, correct?

22   A.   Yes.  I let them -- that was the highlight of my

23   discussion, my conversation.

24   Q.   I believe you testified on direct examination that that

25   meeting lasted approximately an hour, maybe a little bit

1   longer?

2   A.  About an hour, I think.  It was shorter than the other

3   meeting.

4   Q.  And during that meeting you talked about TCIS, right?

5   A.  I did.

6   Q.  You described its history to Mr. Cosme, correct?

7   A.  To some extent, yes.

8   Q.  You described the mission statement of the school, correct?

9   A.  I did.

10  Q.  And you also talked about your background, correct?

11  A.  Talked about my background?

12  Q.  Yes.

13  A.  To some extent, yes.

14  Q.  There was a little discussion had about investments,

15  correct?

16  A.  Not that much.

17  Q.  Very little, right?

18  A.  Not much.

19  Q.  You go to meet this man in the executive lounge in an

20  effort to borrow $55 million, correct?

21  A.  That's correct.

22  Q.  And there is not much talk about investments, correct?

23  A.  Not at that meeting.

24  Q.  At that meeting it was agreed upon or decided that you

25  would enter into an agreement whereby TCIS would borrow $55

1    million, correct?

2    A.  Yes.  We borrow 49.5 and we would put down a 5.5 million

3    deposit.

4    Q.  The 49.5 plus the 5.5?

5    A.  Is 55.

6    Q.  At a very good interest rate, 4 percent, correct?

7    A.  That was attractive to us.

8    Q.  No prepayment penalty, which was very important to you,

9    correct?

10   A.  Very important to us.

11   Q.  And you understood that nothing would happen with respect

12   to the loan being funded until at least 60 days after the $5.5

13   million was wired to Mr. Cosmo, correct?

14   A.  Yes, sir.  We understood that.

15   Q.  You also understood that the reason you were getting this

16   very competitive interest rate was because the school's mission

17   was philanthropic or religious, correct?  That was one of the

18   reasons, correct?

19   A.  According to him, he wanted to help a school, help

20   education, help a Christian institution.  That was his interest

21   area.  It wasn't just a business deal.

22   Q.  I'm getting there.  I'm just thinking of the question.

23   This is an important phase in the history of TCIS.  Would you

24   agree with that, the new construction project?

25   A.  Yes, sir, I would agree with that.

1    Q.  You are considering investing or depositing $5.5 million

2    into the accounts of someone you just met at the airport,

3    correct?

4    A.  That's correct.

5    Q.  And it would be fair to say you did not ask Cosmo a lot of

6    questions, right?

7    A.  I did not.

8    Q.  Because he had learned from Ms. Tsien that Mr. Cosme was

9    very sensitive, right?

10   A.  That's correct.

11   Q.  So rather than offend him and risk blowing this wonderful

12   deal, you asked him very little questions, correct, very few

13   questions, right?

14   A.  That's correct.

15           MR. DeMARCO:  Tim, could you put up Government Exhibit

16   107.

17   Q.  Why don't you look at what's in evidence as Government's

18   Exhibit 107, Doctor.

19   A.  Sure.

20   Q.  That's an e-mail that you received from Thomas Hwang dated

21   Saturday, December 4, 2010, correct?

22   A.  I can't see it yet.  It's not on this screen.

23   Q.  Sorry, Doctor.

24   A.  Can you make it larger.  Yes, I can see it.

25   Q.  It's an e-mail you received from Mr. Hwang on December 4,

1    2010, correct?

2    A.  Correct.

3    Q.  And in that e-mail is the website to Cosmodabi.com,

4    correct?

5    A.  Correct.

6    Q.  You received that e-mail at least -- is it about a week

7    before you come to New York?

8    A.  It's just a few days before the meeting.

9    Q.  So you have the website information in your possession

10   before you go out to that meeting, correct?

