H3GQCOS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              13 Cr. 43 (LAP)

WILLIAM COSME,

          Defendant.

------------------------------x

                             New York, N.Y.
                             March 16, 2017
                             9:55 a.m.

Before:

              HON. LORETTA A. PRESKA,

                             District Judge
                             and a jury

                    APPEARANCES

JOON H. KIM
    United States Attorney for the
    Southern District of New York
MARTIN BELL
NOAH SOLOWIEJCZYK
    Assistant United States Attorneys

MARK S. DeMARCO
    Attorney for Defendant


ALSO PRESENT:  MELISSA BERESFORD, FBI
               RYAN REDEL, FBI
               BIBI HAYAKAWA, Paralegal
               SAMUEL LACHOW, Paralegal

H3GQCOS1

1              (Trial continued; jury not present)

2              THE COURT:  Mr. Cosme, I know you want to talk to me.

3    Can we do that at the first break?

4              THE DEFENDANT:  The first break after the

5    cross-examination?

6              THE COURT:  Well, whenever we take our break.

7              THE DEFENDANT:  No.

8              THE COURT:  All right.  Won't you be seated, counsel.

9              Yes, Mr. Cosme.

10             THE DEFENDANT:  I mentioned these issues, I guess, in

11   the abundance of caution.  As I recall, the other day when we

12   were in court, there was a reference to myself and/or

13   Mr. DeMarco using the F words.

14             THE COURT:  Yes, sir.

15             THE DEFENDANT:  And you had mentioned that those

16   shouldn't be used in court.

17             THE COURT:  Yes, sir.  They shouldn't be used in

18   court, yes, sir.

19             THE DEFENDANT:  What I'm saying to you here in regards

20   to that is that that conduct from the counsel or the conduct

21   that exists between the counsel and the client is not the kind

22   of conduct that would lend to a harmonious or lawful

23   attorney/client relationship.  And, obviously, if the attorney

24   is adversarial, there would be no way to properly or

25   effectively represent his client.  He is actually on the

H3GQCOS1

1    hostile side, including frauds.  The counsel is committing a

2    fraud on the Court with regards to certain exculpatory evidence

3    by concealing it, which is another issue, and the client's

4    challenge to that is that he shouldn't be doing that and the

5    counsel is insisting on doing that.

6          In particular, there is an attorney work product that

7    was produced prior to this particular counsel entering the

8    case.  This particular counsel, DeMarco, was a lead counsel

9    prior to his being a legal advisor and prior to his being

10   assigned as lead counsel again this week.

11         He claimed earlier that he had all of the prior

12   counsel's work product, and that particular work product

13   includes, but is not limited to, this exculpatory evidence that

14   has to do with this alleged website.  And we had experts, PIs,

15   web experts, and witnesses provided to Mr. DeMarco and in the

16   file that actually proved that this website, this alleged

17   website, was not even in existence at the time of the contract

18   and/or at the time of the prior meetings leading up to the

19   executed contract.

20         Mr. DeMarco knows this.  He's insisting on concealing

21   it.  He's insisting that the website exists.  He's arguing it

22   proceeding as if the website exists, as if it is my website.

23   And he's not even aware of my employment at Microsoft or Rolls

24   Royce or GE or SAP.  All of the records that he's checked and

25   all the records that the FBI has are incorrect verifiably in

H3GQCOS1

1   the file.  He omits that.  He treats it as if that information

2   is irrelevant when the government's whole case relies on this

3   entirety of the website, including those details within it,

4   including the employment details.  So there is no possible way

5   anyone could say that the attorney/client relationship is

6   normal.

7            He is in court saying FU.  FU.  That is not normal.

8   That is not normal.

9            THE COURT:  Mr. Cosme, I have not observed that.  I

10  have only heard you use that expression of and pertaining to

11  Mr. DeMarco.

12           MR. DeMARCO:  Mr. DeMarco said --

13           THE COURT:  In my observation, Mr. DeMarco has done

14  nothing except zealously represent you in this matter.

15           And, secondly, with respect to the evidence, it is

16  counsel's decision what evidence to proffer and not to proffer.

17  There are certain decisions that are your decisions, and yours

18  only as the client, but putting in evidence is not one of them.

19           Again, my observation is Mr. DeMarco has done nothing

20  except represent you zealously here before this jury.

21           The fact that you are arguing about the website still

22  confirms my view that you continue to forfeit your right to

23  represent yourself because you will not stay within the bounds

24  of the conduct that is expected of lawyers.

25           THE DEFENDANT:  Your Honor --

H3GQCOS1

1          THE COURT:  Now, the jury is ready.  We are going to

2     bring them in and proceed.

3          THE DEFENDANT:  Your Honor, before we do that, one

4     other issue.  I complied one hundred percent to the United

5     States Constitution and to the Federal Rules of Criminal

6     Procedure.  The party or the groups that are not complying to

7     it are the CJA and the prosecutors.  The record is evidence of

8     that, overwhelming evidence.

9          THE COURT:  All right.  Then that will be an issue on

10    appeal, sir.

11         THE DEFENDANT:  If it's the defendant's choice to

12    appeal, I choose to interlocutory appeal, which is one of the

13    other issues I wanted to raise.  You had mentioned that there

14    is no basis for an interlocutory appeal.  There is a basis.

15    It's the same basis.  There is illegal pretrial asset

16    forfeiture that leads to counsel of choice, and I don't consent

17    to him being counsel.

18         THE COURT:  You do not have my permission to take an

19    interlocutory appeal.  I find that the issue that you want to

20    appeal has been decided.  There is nothing more to decide, but,

21    obviously, you are free to file any piece of paper you want.

22         THE DEFENDANT:  Your Honor, you are -- you are --

23    you're saying that there is no basis for an interlocutory

24    appeal.  The basis is Title 28, Section 1292.

25         THE COURT:  1292(b), I know.  Denied.

H3GQCOS1

1          THE DEFENDANT:  So you're denying.  You're refusing to

2     vacate and/or modify pretrial restraints right now.

3          THE COURT:  Yes, sir.  It's already been decided.

4     Decided after the hearing.

5          THE DEFENDANT:  You just again denied that, that's my

6     point.  So, if you are again denying it, then I'm again going

7     to interlocutory appeal it.

8          THE COURT:  Your request for an interlocutory appeal

9     under 1292(b) is denied.

10          THE DEFENDANT:  Thank you.

11          THE COURT:  Mr. Marshal, would you bring the jurors

12     in?

13          Counsel, we are going to give you the draft request to

14     charge marked as Court Exhibit 2.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2       THOMAS JAMES PENLAND, resumed.

3    CROSS-EXAMINATION

4    BY MR. DeMARCO:

5           THE COURT:  I remind you, you are still under oath.

6           We continue, ladies and gentlemen, with the

7    cross-examination of Dr. Penland.

8           Mr. DeMarco.  Yes, sir.

9           MR. DeMARCO:  May I, your Honor?

10          THE COURT:  Yes, sir.

11   Q.  Good morning, Doctor.

12   A.  Good morning sir.

13   Q.  I just have a few more questions for you, OK?

14   A.  Yes, sir.

15   Q.  This much (indicating).

16          I want to talk to you about the agreement that you

17   ultimately entered, the private funding and security agreement,

18   OK?

19   A.  Yes, sir.

20   Q.  It was entered into evidence as -- the executed version,

21   final version, was entered into evidence by the government as

22   Government Exhibit 190.

23          MR. DeMARCO:  So, Ms. Hayakawa, I am going to ask you

24   at some point to pull that up for me, OK.

25   Q.  You with me, Doctor?

H3GQCOS1                         Penland – Cross

1    A.   Yes, sir.

2    Q.   So, it would be fair to say that this agreement, Government

3    Exhibit 190, if we could pull up the first page.  Is it up

4    there, Doctor?

5    A.   Yes, I see it.

6    Q.   That's the agreement that you ultimately signed for the

7    $55 million loan, correct?

8    A.   If it's a signed agreement, yes, that's the one, 190.

9    Q.   The last page is 17 or 18 is signed?

10   A.   Yes, sir.

11   Q.   I'm going to make that representation to you.

12   A.   Yes, sir.

13   Q.   This agreement, as well as the promissory note attached to

14   it, was received by you by email, correct?

15   A.   That's correct.

16   Q.   And it was an email sent from Ms. Tsien to you, correct?

17   A.   I believe so.

18   Q.   Because Ms. Tsien acted as the intermediary between TCIS

19   and Cosmo Dabi, correct?

20   A.   That's correct.

21   Q.   So you received this document as an email attachment from

22   Ms. Tsien, correct?

23   A.   That's correct.

24   Q.   I'm going to ask you a few questions about the document.

25             You reviewed it carefully, right?

1   A.  I did.

2   Q.  You had two CPA associates of yours look it over, correct?

3   A.  Yes, sir.

4   Q.  And then there came a point in time that you signed it,

5   right?

6   A.  We did.  I did.

7   Q.  And you returned it not to Cosmo Dabi but to Ms. Tsien,

8   correct?

9   A.  That's correct, with Mr. Cosmo's signature.

10  Q.  That's not what I'm asking you, Doctor.

11  A.  Yes, sir.

12  Q.  You signed it, correct?

13  A.  Yes, sir.

14  Q.  And there's what seems to be an electronic signature of a

15  William Cosmo at the end, correct?

16          MR. DeMARCO:  If we go to page 18, Ms. Hayakawa.  I'm

17  sorry page 17.  If you could pull out Mr. Cosmo's signature,

18  please.

19  Q.  It appears to be an electronic signature of some sort

20  Dr. Penland, correct?

21  A.  I can't -- I don't know whether that's electronic or not,

22  sir, I'm sorry.

23  Q.  Yours certainly wasn't electronic?

24  A.  It was not.

25  Q.  You signed it?

H3GQCOS1                          Penland - Cross

1   A.  Yes, sir.

2   Q.  You probably scanned the document back?

3   A.  We did.

4   Q.  And you returned it by email, correct?

5   A.  Correct.

6   Q.  And you returned it to Patricia Tsien at Omni Holdings,

7   correct?

8   A.  That's correct.

9   Q.  Now, you had the opportunity to review the document

10  thoroughly before signing and returning it, correct?

11  A.  I did review it, yes, sir.

12  Q.  Now, I want to ask you a few questions about the document.

13          Now, when you met with Mr. Cosmo at the airport, it

14  was your testimony that you never discussed a specific

15  investment strategy that he had planned for the $5.5 million

16  that you were going to deposit, correct?

17  A.  That's correct.

18  Q.  But this document, the private funding and security

19  agreement, Government Exhibit 190, does discuss what types of

20  investments might be pursued with the $5.5 million, correct?

21  A.  That's correct.

22          MR. DeMARCO:  Excuse me.  My allergies are killing me.

23          THE COURT:  You're telling me it's spring now?

24          MR. DeMARCO:  No, Judge.  It's dust.  We need to get

25  the courtroom dusted.

H3GQCOS1                          Penland - Cross

 1                 THE COURT:  Well then.

 2                 MR. DeMARCO:  Maybe it's that bouquet of flowers.  But

 3       I'm just saying.

 4                 THE COURT:  All right.

 5                 MR. DeMARCO:  If you can pull, Ms. Hayakawa -- and I

 6       know I'm going to butcher that name eventually.  If you could

 7       go to page 3 of 18 of the security agreement.  I'm sorry if you

 8       start at the bottom of page 2 where it says equity deposit.

 9       Would you pull out that paragraph?

10       Q.  Are you with me, Doctor?  Do you see what's on the screen?

11       That's the bottom of page 2 of the funding agreement.  You with

12       me?

13       A.  Yes, sir.

14       Q.  And it speaks to the $5.5 million equity deposit, correct?

15       A.  That's correct.

16       Q.  And it states I'm going to read this.  "The sum of five

17       million five hundred thousand dollars and 00/100 ($5.5 million

18       (the equity deposit) as demonstration of borrower's equity in

19       the construction project, whereby borrower acknowledges that

20       its equity deposit shall be used by the funder to" -- if we

21       could go to page 3, the very top paragraph -- "facilitate,

22       managed, matched, buy/sell/trade finance strategies using

23       private physical gold products, other commodities, automotive,

24       investment grade financial instruments and/or various other

25       types of transactions from which the proceeds shall be used to

H3GQCOS1                          Penland - Cross

1    generate the private funding agreement."

2              Are you with me, Doctor?

3    A.   I am.

4    Q.   So, that basically speaks to the strategies that would be

5    pursued with that $5.5 million, correct?

6    A.   That's correct.

7    Q.   And it speaks in very general terms.  Would you agree with

8    that?

9    A.   Yes.

10   Q.   It says that it can be invested in gold products, correct?

11   A.   Yes.

12   Q.   It's right there.  Right before --

13   A.   Yes, I know.

14   Q.   -- other commodities, correct?

15   A.   That's what it says.

16   Q.   Without any specificity, right?

17   A.   Well, the list is specified, but yes, within that, it's not

18   detailed.

19   Q.   Automotive?

20   A.   Yes.

21   Q.   What does that mean to you?

22   A.   I would say investment in some kind of automotive industry.

23   Q.   OK.  It doesn't say automotive industry.  It says

24   automotive?

25   A.   It does not.

H3GQCOS1                        Penland - Cross

1    Q.  It could mean invest in high-end, luxury automobiles,

2    correct?  It could mean that?  Yes?

3    A.  If it produces some way the private funding amount --

4    Q.  That's --

5    A.  The goal is to be used to produce a private funding amount,

6    the loan.

7    Q.  That's right?

8    A.  That's the point.

9    Q.  It was your understanding that -- and all you really cared

10   about was that this $5.5 million was invested so that the

11   $49.5 million that you were seeking as a loan would be achieved

12   and would be funded, correct?

13   A.  That was the goal, yes, sir.

14   Q.  The point was for that $5.5 million to be invested,

15   correct?

16   A.  Correct.

17   Q.  And to have it grow or appreciate, correct?

18   A.  Correct.

19   Q.  The $5.5 million that was agreed upon in this agreement,

20   correct?

21   A.  That's correct.

22   Q.  You didn't really care where that $5.5 million was invested

23   so long as it was done legally, correct?

24   A.  Correct, and according to this agreement.

25   Q.  According to the contract?

H3GQCOS1                         Penland - Cross

1    A.   That's correct.

2    Q.   Investment grade financial instruments, correct?

3    A.   Correct.

4    Q.   Stocks, bonds, things of that nature.  Would that be fair?

5    A.   Correct.

6    Q.   "And various other types of transactions from which the

7    proceeds shall be used to generate private funding agreement."

8            "Various other types of transactions," that's kind of

9    like a catchall, correct?

10   A.   Within reason, common sense.

11   Q.   Within reason and common sense, right?

12   A.   Correct.

13   Q.   So now we're talking common sense, Doctor?

14   A.   I think in any type of activity there has to be some level

15   of common sense.

16   Q.   That's right.  And in this transaction, you agreed to

17   deposit $5.5 million based on a meeting in the JFK Airport in

18   an hour, right, after an hour, correct?

19   A.   Along with various other conversations and a website --

20   Q.   We went through the website, right?

21   A.   Excuse me?

22   Q.   We went through the website, right?

23   A.   Yes, we did.

24   Q.   We went through the website yesterday in depth, right?

25   A.   Yesterday in here.

H3GQCOS1                         Penland – Cross

1    Q.  Yes.

2    A.  We looked at it, yes.

3    Q.  Now conversations, you're referring to conversations that

4    you had with Ms. Tsien, correct?

5    A.  Yes.

6    Q.  And Mr. Pak?

7    A.  Yes.

8    Q.  And Mr. Hwang, correct?

9    A.  Mr. Cleveland, Mr. Hwang.

10   Q.  Mr. Cleveland, I'm sorry.  The only conversation that you

11   had with Mr. Cosmo was in that lounge at JFK, correct?

12   A.  That's correct.

13   Q.  And that was face-to-face essentially, correct?

14   A.  It was next -- beside each other.

15   Q.  Side-by-side, right?

16   A.  Yes.

17   Q.  And after that meeting, did you have any telephone

18   communications with him?

19   A.  I did not.

20        MR. DeMARCO:  If we can go down, Ms. Hayakawa, to page

21   3, the paragraph marked "Investments."  If you can pull that

22   out.

23   Q.  I'm going to read this, Dr. Penland.  This pertains to

24   investments that -- withdrawn.

25        I'm just going to read it:  "Investments.  Manager

H3GQCOS1                          Penland - Cross

 1    shall enter into managed, matched buy/sell/trade finance

 2    strategies using private physical gold products, other

 3    commodities, automotive and investment grade financial

 4    instruments, and/or various other types of transactions from

 5    which the proceeds shall be used to generate the private

 6    funding amount."  You with me?

 7    A.  Yes, sir.

 8    Q.  And I read that accurately, correct?

 9    A.  Yes, it's the same as above.

10    Q.  That's right.  And you read that before you signed the

11    agreement, correct?

12    A.  I did.

13    Q.  So, you would agree with me that nowhere in this agreement,

14    and especially in those last two paragraphs that I read, there

15    is no discussion of a specific investment strategy, correct?

16    A.  Correct.

17    Q.  And in your mind, the only thing you really cared about was

18    that $5.5 million growing to the $49.5 million needed to finish

19    the construction, correct?

20    A.  That's correct.

21    Q.  So would you agree that if that $5.5 million -- withdrawn.

22          If $49.5 million was won at a blackjack table using

23    that $5.5 million, you would have been OK with that too, right?

24    A.  That was not what I had in mind, sir.

25    Q.  That's not what you had in mind.  What you had in mind was

1  investing $5.5 million and having it grow to $49.5 million,

2  correct?

3  A.  That's not common sense.

4  Q.  Well, the jury is going to decide what common sense is.

5  A.  Yes, sir, I agree with that.  That's my opinion, sir.

6  Q.  OK.  In your opinion, was it common sense for you to invest

7  $5.5 million with Cosmo Dabi International without vetting it

8  or reaching out to any references?  Was that common sense?

9  A.  I have regrets in hindsight for sure.

10  Q.  That's not what I asked you.  The question to you was, was

11  that common sense?

12  A.  Common sense in light of my relationship with Mr. Hwang and

13  Mr. Pak and various other things.  It has some common sense to

14  it, sir.

15  Q.  It was the answer to your prayers, right?  It was common

16  sense in that respect, wasn't it?

17          MR. SOLOWIEJCZYK:  Objection, your Honor.  Relevance

18  at this point.  Also, the question is very unclear.

19          MR. DeMARCO:  I'll withdraw the question, your Honor.

20          THE COURT:  All right.

21  Q.  But you would agree, Doctor, that your primary concern was

22  that $5.5 million investment growing sufficiently enough to

23  fund that $49.5 million loan?

24  A.  The whole point of this --

25  Q.  That was the whole point of it, correct?

H3GQCOS1                          Penland - Cross

1    A.  Yes, sir.

2    Q.  And you would pay back that loan at a 4 percent interest

3    rate, correct?

4    A.  That's correct.

5    Q.  And that was the whole point of this, right?

6    A.  Yes, sir.

7            MR. DeMARCO:  If we could go to page 5 of 18 of

8    Exhibit 190.  If you can pull out the draw schedule box, the

9    entire box.

10   Q.  Is that in front of you, Dr. Penland?

11   A.  It is.

12   Q.  You reviewed that before you signed the document, correct?

13   A.  Yes, sir.

14   Q.  And you've seen it in preparation for your testimony here

15   today, correct?

16   A.  Yes.

17   Q.  And you've actually seen it while testifying also, right?

18   A.  That's correct.

19   Q.  Now, based upon this agreement, the first draw was going to

20   be made 60 business days from the closing date, correct?

21   A.  Correct.

22   Q.  It was your understanding that the closing date would be

23   the day that you wired the funds to the Cosmo Dabi account.  Is

24   that correct?

25   A.  That was my understanding.

1    Q.  So, within 60 business days of January 21, 2011, TCIS was

2    to receive its first draw on the loan, correct?

3    A.  Correct.

4    Q.  And that would be the $15 million, correct?

5    A.  15.

6    Q.  One-five, sorry.  That's my Bronx and my allergies.

7            Now, there's a $3.3 million figure on that draw

8    schedule.  Do you see that?

9    A.  Yes, sir.

10   Q.  And it says, "$3.3 million, origination points payable 60

11   business days from the closing date," correct?

12   A.  Yes, sir.

13   Q.  So that would be also 60 business days from the January 21,

14   2011 wire, correct?

15   A.  Same time as the draw.

16   Q.  So, under this agreement, you would be responsible for

17   $3.3 million on that very same day that you would receive that

18   $15 million draw, correct?

19   A.  Correct.

20   Q.  Did you ever or do you know anyone at TCIS, GSIS, to have

21   paid that $3.3 million within 60 business days?

22   A.  We never thought about paying more money.  We assumed that

23   or discussed, Thomas Hwang and I, that that would be taken out

24   of the first draw.

25   Q.  OK.  So your answer is no?

H3GQCOS1                        Penland - Cross

1    A.  No, to --

2    Q.  You never paid it?

3    A.  No, we didn't pay that.

4    Q.  Now, it was your testimony that that first draw never

5    happened, correct?

6    A.  We never got a loan.  He never originated anything.

7    Q.  I'm correct in saying that first draw never happened,

8    right?

9    A.  You're absolutely correct, sadly.

10   Q.  You sound like my wife.

11            January, February -- so on March 21, 2011, 60 or so

12   business days after that first wire --

13   A.  31st, sir.

14   Q.  I'm sorry?

15   A.  31st.

16   Q.  OK.  That first draw never came, right?

17   A.  No.

18   Q.  And when you were provided the excuse for that failure, you

19   testified that a red flag didn't raise but a yellow flag

20   raised, right?

21   A.  Sure.

22   Q.  And it was the tsunami excuse, right?

23   A.  Japanese earthquake and tsunami.

24   Q.  In April 2011, there was no first draw, correct?

25   A.  No, there was not.

H3GQCOS1                          Penland - Cross

1   Q.  In May of 2011, nothing, right?

2   A.  Yes, sir.

3   Q.  Same for June 2011, correct?

4   A.  Correct.

5   Q.  Same for July 2011, correct?

6   A.  Correct.

7   Q.  Same for August 2011 deadline that you had provided,

8   correct?

9   A.  Correct.

10  Q.  And despite -- one, two, three, four -- more than four

11  failures for that first draw to ever be sent to TCIS, despite

12  that, you didn't ask for the money back, right?

13  A.  I did in June.

14  Q.  You did in June, but not in March, right?

15  A.  No, sir.

16  Q.  Not in April, correct?

17  A.  No, sir.

18  Q.  Not in May, correct?

19  A.  Not yet.

20  Q.  You did in June, is that your testimony?

21  A.  Yes, sir.

22  Q.  When was it that the board of trustees told you to back

23  off, leave it be, we're still hopeful this loan comes through?

24  A.  The 1st of July, around the 1st of July, first week in

25  July.

H3GQCOS1                        Penland - Cross

1    Q.  So you went against the wishes of the board of trustees in

2    June by asking for that money back?

3    A.  I did not have their authority at that point --

4    Q.  So you were --

5    A.  -- officially.

6    Q.  You acted outside the authority of the board of trustees in

7    asking for that money back?

8    A.  Officially, yes.

9    Q.  OK.  What about unofficially?

10   A.  Unofficially, yes.

11   Q.  When did the board of trustees officially give you

12   permission to ask for that money back?

13   A.  August 31.

14   Q.  Now, you testified on direct examination, about an audit,

15   correct?

16   A.  Yes, sir.

17   Q.  You learned that an audit was taking place, correct, based

18   on this agreement?

19   A.  Yes.  I -- not based on the agreement.  I was told about it

20   in July.

21   Q.  You were told about it in July that an audit would take

22   place at the request of the funder, correct?

23   A.  That's correct.

24   Q.  And there came a time that you learned that someone

25   actually came out to South Korea in August of 2011 to conduct

H3GQCOS1                          Penland — Cross

1    this audit, correct?

2    A.   Someone did.

3    Q.   OK.   Now, basically, did you learn that documents were

4    provided or were to be provided to this auditor by Thomas Hwang

5    at the time?

6    A.   That's correct.

7    Q.   And he did that officially, right?

8    A.   He did.

9    Q.   And you knew about this, correct?

10   A.   I knew that he was doing that.

11   Q.   You knew that Thomas Hwang was providing this auditor with

12   documents relating to the construction project, right?

13   A.   Correct.

14   Q.   The financing of that project, right?

15   A.   Correct.

16   Q.   And pretty much everything related to that construction

17   project, correct?

18   A.   As far as I know.

19   Q.   You didn't tell Thomas Hwang, "we want this money back,

20   forget about it, don't comply with the auditor," right?

21   A.   I did not.

22   Q.   Thomas Hwang officially complied with that auditor,

23   correct?

24   A.   As far as I know.

25   Q.   And documents were provided to the auditor, correct?

H3GQCOS1                        Penland - Cross

1   A.   As far as I know, yes.

2   Q.   Have you spoken to Mr. Hwang since August of 2011?

3   A.   Sure.

4   Q.   Did there come a time when you learned that he provided

5   documents to this auditor?

6   A.   I knew it all along that he was providing, according to

7   what he said; and I had some copies of things that he had sent,

8   not everything.

9   Q.   It wasn't like you were totally outside the loop when this

10  was taking place, right?

11  A.   Not totally.

12  Q.   You knew it was happening, right?

13  A.   Yes, sir.

14  Q.   And you were involved to a certain extent, correct?

15  A.   Not directly, but I did visit.  I knew what was going on.

16  Q.   I never said directly.

17  A.   I was monitoring it, yes, sir.

18  Q.   But Mr. Hwang was involved directly, right?

19  A.   Yes, sir.

20  Q.   And so was the auditor, right?

21  A.   As far as I know, yes, sir.

22  Q.   Now, there came a point in time in your direct examination

23  when in response to Mr. Solowiejczyk's questions, you said that

24  nothing in this agreement provided for an audit, correct?

25  A.   I can't recall word for word, but something like that.

H3GQCOS1                         Penland - Cross

1   Q.  You said that there was no specific reference in this

2   funding agreement about an audit requirement at all, correct?

3   A.  Again, I can't recall my testimony word for word, sir, but

4   inferred that, yes.

5   Q.  I'm not asking you to recall it word for word, but I'm just

6   asking if you recall testimony of that nature, of that

7   substance?

8   A.  As I recall, the question was about whether it was required

9   for the loan, and I didn't recall it being required as part of

10  the loan agreement.

11  Q.  OK.  Now, I'm going to refer you again to Government

12  Exhibit 190.  This is the private funding and security

13  agreement.  OK, Doctor?

14  A.  Yes.

15          MR. DeMARCO:  Ms. Hayakawa, can you go to page 2 of

16  that agreement, page 2 of 18.  And if you can pull out from --

17  Q.  I'm referring you to page 2 of the agreement, Doctor.  Are

18  you with me?

19  A.  Yes, sir.

20  Q.  Is it on your screen?

21  A.  Yes, it is, yes.

22  Q.  I am going to read it.

23          "In addition, the word collateral includes all of the

24  following, whether now owned or hereafter acquired, whether now

25  existing or hereafter arising, and wherever located."

H3GQCOS1                          Penland - Cross

 1                I'm going to refer you to paragraph three, OK?

 2       A.  Yes, sir.

 3       Q.  It says, "All accounts, contract rights, general

 4       intangibles, instruments, monies, payments, and all other

 5       rights, arising out of a sale, lease or other disposition of

 6       any of the property described in this collateral section."

 7                I read that accurately, correct?

 8       A.  Yes, sir.

 9       Q.  I'm going to draw your attention to paragraph five.

10                "All records and data relating to any of the property

11       described in this collateral section, whether in the form of a

12       writing, photograph, microfilm, microfiche or electronic media

13       together with all of borrower's right, title and interest and

14       to all computer software required to utilize, create, maintain

15       and process any such records or data on electronic media."

16                Accurately read?

17       A.  Yes, sir.

18                MR. DeMARCO:  Now, if we can go to page three of 18

19       the paragraph that "related documents."

