UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA             :

   -v.-                                          :

WILLIAM R. COSME,                    :     S1 13 Cr. 43 (LAP)
    a/k/a "William R. Cosmo,"
                                     :
           Defendant.
                                     :
-------------------------------------------------------------x


# THE GOVERNMENT'S SENTENCING MEMORANDUM


                                     JOON H. KIM
                                     Acting United States Attorney
                                     Southern District of New York
                                     Attorney for the United States of America


Noah Solowiejczyk
Martin S. Bell
Assistant United States Attorneys
- Of Counsel -

The defendant, William R. Cosme, is scheduled to be sentenced on July 12, 2017 at 10:00 a.m. following his conviction for wire fraud and aggravated identity theft. The Government respectfully submits this memorandum in connection with the sentencing, and in response to the defendant's sentencing submission, dated July 5, 2017 ("Def. Mem.").

## **PRELIMINARY STATEMENT**

A stiff punishment is necessary in this case. William Cosme committed an audacious fraud, one that involved a willful and complete disregard for his victims. He stole $5.5 million from the Taejeon Christian International School ("TCIS"), a Christian missionary school based in South Korea. He did so by lying about who he really was, what his business really did, and what he really planned to do with TCIS's money. This crime was not one of impulse. It required planning by Mr. Cosme, including putting up a website for Cosmo Dabi that was riddled with lies. Once he stole TCIS's money, Cosme told lie after lie to prevent TCIS from obtaining a return of its funds, all the while spending TCIS's $5.5 million extravagantly on himself. Moreover, Cosme used the identities of those close to him, including his own aunt, without authorization in order to further dupe TCIS into believing that Cosmo Dabi had various officers, none of which was true.

For the reasons stated below, the Government respectfully submits that the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range is 111 to 132 months' imprisonment and that a sentence within the advisory Guidelines range would be sufficient, but not greater than necessary, in order to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence.

## BACKGROUND

### I. Offense Conduct

From 2010 through December 2012, William Cosme defrauded $5.5 million from TCIS. In late 2010, TCIS was seeking a source of financing to complete the construction of its new campus in South Korea. The brother-in-law of Thomas Hwang, the business administrator for the school, suggested that the defendant and his company, Cosmo Dabi, could provide the financing to complete the project.

In or about December 2010, Hwang was provided with the website for Cosmo Dabi (the "Cosmo Dabi Website"). Hwang forwarded this information to Dr. Thomas Penland, the headmaster of TCIS, in advance of their meeting with the defendant and representatives of Omni in New York City. (GX 107). The Cosmo Dabi Website contained numerous falsehoods. Among other things, the Cosmo Dabi Website claimed that (i) Cosmo Dabi had $11 billion USD in assets under management; (ii) that Cosmo Dabi had financial operatives and "vast resources" located in Hong Kong, Russia, London, Geneva, Zurich, Greece, Abu Dhabi, Korea, Italy and Monaco; (iii) Cosmo Dabi had significant funding capabilities with "no cap for international projects"; (iv) Cosmo Dabi's "client references include but are not limited to . . . families of royalty"; and (v) Cosmo Dabi had an established track record, with a "consistent net 25% per annum" return over the past 10 consecutive years. (PSR ¶ 13; GX 108). Dr. Penland carefully and thoroughly reviewed the Cosmo Dabi Website in advance of his meeting with the defendant in New York. (PSR ¶ 13). Based on his review of the Cosmo Dabi Website, Dr. Penland was left with the understandable impression that Cosme was "a world player" and that Cosme "was very, very capable" and would have no trouble financing the construction project for TCIS. (Tr. 131,

2

133).  In truth and in fact, as the evidence at trial showed, Cosme was not as he presented himself and his company on the Cosmo Dabi Website.  He had no relevant experience as an asset manager, had only founded Cosmo Dabi in or about May 2010, and had less than $500,000 in total in his own and Cosmo Dabi's bank accounts around this time period.  (GX 911).