11   A.  I didn't print it out, but, yes, I had been on the site.

12   Q.  You went to the site when you received that e-mail?

13   A.  I did.

14   Q.  You went to the site before you visited with the folks in

15   New York City.  Is that what you are saying?

16   A.  Yes, sir.

17   Q.  Would it be fair to say that you relied predominantly on

18   Pat Tsien, Jay Pak, and Thomas Hwang as the references for

19   Cosmo Dabi?  Would that be a fair statement?

20   A.  It was a combination of the information from the website,

21   the information from those parties that I was relying on, and

22   certainly Thomas Hwang and his family relationship was a strong

23   piece of that.

24   Q.  A strong piece of it was Mr. Hwang's family relationship,

25   correct?

1    A.   Yes.

2    Q.   Another piece was the word or the meeting you had with

3    Ms. Tsien and Mr. Cleveland, correct?

4    A.   That was later, after I got to New York.  I didn't really

5    have an impression of them until that meeting.  They were

6    articulate in the meeting and seemed bright.

7    Q.   But it would be fair to say that before coming to New York

8    City and also after leaving New York City, you had access to

9    the Cosmo Dabi website, correct?

10   A.   I did, yes, sir.

11   Q.   I believe it was your testimony on direct examination that

12   you went through that website carefully, correct?

13   A.   I went through it multiple times.  I recall very clearly

14   the first time actually hitting it and going through every page

15   of it.  I went through it multiple times.

16   Q.   Do you recall whether you had gone through it before

17   meeting with Mr. Cosmo in the airport?

18   A.   Yes, sir.

19   Q.   You had?

20   A.   Several times.

21   Q.   Now, I want to ask you a few questions about that website

22   now.  OK?

23   A.   OK.

24            MR. DeMARCO:  Mr. Lachow, will you pull up

25   Government's Exhibit 108, please.

 1    Q.  I am going to direct you to Government's Exhibit 108, Dr.

 2    Penland.  OK?

 3    A.  Yes.

 4    Q.  You saw that on direct examination, right?

 5    A.  I did.

 6    Q.  And you also saw that in December of 2010, correct?

 7    A.  Yes.  Can you make it larger?

 8    Q.  I am going to have him do that.  Bear with me.

 9    A.  Thank you.

10            MR. DeMARCO:  Sam, if you could pull out --

11    Q.  This is page 1, right, Doctor?

12    A.  The one there, yes.

13    Q.  I asked Mr. Lachow to pull out some writing that's on the

14    first page of that website.  Can you read to the jury what Mr.

15    Lachow has pulled out and what is on the first page of the

16    Cosmo Dabi website.

17    A.  Can I read?

18    Q.  Please, Doctor.

19    A.  Activities.  Cosmo Dabi primarily engages in business

20    consulting and in physical gold transactions.  We are not a

21    bank, hedge fund, RIA, or a registered securities firm.  Our

22    core focus primarily serves our family members.

23    Q.  We are not a bank, correct?

24    A.  Correct.

25    Q.  We are not a hedge fund, correct?

 1   A.  That's what it says.

 2   Q.  We are not an RIA, right?

 3   A.  Yes.

 4   Q.  Do you know what an RIA is?

 5   A.  I don't.

 6   Q.  And they are not a registered securities firm.  That's on

 7   the very first page, correct?

 8   A.  Correct.

 9   Q.  Did that raise any questions in your mind about giving $5.5

10   million to Cosmo Dabi?

11   A.  No, sir.

12           MR. DeMARCO:  Mr. Lachow, can you go back to the first

13   page.

14   Q.  I asked Mr. Lachow to pull out another section of page 1 of

15   Government's Exhibit 108.

16           Dr. Penland, this is on the first page of the website

17   also?

18   A.  That's correct.

19   Q.  Can you read what Mr. Lachow has just pulled up on the

20   screen from the website.

21   A.  What we are not.  We are not a bank, a registered licensed

22   securities firm, or hedge fund.

23   Q.  On the first page, on two different spots, there is

24   representations that Cosmo Dabi is not a bank, right?