20       Q.  Is it up there, Doctor?

21       A.  Yes, it's there.

22       Q.  I'm going to read that.

23                "Related documents.  The words related documents mean

24       and include, without limitation, all promissory notes,

25       applications and agreements for letters of credit, loan

H3GQCOS1                         Penland - Cross

```
 1    agreements, guarantees, security agreements, mortgages, deeds
 2    of trust, filings with governmental authorities to establish
 3    and secure funder's interest in the collateral, and all other
 4    instruments, agreements and documents whether now or hereafter
 5    existing, executed in connection with the indebtedness and/or
 6    this transaction."
 7            You see that, right, Doctor?
 8    A.  I do.
 9    Q.  And you read that before signing it, right?
10    A.  I did.
11            MR. DeMARCO:  If you can go to the first paragraph on
12    that same page, Ms. Hayakawa, under Article II, management of
13    equity deposit.  Pull that out, just the first paragraph.
14    Q.  I'm going to read that.  Is it up there, Doctor?
15    A.  Yes.
16    Q.  "Borrower hereby appoints and retains funder as its fund
17    manager (manager) on the terms and conditions set forth herein
18    for the equity deposit.  Funder accepts such appointment and
19    assumes responsibility for the fund management on the closing
20    date and agrees to manage and direct the equity deposit funds
21    to generate the desired private funding amount guaranteed upon
22    all borrower qualifications and conditions being satisfactory
23    to the funder."
24            Accurate?
25    A.  That's correct.
```

H3GQCOS1                         Penland - Cross

1              MR. DeMARCO:  If we can go to page 5 of 18 on Exhibit

2      190, Ms. Hayakawa.  Pull out the entire section that states

3      Article IV conditions.

4      Q.  Is it before you, Dr. Penland?

5      A.  Article IV, conditions?

6      Q.  "Conditions.  The obligation of funder to make the private

7      funding as evidenced by the promissory note shall be subject to

8      the fulfillment of the following conditions precedent on or

9      before the date of such promissory note in a manner

10     satisfactory to funder.  Funder shall have received the

11     following:"

12             I am going to skip to paragraph 2.

13             "The related documents" -- and it refers back to that

14     related document section I read earlier --"in form and

15     substance satisfactory to funder, duly executed by each person

16     a party thereto."

17             Now paragraph three.  "Evidence satisfactory to funder

18     that funder has full authorities and has been granted a

19     perfected, first priority, unsubordinated free and clear lien

20     in and to the collateral.  The collateral must be one hundred

21     percent unencumbered, free and clear of any liens and possess

22     full legal and rightful authority for use by the funder as the

23     underlying collateral in exchange for the funding."

24             Accurately read?

25     A.  Correct.

H3GQCOS1                          Penland – Cross

1    Q.  If we can go to the next page, we are still within the

2    conditions portion of the agreement, but I am going to refer

3    you to paragraph 7.

4              "Such other documents as the funder may request,

5    including, without limitation, documents relating to the

6    existence and good standing of borrower."

7              Accurately read?

8    A.  Yes, accurate.

9    Q.  Now, the word audit hasn't been used in any one of those

10   paragraphs, correct?

11   A.  No, sir.

12   Q.  But you would agree that when taken together, one of the

13   obligations of the borrower would be to provide the requested

14   documents of the funder in order to be compliant with this

15   agreement.  Would you agree with that?

16   A.  Yes, sir.

17   Q.  So, when Mr. Hwang provided documents to this person

18   labeled an auditor in Korea in August 2011, in your mind he was

19   complying with terms of the contract, right?

20   A.  Correct.

21   Q.  So while the term audit might not be explicitly used or

22   specifically, or, however you want to call it, the word may not

23   exist in that document, the "requirement to provide documents

24   at the request of the funder" does exist, correct?

25   A.  Yes, sir.

H3GQCOS1                    Penland - Cross

 1            MR. DeMARCO:  One more time.  If we can go,

 2      Ms. Hayakawa, on that same page.  There's a paragraph that

 3      reads "documentation."  If we can pull that up.

 4      Q.  "Documentation.  All corporate and legal proceedings and

 5      all documents required to be completed and executed by the

 6      provisions of, and all instruments to be executed in connection

 7      with the transactions contemplated by this agreement, shall be

 8      in form and substance satisfactory to funder."

 9            Again, referring to documentation, right, Doctor?

10      A.  Yes, sir.

11            MR. DeMARCO:  If you can pull out on page 8 of 18,

12      Ms. Hayakawa.

13      Q.  There's a paragraph that reads "taxes, assessments and

14      liens."  Is it up before you, Dr. Penland?

15      A.  Yes, it is.

16      Q.  It reads: "Borrower will pay when due all taxes,

17      assessments and liens upon the collateral."

18            That paragraph basically provides that you have to pay

19      your taxes, right?

20      A.  Correct.

21      Q.  And in order to give proof that you paid taxes, you'd have

22      to provide some sort of paperwork, right?

23      A.  Yes, sir.

24            MR. DeMARCO:  OK.  Ms. Hayakawa, the section that

25      starts with "compliance with governmental requirements."  Pull

H3GQCOS1                              Penland - Cross

1    that section out.

2    Q.   "Under this requirement of the contract, TCIS was required

3    to comply promptly with all laws, ordinances and regulations of

4    all governmental authorities now or hereafter in effect

5    applicable to the ownership, production, disposition or use of

6    the collateral."

7         And it goes on, correct?

8    A.   Correct.

9    Q.   In order to prove you were doing that, you would have to

10   provide some documents, right?

11   A.   Yes, sir.

12        MR. DeMARCO:   Thank you, Ms. Hayakawa.

13   Q.   When that "audit" was completed, there came a time when a

14   cure report was issued, right?

15   A.   That's correct.

16   Q.   And that cure report basically gave notice to TCIS of all

17   deficiencies or errors that needed to be complied with in order

18   for the funding to take place, right?

19   A.   That's correct.

20   Q.   And there came a point in time in your mind when you were

21   displeased with this, right?

22   A.   Yes.

23   Q.   In fact, this was in August of 2011, correct?

24   A.   That's a very important date, sir.

25   Q.   That's right.   When did the board of trustees give you

H3GQCOS1                         Penland - Cross

1    official permission to ask for that money back?

2    A.  August 31.

3    Q.  You testified on direct examination that after this deal

4    fell through, you sought your funding elsewhere, correct?

5    A.  Yes, sir.

6    Q.  Where did you receive the funding after this deal went

7    through to complete the project?

8    A.  We had Korean Christian leaders who invested in the school.

9    Multiple parties came together and invested in the school.

10   Q.  So you went to no other banks, is that fair?

11   A.  We did not.

12   Q.  You went to no other investment houses or lenders, correct?

13   A.  That's correct.

14   Q.  The local Christian people in Korea and elsewhere, I

15   presume --

16   A.  It was in Korea.

17   Q.  OK.

18   A.  We had other people outside of Korea interested in

19   investing as well, but it ended up being a Korean investor.

20   Q.  They donated the money or did they loan the money?

21   A.  They did both.

22           MR. DeMARCO:  I'm done, Doctor.  Thank you very much.

23           THE WITNESS:  Thank you.

24           THE COURT:  Thank you.  Redirect, counsel.

25

H3GQCOS1                          Penland - Redirect

1    REDIRECT EXAMINATION

2    BY MR. SOLOWIEJCZYK:

3    Q.  Good morning, Dr. Penland.

4    A.  Good morning.

5    Q.  I'm going to be very brief.

6            During the cross-examination you were asked whether

7    you had any interaction with Mr. Cosmo.  Do you recall that?

8    A.  Yes.

9    Q.  In terms of in-person meetings, you only had one in-person

10   meeting.  Is that right?

11   A.  That's correct.

12   Q.  But in terms of email, correspondence, receiving letters

13   with his letterhead and his name on it, that happened multiple

14   times.  Isn't that correct?

15   A.  That's correct.

16   Q.  And when you asked for your equity deposit back, didn't you

17   ultimately have a direct email back and forth with Mr. Cosmo?

18   A.  We did.

19   Q.  During which he refused to return your equity deposit.

20   Isn't that right?

21   A.  That's correct.

22   Q.  And that wasn't through Patricia Tsien, was it?

23   A.  No, it was not.

24   Q.  When your school sent the $5 and a half million deposit,

25   did it send it to Mr. Tsien's company, Omni, or did it send it

H3GQCOS1                        Penland - Redirect

1    to Mr. Cosmo's company, Cosmo Dabi?

2    A.  It was sent to Mr. Cosmo's company.

3    Q.  You were asked some questions about the due diligence that

4    you did going into this deal?

5    A.  Yes, sir.

6    Q.  Do you remember that?

7            Dr. Penland, you reviewed the website before you

8    entered into the deal.  Isn't that correct?

9    A.  I did.

10   Q.  Multiple times?

11   A.  I did.

12   Q.  Was that one of the factors that led you to feel that you

13   could go forward with this deal?

14   A.  It was.

15   Q.  Why was that?

16   A.  The kind of information that was on there.  That was the

17   main reason for accepting that website was the information

18   presented there.

19   Q.  So, is it fair to say you didn't go into the deal just

20   based on the word alone of Mr. Hwang?

21   A.  No, sir.

22   Q.  Or the word alone of Ms. Tsien?

23   A.  No, sir.

24   Q.  In fact, before you were willing to enter into the deal,

25   you wanted to meet Mr. Cosmo.  Is that correct?

H3GQCOS1                        Penland - Redirect

1   A.  I did.

2   Q.  And during that meeting, did he say anything to you that

3   would lead you to believe -- withdrawn.

4           Did he say anything to you that was inconsistent with

5   the representations on the website?

6   A.  No, sir.

7   Q.  In fact, didn't you testify in your direct that he gave you

8   the sense that this was going to be a relatively small project

9   for him compared to his other projects?

10  A.  Yes, sir.

11  Q.  During your cross-examination, you were asked about the

12  audit that was ultimately conducted of TCIS.  Do you recall

13  that?

14  A.  Yes, sir.

15  Q.  Starting in about early April of 2011, was TCIS expecting

16  the first draw of the loan?

17  A.  Yes, the end of March or early April was our hope and

18  expectations.

19  Q.  Around that time, do you recall during your direct

20  testimony I showed you some emails about explanations as to why

21  the first draw couldn't be provided in that time frame?

22  A.  Yes.

23  Q.  And the deadline, is it fair to say, got pushed once, got

24  pushed again a second time?

25  A.  Multiple times.

H3GQCOS1                        Penland - Redirect

1    Q.   Multiple times.  When those deadlines were getting pushed,

2    did anyone ever say to you, "Oh, and by the way, before you can

3    get the first draw, there's also going to be an audit."  Did

4    anyone ever bring that up with you?

5    A.   Sir, there was never any mention for any kind of need for

6    due diligence from their end to our end, from Mr. Cosme's end

7    to our end at any point until June.  When I began to ask for

8    the deposit back, that's when due diligence from his end became

9    suddenly so important, which was 90 days past March 31.  And

10   that's why I considered it quite -- I mean, if -- I wanted the

11   money back at that point.

12   Q.   So Dr. Penland -- withdrawn.

13            The first time -- withdrawn again.

14            The first time that any mention of an audit was raised

15   with you was after you demanded that equity deposit back in

16   that email in late June.  Isn't that right?

17   A.   That's when it started, the due diligence, the audit stuff.

18   Q.   Did that make you suspicious, Dr. Penland, of the audit?

19   A.   Everything from the website to the meeting in New York,

20   never --

21   Q.   Dr. Penland, my question is, the fact that the audit was

22   only raised after you asked for your money back, did that fact

23   alone make you suspicious?  That's my only question.

24   A.   Did that fact alone?

25   Q.   Yes, the fact that the audit was only brought up after you

1    asked for the money back.

2    A.  Yes, there were other facts that also made me suspicious,

3    but yes, that fact alone also made me suspicious.

4         MR. SOLOWIEJCZYK:  If you could put up Government

5    Exhibit 154B, Ms. Hayakama.  If you could just zoom in.

6    If you could zoom in on the top half, Ms. Hayakawa.  That's

7    perfect.

8    Q.  On cross-examination, you were asked if you relied on the

9    specific names in the document, and I think your testimony is

10   you didn't, right?

11   A.  I did not.

12   Q.  But the reason that TCIS -- withdrawn.

13        Didn't TCIS ask for this documentation because it was

14   required as part of its bank due diligence?

15   A.  Yes, it was.

16   Q.  And aside from the specific names, the fact that this

17   document indicated that Cosmo Dabi had multiple officers rather

18   than just one officer, that was something you saw at the time,

19   correct?

20   A.  Yes.

21   Q.  And did you believe that at the time to be true?

22   A.  I did.

23        MR. SOLOWIEJCZYK:  You can take that down,

24   Ms. Hayakawa.

25   Q.  I'm going to briefly go to the contract, I believe it's

H3GQCOS1                          Penland - Redirect

1    Government Exhibit 190.

2            MR. SOLOWIEJCZYK:  Ms. Hayakama, if you could turn to

3    the fifth page.  Just focus on the schedule.

4    Q.  Dr. Penland, under this draw schedule, if the school did

5    not get the first draw after 60 days, was there a 15-day grace

6    period?

7    A.  15 international banking days, yes.

8    Q.  Once that grace period expired, what was the school

9    entitled to under provision 3 of the schedule?

10   A.  "Further funder agrees to return the equity deposit in full

11   within seven business days thereafter."

12   Q.  It says in full, right?  Not in part?

13   A.  In full.

14   Q.  That would mean the full $5 and a half million, correct?

15   A.  That was our agreement.

16   Q.  Dr. Penland, there was some discussion about how the $5 and

17   a half million was going to be grown in order for you to

18   receive the $55 million loan.  Do you recall that?

19   A.  Yes.

20   Q.  Ultimately, the $55 million was a loan, right?

21   A.  $49.5 was a loan, and $5.5 was our equity deposit.

22   Q.  So you would have to pay that money back ultimately to

23   Cosmo Dabi under the agreement, correct?

24   A.  We had a two-year delay in starting to repay the loan, but

25   yes, it was a loan.  We were going to pay the money back.

H3GQCOS1                         Penland - Redirect

1   Q.  With interest, right?

2   A.  That's correct.

3   Q.  It wasn't like the school was going to be receiving any

4   kind of windfall under this agreement, was it?

5   A.  No, sir.

6   Q.  You'd have to pay the money back with interest, correct?

7   A.  That's correct.

8          MR. SOLOWIEJCZYK:  My apologies, your Honor, I'm

9   trying to find the right page.

10          THE COURT:  Yes, sir.

11          MR. SOLOWIEJCZYK:  Conditions, page 5.  Ms. Hayakawa,

12   if you could just highlight the bottom half of the page.

13   Q.  Now, Dr. Penland, I'd going to read to you.

14          "The obligation of funder to make the private funding

15   as evidenced by the promissory note shall be subject to the

16   fulfillment of the following conditions precedent on or before

17   the date of such promissory note in a manner satisfactory to

18   funder."

19          Then you went through a number of provisions

20   underneath --

21          THE COURT:  Slowly.

22          MR. SOLOWIEJCZYK:  My apologies.  I'm missing my stop

23   signs today.

24   Q.  You went over the various provisions with Mr. DeMarco,

25   correct?

H3GQCOS1                         Penland - Recross

1   A.  We did.  We read this entire sheet.

2   Q.  All of the requirements for documentation in this

3   agreement, that's all in your seeking the loan, correct?

4   A.  Yes, sir.

5   Q.  That documentation is not required if you're just seeking

6   your $5 and a half million equity deposit back, is it?

7   A.  No, sir.

8   Q.  At that point, under this agreement, if the first draw is

9   not disbursed, you're entitled to your money back, correct?

10  A.  Yes, sir.

11          MR. SOLOWIEJCZYK:  Nothing further, your Honor.

12          THE COURT:  Thank you.

13          Recross, counsel.

14          MR. DeMARCO:  Briefly, your Honor.

15          THE COURT:  Yes, sir.

16  RECROSS EXAMINATION

17  BY MR. DeMARCO:

18  Q.  Doctor, Mr. Solowiejczyk asked you some questions about

19  your email correspondence with Mr. Cosme.  You recall that?

20  You just heard it.

21  A.  Yes, sir.

22  Q.  I want to narrow your attention to, let's start with

23  October of 2010, OK, until the wire transfer was made on

24  January 21 of 2011, OK?

25  A.  Yes, sir.

H3GQCOS1                        Penland - Recross

1    Q.  To that specific time period.  Three months, right?

2    A.  Yes, sir.

3    Q.  Would it be fair to say that with respect to the

4    acquisition of this loan, any questions had regarding this loan

5    including email correspondence between TCIS and anyone was --

6    withdrawn.  Man, that's a bad question.

7            In that time period from October 2010 to January 21,

8    2011, your correspondence was with Pat Tsien, correct?

9    A.  Correct.

10   Q.  OK.  By email, correct?

11   A.  My correspondence, yes.

12   Q.  Yes.  Your communication regarding this agreement was

13   between TCIS and Pat Tsien acting as the intermediary, correct?

14   A.  Yes.  With her and through Thomas Hwang as well.

15   Q.  I'm including him under the TCIS umbrella, OK?

16   A.  Part of that, thank you.

17   Q.  In fact, anything that was communicated to you during that

18   time period on Cosmo Dabi letterhead came to you as an

19   attachment to an email sent by Ms. Tsien, correct?

20   A.  Prior to?

21   Q.  October to January 21, 2011.

22   A.  To December, correct.

23   Q.  OK.

24   A.  Yes.

25   Q.  The wiring instructions came to you as an attachment to a

H3GQCOS1                          Penland – Recross

1    Patricia Tsien email, correct?

2    A.  Yes, sir, I believe that's correct.

3    Q.  So when the $5.5 million funded on January 21, 2011, when

4    it was wired, right, there was no direct correspondence by

5    email between TCIS and anyone affiliated with TCIS and William

6    Cosmo, correct?

7    A.  I can't be sure about that.

8    Q.  But you can be sure that the majority of communication

9    during that time period was between TCIS and Pat Tsien?

10   A.  Correct.

11   Q.  And you can also be certain that any attachments or

12   letterheads bearing Mr. Cosmo's name or the name of Cosmo Dabi

13   came as attachments to Patricia Tsien emails, correct?

14   A.  From Patricia Tsien's email, correct, to my knowledge.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H3GMCOS2                              Penland - recross

1    Q.  That's the knowledge we are asking about.

2              Now, Mr. Solowiejczyk also asked you something about

3    that JFK meeting.  Do you remember that?

4    A.  Yes, sir.

5    Q.  Before you went to meet with Mr. Cosmo at JFK you had met

6    with Ms. Tsien and the others at Omni, correct?

7    A.  That's correct, sir.

8    Q.  And it was during that meeting that Ms. Tsien cautioned you

9    not to ask too many questions of Mr. Cosmo, correct?

10   A.  That is correct.

11   Q.  And Ms. Tsien cautioned you that the reason you shouldn't

12   ask a lot of questions is that he was this sensitive

13   high-profile investor, correct?

14   A.  That's correct.

15   Q.  You abided by her warnings, correct?

16   A.  Yes, sir.

17   Q.  You had a brief conversation in the lounge, right, and you

18   didn't ask too many questions, right?

19   A.  We had an hour-plus meeting in that lounge.  I didn't ask

20   many questions of Mr. Cosmo.

21             MR. DeMARCO:  Thank you.  I have nothing further.

22             THE COURT:  Thank you.  Redirect, counsel.

23             MR. SOLOWIEJCZYK:  Nothing further, your Honor.

24             THE COURT:  You may step down, sir.

25             (Witness excused)

H3GMCOS2                        Penland - recross

1            MR. BELL:  Your Honor, the government has a number of

2     stipulations to read into the record.

3            THE COURT:  Are these fact or testimonial?

4            MR. BELL:  They are testimonial.

5            THE COURT:  Ladies and gentlemen, I told you at the

6     outset that there might be times when the parties agree to

7     certain things.  This is one of those and the stipulations that

8     counsel is going to read to you are stipulations of testimony.

9     So you must accept that if the witness who is mentioned were

10    called, the witness would give the testimony that counsel has

11    in the stipulation.  The weight you give to that testimony, of

12    course, is up to you, but you must accept that the witness

13    would give that testimony.

14            Mr. Bell.

15            MR. BELL:  Thank you, your Honor.

16            First stipulation is marked for identification as

17    Government Exhibit 903, and it reads as follows:

18            It is stipulated between the parties that:

19            If called to testify, a representative from Scottrade

20    would testify that the documents marked for identification as

21    Government Exhibit 403 are true and correct copies of Scottrade

22    records and are full and complete records of the acts,

23    transactions, and events described therein; were made and/or

24    received, and thereafter maintained, in the regular course of

25    business; were made at or near the time of the acts,

1    transactions, and events reported therein; and contain

2    information set forth by, or obtained from, persons with

3    knowledge of those matters.  The representative would also

4    testify that the information concerning "Gross Proceeds" on

5    page 106 of that exhibit, Exhibit 403, does not refer to the

6    balance of the account but rather is a measure of trading

7    volume and activity.  I'll get to that in a moment.

8              2.  If called to testify, a representative from

9    Scottrade with knowledge of such matters would further testify

10   that:  The image depicted in the lower half of what has been

11   marked for identification as Government Exhibit 156A is a

12   partial screenshot from a Scottrade user account, as viewed by

13   the user accessing his or her account online.

14             Your Honor, Government Exhibit 156A is already in

15   evidence.  May we publish it right now?

16             THE COURT:  Yes.

17             MR. BELL:  Can you focus in on the lower half of that

18   document.

19             The screenshot is incomplete, and immediately below

20   the "Beginning of Day DTBP," "Today's Impact on DTBP," and

21   "Current DTBP" fields would be a field that informs the user of

22   the trading balance, that is, the actual amount of money in the

23   account available for trading activity.  "DTBP" refers to "Day

24   Trade Buying Power," a measure that applies to margin accounts

25   that refers to the amount of money available to a user to place

H3GMCOS2                        Penland - recross

1    trades on a given day.  That measure is not the same as the

2    account balance, and in fact is typically several times the

3    actual balance of the account.  A "margin account" is an

4    account in which the owner can trade on credit.

5            It is further stipulated that Government Exhibit 403

6    and this stipulation may be received in evidence at the trial

7    of this matter.  It's signed earlier today, March 16, by Martin

8    Bell and Noah Solowiejczyk on behalf of the government, and Mr.

9    DeMarco on behalf of Mr. Cosme.

10           Your Honor, the government offers Government Exhibit

11   903 and Government Exhibit 403 into evidence.

12           THE COURT:  Received.

13           (Government Exhibits 903 and 403 received in evidence)

14           MR. BELL:  Government Exhibit 902 is another

15   stipulation and it reads as follows:

16           It is hereby stipulated and agreed between and amongst

17   the parties that:

18           If called to testify, a representative from King

19   O'Rourke Cadillac in Smithtown, New York, would testify that:

20   The documents marked for identification as Government Exhibit

21   501 are true and correct copies of King O'Rourke Cadillac

22   records pertaining to the sale of a Cadillac Escalade to Cosmo

23   Dabi International Trading Corp., and are full and complete

24   records of the acts, transactions, and events described

25   therein; were made and/or received, and thereafter maintained,

in the regular course of business; were made at or near the

time of the acts transactions and events recorded therein, and

contain information set forth by, or obtained from, persons

with knowledge of those matters.

  2.  If called to testify, a representative from

Ferrari-Maserati of Long Island in Plainview, New York, would

testify that:  The documents marked for identification as

Government Exhibit 502 are true and correct copies of

Ferrari-Maserati of Long Island records pertaining to the sale

of a Ferrari Italia Cosmo Dabi Gold LLC and William Cosme, and

are full and complete records of the acts, transactions, and

events described therein; were made and/received, and

thereafter maintained, in the regular course of business; were

made at or near the time of the acts, transactions, and events

recorded therein; and contain information set forth by, or

obtained from, persons with knowledge of those matters.

  3.  If called to testify, a representative from Nissan

of Manhattan in New York, New York would testify that:  The

documents marked for identification as Government Exhibit 504

are true and correct copies of Nissan of Manhattan records

pertaining to the sale of a Nissan Juke to John Cosme and made

for by Cosmo Dabi International Trading Group, and are full and

complete records of the acts, transactions, and events

described therein; were made and/or received and thereafter

maintained, in the regular course of business; were made at or

near the time of the acts, transactions, and events recorded

therein; and contain information set forth by, or obtained

from, persons with knowledge of those matters.

    4.  If called to testify, John Cosme would testify

that he is related to William Cosme.

    5.  Government Exhibits 501, 502, and 504, and this

stipulation, Government Exhibit 902, may be received in

evidence at the trial of this matter.  It's signed by the

parties and dated March 16.

    Your Honor, the government offers Government Exhibits

501, 502, 504, as well as 902.

    THE COURT:  Received.

    (Government Exhibits 501, 502, 504, and 902 received

in evidence)

    MR. BELL:  Finally, Government Exhibit 901 is a third

stipulation.  It's hereby agreed between and amongst the

parties that:

    1.  If called to testify, a representative from JP

Morgan Chase Bank would testify that:  The documents marked for

identification as Government Exhibits 401, 401A, 401B, 401C,

401D, and 402 are true and correct copies of JP Morgan Chase

Bank records and are full and complete records of the acts,

transactions, and events described therein; were made

and/received, and thereafter maintained, in the regular course

of business; were made at or near the time of the acts,

H3GMCOS2                          Penland - recross

transactions, and events recorded therein; and contain

information set forth by, or obtained from, persons with

knowledge of those matters.

        If called to testify, and I'll summarize here, a

representative from Morgan Stanley Smith Barney would testify

to the same things as to Government Exhibit 406 with respect to

Morgan Stanley Smith Barney.

        Third, if called to testify, a representative from

Sterling National Bank would testify that the document marked

for identification as Government Exhibit 404 is a true and

correct copy of a document retained in Sterling National Bank's

records of the acts, transactions, and events described

therein; was made or received and thereafter maintained, in the

regular course of business; was made at or near the time of the

acts, transactions, and events recorded therein.

        THE COURT:  Slowly.

        MR. BELL:  Almost made it, your Honor.

        And contains information set forth by, or obtained

from, persons with knowledge of those matters.

        Fourth, and finally, it is stipulated that Government

Exhibits 401, 401A, 401B, 401C, 401D, 402, 404, and 406, and

this stipulation may be received in evidence at the trial.

It's dated March 16 and signed by the parties.

        With that, your Honor, the government offers the

stipulation, which is 901, along with 401, 401A through D, 402,

H3GMCOS2                          Penland - recross

1    404, and 406.

2                    THE COURT:  Received.

3                    (Government Exhibits 401, 401A, 401B, 401C, 401D, 402,

4    404, 406, and 901 received in evidence)

5                    MR. BELL:  Thank you, your Honor.

6                    THE DEFENDANT:  Objection, your Honor.

7                    THE COURT:  I'm sorry, Mr. Cosme.  Mr. DeMarco will

8    speak.

9                    THE DEFENDANT:  Mr. DeMarco is not counsel for Cosmo

10   Dabi Gold.

11                   THE COURT:  Mr. Cosme, would you be seated so we can

12   proceed with the trial, sir.

13                   THE DEFENDANT:  Mr. DeMarco is not counsel for Cosmo

14   Dabi Gold.

15                   THE COURT:  Ladies and gentlemen, I think we are going

16   to take a break now.  I'll see you in a few minutes.  Please

17   remember not to discuss the case among yourselves.  Thank you.

18                   (Jury not present)

19                   THE COURT:  Mr. Cosme, you have a right to be present

20   at your trial.  Of course that is the best thing, for you to be

21   present and able to confer with counsel if that's required.

22                   However, if you speak out and if you disrupt matters,

23   you will be taken from the room.  I want to caution you that

24   you are not to speak out.  You are the client, as you

25   recognized this morning in your argument when you referred to

H3GMCOS2                          Penland - recross

 1    yourself as the client, and the only speaking role you will

 2    have is if you decide that you are going to take the stand.