On December 11, 2010, the defendant, representatives of Omni, Hwang and Dr. Penland all met in New York City at the Admiral's Lounge at John F. Kennedy Airport. (PSR ¶ 14).  As Dr. Penland testified, Cosme passed himself off at this meeting as the bigtime investor that he pretended to be on his website.  During the meeting, Cosme proposed that he would lend approximately $55 million to TCIS and that TCIS would provide Cosme with a $5.5 million deposit that Cosme would invest on TCIS's behalf in order to fund the $55 million loan.  Cosme offered an interest rate of 4 percent per annum, which he described as a low rate because he viewed the TCIS campus project as a philanthropic endeavor.  Cosme indicated to Penland, in sum and substance, that the TCIS project was a small project by his standards. (PSR ¶ 13). None of this was true.  Cosme had no conceivable avenue available to him at the time of this meeting to fund a significant loan of $55 million.

In a letter dated January 18, 2011, Cosme stated that upon the receipt of the $5.5 million from TCIS, he would "promptly contact [TCIS] to schedule a conference call with one of my clients with whom you can confer about Cosmo Dabi. . . . You will have ample opportunity to inquire of my asset management performance."  (GX 137-B).  In an email dated January 17, 2011, a representative of Omni sent an email to TCIS indicating that Cosme "always requires that the loan agreement be signed and the funds transferred before he will put you in touch with the reference.  His references are very, very high level Princes and Kings and, requiring the funds to move into his escrow account first, is Cosmo's way of protecting their privacy and

3

signaling to the reference that his client is committed." (PSR ¶ 15).  Cosme never put TCIS in touch with any of his supposed references after receiving TCIS's money.  (Tr. 175).

On or about January 19, 2011, TCIS and Cosmo Dabi entered into the Private Funding and Security Agreement (the "Private Funding Agreement").  Under the terms of the agreement, Cosmo Dabi would lend the International School $55 million, TCIS would provide a deposit of approximately $5.5 million (the "Equity Deposit"), and this deposit would be used by Cosmo Dabi to "facilitate managed, matched buy/sell/trade finance strategies using private physical gold products, other commodities, automotive, investment grade financial instruments and or various other types of transactions from which the proceeds shall be used to generate the [$55 million loan]." (PSR ¶ 18).  Furthermore, under the terms of the Private Funding Agreement, TCIS "appoint[ed] and retain[ed] [Cosmo Dabi] as its fund manager ('Manager') – on the terms and conditions set forth herein for the Equity Deposit. [Cosmo Dabi] accept[ed] such appointment and assume[d] responsibility for the fund management on the [date that the Equity Deposit is received by Cosmo Dabi], and agree[d] to manage and direct the Equity Deposit funds to generate the desired Private Funding Amount guaranteed upon all borrower qualifications and conditions being satisfactory to [Cosmo Dabi]."  (PSR ¶ 18(d)).  Per the terms of the agreement, TCIS could draw down upon the first $15 million (the "First Draw") of the loan sixty days from the date that Cosmo Dabi received the Equity Deposit.  Cosmo Dabi had "an additional 15 international banking days grace to disburse the First Draw and otherwise Cosmo Dabi agreed to "return the Equity Deposit in full within seven (7) Business Days thereafter . . . [u]nless [Cosmo Dabi] and [TCIS] mutually agree[d] in writing to extend the First Draw disbursement date." (PSR ¶ 18(e)-(f)).

On January 21, 2011, TCIS wired the $5.5 million to an account maintained by Cosmo Dabi at JP Morgan Chase Bank. (PSR ¶ 19).[1] At the time TCIS wired the $5.5 million to Cosme, Cosme only had approximately $375,000 in a Cosmo Dabi bank account at Chase and $62,000 in a Cosmo Dabi bank account at Sterling Bank. (GX 911). After sending the wire transfer, Thomas Hwang wrote to Cosme and the representatives of Omni "William, TCIS seed money is now in your hand and please help the school through the new campus relocation project. By the way, thanks for loaning us at an incredible low interest rate. It's really pleasure doing business with you." (GX 141).