25   A.  Correct.

```
 1    Q.  Not a hedge fund, correct?

 2    A.  Correct.

 3    Q.  Not a licensed securities firm, correct?

 4    A.  That's what it says, yes.

 5    Q.  On the very first page, Doctor, correct?

 6    A.  Yes.

 7    Q.  You've been managing budgets for over 15 years at that

 8    point, correct?

 9    A.  Yes.

10    Q.  You had just been turned down by banks to fund the balance

11    of that project for TCIS, correct?

12    A.  Correct.

13    Q.  And on the very first page of this website, are these two

14    representations, correct?

15    A.  Yes, sir.

16    Q.  Did you think about or have any questions about these

17    representations?

18    A.  I thought he was an asset manager and dealing in

19    commodities.

20    Q.  But it said on the very first page of the website that you

21    examined thoroughly, we are not a bank?

22    A.  Yes, sir.

23    Q.  We are not a hedge fund?

24    A.  Yes, sir.

25    Q.  We are not a registered securities firm, correct?
```

```
 1   A.  Correct.
 2   Q.  Did you think of bringing that up to Ms. Tsien during the
 3   meeting at Omni, what does this mean?
 4   A.  No, sir.
 5   Q.  Did you think of asking Mr. Cosmo that at the airport
 6   lounge before you agreed to wire $5.5 million?
 7   A.  I did not bring it up there, no, sir.
 8   Q.  You had that meeting in New York City on what date,
 9   December --
10   A.  Around December 10.
11   Q.  December 10, 2010, correct?
12   A.  Correct.
13   Q.  And the $5.5 million was wired to the JP Morgan Chase
14   account for Cosmo Dabi on January 21 of 2011, correct?
15   A.  That's correct.
16   Q.  Between December 10, 2010 and January 21, 2011, did these
17   two representations make you skeptical about who you were
18   giving your money to?
19   A.  No, not really.
20   Q.  No.  Because in your mind your prayers had been answered,
21   right?
22   A.  Yes.
23   Q.  You're getting $55 million or $49.5 million with no
24   collateral at a 4 percent interest rate, correct?
25   A.  With a 5.5 million deposit.
```

1   Q.  That's right.  This is a great deal for you guys, right?

2   A.  If it worked out it was going to be great.

3   Q.  If it worked out?

4   A.  Yes, sir.

5            MR. DeMARCO:  If you can go to page 2 of the website.

6   If you can pull up Cosmo Dabi International, that project about

7   CDI.

8   Q.  You're with me, Doctor?

9   A.  Yes, sir.

10  Q.  Let's review it together.  Cosmo Dabi International is

11  primarily a family practice with an internationally

12  headquartered parent.  Our main focus is private equity, family

13  global private wealth, asset management for our own family

14  members, SF and business consulting.  Cosmo Dabi also engages

15  the highest caliber financial operatives within the U.S. and

16  abroad to accomplish desired family business objectives.  I am

17  going to go on.  Cosmo Dabi and companies manage $11 billion

18  plus AUM, assets under management, of family U.S. and Swiss

19  assets.  You see that, right, Doctor?

20  A.  I do.

21  Q.  You're with me?

22  A.  Yes.

23  Q.  Did you ever reach out to any of the companies that Cosmo

24  Dabi did business with or represented that they did business

25  with on the website?

1    A.  No, sir.

2    Q.  Did you ever ask him during that meeting in the airport,

3    before agreeing to wire $5.5 million, Mr. Cosmo, can you give

4    me some references?  Did you ever ask him for references?

5    A.  No, sir.  We did ask later.

6    Q.  Did you ever ask Mr. Cosmo the names of any companies,

7    financial or otherwise, that he did business with in order for

8    you to conduct some due diligence into his company?

9    A.  No, sir.

10   Q.  Let's go to page 3 of the web page, of the website.

11          MR. DeMARCO:  If you can pull out, references, Mr.

12   Lachow, the section that says references.

13   Q.  It says on page 3 of this website:  References.  To be

14   provided upon formal engagement.  You see that, right, Doctor?

15   A.  I do.

16   Q.  Now, there came a time that you entered into a formal

17   engagement with Cosmo Dabi, correct?