 3    Otherwise, Mr. DeMarco will speak for you as your counsel.  Do

 4    you understand, sir?

 5            THE DEFENDANT:  I do not.

 6            THE COURT:  If you don't understand, it's because you

 7    choose not to and you continue not to participate properly in

 8    the proceedings, sir.

 9            THE DEFENDANT:  May I respond to that.

10            THE COURT:  You may respond.  But, sir, what I have

11    said is what is going to go.  If in front of the jury you speak

12    out inappropriately, you will be removed from the room.

13            THE DEFENDANT:  Understood, your Honor.

14            The issue is not me, my inability to comply to law.

15    The issue is on the record.  He is not counsel for Cosmo Dabi

16    Gold.  He is not counsel.

17            THE COURT:  Cosmo Dabi Gold is not a party to these

18    proceedings, sir.

19            THE DEFENDANT:  Your Honor, the prosecutor is entering

20    evidence from another corporation that was acquired illegally,

21    that was acquired in violation of the Fourth Amendment.

22            THE COURT:  That will be an issue on appeal, sir.

23    Those are legal issues that are not properly brought before a

24    trial judge.

25            THE DEFENDANT:  Your Honor, they were properly brought

H3GMCOS2                        Penland - recross

1    prior to these proceedings.  They were properly brought at

2    pretrial conferences.  They were properly brought to the Second

3    Circuit.  The Second Circuit has opined that all of the

4    evidence was acquired in violation of the Fourth Amendment.

5              THE COURT:  Sir, then it will be an issue on appeal.

6              THE DEFENDANT:  We were at a pretrial conference.  If

7    we know about the violation, why would we not be able to

8    address it now, as opposed to having go to an appellate court

9    after a conviction, potential conviction, that occurred in

10   violation of a known fundamental constitutional right?

11             THE COURT:  It is the Court's view that the evidence

12   was not obtained illegally.  I already ruled on that.  And we

13   are not going to discuss it any longer.  That is not an issue

14   for a trial jury.

15             THE DEFENDANT:  The district court does not have the

16   authority to change the appellate court's rulings.

17             THE COURT:  That is an appellate issue.  It is not an

18   issue for the trial court.  We are wasting time having this

19   discussion.

20             THE DEFENDANT:  We are wasting time because of

21   improper administration of criminal justice.

22             THE COURT:  It will be an issue on appeal.

23             THE DEFENDANT:  Interlocutory appeal.

24             THE COURT:  Denied.  Construing your request as a

25   request for interlocutory appeal under 1292(b), it is denied.

H3GMCOS2                              Polonitza – direct

1              Counsel.

2              MR. SOLOWIEJCZYK:  Your Honor, we are ready to call

3   our next witness.

4              THE COURT:  Counsel, as long as we have the jury out,

5   why don't you take your five minutes and then we will return.

6   Get the witness in here while you are out.  Thank you, counsel.

7              (Recess)

8              (Jury present)

9              THE COURT:  Who does the call government, please.

10             MR. SOLOWIEJCZYK:  Your Honor, the government calls

11  special agent Jonathan Polonitza.

12   JONATHAN POLONITZA,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15  DIRECT EXAMINATION

16  BY MR. SOLOWIEJCZYK:

17  Q.  Good morning, Special Agent Polonitza.  Where are you

18  employed?

19  A.  I am employed with the FBI here in New York.

20  Q.  How long have you been with the FBI?

21  A.  Approximately six and a half years.

22  Q.  What unit are you currently assigned to?

23  A.  I'm on a squad that handles security fraud and money

24  laundering.

25  Q.  In connection with your duties as an FBI agent, did there

H3GMCOS2                      Polonitza - direct

1    come a time when you participated in the arrest of William

2    Cosmo?

3    A.  I did.

4    Q.  Is that a number of years ago, sir?

5    A.  It was.

6    Q.  During that arrest do you recall if there were any vehicles

7    on the premises of Mr. Cosme's residence?

8    A.  I do.  I remember seeing three vehicles, one at the

9    arrival.  I saw a dark SUV in the driveway, as well as two

10   additional vehicles in the attached garage.

11   Q.  I am going to direct you to what's in front of you as

12   Government Exhibit 701, which is already in evidence.  If you

13   could take a look at page 12 of the document.

14         MR. SOLOWIEJCZYK:  If you could publish that, Mr.

15   Lachow.

16   Q.  Do you recall seeing that vehicle that day in the garage?

17   A.  I do.

18   Q.  What type of vehicle is that?

19   A.  It's a Ferrari.

20   Q.  Did there come a time during that day when the Ferrari was

21   seized by the FBI?

22   A.  Yes.

23   Q.  In conjunction with that seizure was there any inventory

24   taken of the vehicle?

25   A.  There was.

H3GMCOS2                              Polonitza – direct

1    Q.  Is that standard FBI practice when seizing a vehicle?

2    A.  It is.

3    Q.  Did you participate in the inventory of this Ferrari?

4    A.  I did.

5    Q.  In connection with the inventory, what, if any, steps were

6    taken to check the odometer reading?

7    A.  I viewed the odometer.

8    Q.  Sitting here today, do you specifically recall what the

9    odometer reading was off the top of your head?

10   A.  I don't recall.

11   Q.  Is there anything that would help you recall that, any type

12   of document or something else?

13   A.  Yes.  There would have been an inventory recording, a form

14   that I would have completed.

15          MR. SOLOWIEJCZYK:  Your Honor, may I approach?

16          THE COURT:  Yes, sir.

17   Q.  Sir, I would ask that you not read that document aloud.

18   Just read it to yourself.

19   A.  OK.

20   Q.  Based on your review of that document, do you have any

21   recollection of what the odometer reading was on the Ferrari?

22   A.  I do.

23   Q.  What was it?

24   A.  4,946 miles.

25   Q.  During the inventory of the Ferrari, do you recall if there

H3GMCOS2                           McLaren - direct

1  were any other items found inside of the Ferrari?

2  A.  As part of the inventory there were several items.

3  Q.  Don't read from the document.  Just what you recall, sir.

4  A.  I do remember several items.

5  Q.  Anything from the glove compartment, for example?  Do you

6  recall if there were things in there?

7  A.  What I recall is that there was some money in the car, a

8  small amount of money.  I remember there being insurance and

9  insurance card, registration, additional items related to the

10  vehicle itself, like a manual, things of that nature.

11           MR. SOLOWIEJCZYK:  No further questions, your Honor.

12           THE COURT:  Thank you.  Cross-examination, sir.

13           MR. DeMARCO:  No.  Thank you, your Honor.

14           THE COURT:  Thank you, Agent.  You may step down.

15           (Witness excused)

16           MR. SOLOWIEJCZYK:  Your Honor, the government calls

17  Adrian McLaren.

18   ADRIAN McLAREN,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MR. SOLOWIEJCZYK:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  Mr. McLaren, where are you employed?

H3GMCOS2                    McLaren - direct

1   A.  I currently work for the General Electric company.

2   Q.  What's your position for the General Electric company?

3   A.  I'm the leader of the data and metrics team.

4   Q.  Where is your office based, sir?

5   A.  We are currently based in Schenectady, New York.

6   Q.  How long have you worked for General Electric?

7   A.  For 10 years.

8   Q.  Generally speaking, can you give an overview of what your

9   duties and responsibilities are.

10  A.  I oversee a team that is responsible for data collection as

11  well as reporting of payroll and benefits data for the U.S.,

12  for all U.S.-based GE employees.  Those duties also include

13  that we report on data to our headquarters so that they could

14  use those numbers for financial purposes as well as for making

15  decisions regarding company benefit policies.  We also do

16  handle subpoena requests for the organization that require

17  payroll and benefit information gathering.

18  Q.  Sir, in your position do you have full access to General

19  Electric's payroll and benefits information?

20  A.  Yes, I do.

21  Q.  And do you oversee data relating to payroll and benefits

22  for the entire General Electric company or just the portions of

23  the company that are in the United States?

24  A.  Just the United States.

25  Q.  And the records that you have access to, would that just

H3GMCOS2                          McLaren - direct

1    include the General Electric company or would it include

2    subsidiaries of the General Electric company?

3    A.   It would include subsidiaries as well.

4    Q.   In the United States?

5    A.   Correct.

6    Q.   Outside of the United States do you have any mechanism by

7    which you can access payroll and benefits records?

8    A.   Yes.  The same database that stores the U.S.-based data

9    also stores for asset global employees as well.  Based on the

10   role that you are in the company, your access is limited.  I do

11   work with resources that provide the same functions globally

12   that I do for the U.S.

13   Q.   If you wanted to locate an employee who was outside of the

14   U.S., in your role, you would be able to do so, is that right?

15   A.   Correct.

16   Q.   Are General Electric's payroll and benefits records

17   maintained electronically, sir?

18   A.   Yes.

19   Q.   Can you just describe briefly how they are maintained.

20   A.   Currently the data is maintained in a PeopleSoft system.

21   We also have the employee-based data that is housed in Oracle

22   HR system and that information is currently updated in

23   PeopleSoft throughout the day.

24   Q.   Are you able to run searches on that electronic system?

25   A.   Correct.  Part of the function for my team is to be able to

H3GMCOS2                          McLaren - direct

1     query that data and provide details on individuals or large

2     populations of people.

3     Q.   The electronic system, does it list all current employees

4     of General Electric company?

5     A.   Yes, it does.

6     Q.   What time period does the electronic records system cover,

7     approximately?

8     A.   Starting about 1999 forward.

9     Q.   Now, does General Electric company maintain any records

10    with respect to employees from before 1999?

11    A.   Yes.

12    Q.   How are those records maintained?

13    A.   There is a historical database that at the point in time,

14    when we cut over to the new system, that information was stored

15    at that point in time, and then there is also any pension

16    records for individuals that might have participated in a

17    pension prior to that period, those records are stored on

18    microfiche.

19    Q.   And the microfiche system, is there a way to run searches

20    on that as well, sir?

21    A.   Yes.  So initially microfiche was a very manual effort to

22    look up data through that system.  But recently, within the

23    year, the company has updated it to have it be more digital

24    that you can perform digital searches on.

25    Q.   Sir, during the course of your employment at General

1    Electric company, have you conducted a search of General

2    Electric's electronic payroll and benefits records for the name

3    William Cosme?

4    A.  Yes.

5    Q.  What did you find?

6    A.  We were unable to find any records for -- pertaining to

7    William Cosme.  We also searched independently first name

8    versus last name.  We also searched for William Cosmo.  I

9    believe it was Vasily Cosmo as well.  There were several

10   searches that were performed in each of the systems to try to

11   identify that individual as well by the SSN, Social Security

12   number, that was provided.

13   Q.  You also searched based on a Social Security number that

14   had been provided to you?

15   A.  Yes.

16   Q.  That record search, what did it encompass?  Did it

17   encompass just current employees or former employees?  Can you

18   describe briefly what it encompassed?

19   A.  It would encompass current employees, former employees.  It

20   would also include anyone that historically had any pension

21   records as well.

22   Q.  So prior to 1999, you searched those records as well?

23   A.  Yes.

24   Q.  Did you find any records there?

25   A.  No, no records were found.

H3GMCOS2                              McLaren - cross

```
1    Q.  What about records for employees abroad, did you take any

2    steps with respect to that?

3    A.  I worked with the global team for them to perform a similar

4    search for the oracle database, and they were unable to find

5    anyone with the matching name.

6            MR. SOLOWIEJCZYK:  One moment, your Honor.

7            THE COURT:  Yes, sir.

8            MR. SOLOWIEJCZYK:  My apologies, your Honor.  One

9    moment.

10           THE COURT:  Yes, sir.

11   Q.  You mentioned that the searches you ran would include

12   General Electric company subsidiaries, former subsidiary

13   companies?

14   A.  Yes.

15   Q.  Would that search have included a company known as General

16   Electric Medical Systems?

17   A.  Yes, it would.

18           MR. SOLOWIEJCZYK:  No further questions, your Honor.

19           THE COURT:  Cross-examination, sir.

20           MR. DeMARCO:  Thank you, your Honor.

21   CROSS-EXAMINATION

22   BY MR. DeMARCO:

23   Q.  Mr. Good morning, Mr. McLaren.  How are you doing?

24   A.  Doing well.  Thank you.

25   Q.  Is it colder in Schenectady or here?
```

H3GMCOS2                          McLaren - cross

1   A.  Schenectady.

2   Q.  I just have a few questions for you.  You've been in GE for

3   about 10 years, is that fair?

4   A.  Yes.

5   Q.  And you're the leader of the data metrics team.  Is that

6   what you said?

7   A.  Yes.

8   Q.  Now, you did this search, as you described on your direct

9   examination, right?

10  A.  Correct.

11  Q.  You searched the GE systems for many years for past

12  employees, correct?

13  A.  Yes.

14  Q.  Current employees, correct?

15  A.  Correct.

16  Q.  People in the pension system, right?

17  A.  Yes.

18  Q.  You used various names, correct?

19  A.  Yes.

20  Q.  You also searched by Social Security number, right?

21  A.  Correct.

22  Q.  In your 10 years with GE, have you come to learn that GE

23  sometimes utilizes employment agencies for temp positions?

24  A.  Yes.

25  Q.  Did you come to learn in the 10 years of GE that sometimes

H3GMCOS2                           McLaren - cross

1    GE subcontracts work to people who aren't considered employees?

2    A.  Yes.

3    Q.  Subcontractors, right?

4    A.  Yes.

5    Q.  What about consultants who aren't employed by GE and part

6    of the pension system, does GE ever use those types of people?

7    A.  Usually, they are still -- would be in GE's system.

8    Q.  Does GE use those types of people?

9    A.  Correct.

10   Q.  Did you ever in the course of your work on this case and

11   the searches done for the government in this case ever search

12   any employment agencies provided to you by the government?

13   A.  No, I did not.

14   Q.  You search under a social security number, correct?

15   A.  Yes.

16   Q.  Did you ever search under any tax ID number for a business

17   that was provided to you by the government?

18   A.  No.

19   Q.  And it was your testimony that occasionally GE will utilize

20   employment agencies for temporary staffing positions, correct?

21   A.  Yes.

22            MR. DeMARCO:  I have nothing further.

23            THE COURT:  Thank you.  Redirect, counsel.

24            MR. SOLOWIEJCZYK:  No, your Honor.

25            THE COURT:  Thank you, sir.  You may step down.

H3GMCOS2                         Hwang - direct

1              (Witness excused)

2              MR. BELL:  Your Honor, the government calls Thomas

3     Hwang.

4      THOMAS HWANG,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7     DIRECT EXAMINATION

8     BY MR. BELL:

9     Q.  Good morning, Mr. Hwang.  I will ask that you speak as much

10    as you can into the microphone just so that everyone can hear

11    you.

12    A.  Sure.

13    Q.  Mr. Hwang, where were you born?

14    A.  I was born in South Korea.

15    Q.  What country are you a citizen now?

16    A.  U.S.

17    Q.  Where did you go to college?

18    A.  University of Maryland.

19    Q.  And what degree did you get there?

20    A.  Applied physics and mathematics.

21    Q.  Around what year was that?

22    A.  1995.

23    Q.  What's your highest level of education?

24    A.  Graduate school.

25    Q.  Where did you get your graduate degree?

1    A.   University of Phoenix.

2    Q.   What was that graduate degree in?

3    A.   MBA.

4    Q.   When did you get that?

5    A.   2010.

6    Q.   I want to direct your attention to the period of time

7    between May of 2009 and October of 2011.  What did you do for

8    work at that time, sir?

9    A.   May 2009, I started new job as business administrator at

10   GSIS.

11   Q.   What was GSIS?

12   A.   GSIS is Gyeonggi Suwon International School.

13   Q.   What sort of school was it?

14   A.   International school for foreign students, foreign national

15   students and some expats.

16   Q.   You mentioned that you were a business administrator.  What

17   were your duties and responsibilities as a business

18   administrator?

19   A.   My main duty was to manage Korean employees who were part

20   of the school operations, including facility, building

21   management, secretarial operations, various operations of

22   school.

23   Q.   Who did you report directly to in that capacity?

24   A.   In that capacity I was reporting to Mr. John Nelson.

25   Q.   Who was John Nelson?

H3GMCOS2                              Hwang - direct

1   A.   He was the assistant headmaster of the school, of GSIS.

2   Q.   Who did Mr. Nelson report to?

3   A.   Mr. Nelson reported to Dr. Thomas Penland.

4   Q.   Who is Dr. Penland?

5   A.   He was the headmaster of GSIS and TCIS.

6   Q.   You mentioned TCIS.  What is TCIS?

7   A.   TCIS is one -- another international school, a sister

8   school for GSIS.

9   Q.   How far away was it from GSIS, roughly?

10  A.   It was two hours south -- about two hours south of GSIS.

11  Q.   Mr. Hwang, are you married?

12  A.   Yes, I am.

13  Q.   Do you have children?

14  A.   Yes, I do.

15  Q.   How many?

16  A.   Four.

17  Q.   And did any of your children attend either GSIS or TCIS?

18  A.   Yes.  My two girls and a boy, they attended TCIS for about

19  six years or seven, when I was working for Lockheed Martin in

20  Korea, and then when I became a business administrator at GSIS

21  they attended the school.

22  Q.   And did your wife have any connection with either of the

23  schools?

24  A.   Yes.  She was the parent representative at board of trustee

25  for TCIS until 2009.

H3GMCOS2                          Hwang - direct

1    Q.  You mentioned that prior to becoming a business

2    administrator at GSIS you worked for Lockheed Martin?

3    A.  Yes.

4    Q.  Briefly, what did you do there?

5    A.  I was a systems project manager.

6    Q.  What did that involve?

7    A.  Weapon systems, enable weapon systems.

8    Q.  Now, you mentioned that Dr. Penland was the headmaster of

9    both schools.  When you were business administrator at GSIS,

10   when you became business administrator at GSIS, did you have

11   any responsibilities with respect to TCIS?

12   A.  Not until 2010.

13   Q.  What happened in 2010?

14   A.  2010, around October time frame, the board of trustee asked

15   me to help out with the school project.

16   Q.  Which board of trustees was that?

17   A.  That was TCIS board of trustee.

18   Q.  And what did the TCIS board of trustees ask you to help out

19   with?

20   A.  They were asking me to help out with getting the

21   construction permits in line with the construction schedule.

22   Q.  Mr. Hwang, what was the construction project at issue here?

23   A.  What was the -- could you repeat that question.

24   Q.  Sure thing.  You made reference to construction permits and

25   construction schedule.  What was the construction project?

H3GMCOS2                         Hwang - direct

1    A.   Yes.   There was a construction project -- it is actually

2    relocation project.   TCIS was building a new campus to move to

3    from old campus.

4    Q.   And what did the board ask you to do with respect to that

5    relocation project?

6    A.   The board asked me to -- getting the construction permit

7    and because I speak the language they asked me to liaise with

8    the government, local government offices.

9    Q.   Once the TCIS board appointed you, did you report to any

10   individual person in that role?

11   A.   In that role, when I was appointed to help out?

12   Q.   Yes, sir.

13   A.   Yes.   I think there was onsite manager.   Usually it was

14   Dr. Thomas Penland.

15   Q.   Once the TCIS board appointed you to help out with the

16   relocation project, what did you learn, if anything, about the

17   project's finances?

18   A.   I learned later, this was during personal conversation with

19   Mr. John Nelson, he said -- he told me that there may not be

20   enough funding to complete the project.

21   Q.   Did you come to, further in your capacity in helping TCIS,

22   develop an understanding for how bad the problem was?

23   A.   Did I come to an understanding of how bad the problem was?

24   Q.   Yes, sir.

25   A.   Yes.   After talking to Dr. Penland.

H3GMCOS2                          Hwang - direct

1   Q.  What was your understanding of the finance difficulty

2   facing TCIS?

3   A.  The construction schedule, the funding schedule was not --

4   they did not have enough funding to complete the project.  That

5   was my understanding.

6   Q.  What options did the school have for getting the needed

7   funding?

8   A.  Well, they could have stopped the project, but they want to

9   continue and target to relocate by, I think they were targeting

10  for August of 2011.  Then they would need more funding, secure

11  funding.

12  Q.  Was it possible for the school to turn to Korea's banks?

13  A.  I was told they did not have much choice.  TCIS took a lot

14  of loans already.

15  Q.  At this point how close was your relationship with Dr.

16  Penland?

17  A.  We were very close.

18  Q.  How often did you speak with him?

19  A.  At least once a week.

20  Q.  Did you discuss this finance situation with him?

21  A.  Yes.

22  Q.  During these conversations what did he say to you and what

23  did you say to him?

24  A.  During the conversation I told him that I may know somebody

25  who may be able to help out.

H3GMCOS2                          Hwang – direct

1   Q.  Who did you have in mind?

2   A.  The first person I had in mind was Jay Pak.

3   Q.  Who was Jay Pak?

4   A.  Jay Pak is my brother-in-law, is married to my sister, my

5   younger sister.

6   Q.  Why did Jay Pak come to mind in addressing the school's

7   finance difficulties?

8   A.  Yes.  Jay Pak, I think 2010, summer, he told me that he's

9   working for a company named Omni and Omni is interested in

10  investing huge fund for some development project in Korea.

11  Q.  What was it about what Mr. Pak had told you about Omni that

12  made you believe that Omni could be useful here?

13  A.  Yes.  When he told me about Omni was in Korea doing site

14  survey, he mentioned that they were planning to build casinos

15  and whatnot on this biggest landfill in Korea.  It is called

16  Saemangeum.

17  Q.  I wasn't sure if you were finished with your answer to

18  that.

19  A.  I searched the web and I found an article about Omni that

20  they were in Korea and they met with the local governor.  So I

21  thought Omni would have some money to help out with the TCIS

22  project.

23  Q.  Did you speak to Mr. Pak?

24  A.  Yes, I did.

25  Q.  When you spoke to Mr. Pak, what did you say to him and what

1    did he say to you?

2    A.  He said he would talk to his business associates at Omni.

3    Q.  And did there come a time when Mr. Pak spoke to his

4    business associates and got back to you?

5    A.  Yeah.  He got back to me.  He told me Omni doesn't do

6    construction -- not construction -- I don't remember exactly

7    what he said, but he told me that he -- Omni is not -- may not

8    be able to do it, but he knows somebody who may.  The company

9    knows.

10   Q.  Did he tell you who?

11   A.  I don't know if it was that phone call or later, but, yes,

12   he told us -- he told me that Cosmo Dabi name came up.

13   Q.  Had you ever heard of Cosmo Dabi?

14   A.  No, I never heard of them before.

15   Q.  What did Mr. Pak tell you about Cosmo Dabi?

16   A.  He told me Cosmo Dabi is a big asset manager, well-known

17   asset manager.

18   Q.  What, if anything, did Mr. Pak say that Cosmo Dabi could do

19   for the school?

20   A.  He also told me that Cosmo Dabi has multimillion under his

21   responsibility and that he may be interested in humanitarian

22   project.

23   Q.  When you say he may be interested in doing a humanitarian

24   project, what do you mean when you say he?

25   A.  Cosmo.

H3GMCOS2                          Hwang - direct

1    Q.  Who was Cosmo?

2    A.  William Cosmo.

3    Q.  Who did you understand William Cosmo to be?

4    A.  William Cosmo, who did I understand --

5    Q.  What was William Cosmo's relationship to Cosmo Dabi?

6    A.  I understood that he is the president of the Cosmo Dabi.

7    Q.  Did you discuss this possibility with Dr. Penland?

8    A.  Yes.

9    Q.  And what came about as a result of that discussion?

10   A.  As a result of the discussion, we decided to arrange a

11   meeting with William Cosmo.

12   Q.  Who was in charge of making arrangements on behalf of the

13   school?

14   A.  Omni made the arrangement.

15   Q.  Where was the meeting going to take place?

16   A.  New York, Wall Street.

17   Q.  Prior to the meeting taking place, did you do any

18   additional research on Cosmo Dabi or Mr. Cosmo?

19   A.  Yes.  I searched the web.

20   Q.  And when you searched the web, what did you find?

21   A.  Found a website.

22   Q.  I want to direct your attention to what I believe has

23   already been put into evidence as Government Exhibit 107.  It

24   should appear, Mr. Hwang, on your screen.

25        MR. BELL:  Can we just zoom in on the text so it's

H3GMCOS2                          Hwang – direct

1   readable.

2   Q.  Mr. Hwang, are you able to see that OK?

3   A.  Yes.

4   Q.  Do you recall this e-mail?

5   A.  Yes, I do.

6   Q.  It's dated December 4, 2010.  Did you send this e-mail?

7   A.  Yes, I did.

8   Q.  And why did you send this e-mail?

9   A.  I wanted to share with Dr. Penland what I found on the

10  Internet about Cosmo.

11  Q.  When it says, here is the website and then there is a link,

12  what were you sending him?

13  A.  I think it was his home page.

14  Q.  Had you looked over that home page yourself?

15  A.  Briefly, yes.

16  Q.  Did you communicate with anyone from Omni in the days prior

17  to the meeting in New York?

18  A.  Yes.  I talked to Jay.

19  Q.  And did Jay introduce you to anyone else at Omni?

20  A.  Jay told me he works for Patricia Tsien.

21  Q.  Who did you understand Patricia Tsien to be?

22  A.  I understood she was the CEO or owner of Omni.

23  Q.  And did you yourself communicate with Ms. Tsien?

24  A.  I don't remember.  I don't know if I talked to her before

25  the meeting.

H3GMCOS2                          Hwang - direct

1    Q.  I want to direct your attention to Government Exhibit 109
2    which I believe is already in evidence.
3           MR. BELL:  Mr. Lachow, can you publish it, please.
4    Can you zoom in on the top part of the e-mail omitting the
5    signature.
6    Q.  I'll ask you, Mr. Hwang, to take a look at that e-mail.
7    A.  Yes, I do remember this e-mail.
8    Q.  I'll ask you to direct your attention to the first
9    paragraph under dear Dr. Penland.  It says:  Please take a look
10   at documents attached for discussion this afternoon, we will
11   meet up with Omni in their Manhattan office -- Mr. Hwang, I'll
12   ask you, actually, to take a look at the stack of documents in
13   front of you where you should see a copy of the same e-mail.
14   A.  Here?
15   Q.  Yes, sir.
16          MR. DeMARCO:  I have no objection.
17          MR. BELL:  In the absence of an objection from Mr.
18   DeMarco, the government offers 109.
19          MR. DeMARCO:  No objection.
20          THE COURT:  Received.
21          (Government Exhibit 109 received in evidence)
22          MR. BELL:  Can we republish that.  And can we blow it
23   up once again.
24   Q.  I'll ask you to direct your attention again to the first
25   paragraph.  It says:  Please take a look at the documents

H3GMCOS2                              Hwang - direct

1    attached for discussion this afternoon.  We will meet up with

2    Omni in their Manhattan office at 4 p.m. and we will head over

3    to meet with Mr. Cosmo for dinner at 6:00 p.m.

4            Do you recall where you were when you sent this

5    e-mail?

6    A.  We were at the hotel.

7    Q.  The hotel where?

8    A.  New Jersey side, Teaneck.

9    Q.  Did you ultimately have that meeting with Omni in their

10   Manhattan offices?

11   A.  Yes.  We met Omni at their Manhattan office.

12   Q.  And did you wind up meeting Mr. Cosmo for dinner at 6 p.m.,

13   as contemplated here?

14   A.  No.  Dinner never took place.

15   Q.  What happened with dinner?

16   A.  We ended up going to the airport.

17   Q.  What happened to result in the change of plans to the

18   airport?

19   A.  Could you repeat that question.

20   Q.  Sure.  Why in the airport as opposed to dinner?

21   A.  We went to Omni and he was being delayed somewhere at the

22   airport that he cannot make it to the dinner.  But he could

23   only make it to the airport to have a meeting.

24   Q.  Who did you learn that information from?

25   A.  That information I learned from Jay.

H3GMCOS2                          Hwang - direct

1    Q.  Let me ask you a couple of questions about that first

2    meeting at Omni's offices.  First off, who was there

3    representing the school?