As the evidence at trial showed, TCIS's trust in Cosme was sadly misplaced. Instead of investing the entirety of the $5.5 million deposit as he had agreed to, the defendant almost immediately began spending TCIS's "seed money" of $5.5 million on lavish personal expenses. Between February 14, 2011 and June 16, 2011, Cosme made purchases totaling approximately $87,386 in Las Vegas, Nevada, including at various casino hotel resorts, using cards associated with the 6625 Cosmo Dabi Chase Chase Account and the 6619 Cosmo Dabi Chase Account. (PSR ¶ 37). Between April 5, 2011 and May 17, 2011, Cosme transferred a total of $199,000 from Cosmo Dabi bank accounts to a house account maintained at the Venetian casino in Las Vegas. (PSR ¶ 38). Cosme proceeded to rack up gaming losses of approximately $216,000 between February and June 2011 at the Venetian. (GX 913). Cosme's ex-girlfriend, Catherine Catolos, testified that during this trip Cosme was "just gambling and eating." (Tr. 590).

In or about April 2011, TCIS began to seek the first $15 million draw of the loan. Cosme came up with fraudulent excuses why he could not provide the first $15 million of the loan. In

---

[1] The PSR states that the 6619 Cosmo Dabi Chase Account received the $5.5 million deposit (PSR ¶ 19). In fact, it was the Cosmo Dabi JP Morgan Chase bank account ending in 6625 that received the $5.5 million wire transfer from TCIS.

5

May of 2011, Cosme drafted a letter to TCIS stating in pertinent part that "recent, major events particularly in Japan . . . have severely delayed financial transaction pipeline on a global basis including some portions of COSMO DABI pipelines," that he was "experiencing some recoverable business delays as most are from the Japan events," and that accordingly "the first draw will not occur within the 60 International Banking Days . . . set out in the Private Funding Security Agreement." (GX 156-A). Cosme stated, however, that he expected to be able to provide the first $15 million draw by June 17, 2011. Cosme also stated that he was "attach[ing] a copy of the bank account balance printed as of this morning," and that the only change made to the statement was "my red pen." Cosme included a cropped screenshot of a statement listing the "Beginning of Day DTBP" as over $12 million. At trial, the parties stipulated that the screenshot included in the letter "is a partial screenshot from a Scottrade user account," that the screenshot "is incomplete," and that immediately below the cropped portion included in the letter would have been "a field that informs the user of . . . the actual amount of money in the account available for trading activity." (GX 903). The DTBP figure that Cosme attempted to pass off as the balance in the account was in fact "Day Trade Buying Power," which as stipulated by the parties is "a measure that applies to margin accounts that refers to the amount of money available to a user to place trades on a given day" and that this figure was often "several times the actual balance of the account." (GX 903). In other words, Cosme led TCIS to believe that the actual balance in the account was over $12.5 million, when the true balance was far, far less. (PSR ¶ 22).

      Eventually, TCIS began to request the return of its Equity Deposit, and Cosme continued to find fraudulent and increasingly brazen ways to deflect those requests. On or about June 28, 2011, Cosme sent an email to a representative from Omni, which email was then forwarded to

6

TCIS, that stated that TCIS's seeking of a refund caused him to cease activity on behalf of TCIS and that "stop and go flow of dollars retards velocity especially when large trades or investments are teed up…AND READY TO GO…." (PSR ¶ 24).  In reality, the only purported investments Cosme had made were through a Scottrade account (opened in his own name) in highly liquid, publicly traded securities. (PSR ¶ 24).

In order to further delay payment of the first draw of the loan, Cosme claimed that TCIS would first have to pass an audit before he could disburse the funds.  Cosme hired Aesook Kim to conduct the supposed audit.  The audit was nothing more than a sham.  Kim went to TCIS to collect and review certain documents.  On her first day of the audit, she identified certain documents that were missing. She intended to return to TCIS to continue her audit and review these additional documents the next day.  However, when Cosme learned that Kim had identified certain documents that she still needed, he seized on the opportunity to create a further reason not to return the school's money and cut the audit short by instructing Kim to return to the United States immediately rather than going back to TCIS to continue the review the next day. (PSR ¶ 21).  Kim testified that she "never audited…Because I went to Korea and actually it was not audit. This is part of exam. So I never made audit report."  Kim also prepared no cure report. Cosme subsequently claimed in correspondence with TCIS that it had failed this supposed audit and was in "default" as a result.