18   A.  That's correct.

19   Q.  You signed the agreement that we saw in court earlier,

20   right?

21   A.  I did.

22   Q.  And you signed that before you wired the money to his

23   account, correct?

24   A.  I did, yes.

25   Q.  After you signed that agreement or at any time prior to

1   sending that $5.5 to his JP Morgan Chase account, did you ask

2   for any references to be provided by him?

3   A.  I did not.

4   Q.  Did you ever check with any regulatory agency, such as the

5   SEC or the commodities future exchange commission or any

6   agency, about Cosmo Dabi?

7   A.  I did not.

8   Q.  Did you ever even call the Better Business Bureau and ask

9   about them?

10  A.  I did not.

11  Q.  Again, this was a situation of trust, right?

12  A.  Yes.

13  Q.  You trusted Mr. Hwang, correct?

14  A.  Yes.

15  Q.  And you trusted his brother-in-law, Jay Pak, correct?

16  A.  Yes.  I trusted Mr. Cosmo.

17  Q.  Let's go to page, it's Bates stamp 1126 of the website.

18  There is a bio section.  You see that.  Did you ever check with

19  any of these companies or seek a reference from any of these

20  companies on William Cosmo or Cosme or Cosmo Dabi or anything

21  like that?

22  A.  No, sir.

23          MR. DeMARCO:  If you can go to page 1129.  Right

24  underneath transaction requirements.  Can you pull that out,

25  contractual agreements and the line underneath it.

1    Q.  It reads:  Cosmo Dabi holds an international commercial

2    gold refinery license as well as major refinery agreements

3    globally.  Do you see that, Doctor?

4    A.  Read that again, please.

5    Q.  It's right under transactional requirements.

6    A.  Yes, I see it.

7    Q.  Did at any point you ask to see his commercial gold

8    refinery license?

9    A.  No, sir.

10   Q.  Did you ever look into any of his major refinery agreements

11   globally?

12   A.  No, sir.

13   Q.  You spoke earlier also on that website of some news article

14   about Cosmo's investment in the Lotte Group.  Do you recall

15   that?

16   A.  Yes.

17   Q.  Are you familiar with the Lotte Group, based on your

18   residence in South Korea?

19   A.  Yes.

20   Q.  Are they reputable?

21   A.  Yes, they are.

22   Q.  Have you ever done dealings with them?

23   A.  No, not really dealings, but they are one of the tables or

24   top 10 companies in Korea.  They are a huge Korean company.

25   Q.  Did you ever reach out to them to verify what was

1    represented in this news article?

2    A.   I did not.

3    Q.   We heard stuff about princes and kings and sheiks and

4    publicly trading CEOs, companies of publicly trading CEOs.  Do

5    you recall that?

6    A.   Yes, sir.

7    Q.   Did you ever ask for the name of a prince, a sheik, or a

8    king who Cosmo Dabi provided services to?

9    A.   We asked at one point for references and Patricia Tsien

10   offered that or said that that was available.  But we never

11   followed up.  We never checked on it.

12   Q.   You had never followed up because you were concerned that

13   had that request gotten back to Mr. Cosmo, he would have torn

14   up the deal, correct?  He would have backed out of the deal,

15   right?

16   A.   Yes, sir.

17   Q.   Without going through Ms. Tsien or anyone associated or

18   participating in this deal, did you ever do a simple Google

19   search of William Cosmo, Cosmo Dabi, or anything related?

20   A.   I did some.

21   Q.   What did you learn?

22   A.   It was confusing times.  The names and different companies.

23   Particularly with Omni, there are many, many different Omni

24   groups.

25   Q.   I'm talking about Cosmo Dabi or William Cosme or William

1    Cosmo.

2    A.  Not so much.  I did more on Omni.

3    Q.  Even your research on Omni was confusing, correct?

4    A.  At times it was, yes.

5    Q.  So you don't find much on Cosmo Dabi?

6    A.  Not much.

7    Q.  What you find on Omni is confusing, correct?

8    A.  Part of it was.

9    Q.  And you're still anxious to go ahead with this deal, right?

10   A.  We talked about it, Mr. Hwang and I, and he felt and we

11   felt that it was OK.