4    A.  Dr. Penland and myself.

5    Q.  Were you the only two who had made the trip?

6    A.  Yes.

7    Q.  Who was there from Omni?

8    A.  Patricia Tsien was already in the office, and Jay Pak.

9    Q.  And what do you recall of what was discussed at that

10   meeting at Omni's offices?

11   A.  Omni's office, just general stuff.  Pat explained what we

12   would do at the meeting.  The meeting would take place at the

13   airport.  And she showed us around her office.

14   Q.  What was your sense of what was going to happen at that

15   meeting at the airport.  What was the airport meeting supposed

16   to be about?

17   A.  Our expectation was to meet William Cosmo for the first

18   time, introduce our school mission, and expect it to -- get the

19   positive feedback on getting the loan.

20   Q.  What was your hope would happen as a result of the meeting?

21   A.  My hope was to see if he will be funding the school.

22   Q.  After that did you go to the airport?

23   A.  Yes, we went to the airport.

24   Q.  How did you get there?

25   A.  By car.  I think they drove us or we drove together, for

H3GMCOS2                              Hwang - direct

1   sure.

2   Q.  When you got to the airport, where in the airport did the

3   meeting happen?

4   A.  The meeting took place at what appears to be a lounge.

5   Q.  Who was there?

6   A.  I don't think Cosmo was there.  We went there first.

7   Q.  Was it the same people that you had mentioned before:

8   Yourself, Mr. Penland, Jay, and Patricia Tsien?

9   A.  And Thomas Cleveland.

10  Q.  Who was Thomas Cleveland?

11  A.  Thomas Cleveland is the husband of Patricia Tsien.

12  Q.  What relationship, if any, did he have to Omni?

13  A.  I don't know.  I thought he was part of Omni operation.

14  Q.  But you didn't know his title?

15  A.  I don't think we got his title.

16  Q.  Did there come a time when Cosmo showed up at the meeting?

17  A.  Yes.

18  Q.  What happened when he did?

19  A.  We made introduction.  We sat down.  Dr. Penland started to

20  give a briefing of the school.  He explained the mission of the

21  school, background, history.  That took a pretty good amount of

22  the time in the beginning.

23  Q.  Who did most of the speaking on behalf of the school?

24  A.  Dr. Penland.

25  Q.  Who did most of the talking on behalf of Omni?

H3GMCOS2                              Hwang - direct

1    A.  Pat.

2    Q.  After Dr. Penland finished his presentation, what happened

3    in that meeting?

4    A.  At the end William Cosmo, he mentioned that he will help

5    out the school.

6    Q.  And did the Omni folks say anything during that meeting?

7    A.  Yes.  Mr. Cleveland, something about his previous

8    experience with the engineering project, engineering

9    construction project.  Sorry.

10   Q.  What happened after the meeting?

11   A.  After the meeting, we just went about and came back to

12   hotel.

13   Q.  Did you discuss how the meeting went with any of the Omni

14   people?

15   A.  I don't think we did at that time.

16   Q.  After the meeting did you return to Korea?

17   A.  Yes, I did.

18   Q.  What happened after you returned to Korea?

19   A.  We start receiving documents.

20   Q.  In subsequent weeks did you and Dr. Penland have further

21   communications with the Omni people?

22   A.  I did have further communication with the Omni people.

23   Q.  What was your role in the next few weeks in the road to

24   this transaction?

25   A.  I was in the middle of the communication, getting the

H3GMCOS2                        Hwang - direct

1   documents, forwarding them to Dr. Penland.  Dr. Penland would

2   review it.  He would make comments.  And I will send it back.

3   And we were doing contract review and modification work.

4   Q.  Who was your primary point of contact with Omni?

5   A.  At the time the primary contact with Omni was Patricia

6   Tsien.

7   Q.  Did you have any contact, indirect or direct, with

8   Mr. Cosmo?

9   A.  No.

10  Q.  How, if at all, did you hear from Mr. Cosmo?

11  A.  Through Omni.

12  Q.  By the way, I neglected to ask this.  Do you recall what

13  Mr. Cosmo looked like when you met him at the meeting?

14  A.  Yes, I do.

15  Q.  Would you recognize him if you saw him again?

16  A.  Yes, I do.

17  Q.  Do you see him in the courtroom today?

18  A.  Yes, I do.  I see him over there.

19  Q.  Can you identify Mr. Cosme by an item of clothing he is

20  wearing or what he's doing, for that matter?

21  A.  I don't understand the question.

22          THE COURT:  Let the record reflect that Mr. Cosme has

23  stood up and is smiling at the witness.  Thank you, sir.

24          MR. BELL:  Thank you, your Honor.

25  Q.  There is that stack of exhibits in front of you.  You can

H3GMCOS2                              Hwang - direct

1    take it out of the envelope.  I believe that the first two

2    documents are Exhibits 107 and 109.  You can set those aside

3    and I'll ask you to pay attention to the third, which is marked

4    for identification as Government Exhibit 112.  Do you see that,

5    sir?

6    A.  Yes, I do.

7    Q.  Are you familiar with this document?

8    A.  Yes.

9    Q.  How are you familiar with that document?

10   A.  They were asking for proof of funds.

11   Q.  As for the document itself, what sort of document is this?

12   A.  This was to get -- this is sort of engagement document.

13   Q.  Who was this sent to and who is it from?

14   A.  It is from Patricia Tsien and sent to Dr. Penland and

15   myself copied on it.

16            MR. BELL:  Your Honor, the government offers

17   Government Exhibit 112.

18            MR. DeMARCO:  No objection.

19            THE COURT:  Received.

20            (Government Exhibit 112 received in evidence)

21            MR. BELL:  Can we publish Government Exhibit 112.

22            THE COURT:  Yes, sir.

23   Q.  At this point, once documents have started to be exchanged,

24   what was your understanding of what Cosmo Dabi was going to be

25   able to do for the school?

H3GMCOS2                          Hwang - direct

1    A.  My understanding was Cosmo Dabi was willing to fund the

2    school.

3    Q.  What would the school have to do in order for that to

4    happen?

5    A.  I think this was the point where they were asking for a

6    deposit.

7    Q.  How much did you understand the deposit to be?

8    A.  10 percent of the total loan amount.

9    Q.  At this point, Mr. Hwang, was it your job to closely review

10   the papers and the agreements that went back and forth?

11   A.  No, it was not my job.

12   Q.  Whose job was it?

13   A.  The board would appoint Dr. Penland.

14   Q.  And did you, in fact, review the contract, another

15   agreement, closely on your own?

16   A.  Dr. Penland asked me to spot-check a couple of items and I

17   did.

18   Q.  But nothing more than spot checking?

19   A.  I read the documents, but I cannot say I had the full

20   understanding.

21   Q.  Now, what were your impressions of Mr. Cosme after meeting

22   with him in the airport?

23   A.  Impression?

24   Q.  Yes, sir.

25   A.  My impression was he was -- he felt like stock trader,

H3GMCOS2                          Hwang - direct

1     very -- just the impression.

2     Q.  What was your impression of Mr. Cosmo's ability to help the

3     school?

4     A.  My expectation was high.

5     Q.  Why were your expectations high?

6     A.  There was some information we heard from Omni about him.

7     Q.  Such as?

8     A.  That he has multibillion dollar assets under his

9     responsibility.  Also, he does have customer -- clientele for

10    kings and prince, high profile.

11    Q.  Did anything about your meeting with Mr. Cosmo in the

12    airport disrupt that impression?

13    A.  No.

14    Q.  Now, let's take a look at Government Exhibit 112.  The

15    subject line of this e-mail exchange is escrow deposit.  Do you

16    recall there being issues discussed about the escrow for this

17    transaction?

18    A.  Yes.  First, the escrow account was to be set up in Korea,

19    and I think there were multiple changes in the account

20    information.

21             (Continued on next page)

22

23

24

25

H3GQCOS3                        Hwang - direct

1    Q.   Who initiated those changes?

2    A.   Omni initiated.

3    Q.   What do you recall of those changes, Mr. Hwang?

4    A.   It was to be the third-party escrow account in Korea, and

5    it changed to different account.   Like I don't know if it was

6    escrow account or not.   And then at the end, they -- the last

7    it changed to trading account.

8    Q.   So, taking a look at the first email from Patricia Tsien,

9    the body says, "Tom and Thomas:   I hope that you had a good

10   flight back.   And, Thomas, I hope you did as well.   We

11   thoroughly enjoyed our meeting with both of you on Friday

12   evening.   Cosmo is ready.   In order to address the escrow

13   account issue and for us to decide whether we're going to

14   implement a bank or attorney escrow, we'd like to know from

15   which of your many banks you will send the funds.   The proof of

16   funds came from Hana Bank, Korea Exchange Bank, BoA and The

17   National Agricultural Cooperative Federation."

18           Mr. Hwang, what was referred to here as a proof of

19   funds?

20   A.   That is to show how much we had in the bank account.

21   Q.   It then says, "It would be preferable if the transfer was

22   made of one bank giving the funds less of a chance of getting

23   lost.   Is that feasible?"

24           Then at the bottom skipping down ahead, it says,

25   "Don't hesitate to ask any additional questions you may have as

H3GQCOS3                           Hwang - direct

1   you prepare for your board meeting."

2          What did you anticipate was going to happen at the

3   upcoming board meeting, Mr. Hwang?

4   A.  At the upcoming board meeting, we were to report what we --

5   to report about new funding possibility from Cosmo Dabi.

6   Q.  I want to direct you to the second page, which is the next

7   email in the chain.  This one is from you the next day.

8          I want to direct your attention to where it says,

9   "Dear Patricia."  Do you see that?

10  A.  Yes, I do.

11  Q.  "Dear Patricia:  I am safely back in Korea about eight

12  hours ago but I haven't been in my office yet.  To give you a

13  brief answer for the time being, it will most likely be through

14  Korea Exchange Bank.  However, I was going to ask if you can

15  designate a bank account in Korea to put the escrow in."

16         Then later, "My former company, Lockheed Martin, used

17  a local JP Morgan office to move the funds between U.S. and

18  Korea.  Who does Cosmo use in Korea?  If he can designate an

19  escrow account in Korea, then it would be the simplest for us."

20         Was it important to you at the time that a third-party

21  escrow account be used?

22  A.  It was important to me, yes.

23  Q.  Why was it important to you, Mr. Hwang?

24  A.  So that if the deal doesn't go through or anything happens,

25  we can withdraw back.

1    Q.  And were the Omni people agreeable to the idea of a

2    third-party escrow account being used?

3    A.  I think they did in the beginning.

4    Q.  And you said in the beginning.  Did that change?

5    A.  Yes, it changed a couple times.

6    Q.  How did that change?

7    A.  It changed to different -- the JP Morgan Bank that Cosmo

8    used, there was -- and then they change another time to his own

9    trading account.

10   Q.  So I want to direct your attention to the fourth --

11   sorry -- the fifth page of that document, which is numbered

12   1444 at the bottom.  I want to direct your attention to the

13   middle of that page.  There is an email from you, Mr. Hwang

14   sent December 15 at 5:00 a.m.  It begins in the middle of that

15   page.  Do you see it?  I think it's up on the screen, even if

16   you can't see it in front of you.

17   A.  Yeah, I see it.

18   Q.  You can use the screen version, that's fine.

19          "Dear Patricia:  I understand it is to be released

20   from the escrow to Cosmo's account.  I am sure he has dealt

21   with same situation in another country or in multiple countries

22   and asking if he knows a third-party escrow handler who knows

23   exactly what to do in Korea.  For this reason, I am thinking

24   there may be no choice but to go with an attorney escrow, but I

25   won't be sure until I do my due diligence tomorrow.  So let's

H3GQCOS3                          Hwang - direct

```
 1    leave my question at this.  Thanks."
 2             What was happening at this point, Mr. Hwang?
 3    A.  Well, the information we heard about Cosmo, he does
 4    business in multiple countries, so I was quite sure that he
 5    would know where to -- how to handle this.
 6    Q.  Was it surprising that this was still a question at this
 7    point?
 8    A.  It didn't surprise me then.
 9    Q.  Why -- did you say it did or it didn't?
10    A.  No, it did not.
11    Q.  Why?
12    A.  Pat made it sound it was really the process, part of the
13    process.
14    Q.  Did Pat alleviate what concerns you might otherwise have?
15    A.  Yes, she did.
16    Q.  Now, ultimately, did the school wire the money to Cosmo's
17    account?
18    A.  Yes, we had.
19    Q.  And what account did it wire the money to?
20    A.  To his trading account.
21    Q.  Why his trading account?
22    A.  We were told -- Pat sent many emails that we're being late.
23    If we further -- any further delay would cause draw schedule
24    miss.
25    Q.  When you say "draw schedule," what are you referring to?
```

H3GQCOS3                              Hwang - direct

1    A.  On the loan document there was a draw schedule, referring

2    to the draw schedule on the loan document.

3    Q.  Is that the schedule when the school would get payments

4    from the loan?

5    A.  Yes, that is correct.

6    Q.  Now, a trading account isn't the same as an escrow account,

7    is it, sir?

8    A.  No, it is not.

9    Q.  But you nevertheless sent the money to the trading account?

10   A.  We did.

11   Q.  Why was that?

12   A.  We were pressed.

13          MR. BELL:  One moment, please.

14          THE COURT:  Yes, sir.

15   Q.  I want to direct your attention to the next document in the

16   pile which has been marked for identification as Government

17   Exhibit 138.  Are you seeing that one, sir?

18   A.  Yes.

19   Q.  Are you familiar with this document?

20   A.  Yeah, I think this is reply, Pat writing to Cosmo.

21   Q.  And do you remember receiving emails on this email thread?

22   A.  Mmm-hmm, yeah.

23          MR. BELL:  Your Honor, the government offers

24   Government Exhibit 138.

25          MR. DeMARCO:  No objection.

1              THE COURT:  Received.

2              (Government's Exhibit 138 received in evidence)

3              MR. BELL:  Can we publish 138?

4              THE COURT:  Yes, sir.

5    Q.  Thank you, Mr. Lachow.

6              So I would like for you to look at the top email from

7    Ms. Tsien.  It's addressed to Cosmo Dabi at CEO@CosmoDabi.com.

8              Ms. Tsien writes: "Tom Cleveland and Pat Tsien of

9    OmniHoldingsGroup, a Division of OmniGuard Services, LLC (Omni)

10   requested documentation from you that demonstrates your

11   signatory authority over Cosmo Dabi International Trading Group

12   (CDI) and its concomitant bank account at JP Morgan Chase Bank.

13   This information was requested by us on behalf of Dr. Thomas

14   Penland and Thomas Hwang of TCIS in connection with the

15   TCIS-CDI transaction."

16             Had you requested confirmation of signatory authority,

17   Mr. Hwang?

18   A.  Yes, we have.

19   Q.  And why?

20   A.  We need to know who Cosmo Dabi company is owned by if we're

21   sending the money to that company.

22   Q.  At that point, did you have a particular reason to be

23   concerned about Cosmo Dabi or Mr. Cosmo?

24   A.  No.

25   Q.  Did you receive confirmation of signatory authority?

1    A.  I do not remember.

2    Q.  It then says, "None of Tom Cleveland, Pat Tsien Tom Penland

3    or Thomas Hwang are using this information for any malicious

4    intent, whistleblower, IRS, FBI, and/or any other investigative

5    purposes or any other hindering reasons against Cosmo Dabi

6    International Trading Group Inc. and/or William Cosmo."

7           Do you see that?

8    A.  I see it.

9    Q.  Had you requested that Ms. Tsien include that language?

10   A.  No.

11   Q.  To the best of your knowledge, had Dr. Penland?

12   A.  No.

13   Q.  Had you discussed with Ms. Tsien whether you were using the

14   information for IRS, FBI or whistleblower-related purposes?

15   A.  No.

16   Q.  Did seeing that language spark any reaction in you,

17   Mr. Hwang?

18   A.  Now it does.

19          MR. DeMARCO:  Objection.  Move to strike.

20          THE COURT:  Strike.  Right, Mr. Bell?

21   Q.  Did it strike any reaction in you at the time, Mr. Hwang?

22   A.  No, we didn't pay attention to it.

23          THE COURT:  The prior answer should be stricken?

24          MR. BELL:  Yes, your Honor.  I'm quite all right with

25   that.

H3GQCOS3                          Hwang - direct

 1            THE COURT:  Ladies and gentlemen, the "now" answer is
 2   stricken and will play no part in your deliberations.
 3            MR. BELL:  Thank you, your Honor.
 4   BY MR. BELL:
 5   Q.  Do you recall, Mr. Hwang, when the school sent its money to
 6   Mr. Cosme?
 7   A.  Exact date?
 8   Q.  Yes, sir.
 9   A.  I think it was January 21 of 2010.
10   Q.  What role did you play in that process?
11   A.  I had someone, the assistant -- finance assistant from
12   TCIS.
13   Q.  Let's be clear, what year was this?
14   A.  Sorry.  2011.
15   Q.  Thank you, sir.  I want to direct your attention to what
16   should be the next document in that pile.  It is marked for
17   identification as Government Exhibit 139.  Do you recall
18   receiving that email or, rather, sending that email?
19   A.  Yes, I remember sending this email.
20   Q.  Who did you send it to?
21   A.  Sent to Jay Pak, Patricia Tsien, copy Dr. Thomas Penland
22   and Tom Cleveland.
23            MR. BELL:  Your Honor, the government offers
24   Government Exhibit 139.
25            MR. DeMARCO:  No objection.

H3GQCOS3                              Hwang - direct

1          THE COURT:  Received.

2          (Government's Exhibit 139 received in evidence)

3          MR. BELL:  Can we publish the first page?

4   Q.  Now, I want to direct your attention to the body of the

5   email where you write, "Dear all:  I completed wiring

6   compliance with Korea Bank, Central Bank of Korea and wired

7   equity deposit to Cosmo Dabi International Trading Group, Inc.

8   according to your wiring instruction."

9          Mr. Hwang, what is wiring compliance in Korea?

10  A.  As I recall, anything above -- I don't remember exactly,

11  but certain amount of money to be wired overseas, the Bank of

12  Korea, which is equivalent of Federal Reserve here, would

13  require you to give the destination of the funds and the

14  authorization, right authorization of the senders.

15  Q.  It then goes on.  "It was not simple to get the compliance

16  done by Korea Bank, but I was able to convince them that it is

17  the deposit for the loan with documents prepared.  This

18  compliance is only good for 60 days though, so it will have to

19  be extended every 60 days over here.  It is little technicality

20  I have to deal with every 60 days to be in good standing during

21  the whole duration of the funding and repayment period.  Now

22  our deposit is in Cosmo's hand.  I pray that all things work

23  out to meet the first draw schedule, and so on.  Please help

24  TCIS to get through current financial difficulties by meeting

25  draw schedules."

H3GQCOS3                              Hwang – direct

1              Mr. Hwang, what was at this point your expectation as

2     to what would happen next?

3     A.   We will get the funding according to the draw schedule.

4     Q.   And as you recall, under the draw schedule, when should you

5     have first gotten funding?

6     A.   I recall it was March 31.

7     Q.   Come March 31, did that happen?

8     A.   It did not happen.

9     Q.   I want to direct your attention to Government Exhibit 154,

10    which has been admitted into evidence.

11             MR. BELL:  So, Mr. Lachow, I will ask you to publish

12    it now, and to first focus in on the body of the email.  Thank

13    you, sir.

14    Q.   Here, Mr. Hwang, you email an individual named Chang Seok

15    Seo.  Who is Mr. Seo?

16    A.   Mr. Seo was the finance office assistant.

17             THE COURT:  S-E-O.

18             MR. BELL:  Thank you, your Honor.

19    A.   Of TCIS.

20             MR. BELL:  I believe I may have mentioned Chang,

21    C-H-A-N-G.  Seok, S-E-O-K.  Seo, S-E-O.

22    Q.   I want to direct your attention to where it says, "Dear

23    Mr. Seo:  Thanks for your due diligent work all the time

24    especially during spring break.  I apologize for not being so

25    prompt on providing information that you will need for

H3GQCOS3                          Hwang - direct

1    extending Korea Bank filing.  Here is the Cosmo Dabi, Inc.

2    information with a copy of the bank check.  Please let me know

3    if you need more information on filing extension."

4              What was the purpose of sending these documents to

5    Mr. Seo?

6    A.  60 day came about or was about to be expired, the

7    compliance was.

8    Q.  That's the same wiring compliance you described earlier?

9    A.  I think wiring compliance was different, but this is the

10   extension.

11   Q.  Understood.

12   A.  Yeah.

13   Q.  So what was the purpose of sending these two documents?

14   A.  This was requested from Mr. Seo, so I think he knew better

15   about what comprised document request.

16   Q.  Who was Mr. Seo dealing with that he would have to use

17   these documents?

18   A.  He would use these documents, take it to the Bank of Korea.

19   Q.  So, I want to draw your attention to the next document in

20   your stack, which is Government Exhibit 154B.  Do you see that,

21   sir?

22             MR. BELL:  That's been admitted so if you can publish

23   that as well, Mr. Lachow.

24   Q.  Do you recall sending this document to Mr. Seo?

25   A.  Yes, I do.

1    Q.  Where did you get this document?

2    A.  I got it from Omni.

3    Q.  Do you recall who at Omni you got it from?

4    A.  I don't recall who.  It must have been gone up to Jay or

5    Pat.

6    Q.  Did you have any reason when you got this document from

7    Omni to doubt the accuracy as to any of the details on it?

8    A.  No, I didn't have any doubt.

9    Q.  So, I want to very briefly direct your attention to where

10   it says number 3 resolved, and then there's some handwriting

11   underneath.

12        Did you have any reason to doubt that Shirley

13   Goldberger was the vice-president of Omni?

14   A.  I didn't have any doubt.

15   Q.  Or that Hi Feingold was the secretary?

16   A.  No.

17   Q.  Or that Scott Lieberman was the treasurer?

18   A.  No.

19   Q.  Now, I want to direct your attention to Government Exhibit

20   155, which is already in evidence.  It's dated April 19, 2011.

21        Did there come a time, Mr. Hwang, when you received an

22   explanation for why the school had not gotten the first part of

23   the loan as scheduled?

24   A.  Yes, we received the explanation.

25   Q.  Who did you receive the explanation from?

H3GQCOS3                          Hwang – direct

1    A.  It came from Pat.

2    Q.  What did Pat tell you?

3    A.  Pat told in her email that tsunami in Japan caused a

4    financial pipeline constraint.

5    Q.  Did you understand at the time, Mr. Hwang, why or how the

6    tsunami in Japan would have done such a thing?

7    A.  I didn't have any understanding how.

8    Q.  I want to direct your attention to the email at Government

9    Exhibit 155.  You note, "Dear Dr. Penland, as I've informed you

10   earlier, Omni couldn't make the first draw on schedule by

11   April 15 due to mainly following two reasons:  Our escrow was

12   cleared on January 27 to Omni and its associate missing a

13   target day by about 15 banking days."

14        What did you understand that to mean, Mr. Hwang?

15   A.  Oh, this was, I think on contract it says 60-day prior to

16   after the closing to meet March 31.  This is talking about that

17   we made the escrow deposit late.

18   Q.  The next line says, "Japan earthquake and tsunami halted

19   finance pipeline between Omni associates all over the world and

20   caused trading to be on hold."

21        Where did you get the information about Omni

22   associates all over the world, Mr. Hwang?

23   A.  I think this was exact quote out of an email from Pat.

24   Q.  Did you have firsthand knowledge of there being Omni

25   associates all over the world?

H3GQCOS3                          Hwang - direct

1    A.   I didn't pay attention to that, but honestly, no, I have no

2    knowledge about them.

3              MR. BELL:  One moment, please.

4              (Pause)

5    Q.   To be clear, just to go back up to that first bullet point

6    when it says, "Our escrow was cleared on January 27."

7              The money had been wired on January 21, hadn't it,

8    Mr. Hwang?

9    A.   Yes, I think so.

10   Q.   What was your understanding of where the January 27 date

11   came from?

12   A.   Mmm, my understanding was that there was weekend, was

13   non-banking days.

14   Q.   What did you understand that to mean?

15   A.   Banking days are non-holidays -- non-banking days are

16   holidays, national holidays and weekends.

17   Q.   Who had told you all of that?

18   A.   That was my understanding.  I don't think -- I don't

19   remember anybody telling me that.

20   Q.   I want to direct your attention to after the two bullet

21   points, where it says, "Our contract with Omni says first draw

22   after 60 banking days, and this normally equates to about 15

23   normal weeks.  They didn't have enough time to mature the

24   fund."

25              What did you mean by "they didn't have enough time to

1   mature the fund"?

2   A.   Sorry, I'm not looking at the right document.  Which one is

3   it?

4   Q.   You can look at the screen if it helps, sir.  It's the part

5   that has been helpfully highlighted by Mr. Lachow.

6        I want to draw your attention to where it says, "They

7   didn't have enough time to mature the fund."

8   A.   Yes, I see it.

9   Q.   What did you mean by that, sir?

10  A.   I think they explained to me they didn't quite have 60

11  banking days to mature the fund.

12  Q.   And at this point, what did you think was actually

13  happening to the $5.5 million?

14  A.   I think they were investing it someplace, some.

15       MR. BELL:  You can take that down, Mr. Lachow.  Thank

16  you.

17  Q.   I now want to direct your attention to Government Exhibit

18  156, which has already been admitted into evidence.  You have

19  that in your pile, but it is also going to pop up on the screen

20  in just a moment.

21       I want to first draw your attention to the top part

22  where it says, "Dear Dr. Penland:  Whether we have first draw

23  by this month or not, my strategy was to push Konkuk to meet

24  their end of the deal anyway."

25       Who is Konkuk?

1   A.  Konkuk is the main construction contractor.

2   Q.  When you said that your strategy was to push them to meet

3   their end of the deal, what did you mete mean by that?

4   A.  They were supposed to put their cash forward to complete

5   the project.

6   Q.  "They probably heard it from the grapevine about the fund

7   coming from U.S. side and was hoping for their 30 percent

8   portion to be waived.  Well, it is not going to happen and we

9   shouldn't make it easy for them to get off even if we have the

10  funds."

11          What did you mean by that, sir?

12  A.  Someone on construction site told me that they do not have

13  the fund and trying to get it waived, 30 percent.

14  Q.  Sorry, go ahead.

15  A.  Konkuk was running short on their cash, and that's what I

16  heard.

17  Q.  Now, there's an attachment to this email.  Do you see that,

18  sir?

19  A.  Yeah, I see the attachment.

20  Q.  I want to direct your attention to the attachment, which is

21  Government Exhibit 155A, which is already evidence.

22          156A, I'm sorry.

23          Do you recall, Mr. Hwang, where you got this letter?

24  A.  Yeah, I remember looking at this table, screen shot.

25  Q.  Do you recall the letterhead at the top says, Cosmo Dabi

H3GQCOS3                              Hwang – direct

1    International Trade Group, Incorporated in The Trump Building.

2    It's addressed to Dr. Penland and Mr. Hwang at TCIS.  "This

3    communication is an update in regard to the first draw date for

4    TCIS project funding."  Do you see that?

5    A.  Yes.

6         The first paragraph begins, "As you may know, there

7    have been some recent major events particularly in Japan that

8    have severely delayed financial transaction pipelines on a

9    global basis, including some portion of Cosmo Dabi pipelines.

10   At this time, I am experiencing some recoverable business

11   delays as most are from the Japan events but remain fully

12   optimistic and do expect our transactional pipelines to revert

13   to normal and fully stabilized levels shortly.  That said, the

14   first draw will not occur within the 60 international banking

15   days set out in the private funding and security agreement.

16   However, I do expect the first draw funding will occur on or

17   about before the end of the 15 international business day grace

18   period of 17 June, 2011.  I have attached a copy of my bank

19   account balance printed as of this morning.  The only change

20   made to the printout is my red pen."

21        Now, when you saw the screen shot portion, what did

22   you believe to be the case about Mr. Cosmo's bank account?