When TCIS demanded its full refund of the $5.5 million, Cosme refused to return the funds.  Cosme offered a series of bogus and irrational rationales for why TCIS was not entitled to the full refund of its $5.5 million, despite the fact that the Private Funding Agreement expressly called for a full return of the funds.  By way of example, in an email dated September 7, 2011, Cosme informed Dr. Penland and TCIS that Cosmo Dabi would "calculate the loss, expenses

7

etc…for Cosmo Dabi as permitted in our agreements upon defaults etc….and assuming there is a true balance due TCIS, I would immediately work to refund deposit monies." (GX 186). In this same email, Cosme claimed that "the current contract executed has been diminished in value to a zero 'street value' due to TCIS's default, TCIS based on material breach of contract, default and apparent false statements made by your Headmaster in our face to face meetings with TCIS here in NYC . . . It is customary for banks and other private lenders to either sell the mortgage payments due to them or, minimally, to retain the value of the future stream of mortgage payment due them on the lender's balance sheet." (GX 186). Cosme, in a subsequent email, demanded that before he could provide any refund that he would require a "current list of all TCIS assets, status and proofs of all the assets before I can perform any more tasks related to the refund request as they are related." (GX 187).

In total, Cosme spent over $1.8 million using TCIS funds on his own personal expenses between January 2011 and Cosme's arrest in December 2012. (PSR ¶ 44). This included purchasing a Ferrari, a Lamborghini, a Cadillac Escalade, and a Nissan, for a total of over $675,000. (PSR ¶ 40). Cosme also used TCIS funds to obtain bulk quantities of U.S. currency at a check cashing company. At the time of his arrest, a duffel bag filled with approximately $630,000 in U.S. currency was seized. (PSR ¶ 46).

In addition to defrauding TCIS out of $5.5 million, Cosme also engaged in aggravated identity theft by using the identity of his own aunt, Shirley Goldberger, and his former accountant, Scott Lieberman, without authorization. As part of TCIS's due diligence, TCIS sought and received a copy of a resolution allegedly adopted by Cosmo Dabi, which listed Shirley Goldberger as the Vice President of Cosmo Dabi and Scott Lieberman as the Treasurer. (PSR ¶ 45). Goldberger and Lieberman each testified that they never performed any work for

8

Cosmo Dabi, were not officers of the company, and never gave Cosme permission to use their identities in this fashion.

## II.   The Charges and Trial Conviction

Superseding Indictment, S1 13 Cr. 43 (LAP) charged the defendant in Count One with wire fraud, in violation of Title 18, United States Code, Section 1343, 1349, and 2, and in Count Two with aggravated identity theft, in violation of Title 18, United States Code, Section 1028A. On March 21, 2017, following a jury trial, the defendant was convicted on all counts after the jury deliberated for a little over an hour.

## III.  The Applicable Guidelines Range

The Government is not in accord with the Guidelines calculation in the PSR of 70 to 87 months' imprisonment, with a mandatory 24 months' imprisonment to run consecutively with respect to Count Two.  (PSR ¶ 107).  The Government is in full accord with the Probation Office with respect to the base offense level of 7, the 18-level increase due to the loss amount of $5.5 million, and the two-level increase pursuant to U.S.S.G. §  2B1.1(b)(2)(A)(iii) due to the substantial financial hardship for the victim.

The Government, however, respectfully submits that a two-level increase is warranted pursuant to U.S.S.G. §  3C1.1 for obstruction of justice due to the defendant's false testimony during trial regarding the offense for which he was convicted.  The Probation Office has deferred to the Court as to whether this two-level increase is warranted. (PSR ¶ 65).  The enhancement pursuant to U.S.S.G. § 3C1.1 applies to the commission of perjury and for providing materially false information to a judge, including by testifying falsely at trial, as the defendant did here.  *See* U.S.S.G. § 3C1.1, Application Note 4 (noting that examples of covered conduct for the obstruction of justice enhancement include "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that

9

forms the basis of the offense of conviction" and "providing materially false information to a judge or magistrate judge"); *see also United States* v. *Norman*, 776 F.3d 67, 84 (2d Cir. 2015). Under the federal perjury statute, a witness testifying under oath or affirmation is guilty of perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Norman*, 776 F.3d at 84 (internal quotation omitted).