12   Q.  There came a time in January 2011 when you received an

13   e-mail from Pat Tsien that contained some corporate filings by

14   Cosmo Dabi.  Do you recall that?  We can pull that up.  It's

15   Government's Exhibit 137.

16   A.  Yeah.  I'd like to see it.

17   Q.  You're with me.  It says last:  I have attached the

18   business registration information --

19            THE COURT:  Slowly.

20            MR. DeMARCO:  I'm trying to finish by 5.

21            THE COURT:  We have plenty of time.  We can stop at 5

22   and come back tomorrow.

23   Q.  Are you with me, Doctor?

24   A.  Yes, I am there.

25   Q.  Lastly, I have attached the business registration

1  information from New York State for Cosmo Dabi International

2  Group, Inc.  137A, if you can pull that up, Mr. Lachow.  That

3  was the filing from Cosmo Dabi with the Department of State.

4          Do you recall seeing that on direct examination,

5  Doctor?

6  A.  That's correct.

7  Q.  Do you recall seeing that in January 2011?

8  A.  Yes, I did.

9  Q.  Now, the e-mail that you received with this information was

10 on January 19, 2011, correct?

11 A.  That's correct.  I don't have it before me, but I am going

12 to take your word on that.

13 Q.  I don't want you to guess.  I don't want to put words in

14 your mouth.

15          MR. DeMARCO:  Mr. Lachow, the date portion of 137.

16 A.  January 19, 2011.

17 Q.  And attached to this e-mail was 137A, which was the filing

18 with the Department of State by Cosmo Dabi, correct?

19 A.  That was one of the attachments, yes.

20 Q.  We agree that it's on December 19, 2011, correct?

21 A.  January 19.

22 Q.  What did I say?

23 A.  You said December.

24 Q.  I meant January.

25 A.  Yeah.

1   Q.  Now, you received these on January 19, 2011, correct?

2   A.  Yes, I did.

3   Q.  And the money is wired, the $5.5 million is wired to the

4   accounts at Cosmo Dabi two days later, on January 21, correct?

5   A.  That's correct.

6   Q.  Now, you first meet with Mr. Cosme on December 10, 2010,

7   correct?

8   A.  Yes, that's correct.

9   Q.  And he is the principal, in your mind, of this company

10  that's going to loan you $49.5 million, right?

11  A.  Yes, sir.

12  Q.  And on January 19, 2011, two days before you wire that $5.5

13  million, you receive 137A, correct?

14  A.  Correct.

15  Q.  And you reviewed it, correct?

16  A.  I looked at it, yes, sir.

17          MR. DeMARCO:  If you can pull up the initial filing

18  date, Mr. Lachow.

19  Q.  You see the initial filing date of Cosmo Dabi International

20  Trading Group was May 19, 2010.  Do you see that, Doctor?

21  A.  I see it, yes.

22  Q.  Did that raise a question in your mind how this company

23  established a mere seven months before your meeting at the

24  airport was capable of investing and accumulating this much

25  wealth in such a short period of time.  Did that ever enter

1   your mind?

2   A.  No, sir.

3   Q.  Attached to that e-mail was also a letter 137B, Dr.

4   Penland.  It was a letter from -- purports to be from

5   Mr. Cosmo.

6          MR. DeMARCO:  Can you pull that up, Mr. Lachow.

7   Q.  It speaks about instructions for wiring the $5.5 million,

8   correct?

9   A.  It said it was attached with the wiring instructions.

10  Q.  And in the second paragraph, second sentence it reads:  You

11  will have ample opportunity to inquire of my asset management

12  performance.  Did you ever do that prior to sending out any of

13  the money?

14  A.  We did not.

15  Q.  Did you ever do that before, let's say, July or August of

16  2011?

17  A.  No, sir.

18  Q.  When you had not received that first draw in what you

19  considered a timely fashion?