23   A.  First, I realize he's investing somewhere and he grew fund.

24   Q.  And what made you believe that he had grown the fund?

25   A.  Because it grew from the deposit from $5.5 million.  This

1   is about $12.6 million.

2   Q.  Was it your understanding that 12.6 million represented

3   what the balance was at that point?

4   A.  Yes, this is representing his balance.

5   Q.  And how did that apparent growth make you feel?

6   A.  It make me -- first, it made me feel like we acquired an

7   investor.

8   Q.  I want to direct your attention to the next document in the

9   stack before you, which is Government Exhibit 167.  I'd like

10  for you to take a look at that.  Before you do, sir, do you

11  recall -- Mr. Hwang, can I ask you to speak up just a little

12  bit?

13  A.  Sure.

14  Q.  And perhaps speak a little bit closer to the microphone.

15  Just do that so the folks at the very back can hear you, OK?

16  A.  Is this better?

17  Q.  Much.  Thank you, sir.

18  A.  OK.

19  Q.  Now, after you received that screen shot, did you get a

20  revised sense of when you expected some draw down to take

21  place?

22  A.  Did I get advised?

23  Q.  Yes, sir.

24  A.  I think they were talking June.

25  Q.  Did you get a draw down in April?

H3GQCOS3                          Hwang – direct

1    A.   No.

2    Q.   Did you get one in May?

3    A.   No.

4    Q.   Did you get one in June?

5    A.   No, we didn't get one in June either.

6    Q.   Did there come a point when the school began to contemplate

7    taking action as a result of the lack of payment?

8    A.   Yes.

9    Q.   Approximately when was this?

10   A.   I think it was late April, May time frame.

11   Q.   What did the school contemplate?

12   A.   Was about -- they were requesting funds, deposit.

13   Q.   Did there also come a time when Omni and Cosmo began to

14   discuss an audit with you?

15   A.   Yes.

16   Q.   When did you first hear about the audit?

17   A.   May.

18   Q.   And how did it come up?

19   A.   I don't remember exact circumstances how it came up, but it

20   was not mentioned before.

21   Q.   Were you surprised when you did hear about the audit?

22   A.   Yes, I was surprised.

23   Q.   What did Omni want from you with respect to the audit?

24   A.   They were requesting documents, invoice.

25   Q.   What sorts of documents?

1    A.   To being construction related documents; invoices,

2    receipts, contracts.

3    Q.   Did you respond to those requests?

4    A.   Yes.

5    Q.   Did you provide them with documents?

6    A.   Yes.

7    Q.   How did you provide them with documents?

8    A.   We made a scan of the original document and put it into a

9    website they designated for us.

10   Q.   Throughout that process, did you respond to each of the

11   requests that Cosme and Omni made?

12   A.   I believe I did all the requests, responded.

13   Q.   In the context of these conversations, did the term

14   preaudit come up?

15   A.   Yes.

16   Q.   What was meant by preaudit?

17   A.   Preaudit meant time to collect the information.

18   Q.   And what did you understand was going to follow the

19   preaudit?

20   A.   Actual on-site audit, in-person audit.

21   Q.   And who determined what the preaudit was going to consist

22   of?

23   A.   Omni did.

24   Q.   And who determined on what terms the audit was going to

25   take place?

1   A.  Could you repeat that question, please?

2   Q.  Sure.  Who decided on what terms the audit was going to

3   take place?

4   A.  Well, Omni informed us.

5   Q.  I want to direct your attention to 167 now.  Do you recall

6   receiving this email from Ms. Tsien?

7   A.  Yes.

8            MR. BELL:  Your Honor, the government offers 167.

9            MR. DeMARCO:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibit 167 received in evidence)

12           MR. BELL:  Can we publish the first page?

13  Q.  Now, I want to direct your attention to the lower half of

14  that email, the forwarded message from Cosmo, CEO@CosmoDabi.com

15  to Patricia Tsien.  It says, "Hello, Patricia:  As per our

16  discussions, I am in receipt of TCIS letter regarding their

17  willingness to move forward as of Monday July 4, 2011."

18           Do you recall that letter being composed and sent, by

19  the way, Mr. Hwang?

20  A.  Letter from TCIS?

21  Q.  Yes, sir.

22  A.  Yes, I think so.  I remember.

23  Q.  And what discussion had preceded the sending of that letter

24  from TCIS?

25  A.  There were discussion among board members.

1    Q.   What was the nature of that discussion?

2    A.   Whether to accept the delay and take the audit, go with the

3    audit or not.

4    Q.   What was the outcome of that discussion?

5    A.   The outcome of the discussion was to go with the audit.

6    Q.   The email here then continues, "Please be advised that I

7    had lined up the auditor for immediate deployment over a week

8    ago based on TCIS stating they were using GAAP."  What did you

9    understand GAAP to be?

10   A.   Some accounting standard.

11   Q.   "I have recently been informed," it continues, "that the

12   current accounting standard in place is Korean accounting

13   practices which simply results in my deploying a different

14   auditor with the appropriate skill sets.  I am waiting to hear

15   back regarding the auditor's schedules and will notify you and

16   TCIS the moment I am in receipt of.  I expect to hear between

17   now and/or over the weekend.  Please be reminded this is among

18   the most common holiday season observed, and we are working to

19   expedite as much as we can realistically.  In the interim,

20   please remind TCIS to gather for us the specific uses of the

21   first draw funds along with all of the parties associated in

22   construction, engineering, etc. etc.  I look forward to moving

23   forward."

24        I want to direct your attention to the next page of

25   that document.  There is an email from you on Friday July 8

1    that says, "Dear Pat:  I have a few questions."

2           Do you see that, sir?

3    A.  Yes, I do.

4    Q.  Did you have concerns at this point?

5    A.  Yes.

6    Q.  What sorts of concerns did you have?

7    A.  We were being asked for a lot more information than we

8    signed up for.

9    Q.  And I want to direct your attention to the next email below

10   from Friday, July 8 at 11:22 p.m.

11          MR. BELL:  Mr. Lachow, if you can blow that up.

12   Q.  You say, "Dear Pat:  I am confused because the form asks

13   for previous work completed and in your email you are asking

14   for the specific use of the first draw funds.  Please explain."

15          Can you explain your confusion, Mr. Hwang?

16   A.  We didn't get any draw to use.  I mean, I do not -- did not

17   understand what they were asking for.

18          MR. BELL:  You can take that down.  Thanks Mr. Lachow.

19          Just one moment, your Honor?

20          THE COURT:  Yes, sir.

21          (Pause)

22   Q.  When they asked you for information at this point, did you

23   continue to provide it to them, Mr. Hwang?

24   A.  Please ask that -- ask me that question again?

25   Q.  Sure.  At this point when they continued to ask you for

1    information, did you continue to provide it?

2    A.  Yes.

3    Q.  And at this point, did you have an understanding as to

4    whether there were going to be audits or each draw of the loan

5    or whether there was going to be one audit?

6    A.  My understanding was one audit.

7    Q.  Did that understanding change?

8    A.  I think one of the emails said maybe an audit for each

9    draw.

10   Q.  What was your reaction to learning that?

11   A.  I wasn't happy.

12   Q.  Why not?

13   A.  Because all the things happened we didn't get a single dime

14   out of this contract, and they are asking for audit and now

15   they're requesting multiple audits, so --

16   Q.  I want to direct your attention to Government Exhibit 168,

17   which should be the next document in that stack in front of

18   you.  Are you familiar with this email?

19   A.  Yeah, I think this was my response to their request.

20              MR. BELL:  The government offers 168.

21              MR. DeMARCO:  No objection.

22              THE COURT:  Received.

23              (Government's Exhibit 168 received in evidence)

24              MR. BELL:  Can we publish the first page and focus in

25   on the first couple paragraphs of that email.

1   Q.  So you write here, "Dear Pat:  Please find the description

2   of completed and ongoing work for your audit.  Photos were

3   provided to you separately.  Lien waivers and receipts attached

4   will be supplemented with receipts, proof of payments and

5   copies of the contracts or will be obtained separately for

6   completed works from vendors."

7           Mr. Lachow, can I ask you to skip ahead within this

8   exhibit to Bates stamp 1219?  It should be 12 pages in.  Let's

9   zoom in just on that first page.

10  Q.  Now, are you familiar with this information, Mr. Hwang?

11  A.  Yes.

12  Q.  Who put this information together?

13  A.  Mr. Seo.

14  Q.  For what purpose?

15  A.  To show the finance status at that point in time of

16  construction project.

17          MR. BELL:  Can we go to the next page?  And the last

18  page?  Or the next page and the last page.  The next page after

19  that and can you zoom in on, I guess, the main part of the page

20  starting a little north of that?  Can you do that but also

21  catch the $15 million total at the bottom?

22  Q.  Now, what was this form, Mr. Hwang?

23  A.  Let's see I think this was response to how first draw would

24  be used.

25  Q.  Who put this together?

H3GQCOS3                         Hwang - direct

1    A.  I believe it was Mr. Seo from TCIS.

2    Q.  Now, with the actual preaudit phase continuing and with

3    their asking for this information, did there come a point when

4    they announced that the actual audit was going to happen,

5    in-person audit?

6    A.  Yes.

7    Q.  When you were told that the auditor was actually going to

8    come, what did that lead you to believe about how successful

9    the preaudit phase had been?

10   A.  Probably they have all the information they requested.

11           MR. BELL:  Your Honor, this may be a logical point to

12   take the lunch break.

13           THE COURT:  All right then.  Let's take the lunch

14   break, ladies and gentlemen.  Please leave your notebooks in

15   the jury room.  Remember not to discuss the case among

16   yourselves or with anyone else, not to do any research.  Mostly

17   we will look for the weather report at 2:00 when we return.

18   Thank you for your attention.

19           (Jury not present)

20           THE COURT:  Anything else on the record, counsel?

21           MR. BELL:  Not from the government.

22           MR. DeMARCO:  Not from the defendant.

23           THE COURT:  Thank you.  See you after lunch.

24           (Luncheon recess)

25

H3GMCOS4

AFTERNOON SESSION

2:00 p.m.

1
2
3           THE COURT:  May we bring the jurors in, ladies and
4    gentlemen.
5           THE DEFENDANT:  Before we get started can I mention
6    something to you?
7           THE COURT:  Sure.
8           THE DEFENDANT:  Thank you.  It will be five minutes.
9           THE COURT:  You can't do five minutes.  The jury is
10   ready.
11          THE DEFENDANT:  One of the most relevant aspects of
12   the case is finance.  It's a complex case and it relates to
13   finance.  And Mr. DeMarco is attempting to cross-examine a
14   witness with an MBA that has an extensive amount of finance,
15   and I have observed that in my communications with Mr. DeMarco
16   that he's not up to date on structured finance, investment
17   banking, leverage margin accounts, trading, anything that I do
18   that would support my case to disprove the government's case.
19   So I'm suggesting that we get an expert to work with me to
20   better articulate that aspect of the case.
21          THE COURT:  Again, what counsel needs is up to counsel
22   and not to the client.
23          Mr. Marshal, would you bring the jurors in, please.
24          THE DEFENDANT:  I wasn't finished, your Honor.
25          THE COURT:  We will pick it up later.

1           THE DEFENDANT:  OK.

2           (Jury present)

3           THE COURT:  We continue with the direct examination of

4    Mr. Hwang.

5           Mr. Hwang, you are reminded you are still under oath,

6    sir.

7           Mr. Bell.

8           MR. BELL:  Thank you, your Honor.

9    BY MR. BELL:

10   Q.  Good afternoon, Mr. Hwang.

11   A.  Good afternoon.

12   Q.  Mr. Hwang, can I direct your attention back to that stack

13   of exhibits in front of you.  Hopefully it's where it was

14   before.  And I'll ask you to take a look at what's been marked

15   as Government Exhibit 170.  Do you have that one, sir?

16   A.  I have Exhibit 170 in front of me, yes.

17   Q.  I'll ask you just to take a moment to look at it.

18           Are you familiar with this e-mail, sir?

19   A.  I don't think this e-mail was -- it was forwarded to me.

20   I'm reading it.

21   Q.  Seeing this e-mail, did it in fact go to you at two e-mail

22   addresses?

23   A.  Yes, it did.

24   Q.  Were both of those your e-mail address?

25   A.  Yes.

H3GMCOS4                          Hwang – direct

1             MR. BELL:  Your Honor, the government offers

2      government 170.

3             MR. DeMARCO:  No objection.

4             THE COURT:  Received.

5             (Government Exhibit 170 received in evidence)

6             MR. BELL:  Can we publish.

7             Mr. Lachow, I'll ask you to focus on the first and the

8      top half, including the two to-from clusters.

9      Q.  You see that Patricia Tsien e-mails you, Dr. Penland, and

10     others.  It says:  See below.  Follow up from Cosme's review.

11            Now we will focus on the bottom part of the page.  The

12     forwarded e-mail is an e-mail from Cosmo Dabi to Patricia Tsien

13     at OmniHoldings and Mr. Cleveland.  It says:  If I were to

14     forward what has been given to us directly to an auditor, they

15     would be in pause mode out of the gate.  My normal prelim is

16     required and is standard.  It is important so we can get

17     through a flawless audit.  Now I will have someone call Thomas

18     as soon as I complete this review.  Want to be certain.  I set

19     proper expectations for audit.

20            Prior to that point you had sent certain documents as

21     part of the preaudit process, is that correct?

22     A.  That is correct.

23     Q.  Were you surprised by this reaction from Cosmo?

24     A.  Yes.

25     Q.  Why were you surprised?

1   A.   That we completed -- we sent all the information requested.

2   This sound like they did not have enough information to go by.

3   Q.   It then says:  Keep in mind a preliminary review is advised

4   to the advantage of the client because if something isn't

5   quote/unquote right, we can do damage control as opposed to a

6   large-firm auditor taking it back or generating a potential

7   report that can cause a vulnerable paper trail.

8              Based on that language, did you expect that the

9   auditor coming your way would be from a large firm?  I'm

10  directing you specifically to the part where Mr. Cosme makes

11  reference to a large-firm auditor.

12  A.   Yes.

13  Q.   It then says:  It is important that the first audit

14  especially goes perfectly.  Also, docs need to be translated by

15  my own people.

16             Prior to this point, had you heard anything about a

17  need for Mr. Cosme to translate the documents himself?

18  A.   No.

19  Q.   It then says:  Below are a few questions.  I want to direct

20  you to the bottom of the list on the next page.  I want to

21  direct you to item No. 8 on that list.

22  A.   Yes.

23  Q.   Where it says:  A law firm agreements, contracts,

24  engagements, etc. . . .  Do you see that?

25  A.   Yes, I see it.

1   Q.  With the engagements, etc., . . ., did you even understand

2   what it was that Mr. Cosmo was asking for?

3   A.  No.

4   Q.  I want to direct your attention now to the third page of

5   this document, Bates stamped 1241.  Mr. Hwang, you respond and

6   say:  Pat, here are our answers to Cosmo's questions.  I want

7   you to take a quick look at what follows.

8           Did you answer all of those questions?

9   A.  Yes.  This is from me.

10  Q.  And did the answers include certain other documents?

11  A.  I have to read through.

12  Q.  Sure.

13  A.  I think I answered as much as I can.

14  Q.  Did you leave any questions unanswered here?

15  A.  I think No. 8 was not.

16  Q.  Let's take a look at No. 8:  All law firm agreements,

17  contracts, engagements, . . .

18          MR. BELL:  Mr. Lachow, can you go to the next page

19  after that, and focus in on 7 and 8.

20  Q.  Where it says all law firm agreements, contracts,

21  engagements, etc., there is some text afterwards, isn't that

22  right, Mr. Hwang?

23  A.  Excuse me?

24  Q.  Do you see where it says law firm agreements, contracts,

25  engagements, etc.?

H3GMCOS4                        Hwang - direct

1    A.   Um-hum.

2    Q.   And what did you note after that?

3    A.   What did I note?

4    Q.   You see where it says:  We don't have any law firm?

5    A.   Yes.  This was my response.  We don't have any law firm

6    agreement.

7    Q.   What else did you say?

8    A.   We consult with one of our BOT member who is a licensed

9    U.S. lawyer.

10   Q.   Did you answer that question, Mr. Hwang?

11   A.   I guess.  Sorry.

12   Q.   To the extent that you could?

13   A.   To the extent that I could, yeah.

14   Q.   Let's take that down.  I want to direct your attention to

15   the next document in the pile, which is Government Exhibit 319.

16   Are you familiar with that document?

17   A.   Yes.

18   Q.   Is this an e-mail chain that you were a party to?

19   A.   Yes.

20            MR. BELL:  The government offers Government Exhibit

21   319.

22            MR. DeMARCO:  No objection.

23            THE COURT:  Received.

24            (Government Exhibit 319 received in evidence)

25            MR. BELL:  We are actually not going to publish this.

1    Q.  Looking at the next document in the pile, Mr. Hwang --

2    actually, the next three which are labeled Government Exhibit

3    325, 333, and 343.

4    A.  I have them in front of me, yes.

5    Q.  Are these, likewise, e-mail chains that you were a party to

6    along with individuals from Omni and Dr. Penland?

7    A.  Yes.

8             MR. BELL:  The government offers governments 325, 333,

9    and 343.

10            MR. DeMARCO:  Let me just check out 343.  No

11   objection.

12            THE COURT:  Received.

13            (Government Exhibits 325, 333, and 334 received in

14   evidence)

15   Q.  Finally, as to this bunch I will ask you to take a look at

16   what's been marked as Government's Exhibits 344 and 354.  Do

17   you see those, sir?

18   A.  Yes, I do see it.

19   Q.  Are those, likewise, e-mail communications between

20   yourself, the people at Omni, and Dr. Penland concerning the

21   audit?

22   A.  That's correct.

23            MR. BELL:  The government offers 344 and 354.

24            MR. DeMARCO:  No objection.

25            THE COURT:  Received.

1           (Government Exhibits 344 and 354 received in evidence)

2      Q.  Mr. Hwang, I now would like to direct your attention to

3      Government Exhibit 171.

4      A.  Yes.

5      Q.  Are you familiar with this e-mail?

6      A.  Yes, I am.

7      Q.  And who was this e-mail from and who was it to?

8      A.  It was from Patricia Tsien to me, to myself.

9           MR. BELL:  The government offers Government Exhibit

10     171.

11          MR. DeMARCO:  No objection.

12          THE COURT:  Received.

13          (Government Exhibit 171 received in evidence)

14          MR. BELL:  Can we publish 171, Mr. Lachow.  Can we

15     focus in on the text of that first e-mail.

16     Q.  The subject line was:  Forward TCIS audit draw site.  And

17     on July 16, Tsien writes:  Thomas, thank you for the hard work

18     from you and your team.  See the TCIS auditor web link below.

19     You can click on the URL address and input the ID and password

20     provided.

21          What was the TCIS auditor web link, Mr. Hwang?

22     A.  This is file transfer site.

23     Q.  What was the purpose of this file transfer site?

24     A.  To drop -- it works like a drop box.  How do I explain it.

25     To deposit files into a site.

H3GMCOS4                           Hwang - direct

1    Q.  It then says:  Cosmo is reviewing the material provided by

2    working through all the data you have provided and that we have

3    loaded onto the link.  It is this link that we will provide the

4    auditor to work from.  It is the best way to control the

5    information flow.  Please provide the last of the information

6    requested today, and we can move into the formal audit ASAP.

7            Do you recall accessing that link?

8    A.  Yes.

9    Q.  And do you recall adding additional information that had

10   been requested to that?

11   A.  Yes.  We uploaded big sizes of files.

12   Q.  Once you uploaded those files, what was your understanding

13   with respect to where you stood for the preaudit phase?

14   A.  Completed.

15   Q.  When the audit actually took place, who made the

16   arrangements for the audit?

17   A.  Omni.

18   Q.  What was your expectation of how long the auditor was

19   staying?

20   A.  Three, four days.

21   Q.  And where did you get those expectations from?

22   A.  From Patricia.

23   Q.  Did you have any input as to how long the audit was going

24   to be?

25   A.  Did I have any input?  No, I didn't have any input.

1  Q.  What did you understand the purpose of the onsite audit to

2  be, with all of those documents having already been submitted

3  electronically?

4  A.  The onsite audit was to verify the original documents.

5  Q.  Did you believe that the documents that were going to be

6  reviewed in person were documents that had already been

7  provided during the preaudit stage?

8  A.  I believe it was previewed by the person.

9  Q.  I want to direct your attention to Government Exhibits 221

10 and 222.  Are these two e-mail exchanges between yourself,

11 Omni, and Dr. Penland concerning the audit?

12 A.  That is correct.

13          MR. BELL:  The government offers 221 and 222.

14          MR. DeMARCO:  No objection.

15          THE COURT:  Received.

16          (Government Exhibits 221 and 222 received in evidence)

17 Q.  I direct your attention to Government Exhibits 223, 225,

18 and 227.

19          Mr. Hwang, are these likewise e-mail exchanges

20 regarding the audit between yourself, Dr. Penland, the folks at

21 Omni, and others?

22 A.  That is correct.

23          MR. BELL:  The government offers 223, 225, and 227.

24          MR. DeMARCO:  No objection.

25          THE COURT:  Received.

H3GMCOS4                              Hwang - direct

1               (Government Exhibits 223, 225, and 227 received in

2      evidence)

3      Q.  I want to direct your attention to 231 and 236.  Mr. Hwang,

4      are these, likewise, e-mail exchanges concerning the audit

5      between yourself, the folks at Omni, and Dr. Penland?

6      A.  That is correct.

7      Q.  Now I want to direct your attention to what's been marked

8      for identification as Government Exhibit 234.  Are you familiar

9      with that e-mail, sir?

10     A.  Yes.

11     Q.  Now, who is this e-mail from and who is it to?

12     A.  It's from Patricia Tsien.

13     Q.  Do you recall having received this e-mail back in July of

14     2011?

15     A.  Yes.

16               MR. BELL:  The government offers 234.

17               MR. DeMARCO:  No objection.

18               THE COURT:  Received.

19               (Government Exhibit 234 received in evidence)

20               MR. BELL:  Can we publish that, Mr. Lachow.

21               The government also offers 231 and 236.

22               MR. DeMARCO:  No objection.

23               THE COURT:  Received.

24               (Government Exhibits 231 and 236 received in evidence)

25     Q.  Returning now to 234, the subject line is:  Quick update

H3GMCOS4                          Hwang - direct

1   from Cosmo.  And let's take a look at what Ms. Tsien wrote on

2   July 21.  Cosmo expects -- hopes to have preaudit results

3   tomorrow.  The review being performed is evaluating the

4   information and classifying them as follows:  1.  Satisfactory;

5   2.  Needs to discuss; 3.  Need more information; 4.

6   Information missing.

7          Had you been expecting, Mr. Hwang, to get information

8   from Cosmo regarding results of a preaudit?

9   A.  No.

10  Q.  Were you surprised when you did get this e-mail?

11  A.  No.  I was surprised, yes.

12  Q.  Why were you surprised?

13  A.  It's like a one step -- another step after another step.

14  It was never ending.

15  Q.  And it says:  As soon as I receive the results I will work

16  with Thomas to turn around to Cosmo as quickly as possible.  It

17  says:  Thomas has asked what happens if there is an unfavorable

18  audit.

19          Had you in fact asked that of Ms. Tsien?

20  A.  Yes.

21  Q.  And why had you asked that of Ms. Tsien?

22  A.  The audit was explained to me as part of the technicality

23  to comply.

24  Q.  The next line says:  The answer is that by handling the

25  audit as it's being handled -- then in all caps -- TCIS will

H3GMCOS4                        Hwang - direct

1    not have an unfavorable audit.  The preaudit ensures that we

2    are addressing everything before the official audit and if the

3    requirements can't be addressed, Cosmo knows how to position it

4    with the auditors so that whatever is missing becomes

5    unimportant.  We can't guarantee that TCIS will noy -- I

6    imagine that's supposed to be now -- have an unfavorable audit,

7    but we are doing everything we can to ensure that you don't.

8    It may seem slower now, but this approach allows a faster

9    formal audit.

10           What was your reaction to this e-mail, Mr. Hwang?

11   A.  I don't remember how I react to it, but I was not happy.

12   Q.  Did you say, but I was not happy?

13   A.  That's correct.

14   Q.  What do you mean by that?

15   A.  Well, just like I said before was, steps that were not

16   explained were popping up.

17   Q.  I now want to draw your attention to the next e-mail in the

18   stack, Government Exhibit 235.  Did a time come, Mr. Hwang,

19   when you volunteered to help with the preaudit?

20   A.  Yeah.  To speed things up.

21   Q.  And why did you volunteer to help to speed things up?

22   A.  I think along the lines I heard there is a translation

23   problem.  I thought I could help them with the translation

24   part.

25   Q.  Sir, are you familiar with the e-mail exchange in

H3GMCOS4                        Hwang - direct

 1    Government Exhibit 235?

 2    A.   Yes.   This looks like Patricia Tsien's response to that.

 3              MR. BELL:   Government offers 235.

 4              MR. DeMARCO:   No objection.

 5              THE COURT:   Received.

 6              (Government Exhibit 235 received in evidence)

 7              MR. BELL:   Can we publish 235, Mr. Lachow.   Thank you.

 8    Q.   The top e-mail begins:   Thomas, see Cosmo's response below.

 9    And there is a back and forth below between Ms. Tsien and Cosmo

10    Dabi.

11              Can we go to the second page of the original e-mail

12    between NY Tsien and OmniHoldings.com and CEO@Cosmodabi.com.

13    The body says:   Thomas called me tonight.   He suggested, to

14    speed things up, that he could fly to the U.S. to work with

15    your preaudit person to address any and all open questions.   If

16    there is still missing information, you would have someone on

17    standby in Korea to pull what's needed.   That way we have

18    immediate turnaround and speedy closure.   Thoughts.   I need to

19    get back to Thomas on his suggestion tonight, if possible.

20    Separately, Thomas is being aggressively badgered by the

21    contractors and vendors.   He was wondering if it would be

22    possible for us to provide a letter where you formally tell

23    TCIS that you would fund immediately upon the conclusion of a

24    successful audit, with successful in italics.   If that letter

25    also had a screenshot like the April letter, that would make

H3GMCOS4                         Hwang - direct

1   his day.

2              Did you recall asking for a screenshot?

3   A.  Yes.

4   Q.  Why did you want another screenshot, Mr. Hwang?

5   A.  First of all, I wanted to make sure he had the fund.  That

6   was for me to verify.  And, second, that if he did -- if he was

7   ready for the successful -- what do you call -- funding after

8   the successful audit.

9   Q.  You said that you wanted to make sure that the money was

10  there.  What was your understanding of what was happening to

11  the school's deposit at this time?

12  A.  I wasn't sure.

13  Q.  What was your understanding of what should have been

14  happening at that time?

15  A.  There should be sufficient funds up to the point or all the

16  draw added up together.

17  Q.  The response, which begins at the bottom of page 1, comes

18  from Cosmo Dabi:  Hello, Patricia, I am moving things along as

19  quickly as I can under the circumstances, and I am fairly

20  certain things will be fine.  I have been making accommodations

21  to push things along as rapidly as possible.  There is no money

22  problem.  There is just time required to do what needs to be

23  done for this first audit.  By no means is TCIS's personnel to

24  be involved in any preliminary audit, etc.  Their internal

25  involvement on prelim would contaminate the prelim and defeat

H3GMCOS4                         Hwang - direct

1   the entire purpose of it, but I thank you and them for the

2   offer.

3           Essentially, the prelim has just started as of last

4   week and is still incomplete as stated.  We have to translate

5   using trusted resources, compilations to be permitted by

6   certified internal personnel before it is turned over to an

7   onsite audit person.  A letter is possible subject to my review

8   prior to release or, naturally, I can just draft a letter.

9   There is no possible rush job on this under circumstances.  I

10  need to perform the prelim to perfection, audit in a manner

11  that confirms to a solid compliant justification before

12  releasing any draw funds.  We may work weekends, etc., outside

13  of normal business hours, but unfortunately, others do not.

14          Did Mr. Cosme send you a screenshot of his account in

15  this correspondence?