Here, Cosme testified falsely as to numerous material matters, and he did so with the willful intent to provide false testimony. By way of example:

- During his direct testimony, Cosme testified that he did not know how the Cosmo Dabi website came into existence. (Tr. 743, 744). Given that Cosme was the sole individual running Cosmo Dabi and readily acknowledged that he was the CEO and President of Cosmo Dabi, his claim that he had no idea how the website came into existence was plainly and willfully false. On cross-examination, Cosme testified that, while he was aware of the existence of the web address www.cosmodabi.com, he was not responsible for creating the content and indeed had no knowledge of the content of the Cosmo Dabi website in or about December 2010. (Tr. 771-72). Evidence presented at trial showed that Cosme in December 2010 (at the same time he was in contact with the International School about the fraudulent loan transaction) sent emails and hard copy correspondence that included the Cosmo Dabi website on the letterhead and in his signature block, undermining Cosme's testimony that he did not know what was on the Cosmo Dabi website at this time. (*See, e.g.,* Def. Ex. A; GX 115). Cosme was questioned during cross examination regarding the fact that "at the time, December of 2010, there was a website, www.cosmodabi.com. You knew what was on that website, correct?" (Tr. 771) Cosme responded, "No. I did know of the domain name, but I did not know of the web content. The domain name is not a web content." (Tr. 771). In other words, Cosme testified that he did not know the content of the very website he included in his signature block in his emails and in the letterhead for Cosmo Dabi correspondence that he signed. This testimony was incredible and willfully false. Cosme's knowledge of the contents of the Cosmo Dabi website was material because the Cosmo Dabi website contained numerous false representations about the nature of Cosmo Dabi's business, its clients, and its assets under management that TCIS relied on in deciding to provide Cosme with its $5.5 million deposit.

- The Cosmo Dabi website stated that Cosmo Dabi had assets under management in excess of $11 billion USD. (GX 108). Cosme testified that he, in fact, did manage $11 billion in assets. (Tr. 776). When pressed on the assets under management of Cosmo Dabi in or about 2011, Cosme testified that Cosmo Dabi had just slightly less

than $11 billion in assets under management in or about 2011. (Tr. 777, 781).  The evidence at trial showed that neither Cosme personally nor his company Cosmo Dabi controlled or managed anywhere close to $11 billion at the time Cosmo Dabi received the $5.5 million deposit from the International School (*See, e.g.*, GX 911, 401, 401-A, 401-B, 401-C, 401-D, 402, 403, 505).

- Cosme testified that the Ferrari he purchased using TCIS funds was "exclusively set up to transport gold" and that he was "using that particular car to transport gold." (Tr. 759).  This claim is on its face preposterous, but moreover Shirley Goldberger, Cosme's aunt, testified that she had seen Cosme driving the Ferrari around Long Island as his personal vehicle, including driving it to Goldberger's mother's home. (Tr. 565).

- Regarding his spending of TCIS's funds in Las Vegas, Cosme testified that "as far as the Las Vegas expenditures go, all of the calculations, I would say, are incorrect. None of them are verifiable, from what I've heard from this Venetian Palazzo person that was here to testify . . . And I could just say that all of that is inaccurate, all of the calculations are inaccurate. Some of it is accurate, like the stuff you see on the debit cards. That stuff is accurate. And all of that money is my own money. It has nothing to do with any school money or any accounts that the school money went in, to my knowledge, based on the tracing." (Tr. 763).  The evidence presented at trial showed Cosme's testimony was willfully false.  TCIS's $5.5 million was wire transferred into the Cosmo Dabi Chase Account ending in 6625 on January 21, 2011.  At that time, the account had a balance of $1,000.  Cosme then transferred over $5 million of those funds to the Cosmo Dabi Chase Account ending in 6619 by January 25, 2011. (GX 911).  Cosme then began spending funds in Las Vegas using the 6619 Cosmo Dabi Chase Account and the 6625 Cosmo Dabi Chase Account in February 2011 through June 2011 for a total amount of $87,386. (GX 914, 401).  These were plainly TCIS funds and Cosme, as the individual who controlled these bank accounts, knew it.