20  A.  No, sir.

21  Q.  Did you ever start reaching out to references to see what

22  this company was about?

23  A.  No, we did not.

24  Q.  Did you ever reach out to any regulatory agencies to see

25  what was up with the company?  Is it trustworthy?  Did you ever

1   do any of that?

2   A.  No, sir.  I wanted to reach out to legal authorities, law

3   enforcement in June, but --

4   Q.  You were dissuaded from doing so by the board of trustees,

5   correct?

6   A.  That's correct.

7   Q.  Because the board of trustees, like you at one point, were

8   anxious to fund this project, correct?

9   A.  Yes, sir.

10  Q.  And anything that might jeopardize this funding was

11  dissuaded by the board of trustees, correct?

12  A.  Yes, sir.

13  Q.  Now, on direct examination you testified about receiving a

14  corporate resolution from Cosmo Dabi.  Do you recall that?

15  A.  Yes.

16         MR. DeMARCO:  We will pull it up.  It's 154B.

17  A.  I recall it.

18  Q.  I'm going to have it pulled up.

19  A.  Yes.

20         MR. DeMARCO:  And if you can pull up, Mr. Lachow, the

21  entirety of paragraph 3.

22  Q.  On this corporate resolution that you received there lists,

23  in addition to Mr. Cosmo, three corporate officers.  Do you see

24  that?

25  A.  I do.

1   Q.  One is vice-president Shirley Golberger.  You see that?

2   A.  I see it.

3   Q.  Secretary Hi Feingold.  You see that?

4   A.  I do.

5   Q.  And the treasurer was Scott Lieberman, CFO.  Do you see

6   that?

7   A.  I did.

8   Q.  At any point in time from December 2010 until September of

9   2011, did you do any research or rely in any way upon any of

10  these names in making your decision?

11  A.  No, sir.

12  Q.  Did you ever Google the name Shirley Golberger, Hi

13  Feingold, or Scott Lieberman?

14  A.  No, sir.

15  Q.  Did you ever reach out and contact any of these individuals

16  at any point in time in your efforts to get this $55 million?

17  A.  No, I did not.

18  Q.  Did you ever rely on those names for any reason whatsoever?

19  A.  No.

20  Q.  It didn't really matter to you who the vice-president of

21  the company was when you received this, correct?

22  A.  No, it did not.

23  Q.  Didn't matter who the secretary of the company was,

24  correct?

25  A.  No.

1  Q.  It didn't really matter who the treasurer was either,
2  right?
3  A.  No.
4  Q.  What mattered was, you were depositing $5.5 million as a
5  down payment or a deposit towards a $49.5 million loan, right?
6  A.  And the president, Mr. Cosmo.
7  Q.  Now, $5.5 million was a lot of money, right?
8  A.  Yes, sir.
9  Q.  It is a lot of money?
10  A.  Yes.
11  Q.  It was a lot of money that TCIS didn't even have?
12  A.  That's correct.
13  Q.  In fact, TCIS had to borrow the money from GSIS, right?
14  A.  That's correct.
15  Q.  Did at any point in time you ask Mr. Cosmo, at any point in
16  time, what are you going to do with this $5.5 million, what are
17  you going to invest it in?
18  A.  Did I ask him directly?
19  Q.  Yeah.
20  A.  No, sir.
21  Q.  Did you ever ask Pat Tsien, what is he going to invest this
22  money in?  Were you curious?
23  A.  We talked about some of that at the meeting in New York.
24  Q.  And in that one-hour meeting on December 10, 2010, you
25  talked about where he was going to invest this money?

```
 1   A.  The kind of things that he invested in, yes, sir.

 2   Q.  Specifically with respect to this money.

 3   A.  The assumption of the conversation was about that money,

 4   but about all that he did with his money and funds.  But we did

 5   not specifically say, is he going to do this with the money.

 6   Q.  Did you ask her, what are you going to do with this money?

 7   Where is it going to go?

 8   A.  Not specifically, no.

 9   Q.  Now, after your New York trip you returned to South Korea,

10   correct, obviously?

11   A.  Yes, sir.

12   Q.  How much time did you spend?  Do you recall when you

13   returned to South Korea?

14   A.  It was the day after the meeting.  I think the flight left

15   the next day.

16   Q.  Would it be fair to say that your return, at the earliest,

17   to South Korea on December 11, 2010?

18   A.  Yes.  I would say that would be a very accurate date,

19   probably.  Maybe the 12th because you lose a day flying.

20   Q.  Within a few days after, within five or six days after your

21   return to South Korea, this deal was approved by the board of

22   trustees, correct.  Hooray.  The e-mail went out hooray.  Do

23   you recall that?

24   A.  Yes.

25   Q.  From December 10 to less than a week later, this deal was
```