16  A.  No.

17  Q.  Did he ever send you a screenshot again?

18  A.  No.

19  Q.  Did you ever get any other confirmation of how much money

20  was in the trading account?

21  A.  No.

22  Q.  When Ms. Tsien forwarded you this e-mail, did you have an

23  understanding of why your involvement in the preaudit would

24  contaminate it?

25  A.  I did not understand.

H3GMCOS4                          Hwang – direct

1    Q.   Let's take 235 down and I am going to direct your attention

2    to Government 240.  Actually, may I direct your attention to

3    Government 237, which in your pile should be right next to it.

4    Are you familiar with Government 237?

5    A.   Yes.

6    Q.   And what is Government 237?

7    A.   This is Patricia Tsien sending onsite audit schedule.

8             MR. BELL:  The government offers 237.

9             MR. DeMARCO:  No objection.

10            THE COURT:  Received.

11            (Government Exhibit 237 received in evidence)

12            MR. BELL:  You can publish that, Mr. Lachow.

13   Q.   In this e-mail, subject line, auditor's site visit from

14   Patricia Tsien, on Monday, August 1, she writes:  Mr. Cosmo has

15   confirmed to me this morning that the audit will occur August

16   10 through 12 unless there are some logistics issues, in which

17   case it will be no later than early the following week.  The

18   auditor is on standby and will fly to Korea with two days'

19   notice, which will be given two days before completing the

20   preaudit.

21            The preaudit is proceeding well such that the auditor

22   that comes onsite will be able to confirm the preaudit results

23   in two days and authorize the first draw upon successful audit.

24   Thank you for your patience.

25            What was your reaction receiving this e-mail,

H3GMCOS4                          Hwang - direct

1    Mr. Hwang?

2    A.   My reaction was that auditor eventually would come onsite

3    to complete -- this would be the last.

4    Q.   What did this e-mail tell you with respect to the status of

5    the preaudit?

6    A.   It was -- it tells me it was still proceeding.

7    Q.   Let's take that down and let me direct your attention to

8    Government Exhibit 240 marked for identification.  Mr. Hwang,

9    it would be the next exhibit.  Are you familiar with this

10   e-mail, sir?

11   A.   Yes.

12   Q.   Who was it from?

13   A.   It's from Patricia to me.

14           MR. BELL:  The government offers Government Exhibit

15   240.

16           MR. DeMARCO:  No objection.

17           THE COURT:  Received.

18           (Government Exhibit 240 received in evidence)

19           MR. BELL:  Can we publish the first page.  Thank you,

20   Mr. Lachow.

21   Q.   Subject line is:  Forward TCIS expectations need to be set

22   properly.  Who was the forwarded e-mail from, Mr. Hwang?

23   A.   Cosmo Dabi.

24   Q.   Why don't we go down to that forwarded e-mail which is

25   sent, according to this, on Wednesday August 17, 2011.  Hello,

H3GMCOS4                              Hwang - direct

1    PT.  Please forward this and/or clearly communicate this to

2    TCIS so proper expectations are set.

3           1.  There will be two to four audit persons.  Audit

4    person 1 is expected to be at TCIS offices Friday 9 a.m.  Her

5    sole role is to only perform audit on the documents that have

6    been provided to Cosmo Dabi by TCIS.  She will not give any

7    opinions either until Cosmo Dabi internal review is completed.

8           Prior to this point, Mr. Hwang, were you aware that

9    there was going to be more than one person involved in the

10   onsite audit?

11   A.  Prior to this I wasn't aware.

12   Q.  Prior to this did you know that onsite auditors were going

13   to be sent in more than one stage?

14   A.  Prior to this, no.

15   Q.  It continues:  Auditor 1's role is not to discuss draw

16   schedules, timelines, expectations, projections, hostilities,

17   concerns, complaints, compliments, sit with committees, boards,

18   or anything else other than questions -- and then in bold --

19   she may have for TCIS.  Auditor 1 will report all findings to

20   Cosmo Dabi HQ, then Cosmo Dabi HQ will review and provide

21   results to TCIS at a reasonable to rapid pace.  No. 3, auditors

22   2 through 4, this team will consist of engineers and technical

23   types and be deployed upon satisfaction of auditor 1's reports.

24   They will assess work completed, quality of work, costs,

25   estimated production timelines, percentage completed, etc.  Up

H3GMCOS4                              Hwang – direct

1   until this point, Mr. Hwang, had you been preparing in any way

2   for engineering and technical auditors?

3   A.  No.

4   Q.  Up until this point did you know that technical and

5   engineering auditors were going to be sent?

6   A.  No.

7   Q.  It then says:  Or once all four auditors submit findings,

8   discoveries, etc., and review to the satisfaction of Cosmo

9   Dabi, which we are expecting, draw 1 will be released.  I am

10  looking forward to closure.

11          What was your reaction to this e-mail, Mr. Hwang?

12  A.  Mixed up.

13  Q.  What do you mean by mixed up?

14  A.  I was a little happier when they are actually sending

15  auditors out.  But reading down the line, it is committee who

16  is deciding the outcomes of the audit.  I wasn't sure what the

17  outcome would be.

18  Q.  Did there come a time when the auditor actually showed up?

19  A.  One showed up.

20  Q.  One showed up.  What was her name, if you can recall?

21  A.  Donna Kim.

22  Q.  And what was supposed to happen when the auditor came to

23  Korea, logistically?

24  A.  Logistically, we would prepare a space for her to sit down

25  and review the documents.

H3GMCOS4                         Hwang - direct

1    Q.  Where was that space?

2    A.  That was inside the TCIS finance office.

3    Q.  Was the auditor supposed to visit any TCIS property aside

4    from that office?

5    A.  Yes, construction site.

6    Q.  And who determined what this itinerary or agenda was going

7    to be?

8    A.  Omni.  I didn't know who were determining it.  We were not.

9    Q.  But somebody at Omni?

10   A.  I think so.

11   Q.  Did you determine it, Mr. Hwang?

12   A.  No.

13   Q.  What happened when the auditor actually arrived?

14   A.  She went to TCIS finances office.

15   Q.  What happened then?

16   A.  So assistant over there who were preparing documents

17   provide her space to work inside.

18   Q.  And what happened when she got to that space?

19   A.  She closed the door behind her and she went through the

20   document, I think.  Nobody saw her inside.

21   Q.  What else happened that day, to your knowledge, with

22   respect to the audit?

23   A.  I do not recall how long she was there, but after she --

24   she left.

25   Q.  When she left, what happened to the items that she had been

H3GMCOS4                          Hwang - direct

1    reviewing?

2    A.   There were a box full of the documents left inside the

3    office.

4    Q.   And what were you expecting to happen the next day?

5    A.   I was expecting her to show up again to continue with the

6    audit.

7    Q.   Did she?

8    A.   No, she did not.

9    Q.   What, if anything, did you do with respect to the items in

10   the boxes in her work space?

11   A.   We sent the boxes to a hotel.

12   Q.   To whose hotel?

13   A.   Donna's hotel.

14   Q.   Why did you do that?

15   A.   She told somebody at the office that she would be working,

16   taking the boxes and working from the hotel.

17   Q.   And did she in fact take the boxes with her?

18   A.   No, she did not.

19   Q.   The next day, when the auditor did not arrive, what

20   happened?

21   A.   I call Patricia.

22   Q.   And did you speak to her?

23   A.   Yes, I spoke to her.

24   Q.   What did Patricia say to you and what did you say to her?

25   A.   She told me she is not coming back.

H3GMCOS4                                Hwang - direct

1   Q.  Did she offer a reason?

2   A.  Yes.  She said we weren't supposed to know where she was

3   staying.  You shouldn't have delivered -- not delivered.  You

4   shouldn't have known where she was staying.  She said this is a

5   breach of a security.

6   Q.  Just to be clear here, when you said you weren't supposed

7   to know where she was saying, who was Patricia talking about

8   there?

9   A.  She was talking about the auditor.

10  Q.  Did she offer a reason why that meant that the auditor

11  could not have come that day?

12  A.  Repeat that question.

13  Q.  What did that have to do with why the auditor didn't show

14  up the next day?

15  A.  I don't see a reason why.

16  Q.  After you got Patricia's explanation of why the auditor

17  didn't show up the second day, what happened?

18  A.  She left the country.

19  Q.  Did Omni ever send another auditor to the site?

20  A.  They never.  Nobody did.

21  Q.  Just for completeness, did Cosme or Cosmo Dabi ever send

22  another auditor to that site?

23  A.  No.

24  Q.  I want to direct your attention to what has been marked as

25  Government Exhibit 177 before you.  I want you to pay attention

1    to both the e-mail in the front and to the communication that

2    starts at 13:08.  Do you see that, Mr. Hwang?

3    A.  Yes, I do.

4    Q.  Are you familiar with this e-mail?

5    A.  Yes, I do.

6    Q.  Do you recall sending it?

7    A.  Yes.

8              MR. BELL:  The government offers Government Exhibit

9    177.

10             MR. DeMARCO:  No objection.

11             THE COURT:  Received.

12             (Government Exhibit 177 received in evidence)

13             MR. BELL:  Can we publish 177.

14   Q.  I want to direct your attention, first, from the top of the

15   e-mail down to before it says:  Hi, Thomas.  It says:  Dear

16   respectful board members and Dr. Penland:  Please find the

17   audit report attached.  Cosmo turned around very quickly and

18   issued this report for us.  Also, Cosmo is issuing the cure

19   report based on findings during this audit by Wednesday a.m.

20   His next step is explained in the report.

21             When was the first, Dr. Hwang, that you heard about a

22   cure report?

23   A.  Must be some time before this.  I don't recall exactly

24   when.

25   Q.  Let me direct your attention to page 1308.  There is an

1    attached letter.  Do you see that?  It's up on the screen, if

2    that's helpful.

3          MR. BELL:  Can we focus in on the top half.

4    Q.  Do you recall sending this letter out to Dr. Penland and

5    the board as an attachment?

6    A.  Yes.

7    Q.  Where did you get the letter from?

8    A.  I believe it came from Omni.

9    Q.  I'll direct your attention to the body of that letter.  It

10   says:  This letter reports and contains impartial results of

11   our audit for the TCIS construction project performed August

12   19, 2011 by Cosmo Dabi staff following three weeks of preaudit

13   in New York to prepare for the onsite audit.  The objectives of

14   the audit were to determine whether (1) revenues were properly

15   deposited and recorded in accordance with described procedures;

16   (2) expenditures were allocable and allowable to the

17   construction vendors; and (3) internal controls were in place

18   to ensure the effective and efficient operations of the TCIS

19   construction project.

20          A bit further down it says:  Prior to the audit, we

21   requested that the audit take place wherever original documents

22   were available.  And having discovered their lack of existence

23   at the construction site, the audit moved to the TCIS business

24   office only to find that large numbers of original contracts

25   and invoices were still missing.

1      Had you expected, Mr. Hwang, for the auditor, Ms. Kim,

2  to review additional documents, the second day?

3  A.  Yes.

4  Q.  And the third day?

5  A.  Yes.

6  Q.  And the fourth day, if there had been one?

7  A.  As long as it takes, we will be ready.

8  Q.  Did she ever get the chance to review those documents, to

9  your knowledge?

10  A.  She didn't come back, so --

11  Q.  Now, additionally it says towards the bottom of the page:

12  Our early and immediate findings have also determined that more

13  of the information previously requested and stated by TCIS and

14  confirmed by TCIS as being audit ready, on several prior

15  occasions to the auditor being on site simply was not,

16  including, and there is a list of six items.

17      It then says:  At this point I have aborted further

18  audits until TCIS addresses the items on a cure report that

19  Cosmo Dabi will issue shortly.  Subject to curing the

20  identified open items, I am of the opinion that TCIS should be

21  able to cure some and/or most of the negligent findings upon

22  discussions and strict adherence to our guidelines and

23  requests.  I'm available any time Monday to discuss the above,

24  should you desire to do so, or as soon as you receive a copy of

25  the cure report.  Only then can we work together through an

H3GMCOS4                          Hwang - direct

1   appropriate timeline for the release of the first draw, which I

2   am committed to making, as soon as the full audit has been

3   successfully completed.  Sincerely, Cosmo Dabi, Inc.,

4   Mr. William Cosmo.

5          Did have did you speak to Mr. Cosmo after this?

6   A.  No.

7   Q.  Why not?

8   A.  There was no point in talking.

9   Q.  I want to direct your attention to what's been marked as

10  Government Exhibit 245.  Are you familiar with 245?  Do you

11  have 245 there, sir?

12  A.  245?

13  Q.  Yes, sir.

14  A.  Yes.

15  Q.  Are you familiar with Government Exhibit 245?

16  A.  Yes.  This is about the cure report release.

17          MR. BELL:  The government offers 245.

18          MR. DeMARCO:  No objection.

19          THE COURT:  Received.

20          (Government Exhibit 245 received in evidence)

21          MR. BELL:  Can we publish it.

22  Q.  There is another e-mail here from Patricia Tsien forwarding

23  you another e-mail from Cosmo Dabi.  I want to direct your

24  attention to that lower e-mail.  Hello, Patricia, please notify

25  TCIS that I will have the cure draft out to them on their end

H3GMCOS4                          Hwang – direct

1    of day Friday.  The delay was due to the translation accuracy

2    of some of the documents, and other areas of the TCIS

3    accounting.

4            When it says the delay was due to the translation

5    accuracy of some of the documents, what was your understanding

6    of who had translated the documents or who had arranged for the

7    translation of the documents?

8    A.  I don't know who did the translation.

9    Q.  Did you eventually receive a cure report?

10   A.  Yeah, I think so.

11   Q.  I want to direct your attention to Government Exhibit 179,

12   which is the next one in the stack.  Do you recall receiving

13   this document, Mr. Hwang?

14   A.  Yes.

15           MR. BELL:  Your Honor, the government offers 179.

16           MR. DeMARCO:  No objection.

17           THE COURT:  Received.

18           (Government Exhibit 179 received in evidence)

19           MR. BELL:  Let's put up the first page.

20   Q.  It then says:  Subject line audit, cure report for the

21   board.  Tsien says:  Attached is the cure report prepared by

22   the Cosmo Dabi audit team which reports the facts and

23   highlights errors, omissions, and deficiencies in the way that

24   TCIS has been managing and controlling the new campus

25   construction.

1          I preface your reading of the report with Cosmo's

2     reaffirmation that he desires and fully intends to fund against

3     the draw schedule, but each of you must bear in mind the

4     following tenet.  The transaction entered into is a loan and

5     the implication is that TCIS, as the borrower, must be

6     sufficiently well organized and disciplined to manage its

7     affairs so that it will be able to repay the loan.  In the cure

8     report you'll observe significant TCIS lapses in management

9     procedures customary to any seriously run organization which

10    was reconfirmed independently from the 2009 to 2010 management

11    letter prepared by KPMG.

12          What was the management letter from KPMG that was

13    being referenced there, Mr. Hwang?

14    A.  This was -- schools are required to have audits two or

15    three years.  I think this is one of the audit reports.

16    Q.  To your knowledge, what had happened, if anything, as a

17    result of the KPMG audit?

18    A.  I think the KPMG audit was negative about going forward

19    with the construction project.

20    Q.  Now, when you say the KPMG report was negative about going

21    forward with the construction project, was KPMG aware of the

22    fact that you were going to get financing from Cosmo Dabi

23    International at the time that that audit report was put out?

24    A.  No, not at all.

25    Q.  Moving forward within the e-mail, at the bottom line it

H3GMCOS4                          Hwang - direct

1    says -- within the next paragraph it says:  The financial audit

2    must be successfully completed so that the technical audit can

3    be initiated, at which time the technical team will help TCIS

4    management design and implement sound project management

5    procedures.

6            Mr. Cosmo expresses high confidence that TCIS will

7    reform its management processes so that the project will return

8    to being a viable operation and that the school can continue

9    delivering superior education while positioning itself capable

10   of repaying the loan.

11           Prior to this matter of the cure report, Mr. Hwang,

12   during all of those stages of the preaudit, had Omni or Cosmo

13   raised any issues concerning lapses in management procedures?

14   A.  No.

15   Q.  Had they raised any issue concerning possible risk

16   management of the school?

17   A.  No.

18   Q.  Directing your attention to the second page of that

19   document, it's a letter from Cosmo Dabi.  Do you see that?

20   A.  Yes, I see it.

21   Q.  I want to direct your attention to -- right under it says:

22   Dear Dr. Penland.  We believe that your construction project of

23   the new Taejon Christian International School campus can be

24   completed if the TCIS management team, other personnel and

25   construction team involved will agree to follow standard

```
1    operating procedures for this project type.  To that end, I
2    thought it helpful if I summarized the major speed bumps that
3    are currently slowing the pace in achieving our mutual goal of
4    a completed transaction and disbursement of the first draw.
5              Did you read the cure report?
6    A.  I don't recall every details, but I think I did.
7    Q.  Do you recall your general reaction to the cure report?
8    A.  Yes, I do recall my general reaction.
9    Q.  What was your reaction to the cure report?
10   A.  Impossible.
11   Q.  What do you mean by impossible?
12   A.  To me it sounds like you're requesting same information
13   over and over again.
14   Q.  I want to direct your attention to a few pages into the
15   cure report at Bates stamp 1319.  It's five pages in.  I want
16   to direct your attention to just that section of the cure
17   report near where it says No. 13.  This part of the cure report
18   says:  The final version of all expense data sorted by the
19   fiscal year, Mr. Seo was unable to complete prior to our
20   auditor's departure.
21             How far into the audit did the auditor depart?
22   A.  Could you repeat that question.
23   Q.  Sure.  It says here that Mr. Seo was unable to complete the
24   final version of expense data before the auditor's departure.
25   After how long did the auditor depart?
```

1    A.  She departed after one day.

2    Q.  How long was she supposed to be there?

3    A.  Three days.

4    Q.  What happened after the school, in the person of you and

5    Dr. Penland, received this cure report?

6    A.  What happened?

7    Q.  Yes, sir.

8    A.  After we received this cure report?

9    Q.  Did you share it with Dr. Penland?

10   A.  Yes.

11   Q.  What was the reaction?

12   A.  I didn't get any response.

13   Q.  I want to direct your attention to Government Exhibit 253.

14   Are you familiar with this document?

15   A.  Yes.

16   Q.  Is this a further e-mail communication between you and Omni

17   regarding the audit or, rather, regarding the project?

18   A.  Yeah.  I think this was probably the last.

19           MR. BELL:  The government offers Government Exhibit

20   253.

21           MR. DeMARCO:  No objection.

22           THE COURT:  Received.

23           (Government Exhibit 253 received in evidence)

24   Q.  The subject line is:  Deposit return critical.  And I want

25   to direct your attention to the e-mail that starts midway

H3GMCOS4                         Hwang - direct

1    through the first page, from you to Pat Tsien, copying Pak and

2    in Cleveland.

3            Dear Pat, board has approved the motion on the return

4    of the deposit.  They fought hard, but parents do want it back.

5    It continues onto the next page.  I am really sad and

6    disappointed because we have been working really hard at this.

7            At that time, Mr. Hwang, were you actually really sad

8    and disappointed that the school was asking for its money back?

9    A.  Like I said, I was mixed up.  I had a lot of mixed-up

10   feelings then.

11   Q.  What do you mean by that?

12   A.  Sometimes I thought they were really working hard and

13   sometimes I wasn't sure what they were doing.  I was confused.

14   Q.  Then you said:  The only chance for this deal to stay alive

15   is unconditional interim funding, but I seriously doubt you

16   will be able to convince Cosmo to go for that.  Thanks for all

17   your hard work and sorry for all the BS and insults you had to

18   put up with.

19           Mr. Hwang, did you in fact think that the Omni people

20   had to put up with BS and insults through this process?

21   A.  I don't know.

22   Q.  Why did you write that?

23   A.  I do not know why I did that.

24   Q.  At this point were you still hoping to get the money back?

25   A.  Yes.

H3GMCOS4                          Hwang - direct

1   Q.  You then said:  Please let me know what will be the best

2   and least hassle way to get our deposit back.  I don't want to

3   raise any legal issues and put more damage on my reputation

4   anymore, and possible invisible discrimination against my kids

5   in school.  I am sure you understand.  Sincerely.

6           The response at the top of page 1 from Pat Tsien says:

7   I think we need a formal request from Dr. Penland.  We are

8   going to have to put TCIS on default notice as well, not

9   something we want to do, but given the quote/unquote parents

10  and Dr. Penland's behavior, we don't have a choice.  That is

11  independent of the return of the deposit.

12          Had you heard about the possibility of Omni declaring

13  default before the school asked for its money back?

14  A.  I heard the possibility --

15  Q.  Did they raise the possibility of default before the school

16  started asking for its money back?

17  A.  Yeah, they raised a couple of times with points about

18  default before.

19  Q.  When?

20  A.  Before the audit, before the audit.

21  Q.  What had prompted them to start talking about default

22  before the audit?

23  A.  They were talking about default because Dr. Penland's

24  letter to Cosmo Dabi caused a stop-and-go situation, and that

25  is the cause of the default.

1    Q.  Is it safe to say, Mr. Hwang, that whenever the school

2    started making noises about wanting its money back, one of

3    those occasions would always happen before they started talking

4    about defaults?

5    A.  Yes.

6    Q.  The last line here is:  Why do parents have a say.  What

7    did you understand that to mean?

8    A.  Why do parents have a say?

9    Q.  Yes, sir.

10   A.  The school.  Parents know what's going on at school.  They

11   get reports.  Why do parents have a say.  To me, of course they

12   do have a say, but I don't know why she was asking this

13   question.

14   Q.  After this do you recall hearing from the school again?

15   I'm sorry.  Do you recall hearing from Omni or Cosmo again

16   directly?

17   A.  No.

18   Q.  After this, what did the school do?

19   A.  TCIS board of trustee removed Dr. Penland from headmaster

20   position.

21   Q.  What, if anything, happened to you, Mr. Hwang?

22   A.  Months later I voluntarily resigned from work.

23   Q.  Why?

24   A.  The school is very small society, close society.  Everybody

25   knows everybody's business.  I did not want to have my children

H3GMCOS4

1    being in there.  Became little hostile.

2    Q.  What was the source of the hostility?

3              MR. DeMARCO:  Objection.

4              THE COURT:  Sir.

5              MR. DeMARCO:  Relevance.

6              THE COURT:  I'm sorry?

7              MR. DeMARCO:  Objection.  Relevance, your Honor.

8              THE COURT:  Counsel.  What's the relevance of this?

9              MR. BELL:  I think it goes to bias, but I'll withdraw

10   it.

11             Your Honor, we have no further questions for

12   Mr. Hwang.

13             THE COURT:  Thank you.

14             Ladies and gentlemen you want to take five now before

15   we start the cross.

16             Quick, take five.  Six.  All right.  Thank you.

17             (Jury not present)

18             THE COURT:  Anything on the record?

19             MR. BELL:  No, your Honor.

20             MR. DeMARCO:  No.  Thank you.

21             THE COURT:  Mr. Cosmo.  Yes, sir.

22             THE DEFENDANT:  Judge, probably best to speak to you

23   in the absence of Mr. Hwang.

24             THE COURT:  Mr. Marshal, will you take Mr. Hwang out

25   into the hall, sir.  Thank you.

1          THE DEFENDANT:  One of the issues, as you know, that

2     comes up all the time that you have articulated was resolved in

3     prior litigation has resurfaced and it has to do with asset

4     forfeiture.

5          Mr. Hwang testified that he had sent funds to my

6     trading account in the asset forfeiture litigation.  I think it

7     was on July or June 19, the judicial probable cause finding,

8     you had traced all of my preexisting money to all of the

9     accounts tied to TCIS, including the Scottrade trading account.

10    This particular witness testified that he had sent $5.5 million

11    to my trading account.  The record shows, based on your own

12    traces and the government's traces, and the FBI's traces, that

13    none of that money was deposited into the trading account.

14         Mr. Hwang testified that he sent the $5 million to the

15    trading account.  He didn't.  He sent it to an operating

16    account.  That being said, in my view, that reopens up the

17    entire forfeiture and several other issues.

18         Judge Baer, prior to your arrival, prohibited the CJA,

19    all CJA from litigating any all forfeiture-related litigation,

20    meaning administrative civil, criminal forfeiture because he

21    considered forfeiture civil litigation not a criminal offense,

22    and I believe that's correct.  All forms of forfeiture in this

23    case are considered civil litigation.

24         That being said, we also have the issue of Pryor

25    Cashman contractually obligating themselves to all of the

H3GMCOS4

1    forfeiture litigation in the case in addition to lots of other

2    things.

3              THE COURT:  Mr. Cosme, we have finished discussing

4    Pryor Cashman.

5              THE DEFENDANT:  Your Honor, respectfully, you

6    cannot --

7              THE COURT:  What are you asking me for now?

8              THE DEFENDANT:  I'm asking you for all of the assets

9    because Mr. Hwang's testimony just verified that he deposited

10   the funds into an account that wasn't the trading account that

11   you allegedly connected to all of this money, based on the

12   traces.  That being said, that's a defect, a discrepancy, a

13   fatal defect, a five million dollar error.

14             What we need to do is reopen that and address that

15   issue so we can have counsel of choice reinstalled so you could

16   have Mr. DeMarco go do what he does best, which is not this

17   case, respectfully.

18             THE COURT:  Does anyone have any comment?  Government,

19   Mr. DeMarco, anybody?

20             MR. DeMARCO:  I have no comment.

21             MR. BELL:  No, your Honor.

22             THE COURT:  Denied.  Thank you, counsel.

23             (Recess)

24             MR. DeMARCO:  According to the CSO, the marshal, he

25   observed Mr. Cosme get on the elevator and go down, so the CSO

H3GMCOS4

```
 1    is going to the eighth floor to look for them.
 2              MR. BELL:  Should we note the time, your Honor?
 3              THE COURT:  The time is 3:18 on the phone.
 4              MR. BELL:  Thank you, your Honor.
 5              THE COURT:  Thank you, gents.
 6              Mr. Marshal.
 7              THE MARSHAL:  The defendant is not on the eighth
 8    floor.  He is not on the 12th floor premise right now.
 9              THE COURT:  Thank you.
10              The marshal from court security informed me that
11    Mr. Cosme was in the pavilion and he is coming back up.
12              Here he is.
13              Mr. Cosme, as I told you before, of course you have
14    the right to be present at your trial.  If you do anything to
15    absent yourself intentionally, we might proceed without you and
16    that's not a good thing.  Do you understand, sir?
17              THE DEFENDANT:  I understand it to the extent that it
18    applies to both sides.
19              THE COURT:  I don't know what that means.
20              THE DEFENDANT:  Let's figure it out.
21              THE COURT:  We told the jurors we are going to take a
22    five or six-minute break and it was five minutes since
23    everybody else was ready and the jury was ready.  That's 10 to
24    15 minutes of break.  You need to be present, sir.  You can't
25    be going out or otherwise absenting yourself, or we might
```

H3GMCOS4                              Hwang - cross

1    proceed without you.

2              THE DEFENDANT:  Your Honor, I was just trying to call

3    my attorney for purposes of what's going on in these

4    proceedings.  Thank you.

5              THE COURT:  May we bring the jurors in.

6              MR. BELL:  Yes, your Honor.

7              THE COURT:  Where is the witness?

8              They can come in, Mr. Marshal.  Thank you.

9              (Jury present)

10             THE COURT:  We continue now with the cross-examination

11   of Mr. Hwang.  Mr. DeMarco.

12             MR. DeMARCO:  Your Honor, may I inquire?

13             THE COURT:  Yes, sir.

14   CROSS-EXAMINATION

15   BY MR. DeMARCO:

16   Q.  Good afternoon, Mr. Hwang.

17   A.  Good afternoon.

18   Q.  How are you doing?

19   A.  I'm doing fine.

20   Q.  That's good.

21             Now, you still got that pile in front of you?

22   A.  Yes.

23   Q.  That's some pile, huh?

24             Now, one of the last exhibits that Mr. Bell showed you

25   was Government Exhibit 253.  Do you remember that one?