- Cosme was asked during his direct testimony "what, if any, lies or misrepresentations have you made to Dr. Penland, Thomas Hwang, or anyone from TCIS?"  Cosme responded, "None." (Tr. 763).  Cosme also testified that he had never intentionally deceived these individuals or the International School or defrauded them of $5.5 million. (Tr. 763).  This testimony was flatly inconsistent with the other evidence and testimony offered in the Government's case-in chief.  Moreover, the jury plainly rejected the defendant's testimony in reaching their verdict of guilty on both counts charged in the Indictment.

While the defendant had a right, of course, to testify in his own defense at trial, he did not have a right to do so falsely and in violation of the sworn oath he took upon taking the witness stand.  *See United States* v. *Hasan*, 586 F.3d 161, 169 (2d Cir. 2009) (the enhancement under

11

U.S.S.G. § 3C1.1 "'does not violate a defendant's constitutional right[ ] [to testify in one's own defense] if the defendant has made sworn statements that he knows to be false'") (quoting *United States* v. *Johnson*, 994 F.2d 980, 988 (2d Cir. 1993)) (alterations in the original).

Accordingly, the Government respectfully submits that the two-level increase in the offense level is warranted pursuant to U.S.S.G. § 3C.1.1. We respectfully make the specific request that the Court find that the testimony referenced above concerned material matters, and was given with the willful intent to provide false testimony, rather than as the product of confusion, mistake, or faulty memory. In the event the Court does impose this two-level increase, the total offense level applicable to Count One would be 29 rather than 27 and the Guidelines range for Count One would be 87 to 108 months' imprisonment. The Guideline applicable to the aggravated identity theft offense charged in Count Two is U.S.S.G. § 2B1.6, pursuant to which the Guideline sentence is the twenty-four month term of imprisonment required by statute, which is to run consecutive to any other term of imprisonment imposed. *See* U.S.S.G. § 2B1.6. Accordingly, the total Guidelines range would be 111 to 132 months' imprisonment.

## DISCUSSION

### I. A Guidelines Sentence of Incarceration is Warranted

A sentence of incarceration within the Guidelines range of 111 to 132 months' imprisonment is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford

adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(C).

The defendant's brazen scheme to con a South Korean Christian missionary school out of $5.5 million is an extremely serious crime that requires significant punishment.  This crime did not involve merely a single false representation, or one act of fraud.  Rather, it involved a concerted and sustained effort by Cosme to tell lie upon lie to TCIS over a period of many months, all in an effort to steal TCIS's $5.5 million.  As the evidence at trial showed, Cosme made an array of false representations about his company, Cosmo Dabi, and its capabilities to TCIS in order to convince TCIS to initially part with its $5.5 million.  Neither Cosme nor his company ever had the ability to fund a $55 million loan.  After Cosme tricked TCIS into giving him its money, he spent that money on himself.  When TCIS asked for the first draw on the loan, Cosme did not have the $15 million – indeed, he had already started spending large quantities of TCIS's funds.  Instead of admitting he did not have the money, he made up bogus excuses to put off TCIS, including his claim that a disruption in his financial pipelines due to the tsunami in Japan would delay the first draw.  He also sent a screenshot from his Scottrade account to TCIS, claiming that he had grown TCIS's funds to a $12.5 million account balance. In truth, the number Cosme pretended was the account balance was nothing of the sort.  All the while, he kept lavishly spending TCIS's money on himself in Las Vegas and elsewhere.  When TCIS finally began asking for the return of its equity deposit, Cosme orchestrated a farcical "audit" of TCIS in order to create a pretext for him to claim TCIS was in "default" so he could keep TCIS's money.