1   discussed, vetted, presented, and approved by the board of

2   trustees, correct?

3   A.  That's correct.

4   Q.  Now, we saw in evidence the agreement that you ultimately

5   signed to memorialize this transaction, correct?

6   A.  Yes, sir.

7   Q.  It was Government's Exhibit 190?

8          MR. DeMARCO:  Government's Exhibit 190.  Mr. Lachow,

9   if you could pull up just the first page of it.

10  Q.  That's the agreement that you ultimately signed that

11  memorialized this transaction, correct?

12  A.  Is that the signed copy or not?

13  Q.  Let's go to the last page.  I believe it is.  But let's go

14  to the last page.  It's page 17 of 18.  Yes, it is the signed

15  copy.

16  A.  Yes, it is.

17  Q.  Now, it's dated January 19 of 2011, correct?

18  A.  Yes, sir.

19  Q.  Is that the date you signed it?

20  A.  Go back to the back and that will give you the date.  I

21  think the signature back there has the date on it.

22  Q.  It doesn't.  Yes, it is.  I'm sorry.  On page 17, the very

23  first few lines.

24  A.  Yes.  January 19.

25  Q.  That's more than a month after you met with Mr. Cosme,

```
 1   correct?

 2   A.   Yes.

 3   Q.   Do you recall when in relation to signing this agreement

 4   that you actually received it?

 5   A.   I am not sure I can answer that for sure.

 6   Q.   How about you estimate.  How long was it on your desk

 7   before you executed it?

 8   A.   There are different versions and so I'm not sure on this

 9   one when I received it.

10   Q.   Let me --

11   A.   -- without looking through my e-mail.

12   Q.   Do you recall approximately when you received the very

13   first version?

14   A.   Yes.  We signed an agreement with those documents -- I

15   signed that and sent that in with client information, my

16   passport information, on December 25, 24.

17   Q.   You sent it to whom?

18   A.   To Patricia Tsien.

19   Q.   The final agreement was dated January 19 and signed by you

20   on January 19, correct?

21   A.   That's correct.

22   Q.   Between the date that you first received any version of

23   this agreement until signing the final version that we are

24   talking about now, did you ever bring it to one of your lawyers

25   to review it?
```

```
 1   A.  No, sir, I did not have a lawyer review it.

 2   Q.  Do you have any lawyers on your board?

 3   A.  No.  We did have one lawyer in Suwon appearing.

 4   Q.  Did you ever e-mail the document to that parent and ask him

 5   to do you a favor and review this agreement?

 6   A.  I did talk with her about it, but very, very late in June.

 7   Q.  June of?

 8   A.  2011.

 9   Q.  It's already been signed and submitted by then?

10   A.  Yes.  They saw the document, but not --

11   Q.  What I'm asking you, Doctor --

12   A.  No lawyer reviewed it.

13   Q.  Before signing the final version on January 19 of --

14   A.  Did I have legal review, no.

15   Q.  Did you bring it to a lawyer's office?  Did you retain

16   counsel?  Did you have any --

17   A.  I did not.

18   Q.  You did not.  OK.

19            Now, you talked about presenting it to a couple of

20   CPAs.  Do you recall that?

21   A.  Yes.

22   Q.  Were they CPAs that were retained by TCIS or just --

23   A.  One was a personal friend and one was a board member.

24   Q.  And let's talk about the board member who has an interest

25   in this school, correct?
```

1    A.  Correct.

2    Q.  Did the board member review this agreement, board member's

3    CPA?

4    A.  I believe so.

5    Q.  When?

6    A.  In January.

7    Q.  You signed it on January 19.  In relation to when you

8    signed it, when was it reviewed by that board member?