H3GMCOS4                         Hwang - cross

1   A.  Yes.

2   Q.  It's the one that contains an e-mail chain on August 31,

3   2011.  Do you recall that one?

4   A.  Yes, I do.

5   Q.  On page 2 of that exhibit, this is an e-mail exchange

6   between you and Pat Tsien, correct?

7   A.  That is correct.

8   Q.  And also Jay Pak is CC'd on it and Thomas Cleveland is CC'd

9   on it, right?

10  A.  Right.

11  Q.  You apologize to Patricia Tsien, right?

12  A.  It appears to be that's what was written.

13  Q.  I don't want to appear it to be anything.  I am going to

14  read it for you.  It's on page 2.  It's in the e-mail from you

15  to Ms. Tsien.  The subject line is deposit return critical.  On

16  page 2 you write:  Thanks for all your hard work and sorry for

17  all the BS and insults you had to put up with.  You wrote that,

18  right?

19  A.  I did.

20  Q.  You deposit $5.5 million, right?

21  A.  That's what we are talking about here.

22  Q.  You don't get the loan that you were promised in exchange

23  for that 5.5 deposit, correct?

24  A.  Say that again, please.

25              MR. DeMARCO:  Withdrawn.

H3GMCOS4                          Hwang - cross

1   Q.  Why were you apologizing to Pat Tsien?

2   A.  I think I was trying to be nice.

3   Q.  Trying to be nice.  This woman had $5.5 million of yours,

4   right?

5   A.  Yes.

6   Q.  And didn't want to return it, right?

7   A.  I didn't want the chance to be gone to get the money back.

8   Q.  OK.  Fair enough.  You can put that down, Mr. Hwang.

9           At some point in the latter part of 2010 you are

10  working as the business administrator at GSIS, correct?

11  A.  That is correct.

12  Q.  And there comes a time in late 2010 that you were asked to

13  help out with the construction project by TCIS, correct?

14  A.  That is correct.

15  Q.  Now, the board of trustees asked you to get involved,

16  right?

17  A.  Yes.

18  Q.  To help get construction permits, right?

19  A.  That's right.

20  Q.  And to be a liaison between the school and the local

21  government, correct?

22  A.  Yes.

23  Q.  And did you have that MBA degree at that time?

24  A.  I think I completed my MBA before that.

25  Q.  With this expertise, with this advanced degree, the board

H3GMCOS4                              Hwang – cross

1    of trustees also asked for your help out with the financing,

2    correct?

3    A.   Did not ask for help.

4    Q.   I'm sorry?

5    A.   They did not ask me to help out with the financing at the

6    beginning, no.

7    Q.   But there came a time that you became involved in the

8    financing of that construction project, right?

9    A.   Later.

10   Q.   There came a time that you became involved, right?

11   A.   Yes, I became involved.

12   Q.   If I ask you a question that you don't understand, please

13   let me know.   OK?

14   A.   Sure.

15   Q.   Now, when you became interested in the construction

16   project's financing, there came a time that you learned that

17   there was not enough money to complete the job, right?

18   A.   I learned initially from Dr. Penland.   Could you repeat the

19   question.

20   Q.   I am going to repeat the question.   There came a time,

21   after you became involved with the TCIS construction project,

22   that you learned from somewhere that there wasn't enough money

23   to complete the job, correct?

24   A.   Yes.

25   Q.   There wasn't enough funding to complete the construction

1    project, right?

2    A.   Correct.

3    Q.   And you talked on direct examination, in response to the

4    questions that Mr. Bell asked you, that the school was left

5    with several options.  Do you recall that?

6    A.   I think there could be several options.

7    Q.   One of the options were to stop the project, right?

8    A.   Yes.

9    Q.   Another option was to continue the project, right,

10   obviously?

11   A.   Correct.

12   Q.   But in order to continue you needed more money, right?

13   A.   Yes.

14   Q.   Now, I believe on direct examination, in response to

15   Mr. Bell's questions, you talked about TCIS's finances.

16   Withdrawn.

17          You talked a little bit about TCIS's finances,

18   correct?

19   A.   I don't understand the question.

20   Q.   More money was needed to complete the project, right?

21   A.   Yes.

22   Q.   Going to the banks was no longer an option, right?

23   A.   I don't think it was.

24   Q.   In fact, you testified in response to Mr. Bell's questions

25   that you couldn't go to the banks because of all the loans

1    taken out by TCIS at that point.  Do you recall saying that?

2    A.  I don't recall saying that.  My understanding was, there

3    was not enough funding to complete the project.  I don't think

4    there was an option for TCIS to take the bank loans.

5    Q.  Why not?

6    A.  Why not?  I think there were already series of loans taken

7    out.

8    Q.  There were a series of loans taken out?

9    A.  Um-hum.

10   Q.  And how would that affect whether or not you would apply

11   for more?

12   A.  How would that affect?

13   Q.  You just said seconds ago that you didn't think going to

14   other banks was an option, right?

15   A.  Right.

16   Q.  Why not?

17   A.  Korean banks, I think they were allowed too many loans.

18   Q.  I just said it, didn't I?

19           MR. BELL:  Objection.

20           MR. DeMARCO:  Withdrawn.

21   Q.  Applying for additional funds from other banks was now not

22   an option.  Would you agree with that statement?

23   A.  Other banks where?

24   Q.  Mr. Hwang, I am going to ask you a couple of questions.

25   Before testifying in this courtroom today did you meet with the

H3GMCOS4                              Hwang - cross

1    prosecutors to prepare for your testimony?

2    A.   I did.

3    Q.   Did they go through the questions they were going to ask

4    you in this courtroom?

5    A.   What questions?

6    Q.   The questions that Mr. Bell asked you on direct

7    examination, did he go through them with you while he was

8    preparing you to testify?

9    A.   He asked me some questions, yes.

10   Q.   So you spent time with Mr. Bell and Mr. Solowiejczyk in

11   preparing to testify in this courtroom today, correct?

12   A.   Could you repeat the question.

13   Q.   Sure.  You spent some time with the prosecutors, Mr. Bell

14   and Mr. Solowiejczyk, preparing for the testimony that you gave

15   earlier today.  Is that fair?

16   A.   I think so.

17   Q.   You think so?

18   A.   I think it's fair.

19   Q.   Did you meet with them, yes or no?

20   A.   Yes.

21   Q.   Did they prepare you for your testimony, yes or no?

22   A.   They prepared me to testify.

23   Q.   That's a yes?

24   A.   That's a yes.

25   Q.   Now, when you learned that more funding was needed to

H3GMCOS4                              Hwang - cross

1    finish the project and when it was your opinion that going to

2    the banks for more money was not an option, you thought of your

3    brother-in-law, Jay Pak, right?

4    A.   Yes.

5    Q.   As you sit here today, is Mr. Pak still your

6    brother-in-law?

7    A.   Yes, still is my brother-in-law.

8    Q.   He is still married to your sister?

9    A.   My younger sister, yes.

10   Q.   Is he still invited to Thanksgiving dinner?

11   A.   No.

12   Q.   That's what I thought.

13         You knew that Mr. Pak worked at this investment

14   company in New York City.  You knew that, right?

15   A.   Yes.  Because he told me.

16   Q.   Because he told you.  And he worked at Omni in New York

17   City?

18   A.   Yes.

19   Q.   And you learned through your conversations with Mr. Pak

20   that one of the things Omni did was introduce prospective

21   borrowers with prospective lenders, correct?

22   A.   That I didn't know.

23   Q.   You learned, didn't you?

24   A.   I learned.

25   Q.   You came to New York City in December 2010, didn't you?

H3GMCOS4                          Hwang - cross

1    A.   I thought you were asking me questions when I first contact

2    him, what I knew about Omni.

3    Q.   Over the course of time you learned that Omni was a company

4    that often acted as an intermediary or go-between --

5    A.   I learned that this was one of their business areas.

6    Q.   Now, you also learned that Omni invested large sums of

7    money all over the world, correct?

8    A.   I didn't have any facts on it.

9    Q.   You testified on direct examination that you learned about

10   Cosmo Dabi through Jay Pak, right?

11   A.   Yes.

12   Q.   Cosmo Dabi, according to Jay Pak, was a big asset manager,

13   right?

14   A.   Yes.

15   Q.   A firm that was responsible for multimillion dollar

16   investments, right?

17   A.   Yes.

18   Q.   And Cosmo Dabi was a firm that might be interested in this

19   humanitarian construction project, right?

20   A.   Right.

21   Q.   And you also learned, and this is through Jay Pak, that the

22   president of Cosmo Dabi was a William Cosmo, right?

23   A.   Yes.

24   Q.   And this was an option, in your mind, to obtain the

25   additional money needed to complete the construction job,

1    right?

2    A.  It was an option.

3    Q.  It was an option that you pursued, correct?

4    A.  Yes.

5    Q.  Yes, right?

6    A.  Yes.

7    Q.  You seemed indecisive up there.

8            MR. BELL:  Objection.

9            MR. DeMARCO:  Withdrawn.  Sorry, your Honor.  I

10   apologize.

11           THE COURT:  Yes, sir.

12   Q.  You discussed OmniHoldings and Cosmo Dabi with Dr. Penland,

13   correct?

14   A.  Yes.

15   Q.  And you discussed with Dr. Penland coming to New York,

16   meeting with your brother-in-law, Jay Pak, and the

17   representatives from Omni, right?

18   A.  We discussed, yes.

19   Q.  And you also discussed that your brother-in-law might put

20   you into contact with Cosmo from Cosmo Dabi, right?

21   A.  I think the sequence is a little off.  Could you repeat the

22   question.

23           MR. DeMARCO:  I'll withdraw the question.

24           Mr. Lachow, can we pull up Government's Exhibit 101.

25   I'm sorry.  107.  Can you focus on the body.

H3GMCOS4                          Hwang - cross

1   Q.  That's an e-mail from you, right, Mr. Hwang?

2   A.  Yes.

3   Q.  And it's from you to Dr. Penland, correct?

4   A.  Correct.

5   Q.  And in that e-mail contains the Cosmo Dabi website, right?

6   A.  Yes.

7   Q.  And you provided the Cosmo Dabi website to Dr. Penland on

8   or about December 4 of 2011, isn't that correct?

9   A.  Yes.

10  Q.  2010, I should say.  Withdrawn.  Right?

11  A.  Yes.

12  Q.  Who provided you with the link to the Cosmo Dabi website?

13  A.  I think I found this on the website.

14  Q.  You think or you are not sure?

15  A.  I did search for it on the Internet.

16  Q.  You're sure it wasn't given to you by Jay Pak?

17  A.  I don't think so.

18  Q.  What about Pat Tsien.  Are you sure it wasn't given to you

19  by her?

20  A.  No.

21  Q.  But you found it, right?

22  A.  Yeah.

23  Q.  And you conveyed to Dr. Penland, correct?

24  A.  Yes.

25  Q.  And it was your testimony on direct examination that you

H3GMCOS4                         Hwang - cross

1    looked at the Cosmo Dabi web page briefly, isn't that correct?

2    A.  Yes, I did.

3    Q.  And it was before coming to New York City, correct?

4    A.  Um-hum.

5    Q.  Now, prior to coming to New York City you had at least

6    several conversations with Jay Pak, right?

7    A.  Jay Pak, yeah.

8    Q.  Where are you going to stay, right; where you are going to

9    meet, right?

10   A.  Yes.

11   Q.  Who you are going to meet with, correct?

12   A.  Yes.

13   Q.  The objectives of the meeting, correct?

14   A.  Um-hum.

15   Q.  Maybe meeting with Cosmo from Cosmo Dabi, right?

16   A.  Yes.

17   Q.  And up until the time you came to New York, pretty much all

18   of your conversations regarding this loan application were with

19   Jay Pak, right?

20   A.  Most of them, yes.

21   Q.  If not Jay Pak, then with Pat Tsien, correct?

22   A.  Yes.

23   Q.  Anything with Mr. Cleveland?

24   A.  No.

25   Q.  You also learned that Pat Tsien, she was the CEO of Omni,

1   correct?

2   A.  That's what I understood, yes.

3   Q.  And prior to having that meeting at JFK Airport you met in

4   the offices of OmniHoldings, correct?

5   A.  Yes.

6   Q.  And you were present with Dr. Penland, correct?

7   A.  Correct.

8   Q.  You guys represented the school, right?

9   A.  We were representing the school.

10  Q.  And representing OmniHolding was Jay Pak, your

11  brother-in-law, right?

12  A.  Um-hum.

13  Q.  Yes?

14  A.  Yes.

15  Q.  Thomas Cleveland, right?

16  A.  Yes.

17  Q.  And Pat Tsien, correct?

18  A.  Yes.

19  Q.  And Pat Tsien did most of the talking at that meeting,

20  correct?

21  A.  Which meeting?

22  Q.  The one in the offices of Omni.

23  A.  Offices of Omni, yes.

24  Q.  That meeting lasted about how long?

25  A.  It wasn't really a meeting.  It was more of like a showing

H3GMCOS4                          Hwang - cross

1    our operations in her office.  Did not last more than 20

2    minutes, I don't believe.

3    Q.  So you meet with Pat Tsien roughly 20 minutes in her

4    offices in lower Manhattan, correct?

5    A.  That is right.

6    Q.  And she shows you the offices.  She gives you a tour of her

7    offices?

8    A.  Yes.  She has an operation there.

9    Q.  Describe the operation you saw.

10   A.  She was in artwork operation.

11   Q.  So you saw artwork?

12   A.  Yes.

13   Q.  Did you see employees and work stations and stuff like

14   that?

15   A.  Right.  And big huge scanner.

16   Q.  Big huge scanner?

17   A.  Um-hum.

18   Q.  Computers?

19   A.  Right.

20   Q.  Monitors, correct?

21   A.  Um-hum.

22   Q.  Impressive operation, in your opinion, right?

23   A.  What do you mean, impressed?

24   Q.  Were you impressed?

25   A.  She had a nice office.

1    Q.  She had a nice office, right, and this was someone who you

2    were looking to borrow a large sum of money from, correct?

3    A.  Initially, Omni was.

4    Q.  Later on that same day you met with Mr. Cosmo at JFK

5    Airport, correct?

6    A.  That is correct.

7    Q.  Prior to going to JFK, Pat Tsien spoke to you and Dr.

8    Penland about Mr. Cosmo, right?

9    A.  I think she just went over logistics, how we are going to

10   meet up, where we are going to meet.

11   Q.  Did she warn you against asking him too many questions?

12   A.  I don't remember.

13   Q.  Did she tell you about his multinational investments?

14   A.  I don't remember.

15   Q.  Did she tell you about the amount of money he managed?

16   A.  I don't remember.

17   Q.  Did she tell you anything about the types of people or

18   clientele he worked with?

19   A.  No.  I don't remember.

20   Q.  This was the day that started this loan application process

21   and funding pursuit, correct?

22   A.  That's right.

23   Q.  This is the first meeting you had with any potential

24   investors in New York City, correct?

25   A.  First meeting, correct.

H3GMCOS4                          Hwang – cross

1   Q.  You flew all the way over here from South Korea, correct?

2   A.  Um-hum.

3   Q.  Remember you stayed in a hotel in Teaneck, New Jersey,

4   right?

5   A.  Yes, we did.

6   Q.  And you don't remember any of the specifics of what was

7   discussed in the offices of OmniHoldings.  Is that what you are

8   saying?

9   A.  We did not discuss much about -- I don't remember

10  discussing about anything else.

11  Q.  You don't remember discussing anything about the person who

12  you were potentially giving $5.5 million of the school money

13  to, you don't remember talking about anything about that

14  person.  Is that what you're saying?

15  A.  I don't remember myself.

16  Q.  If you don't remember, you don't remember.  Is that what

17  you are saying?

18  A.  Correct.

19  Q.  But you do remember that from that point forward Pat Tsien

20  was the primary contact point for you, correct?

21  A.  She became the primary contact point.

22  Q.  In fact, every one of those e-mails in that pile is between

23  you and Pat Tsien directly, correct?

24  A.  That's correct.

25  Q.  From December of 2010 through August or September of 2011,

1    the only contact you had directly with anyone concerning this

2    deal was with Patricia Tsien, correct?

3    A.  Yes.

4    Q.  In fact, during that entire period of time you had

5    absolutely no direct contact with William Cosme, William Cosmo

6    or any representative from Cosmo Dabi, correct?

7    A.  You said any representative?

8    Q.  Any representative who worked for Cosmo Dabi.

9    A.  Does the auditor count as a representative?

10   Q.  No.  We will get to that.  Before the auditor came.

11   A.  Before the auditor came, no.

12   Q.  None whatsoever, right?  Every e-mail exchange was with Pat

13   Tsien, right?

14   A.  Right.

15   Q.  Every document pertaining to this funding agreement was

16   sent to you from Pat Tsien, correct?

17   A.  Yes.

18   Q.  Every letter and every e-mail that was purported to be from

19   Cosmo Dabi or William Cosmo was sent to you through Pat Tsien,

20   correct?

21   A.  Yes.

22   Q.  You had some contact with the auditor who came out to South

23   Korea, right?

24   A.  The auditor came.

25   Q.  Donna Kim, I believe you mentioned?

1    A.  Yes, Donna Kim.

2    Q.  Even after Donna Kim left South Korea after spending a day

3    there, the only direct contact you had with anyone regarding

4    this agreement or this deal was with Pat Tsien, correct?

5    A.  Yes.

6    Q.  Up until that day you had never met William Cosmo, right?

7    A.  You mean December meeting?

8    Q.  December 10, 2010.

9    A.  Never met Cosmo before.

10   Q.  In fact, the first time you met him was at the airport,

11   right?

12   A.  That was the first time.

13   Q.  And how long did that meeting at the airport take?

14   A.  Slightly over one hour.

15   Q.  Just over an hour, right?  And why was it that instead of

16   going to an office building you met with him at the airport.

17   Do you know?

18   A.  As explained to us, he couldn't make it to the office on

19   time.

20   Q.  Were you leaving that day?  Was there some urgency to

21   seeing him on December 10, 2010?

22   A.  Was I leaving that day?

23   Q.  Yes.

24   A.  On our part?

25   Q.  Yes.

H3GMCOS4                          Hwang - cross

1   A.  No.  We were there to meet him.  Even if it was emergency,

2   we would have postponed it.

3   Q.  You met with him at the airport, correct?

4   A.  We met him at the airport, yes.

5   Q.  As the business administrator of GSIS from 2009 to 2011,

6   how many meetings had you had in airports prior to that day?

7   A.  Never had one.

8   Q.  First one, right?

9   A.  Um-hum.

10  Q.  At that airport meeting on December 10 of 2010, Pat Tsien

11  was there, right?

12  A.  Yes.

13  Q.  Thomas Cleveland?

14  A.  Yes.

15  Q.  Jay Pak?

16  A.  Yes.

17  Q.  And you and Mr. Penland, correct?

18  A.  Yes.

19  Q.  And I believe it was your testimony on direct examination

20  that Dr. Penland did a lot of talking at that meeting, correct?

21  A.  Dr. Penland did lot more.

22  Q.  And he basically described the structure of TCIS, right?

23  A.  Yes.

24  Q.  The history of the school, correct?

25  A.  Um-hum.

H3GMCOS4                              Hwang - cross

1    Q.  And also its mission statement, is that true?

2    A.  That is right.

3    Q.  Mr. Cosmo was there, correct?

4    A.  Yes, he was there.

5    Q.  He listened, right?

6    A.  Yes.

7    Q.  When you left that meeting it was your understanding that

8    you had found someone who had loaned $55 million to your

9    school, right?

10   A.  That we had found someone?

11   Q.  That's right.

12   A.  We left the meeting with that feeling, yes.

13   Q.  All you would have to do is deposit $5.5 million, right?

14   A.  On our end.

15   Q.  And you would get a $55 million loan at an extremely

16   competitive interest rate, correct?

17   A.  Yes.

18   Q.  Did you or Dr. Penland ask Mr. Cosme for any business

19   references during that meeting?

20   A.  Not during the meeting.

21   Q.  You didn't ask him anything about what investment

22   strategies he would employ with that $5.5 million you were

23   going to give him, right?

24   A.  I don't remember asking the question.

25   Q.  Did you question Mr. Cosme about his background, for

H3GMCOS4                        Hwang - cross

1   example?

2   A.  During that meeting?

3   Q.  Yeah.

4   A.  No.

5   Q.  That was the only time you met him?

6   A.  Only time I met him.

7   Q.  Did you ever talk to him about any other investments that

8   he had made throughout the world?

9   A.  I don't remember asking the question.

10  Q.  Do you remember Dr. Penland asked any of these questions?

11  A.  That I can tell because I took some break, too, between the

12  meeting.

13  Q.  I'm sorry?

14  A.  I don't remember --

15  Q.  I'm sorry.  I just didn't hear you, Doctor.  I'm not

16  questioning what you said.

17  A.  I took like five-minute breaks.  Maybe he asked during the

18  time.  I'm not sure.

19  Q.  But you weren't present when these types of questions were

20  posed to Mr. Cosme by Dr. Penland or anyone else, correct?

21  A.  When I was present, I don't remember asking the questions.

22  Q.  So it would be fair to say that most about what you learned

23  or most of the information provided to you about Cosmo Dabi and

24  William Cosme or William Cosmo was provided to you by Pat Tsien

25  and Jay Pak, correct?

1   A.   Up to the meeting?

2   Q.   Up to that meeting and up to the time you wired that $5.5

3   million to him.

4   A.   Except for information that I collected from his website.

5   Q.   Except for that you relied on the word of Pat Tsien,

6   correct?

7   A.   Yes.  Their opinions -- yes.

8   Q.   And you trusted your brother-in-law, right?

9   A.   I trusted he would find somebody, person to help out.

10  Q.   When your brother-in-law, a member of your family,

11  recommended Cosmo Dabi, you trusted him, right?

12  A.   Could you repeat the question.

13  Q.   You trusted Jay Pak's opinion and reference, correct?

14  A.   I trusted his reference about Cosmo Dabi because I did the

15  search on the website.

16  Q.   You searched independent of the website or you used the

17  website to conduct your research?

18  A.   Could you repeat the question.

19  Q.   You said that you searched his website.  Is that what you

20  said?

21  A.   Yeah.  I found his website.

22  Q.   But you testified on direct examination that you only

23  viewed it briefly, right?

24  A.   Yes.

25  Q.   That was the truth, right?

H3GMCOS4                          Hwang – cross

1    A.   Um-hum.

2    Q.   You relied pretty much entirely on Jay Pak and Patricia

3    Tsien when you chose to do this deal with Cosmo Dabi, correct?

4    A.   Big portion, yes.

5    Q.   The majority of it, right?

6    A.   Yes.

7    Q.   Now, in December 2010, had you earned your master's in

8    business administration?

9    A.   Yes.

10   Q.   You were aware of financial markets and how they worked and

11   investing and stuff like that, correct?

12   A.   No.  MBA doesn't get you the expertise in finance markets.

13   Q.   Do you have in front of you, Mr. Hwang, Government's

14   Exhibit 109 and 109A?

15   A.   I'll look for it.

16   Q.   It's in the pile.

17   A.   I have 109.

18   Q.   You have 109, correct?

19   A.   Yes.

20   Q.   In 109 there are several attachments listed below.  You see

21   those?

22   A.   Yes, I see two attachments.

23   Q.   There is a TCIS escort agreement, correct, is one of the

24   attachments?

25   A.   Yes.

H3GMCOS4                              Hwang - cross

1   Q.   And the second attachment is an TCIS engagement prop.   You

2   see that?

3   A.   Yes, I see it.

4   Q.   These two attachments were documents that were sent to you

5   by Pat Tsien, correct?

6   A.   Yes.

7   Q.   In fact, all of the documents in this case were sent to you

8   by Pat Tsien, correct?

9           MR. BELL:   Objection.

10          MR. DeMARCO:   Withdrawn.   I'll be more specific.

11  Q.   The funding agreement that was ultimately executed by TCIS

12  and Dr. Penland, that was sent to you by Pat Tsien, correct?

13  A.   Yes.

14  Q.   The escort agreement was sent to you by Pat Tsien?

15  A.   Which one?

16  Q.   The escrow agreement.

17  A.   Yes.

18  Q.   The engagement letter or proposition, that was sent to you

19  by Pat Tsien, correct?

20  A.   Yes.

21  Q.   In fact, you and Pat Tsien working together ultimately

22  drafted these agreements or made revisions to the agreements,

23  correct?

24  A.   Drafted the agreement?   I never drafted the agreement with

25  her.

H3GMCOS4                          Hwang - cross

1    Q.  Did you suggest revisions to the agreements?

2    A.  I never suggested -- I suggested one spot.

3    Q.  Was that suggestion accepted?

4    A.  Yes.

5    Q.  So you and Pat Tsien together drafted the agreement,

6    correct?

7    A.  I said I did not draft the agreement with her.

8    Q.  Government Exhibit 112.  It's in front of you, right?

9    A.  112?

10   Q.  112.

11   A.  Yes.

12   Q.  That's an e-mail dated December 14, 2010, is it not?

13   A.  December 14, 2010, yes.

14   Q.  It's an e-mail from Pat Tsien, correct?

15   A.  Yes.

16   Q.  To Thomas Penland, correct?

17   A.  Um-hum, yes.

18              (Continued on next page)

19

20

21

22

23

24

25

H3GQCOS5                                    Hwang - cross

1    Q.  Copied on that email are you, right?

2    A.  Right.

3    Q.  Thomas Cleveland and Jay Pak, correct?

4    A.  Yes.

5    Q.  In that email, Pat Tsien informs Dr. Penland and the others

6    that Cosmo is ready, correct?

7    A.  Yes, I see it.

8    Q.  What did you understand that to mean that Cosmo is ready?

9    A.  My understanding was Cosmo is ready to go with funding the

10   school -- the funding project.

11   Q.  Now, there's a whole chain of emails in Government Exhibit

12   112.  I believe there are 12 pages of emails, right?

13   A.  Yes.

14   Q.  And it's 12 pages of emails pertaining to this agreement to

15   borrow $55 million to fund the project, correct?

16   A.  Yes.

17   Q.  And attached to these emails starting at Bates stamp is

18   1452, there's an asset management agreement, correct?

19   A.  Yeah, I read it as asset management agreement, correct.

20   Q.  That's what it says, right?

21   A.  Mmm-hmm.

22   Q.  There are quite a few emails in this chain, correct, 12

23   pages?

24   A.  12 page?

25   Q.  12 pages of emails in that chain, correct?

H3GQCOS5                          Hwang - cross

1    A.  You want me to count?  I don't know.

2    Q.  You can count.  You can count.  Go ahead.

3    A.  Without the attachment, it looks like ten.

4    Q.  I'm sorry?

5    A.  Ten page.

6    Q.  Let's start with Bates stamp 1440, OK, on the very first

7    page of Government Exhibit 112?

8    A.  Yes, I see it 12 page.

9    Q.  The 12h page is Bates stamp number 1451, correct?

10   A.  Yes.

11   Q.  Would you agree that there are several emails contained on

12   these 12 pages?

13   A.  Yes.

14   Q.  Is Mr. Cosmo or anyone from Cosmo Dabi either a recipient,

15   a party or copied on any of these emails, Mr. Hwang?

16   A.  No, I don't see that.

17   Q.  You don't see it or it's not there?

18   A.  It's not on the emails.

19   Q.  So, no one from Cosmo Dabi or William R. Cosme me is a

20   party to these emails, correct?

21   A.  Not these emails, correct.

22   Q.  And that's a few days after you returned to Korea after

23   that meeting in New York City, correct?

24   A.  Yes, it looks like it, mmm-hmm.

25   Q.  Can you pull out Government Exhibit 138?  It should be in

1   front of you also:

2              MR. DeMARCO:  Mr. Lachow, can you pull up this one for

3   me, please?  It's dated January 20, 2011.  If you can pull out

4   the top email subject line and email addresses.

5   Q.  Just so we're clear, this is an email from Pat Tsien,

6   correct?

7   A.  Correct.

8   Q.  It's to Cosmo Dabi and several others, correct?

9   A.  Yes.

10  Q.  Several others are Thomas Cleveland, Thomas Penland and

11  you, Mr. Hwang?