Cosme's fraud wreaked havoc for TCIS.  As is set forth in the letter of Dr. Penland to the Court dated July 1, 2017, Cosme's theft brought the school to the brink of ruin.  While TCIS

ultimately did find another source of financing to complete the construction project, TCIS had to use school operational funds to support the project, and also paid an additional $6 million in interest payments on loans that it had to obtain to complete the project. There were also additional construction costs occasioned by Cosme's fraud. As Dr. Penland notes, TCIS also suffered a significant reputational harm as a result of having been defrauded by Cosme, which has led to a drop in student enrollment and the loss of tuition income. None of this takes into account the distress and emotional damage that Cosme caused to TCIS students, parents, and staff.

The defendant has displayed no regard or remorse for his crime or the harm that he caused to TCIS as a result of his repeated and flagrant lies. Indeed, to this day the defendant is entirely unrepentant for his actions. When he testified under oath at trial, Cosme said this about the victim of his fraud, TCIS:

> I would say to you that I think this is just a case of a school that needed money. They were desperate. They got themselves into a bad situation. They lied. And I foreclosed on them and took all their assets, unfortunately. That's basically it. They got into a contract. They lost on the contract fair and square. And that's what happens when you can't repay your bills in a foreclosure situation. That's basically what happens. If you fail to pay the lender or if you fail to abide by the terms and conditions of your contract, then the lender going to take the actions pursuant to that contract and that's exactly what I did.
>
> That's basically it in a nutshell. It's a simple foreclosure. It's a dead beat client, unfortunately, that lost, that lost on the deal. That's it.

(Tr. 769-70). That the defendant shows no remorse for his crimes and, indeed, blames the victim of his fraud is telling of the likelihood that he will re-offend. Accordingly, a substantial sentence of incarceration is also necessary to "protect the public from further crimes of the defendant" and afford adequate specific deterrence.

A substantial sentence of incarceration is also sufficient but not greater than necessary to provide general deterrence to those engaged in advance fee schemes similar to the offense in this case, as well as to deter those who seek to defraud unsophisticated victims, as the defendant did here. Given the difficulties of detection and prosecution, and the substantial potential rewards from the criminal conduct, the imposition of a lengthy sentence is necessary to deter others from following in the defendant's footsteps.

Finally, while defense counsel seeks to argue that Cosme's personal characteristics and Cosme's age weigh in favor of a more lenient sentence, there is nothing extraordinary about the defendant's personal history or age that would warrant a sentence below the Guidelines range. The defendant was a mature adult when he committed this crime. He chose to commit this crime, and it was a crime that, at bottom, was motivated by the defendant's own greed. While defense counsel in his submission predicts that "Mr. Cosme's age seriously erodes his capacity to threaten society" and that "it is hard to image a 51 year old man having the physical and mental capacity to commit additional crimes," (Def. Mem. at 4), there is nothing to suggest that Cosme would not be able to commit additional acts of fraud after he is released. During his testimony at trial, for example, Cosme lied extensively, showing that his desire and ability to tell falsehoods has not diminished in the years since he committed this crime in 2010 and 2011. Moreover, fraud is not the type of crime that requires the physical capacity of a younger man.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a Guidelines sentence is appropriate and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.[2]

Dated: New York, New York
July 7, 2017

               Respectfully submitted,

               JOON H. KIM
               Acting United States Attorney

         By: s/ Noah Solowiejczyk
             Noah Solowiejczyk
             Martin S. Bell
             Assistant United States Attorneys
             Southern District of New York
             (212) 637-2473/2463

cc: Mark DeMarco, Esq.

   William Cosme
   Reg. No. 67795-054
   MDC Brooklyn
   P.O. Box 329002
   Brooklyn, NY 11232

---

[2] The Government has ninety days following the date of sentence to provide the Court with full information concerning the victims and the amount of restitution owed to each of them. *See* 18 U.S.C. § 3664. The Government intends to submit a proposed restitution order shortly, but in any event requests that restitution be ordered on the day of sentencing. The Government is also preparing a proposed final order of forfeiture.

16