9    A.  I am not sure he reviewed this actual agreement.  I know he

10   reviewed the first agreement, the first draft of the agreement.

11   Q.  And like the others on the board he was anxious to get this

12   construction funding finished, right?

13   A.  That's correct.

14   Q.  What about your friend who is the CPA, did he or she review

15   the document?

16   A.  I don't know if he got the final draft or not, but he did

17   review a draft of it, yes.

18           MR. DeMARCO:  This might be a good time --

19           THE COURT:  This is a good time.  We are going to have

20   to come back for redirect anyway.

21           Ladies and gentlemen, we are going to let you go out

22   into the cold now.  If you've been keeping notes, would you

23   leave your notebooks in the jury room, please.

24           Remember, please, do not discuss the case with anyone.

25   Do not allow anyone to talk with you about the case.  You see

1    any of the people involved in the case, run the other way.

2    And, most importantly, please don't do any research about the

3    case.

4            Your coffee will be ready for you at 9:30.  We look

5    forward to seeing you tomorrow and thank you for your

6    attention.  Have a good evening.  Please stay warm.

7            (Jury not present)

8            THE COURT:  Anything else on the record, counsel?

9            MR. BELL:  Not from the government, your Honor.

10            (Adjourned to March 16, 2017, at 10:00 a.m.)

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                               Page

 3   THOMAS JAMES PENLAND

 4   Direct By Mr. Solowiejczyk . . . . . . . . . . 128
     Cross By Mr. DeMarco . . . . . . . . . . . . . 267
 5                     GOVERNMENT EXHIBITS

 6   Exhibit No.                              Received

 7    109A   . . . . . . . . . . . . . . . . . . 147

 8    111, 111A and 111B . . . . . . . . . . . . 155
      113 and 114  . . . . . . . . . . . . . . . 160
 9    115  . . . . . . . . . . . . . . . . . . . 162

10    118  . . . . . . . . . . . . . . . . . . . 164

11    118A and 118B  . . . . . . . . . . . . . . 165

12    128  . . . . . . . . . . . . . . . . . . . 167

13    135  . . . . . . . . . . . . . . . . . . . 169

14    137, 137A through 137E  . . . . . . . . . . 177

15    190  . . . . . . . . . . . . . . . . . . . 185

16    141  . . . . . . . . . . . . . . . . . . . 197

17    154  . . . . . . . . . . . . . . . . . . . 202

18    154A and 154B  . . . . . . . . . . . . . . 203

19    206  . . . . . . . . . . . . . . . . . . . 205

20    155  . . . . . . . . . . . . . . . . . . . 208

21    156 and 156A . . . . . . . . . . . . . . . 213

22    309  . . . . . . . . . . . . . . . . . . . 219

23    161  . . . . . . . . . . . . . . . . . . . 225

24    316  . . . . . . . . . . . . . . . . . . . 230

25    214  . . . . . . . . . . . . . . . . . . . 232
```

1   166  . . . . . . . . . . . . . . . . . . 235

2   354  . . . . . . . . . . . . . . . . . . 237

3   177  . . . . . . . . . . . . . . . . . . 241

4   179  . . . . . . . . . . . . . . . . . . 242

5   360  . . . . . . . . . . . . . . . . . . 246

6   181  . . . . . . . . . . . . . . . . . . 248

7   183  . . . . . . . . . . . . . . . . . . 249

8   185  . . . . . . . . . . . . . . . . . . 252

9   186  . . . . . . . . . . . . . . . . . . 253

10  187  . . . . . . . . . . . . . . . . . . 260