12  A.  Yes.

13  Q.  Now, on direct examination Mr. Bell highlighted the

14  paragraph that starts with, "none of Tom Cleveland."

15             If you can pull that up, Mr. Lachow?

16  Q.  Do you recall Mr. Bell asking you a question about that,

17  Mr. Hwang.  It's on the monitor if you want to check it out?

18  A.  Yes, I do.

19  Q.  That paragraph reads:  "None of Tom Cleveland, Pat Tsien,

20  Tom Penland or Thomas Hwang are using this information for any

21  malicious intent, whistleblower, IRS, FBI or any other

22  investigative purposes or any other hindering reasons against

23  Cosmo Dabi International Trading Group, Inc. and/or William

24  Cosmo."

25             Do you see that?

1  A.  I see it.

2  Q.  That was drafted and written by Patricia Tsien, correct?

3  A.  Must be.

4  Q.  It's an email from Patricia Tsien, correct?

5  A.  It is an email from Patricia Tsien.

6          MR. DeMARCO:  Thank you, Mr. Lachow.

7  Q.  If you could pull up Government Exhibit 139.  It's an email

8  entitled wiring compliance completed, and it's dated

9  January 21, 2011.  Are you there?

10  A.  Yeah, I'm looking at it.

11  Q.  That's an email sent from you to Jay Pak, Pat Tsien and

12  copied on it are Dr. Penland and Thomas Cleveland, right?

13  A.  Right.

14  Q.  It's basically an email informing Pat Tsien and Jay Pak

15  from Omni Holding that you wired the money, correct?

16  A.  Correct.

17  Q.  Put that down.

18          Government Exhibit 170, it's an email dated July 15,

19  2011.  You got that, Mr. Hwang?

20  A.  170?

21  Q.  One seven zero.

22  A.  Yes, I have it.

23  Q.  By July of 2015, there was no draw ever made on that loan,

24  right?

25  A.  There was no draw.

H3GQCOS5                          Hwang - cross

1   Q.  And you're still directly corresponding with Pat Tsien,

2   correct?

3   A.  Yes.

4   Q.  Any messages or correspondence from Cosmo Dabi or William

5   R. Cosmo was relayed to you through Pat Tsien, correct?

6   A.  Yes.

7   Q.  Never directly from Cosmo Dabi or William Cosmo, right?

8   A.  I can not remember, but this one yes.

9   Q.  Let me ask you this:  Of all the emails in that pile

10  introduced by the government into evidence, are there any

11  emails directly between you and Mr. Cosme, Mr. Cosmo or Cosmo

12  Dabi?

13  A.  No, there was no direct.

14  Q.  And we sat through a lot of emails today, right?

15  A.  Hmm?

16  Q.  We listened to testimony today about a lot of emails in

17  this courtroom, right?

18  A.  Yes.

19  Q.  Let me ask you this:  Does Jay Pak still live in the United

20  States, if you know?

21  A.  I believe so.

22  Q.  Does he live in the New York City area?

23          MR. BELL:  Objection.

24          THE COURT:  Counsel?

25          MR. BELL:  Relevance.

H3GQCOS5                         Hwang - cross

1                THE COURT:  Sir?

2                MR. DeMARCO:  I believe it's relevant, Judge.  I do

3      believe it's relevant.

4                THE COURT:  I know you do, but do you want to tell me

5      why.

6                MR. BELL:  This may be worth a side bar, your Honor.

7                MR. DeMARCO:  No, I'll withdraw the question.

8                THE COURT:  Thank you.

9      BY MR. DeMARCO:

10     Q.  I'm going to ask you to pull out Government Exhibit 319.

11     That's an email from Pat Tsien to you and Dr. Penland dated

12     July 8, 2011.  Are you with me?

13     A.  Yes, I'm looking at it.

14     Q.  And in that email, Pat Tsien brings to your attention

15     Mr. Cosmo's update and the status of audit.  Do you see that?

16     A.  Which line?

17     Q.  The very first line.  "Please refer to below with

18     Mr. Cosmo's update and status of the audit."

19     A.  Yes, I read it.

20     Q.  Here is another instance where Pat Tsien from Omni Holding

21     conveyed opinions or messages from Mr. Cosmo to you, correct?

22     A.  Yes.

23     Q.  There came a time where an audit was discussed, correct.

24     In or about August of 2011, there was talk about an audit being

25     conducted on the project?

H3GQCOS5                           Hwang - cross

1    A.  August?

2    Q.  Was it August 2011?

3    A.  You mean the on site?

4    Q.  Yes, that's what I meant.

5    A.  Around 10th, 11th, right, was scheduled.

6    Q.  Sorry?

7    A.  It was scheduled for August 10, 11.

8    Q.  OK.  And if you could pull up Government Exhibit 354.

9    A.  I have 354 in front of me.

10   Q.  In fact, I'm going to withdraw the question.  If you could

11   pull up Government Exhibit 171.  It's an email dated July 16,

12   2011?

13   A.  OK.

14   Q.  It's entitled, "TCIS audit draw site."  Do you see that?

15   A.  I see it.

16   Q.  It's an email from Pat Tsien, right?

17   A.  Right.

18   Q.  To you?

19   A.  Right.

20   Q.  And copied are several other people, correct?

21   A.  Yes.

22   Q.  Dr. Penland, Mr. Seo, right?

23   A.  Yes.

24   Q.  Mr. Cleveland and Jay Pak, right?

25   A.  Right.

H3GQCOS5                          Hwang – cross

1   Q.  It's an email regarding an audit, correct?

2   A.  Yes.

3   Q.  There's information at the bottom of that email with a link

4   for TCIS audit first draw site.  Do you see that?

5   A.  Yeah, I see it.

6   Q.  You testified on direct examination about this being a drop

7   box type of application.  Do you recall saying that?

8   A.  Yes, I do.

9            MR. DeMARCO:  Mr. Lachow, can you pull up the link

10  that is provided on the bottom of that email.

11  Q.  It's on the monitor in front of you, Mr. Hwang and it

12  reads, "Below is the link for TCIS audit first draw site."  Do

13  you see that?

14  A.  Yes.

15  Q.  There's a link attached, correct?

16  A.  Yes.

17  Q.  And the link is OmniHoldingsGroup.com/TCIS/auditdraw1,

18  right?

19  A.  Right.

20  Q.  And there is a user name, user ID, right?

21  A.  Right.

22  Q.  And a password, right?

23  A.  Right.

24  Q.  "Please let me know if you have any questions."  Right?

25  A.  Mmm-hmm.

H3GQCOS5                          Hwang - cross

1              MR. DeMARCO:  Thank you, Mr. Lachow.

2    Q.  This is provided to you again by Pat Tsien from Omni

3    Holdings, right?

4    A.  Right.

5    Q.  The only person in all of those emails in front of you who

6    you had any direct contact with, correct, by email?

7    A.  Yes.

8    Q.  Government Exhibit 221, could you pull that out, Mr. Hwang?

9    A.  Yes, I have it in front of me.

10   Q.  It's dated July 8, 2011.  The subject line is status and

11   next steps, correct?

12   A.  I'm searching for subject line.  Yes status and next steps.

13   Q.  It's from Thomas Hwang to Pat Tsien, correct?

14   A.  Correct.

15   Q.  Government Exhibit 222.  Can you go to 222, Mr. Hwang?

16   A.  Yes, 222.

17   Q.  It's another email, subject line -- is it the same email?

18   It is dated July 8, and it's from you to Pat Tsien, correct?

19   A.  Correct.

20   Q.  That's an email, that's 222, right?

21   A.  Right.

22   Q.  From you to the primary recipient, Pat Tsien, correct?

23   A.  Right.

24   Q.  And you cc'd some others, correct?

25   A.  Correct.

1    Q.  Ms. Tsien in July of 2011 is still your main point of

2    contact with respect to this deal, correct?

3    A.  Yes.

4    Q.  Just like it was in December 2010, correct?

5    A.  Yes.

6    Q.  Can you pull up Exhibit 227?

7    A.  Yes, I have 227.

8    Q.  That's an email dated July 12, 2011, correct?

9    A.  Yes.

10   Q.  And the subject reads, "Description of completed and

11   ongoing work for audit."  And in capital letters or upper case

12   letters the word URGENT, right?

13   A.  Right.

14   Q.  That's from Pat Tsien to Thomas Hwang, correct?

15   A.  Correct.

16   Q.  We are nearing the end, Mr. Hwang, I promise you.  You will

17   be back in South Korea in no time.

18          Pull up 234, Exhibit 234, Mr. Hwang.

19   A.  I have 234.

20   Q.  The subject line is "Quick update from Cosmo."  Do you see

21   that?

22   A.  Yes, I see it.

23   Q.  It's dated July 27, 2011, right?

24   A.  Right.

25   Q.  And it's from Pat Tsien to you, correct?

H3GQCOS5                          Hwang - cross

1    A.  Yes.  And Dr. Penland.

2    Q.  Dr. Penland is copied on it, correct?

3    A.  Right.

4    Q.  But the primary recipient of that email is you, Thomas

5    Hwang, correct?

6    A.  And Dr. Penland.

7    Q.  Is it?  I missed that?  Hold on.  OK, HD -- headmaster,

8    that's Dr. Penland?  I did see that.  HDMST@TCIS.OR.KR, that's

9    Dr. Penland's email?

10   A.  Yes.

11   Q.  I'm sorry.  And to you, right?

12   A.  Yes.

13   Q.  Government Exhibit 235, email dated July 28, 2011, correct?

14   A.  Yes.

15   Q.  That's an email from Pat Tsien, correct?

16   A.  Correct.

17   Q.  This one is directly to you as the primary recipient,

18   correct?

19   A.  Correct.

20   Q.  And the subject line is "TCIS not complete yet," correct?

21   A.  Yes.

22   Q.  If you could pull up 237, please, Mr. Hwang.  Are you with

23   me?

24   A.  Yes, I have it.

25   Q.  That's an email dated August 1, 2011, correct?

H3GQCOS5                          Hwang - cross

1    A.   Yes.

2    Q.   The subject line of that email is "auditor's site visit,"

3    correct?

4    A.   Correct.

5    Q.   It's from Pat Tsien to Thomas Penland, correct?

6    A.   Yes.

7    Q.   And you're copied on that email?

8    A.   I'm copied on email.

9    Q.   Yes, sir, with other people, correct?

10   A.   Correct.

11   Q.   The board of trustees is copied, Thomas Cleveland is

12   copied, and your brother-in-law Jay Pak is copied as well,

13   right?

14   A.   Yes.

15   Q.   If you can pull up Exhibit 240.  Do you have it, Mr. Hwang?

16   A.   Yes, I have 240.

17   Q.   That's an email dated August 17, 2011, correct?

18   A.   That is correct.

19   Q.   The subject line reads, "TCIS expectations need to be set

20   properly," correct?

21   A.   Correct.

22   Q.   And it's from Ms. Tsien, right?

23   A.   Yes.

24   Q.   To you, correct?

25   A.   Yes.

H3GQCOS5                        Hwang - cross

1    Q.   And copied are Mr. Cleveland and your brother-in-law, Jay

2    Pak, right?

3    A.   Yes.

4    Q.   That email forwards what purports to be an email from Cosmo

5    Dabi or William Cosme, correct?

6    A.   Correct.

7    Q.   Again, any communications that you ever had with the

8    exception of that meeting at the airport with William Cosmo or

9    anyone from Cosmo Dabi was indirectly or through the

10   intermediary Pat Tsien, correct?

11   A.   Correct.

12   Q.   As a business manager intimately involved in this deal,

13   what was your understanding about how much, if any, money was

14   being made by Pat Tsien and the folks at Omni Holding?

15   A.   I thought they would be making part of the origination fee.

16   Q.   And any idea specifically how much they would be making?

17   A.   I do not know.

18   Q.   So this wasn't a philanthropic endeavor by Omni Holdings,

19   right?

20   A.   Yeah -- what?

21   Q.   This wasn't a charitable endeavor by Omni and Pat Tsien,

22   right?  They were making money on the deal, correct?

23   A.   I think they were.

24   Q.   You think they were?

25   A.   I don't know.

H3GQCOS5                              Hwang - cross

1   Q.  Didn't Jay Pak, your brother-in-law, ever say "I'm going to

2   be making X amount of money on this deal"?

3   A.  He said it.

4   Q.  Did you ever discuss it?  Did he tell how much?

5   A.  He said maybe one percent.

6   Q.  One percent of what, the 5.5 or the 55 million?

7   A.  Origination fee.

8   Q.  Which was how much?

9   A.  What is it?

10  Q.  You don't remember?

11  A.  Part of the origination fee.

12  Q.  OK.  If you can pull up, Mr. Hwang, Government Exhibit 245.

13          MR. DeMARCO:  Your Honor I should only be about ten

14  more minutes, 15 tops, just so you know.

15  A.  245?

16  Q.  Yes, sir, 245.  It's from Pat Tsien to you, correct?

17  A.  Correct.

18  Q.  And the subject line is "TCIS," right?

19  A.  Yes.

20  Q.  If you recall, this refers to the cure report that was

21  supposed -- that was going to be forwarded to you after the

22  on-site audit, correct?

23  A.  Yes, this was about cure report.

24          MR. DeMARCO:  Mr. Lachow, could you do me a favor and

25  pull up the very first sentence of Government Exhibit 245?  It

H3GQCOS5                          Hwang - cross

1    starts with "Thomas see below."

2    Q.  Do you see that on the monitor, Mr. Hwang?

3    A.  Yes, I do see it on the monitor.

4    Q.  Now, Omni Holdings, Pat Tsien, Jay Pak, Thomas Cleveland,

5    they were intermediaries on this deal, correct, as far as you

6    understood?

7    A.  Yes.

8    Q.  Their job was to bring you, the borrower, together with a

9    lender, correct?

10   A.  Yes.

11   Q.  And in late August of 2011, there was some talk about a

12   cure report that was going to be issued based on the on-site

13   audit, correct?

14   A.  Late August, yes.

15   Q.  And in this email, Ms. Tsien, the intermediary, writes:

16   "Thomas see below.  He" -- referring to Cosmo,right -- "is

17   going to get it to me late tonight my time for my review.  I

18   will finalize as quickly as possible, but it will be tomorrow

19   morning our time and your EOD Friday."

20            Do you see that?

21   A.  Yeah, I see it.

22   Q.  So, not only was Omni an intermediary, they were intimately

23   involved in the transaction, correct?

24   A.  This email tells me that she was reviewing.

25   Q.  Pat Tsien tells you she is going to review the report and

1   finalize it, correct?

2   A.  In this email.

3   Q.  She is not the lender.  She's not supposed to be the

4   lender, right?

5   A.  Right.

6   Q.  Right?  And she is finalizing the report, right?  That's

7   what she says in that email, right?

8   A.  Yes, in this email.

9   Q.  All right.  If you can pull up -- I think this is the last

10   email I'm going to refer you to -- Government Exhibit 179?

11   A.  I have it in front of me.

12   Q.  The subject line is "audit cure report for the board,"

13   correct?

14   A.  That is correct.

15   Q.  Who wrote that email?  Can you tell?  Can you tell us?

16   It's Pat Tsien, isn't it?

17   A.  It's from Pat Tsien.

18   Q.  And it's to the board of trustees at TCIS, right?

19   A.  Yes.

20   Q.  And you're copied on it, right, as is Dr. Penland, correct?

21   A.  Correct.

22   Q.  And it's involving the cure report, correct?

23   A.  Yes.

24   Q.  In fact, there's an attachment and it's the cure report,

25   correct?

H3GQCOS5                              Hwang - cross

1   A.  Yes.

2   Q.  Now, it was your understanding that when this on-site

3   auditor was going to conduct the audit at TCIS, that that

4   person would stay there for three, maybe four days.  That was

5   your testimony, right?

6   A.  For the first audit, yes.

7   Q.  Your understanding was a proper audit would take about that

8   long, right?

9   A.  Yes.

10  Q.  Now, it was your testimony that the auditor, Ms. Donna Kim,

11  she arrived, and she only -- she disappeared after one day,

12  correct?

13  A.  She didn't return second day.

14  Q.  She didn't return after the first day of work, correct?

15  A.  Mmm-hmm.

16  Q.  And it was Pat Tsien who told -- who gave you the reason

17  why she failed to return, correct?

18  A.  Yes, Pat called me.

19  Q.  Pat called you, Pat Tsien, and told you, "Kim's not coming

20  back, right?  Donna Kim is not coming back"?

21  A.  Right.

22  Q.  Because -- I believe it was your testimony because you

23  should have known when she was staying when she was in South

24  Korea, correct?

25  A.  Correct.

H3GQCOS5                          Hwang - redirect

1   Q.  So from the beginning of this transaction until the very

2   end of this transaction, your contact was directly with Pat

3   Tsien regarding all phases, correct?

4   A.  Yes.

5            MR. DeMARCO:  I don't have anything else for you.

6   Thank you, Mr. Hwang.

7            MR. BELL:  I am three minutes away from being able to

8   send Mr. Hwang home, your Honor.

9            THE COURT:  You have your three minutes.  Go ahead.

10  With the jury's permission, of course.

11           MR. BELL:  Thank you, your Honor.

12  REDIRECT EXAMINATION

13  BY MR. BELL:

14  Q.  Mr. Lachow, I'm going to ask you to put up Government

15  Exhibit 141.

16           I am going to direct your attention, to page 7 of that

17  document?

18  A.  Give me one second I'm.  Looking for it.

19  Q.  You can just check the screen, Mr. Hwang.  Can we get to

20  the first full email on that page including the to/from.  Thank

21  you, Mr. Lachow.

22           This is an email from you, is it not, Mr. Hwang?

23  A.  Yes.

24  Q.  Who is it to?

25  A.  It is to Thomas Cleveland and CEO at Cosmo Dabi.

1   Q.  Who is CEO at Cosmo Dabi?

2   A.  That's William Cosmo.

3   Q.  And you say, among other things, "Dear all:  This looks

4   like a confirmation that we completed our end of the deal for

5   now."  That's from January 22, isn't it?

6   A.  Yes, it's January 22.

7   Q.  What had happened the day before?

8   A.  Wiring.

9   Q.  Now, I want to direct you to the previous page in that

10  exhibit, and the very bottom of that page beginning with that

11  first full email.  Thank you, Mr. Lachow.

12          Who is this email from, Mr. Hwang?

13  A.  This is email from Cosmo Dabi.

14  Q.  Who is it to?

15  A.  To me.

16  Q.  And he says, "Hello Tom.  Yes, sir, it appears that you

17  have done all that you stated you would do and all that was

18  required on your side thus far which admirable and awesome."

19          So, you did hear from Mr. Cosme at this point.  Isn't

20  that right?

21  A.  That is right.

22          MR. BELL:  Mr. Lachow, pull up 221.  I will ask you to

23  zoom in on the first third or so of that.

24  Q.  Do you recall Mr. DeMarco asking you about 221 a few

25  minutes ago?

H3GQCOS5                          Hwang – redirect

1    A.  Yes, I recall this.

2    Q.  Who is this email from?

3    A.  It is from me.

4    Q.  Who is it to?

5    A.  Patricia Tsien.

6    Q.  Who is on the cc. line?

7    A.  CEO at Cosmo Dabi.

8    Q.  Among others, but this is an instance in which you emailed

9    Mr. Cosmo.  Isn't that right?

10   A.  Yes.

11   Q.  Do you recall Mr. DeMarco also asking you about Government

12   Exhibit 222 a few minutes ago?

13   A.  222?

14   Q.  Yes.

15           MR. BELL:  Why don't we put that up, Mr. Lachow?

16   Q.  This email sent on Friday, July 8, who is it from?

17   A.  That is from me.

18   Q.  And who is it to?

19   A.  William Cosmo.

20   Q.  Among others, Mr. Hwang?

21   A.  Other people?  Yeah, among others, correct.

22   Q.  So here where you have a question about the run up to the

23   audit, among the people that you ask is Mr. Cosme.  Fair to

24   say?

25   A.  Yes.

1    Q.   Now, these events all happened quite some years ago.  Is

2    that correct, Mr. Hwang?

3    A.   Yes, back in 2011.

4    Q.   So we're talking about over five years ago.  Is it safe to

5    say that your recollection of some of those events is better

6    than others?

7    A.   Some of the events.

8    Q.   Some of the events that took place?

9    A.   My recollection for some of the events is better than for

10   some of the others, yes.

11   Q.   When you met with Mr. Cosmo originally, were you scared?

12   A.   Was I scared of him?

13   Q.   Yes.  Were you scared of him?

14   A.   No.

15   Q.   When you dealt with later circumstances in which the first

16   draw date had passed and then passed and then passed and then

17   passed again and the school was out $5 and a half million, were

18   you scared then?

19             MR. DeMARCO:  Objection, your Honor.

20             THE COURT:  Sir?

21             MR. DeMARCO:  Relevance.

22             THE COURT:  Relevance.

23             MR. BELL:  It's going to tie into Mr. Hwang's memory,

24   how he remembers some of these details better than others.

25             THE COURT:  All right, I'll permit it.

1              You may answer, sir.  Do you have in mind the

2    question, or do you need it again?

3              THE COURT:  Could you repeat that again?

4              MR. BELL:  Sure thing.

5    Q.  Later on, well after you met with Mr. Cosme in the airport

6    when months had passed and the school still had not gotten a

7    loan draw and was out $5 and a half million and was trying to

8    get that money back, were you scared then?

9    A.  I was scared of the whole situation.

10   Q.  Were you stressed out?

11   A.  I was very much stressed out.

12   Q.  In your experience, Mr. Hwang, do you tend to recall scary

13   moments better than non-scary moments?

14             MR. DeMARCO:  Objection.

15             THE COURT:  You are not going to lead excessively, are

16   you?

17             MR. BELL:  I reckon we are not, your Honor.  I will

18   withdraw that question.  One moment, please.

19             THE COURT:  Yes, sir.

20             MR. BELL:  We have no further questions for Mr. Hwang.

21             THE COURT:  Recross.  Thank you.

22   RECROSS EXAMINATION

23   BY MR. DeMARCO:

24   Q.  It's fair to say your memory is not perfect today of the

25   events in 2010 and 2011, correct?

H3GQCOS5                          Hwang - redirect

1    A.  It's not perfect.

2    Q.  OK.  But would it be safe to say that the most important

3    person on the lender's end of this transaction in December of

4    2010 forward was Pat Tsien?  Would it be safe to say that?

5    A.  You mean lender's representative?

6    Q.  From the lender's end.

7    A.  Lender's end.

8    Q.  The most important person in your mind in this transaction

9    was Pat Tsien?

10   A.  I think you need to -- can you -- are you asking me

11   different question here?  Someone who signed the document is

12   most important.

13   Q.  OK.  But the most important person -- withdrawn.

14          I will figure this out, Mr. Hwang.  I'll get it.  It's

15   late in the day, but I'll get it.

16          The person on the lender's end who you have the

17   majority of communication with discussing all issues was Pat

18   Tsien, correct?

19   A.  I had majority of discussion with Pat Tsien.

20          MR. DeMARCO:  That's basically all.  I'm good.

21   Thanks.

22          THE COURT:  Sir.

23   REDIRECT EXAMINATION

24   BY MR. BELL:

25   Q.  Mr. Hwang, who had your money?

H3GQCOS5                         Hwang – redirect

1    A.   William Cosmo.

2              MR. BELL:  Nothing further.

3              THE COURT:  Anything further, Mr. DeMarco?

4              MR. DeMARCO:  No, your Honor.  Nothing further.

5              THE COURT:  Thank you.  You may step down, sir.

6              (Witness excused)

7              THE COURT:  Ladies and gentlemen, we are going to

8    break for the day now.  Would you follow your normal

9    instructions of not discussing the case among yourselves or

10   with anyone else.  Please do not do any research on the case.

11   Your coffee will be ready for you at 9:30 tomorrow.  Have a

12   pleasant evening.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H3GQCOS5                          Hwang - redirect

1          (Jury not present)

2          THE COURT:  Mr. Cosme at filed at Docket No. 340 a

3     document entitled Motion to Appoint Counsel.  It is, however a

4     copy of the Court of Appeals order dated June 23, 2015.  To the

5     extent that it is, in fact, a motion to appoint counsel, the

6     motion is denied.  Mr. DeMarco is counsel.

7          Is there anything else on the record?

8          MR. BELL:  Not from the government, your Honor.

9          THE DEFENDANT:  Yes, your Honor, I object to that.

10          THE COURT:  Thank you.

11          Anything else on the record?

12          MR. DeMARCO:  No.  Thank you, your Honor.

13          THE DEFENDANT:  Yes, one more thing.

14          THE COURT:  Mr. Cosme, on the record.

15          THE DEFENDANT:  William Cosme, he votes counsel of

16     choice.

17          THE COURT:  Off the record.

18          (Off the record)

19          THE COURT:  Mr. DeMarco, I had just asked you when we

20     might know the length of any defense case.

21          MR. DeMARCO:  My response is, your Honor, Mr. Cosme

22     and I have begun discussing his absolute right to testify.

23     Whether I think he should or not, he has the absolute right to

24     testify.  What we plan on doing is meeting early tomorrow

25     morning before court and continuing that discussion.

H3GQCOS5                          Hwang – redirect

1   Hopefully, at some point tomorrow, we will have come to a

2   decision; but just so the record is clear, I have discussed

3   with him his right to testify.

4              THE COURT:  All right.  Thank you.

5              MR. DeMARCO:  Thank you.

6              THE COURT:  Thank you, counsel.  Good afternoon.

7              (Trial continued March 17, 2017 at 10:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              INDEX OF EXAMINATION

2     Examination of:                                   Page

3     THOMAS JAMES PENLAND

4     Cross By Mr. DeMarco . . . . . .337

5     Redirect By Mr. Solowiejczyk . .363

6     Recross By Mr. DeMarco . . . . .370

7     JONATHAN POLONITZA

8     Direct By Mr. Solowiejczyk . . .383

9     ADRIAN McLAREN

10    Direct By Mr. Solowiejczyk . . .386

11    Cross By Mr. DeMarco . . . . . .391

12    THOMAS HWANG

13    Direct By Mr. Bell . . . . . . .394

14    Cross By Mr. DeMarco . . . . . .478

15    Redirect By Mr. Bell . . . . . .520

16    Recross By Mr. DeMarco . . . . .524

17    Redirect By Mr. Bell . . . . . .525

18                              GOVERNMENT EXHIBITS

19    Exhibit No.                                    Received

20     903 and 403   . . . . . . . . . . . . . . . 376

21     501, 502, 504, and 902  . . . . . . . . . . 378

22     401, 401A, 401B, 401C, 401D, 402, 404,  . . 380

23              406, and 901

24     109  . . . . . . . . . . . . . . . . . . . 404

25     112  . . . . . . . . . . . . . . . . . . . 410
```

1    138    . . . . . . . . . . . . . . . . . 418

2    139    . . . . . . . . . . . . . . . . . 421

3    167    . . . . . . . . . . . . . . . . . 433

4    168    . . . . . . . . . . . . . . . . . 436

5    170    . . . . . . . . . . . . . . . . . 441

6    319    . . . . . . . . . . . . . . . . . 444

7    325, 333, and 334   . . . . . . . . . . . 445

8    344 and 354   . . . . . . . . . . . . . . 446

9    171    . . . . . . . . . . . . . . . . . 446

10   221 and 222   . . . . . . . . . . . . . . 448

11   223, 225, and 227   . . . . . . . . . . . 449

12   234    . . . . . . . . . . . . . . . . . 449

13   231 and 236   . . . . . . . . . . . . . . 449

14   235    . . . . . . . . . . . . . . . . . 452

15   237    . . . . . . . . . . . . . . . . . 455

16   240    . . . . . . . . . . . . . . . . . 456

17   177    . . . . . . . . . . . . . . . . . 462

18   245    . . . . . . . . . . . . . . . . . 465

19   179    . . . . . . . . . . . . . . . . . 466

20   253    . . . . . . . . . . . . . . . . . 470