H7e6cos1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        13 CR 43(LAP)

5  WILLIAM COSME,

6              Defendant.

7  ------------------------------x

8                                    New York, N.Y.
                                     July 15, 2016
9                                    2:00 p.m.

10

   Before:
11
                        HON. LORETTA A. PRESKA,
12
                                        District Judge
13

14                       APPEARANCES
   JOOH H. KIM
15      Acting United States Attorney for the
        Southern District of New York
16  NOAH SOLOWIEJCZYK
   MARTIN BELL
17      Assistant United States Attorneys

18  MARK DeMARCO, ESQ.
        Attorney for Defendant
19

20

21

22

23

24

25

H7e6cos1

```
 1                   (In open court; case called)
 2                   THE COURT:  Is the government ready?
 3                   MR. SOLOWIEJCZYK:  Good afternoon, your Honor.  Noah
 4     Solowiejczyk and Martin Bell on behalf of the government.  We
 5     are joined at counsel table by paralegal specialist Samuel
 6     Lachow and Bebe Iacoha.
 7                   THE COURT:  Good afternoon.
 8                   Is the defense ready?
 9                   MR. DeMARCO:  Yes.  Mark DeMarco for Mr. Cosme.
10                   THE COURT:  Good afternoon.
11                   Mr. Cosme, I know that in the past you have indicated
12     your desire to represent yourself.  Is that what you want to do
13     today, or do you want to have Mr. DeMarco represent you today,
14     sir?
15                   THE DEFENDANT:  Your Honor, I have sent several
16     communications to the Court and Mr. DeMarco in regards to my
17     intention of the firm named K&L Gates, who will be representing
18     me at the District Court level as well as the appellate court
19     level.  I do have those documents here with me today for your
20     viewing.
21                   THE COURT:  Mr. Cosme, as you know in the past, I have
22     told you that any time retained counsel puts in a notice of
23     appearance, retained counsel may appear.  I do not have a
24     notice of appearance by K&L Gates.
25                   So my question to you, sir, is:  During this
```

H7e6cos1

```
1    proceeding, do you want Mr. DeMarco to speak on your behalf or

2    do you want to speak on your own behalf?

3              THE DEFENDANT:  Neither, your Honor.  I prefer my

4    retained counsel to be speaking with me on my behalf and if

5    possible maybe potentially adjourn this after until the 27th

6    when counsel is actually back in town.  They are out of town

7    and I have all the supporting documentation to support that.

8              THE COURT:  Mr. Cosme, as I said I have mentioned to

9    you on numerous occasions that if retained counsel puts in a

10   notice of appearance, retained counsel may appear.  I have no

11   indication from retained counsel that counsel wishes to appear.

12   Accordingly, we're going to go forward today.

13             THE DEFENDANT:  Your Honor, I do object --

14             THE COURT:  That said, I will ask you one more time:

15   Do you wish to represent yourself today at these proceedings,

16   or do you want Mr. DeMarco to represent you?

17             THE DEFENDANT:  Your Honor, I would like to give you a

18   little bit more background before I answer that question in

19   regards to the retained issue.

20             THE COURT:  We're finished with the retained issue,

21   sir.  I have no indication that retained counsel wishes to

22   appear.

23             THE DEFENDANT:  Your Honor --

24             THE COURT:  Answer my question.  Do you want to

25   represent yourself, or do you want Mr. DeMarco --
```

H7e6cos1

1          THE DEFENDANT:  Your Honor, I have evidence that the

2     retained counsel is willing to appear.  I have 13 pages of

3     their retainer agreement with me.

4          THE COURT:  Again, Mr. Cosme, there is no notice of

5     appearance by retained counsel and there is no indication from

6     counsel that counsel wishes to appear.

7          If you do not answer me that you wish to represent

8     yourself, I will have Mr. DeMarco represent you.

9          Last time.  Do you wish to represent yourself, or do

10    you wish Mr. DeMarco to represent you?

11         THE DEFENDANT:  My response is I invoke counsel of

12    choice pursuant to the Sixth Amendment.

13         THE COURT:  Given that Mr. Cosme will not answer my

14    question and thus I cannot find that he has knowingly and

15    voluntarily waived his right to counsel, I will ask Mr. DeMarco

16    to continue to represent him.

17         Mr. Cosme just made reference to various documents he

18    has sent.  Among the documents I have are documents dated

19    June 29, June 30, July 3, two on July 4, July 7, July 8,

20    July 11, and July 12th.  In large part the documents review

21    issues that we have discussed during this case on numerous

22    occasions.  Included among those issues are that the evidence

23    presented at trial, including witnesses who Mr. Cosme

24    suggestions were lying, the victim impact statements and other

25    material disproves Mr. Cosme's guilt, calls into question the

H7e6cos1

asset forfeiture and the like.  Those motions are denied.

       To the extent that Mr. Cosme discusses yet again
counsel of choice, we have been through this many times.  As I
have noted today, I have indicated to Mr. Cosme that any time
counsel of choice files a notice of appearance, that notice of
appearance will be recognized and counsel may appear.  No such
notice of appearance has been filed.

       With respect to Mr. Cosme's repeated requests to
release funds so he can retain counsel of choice, that motion
is denied.  It was discussed at the hearing.

       Mr. Cosme notes that Mr. DeMarco's motion to be
relieved as appellate counsel in the Second Circuit in Docket
No. 17-1759, Document 13-2 was granted in Document 20.  While
that is true, it was with respect to representing Mr. Cosme as
appellate counsel.  Accordingly, it has no relevance here.

       Mr. Cosme also makes reference to Pryor Cashman's
motion to withdraw in the Court of Appeals in Docket No.
14-1625, Document No. 62-1.  That was the law firm's motion to
withdraw after argument of the appeal but prior to the decision
on the appeal on the bases, inter alia, that Mr. Cosme asked
counsel to make arguments that were not warranted on the facts
or the law, that Mr. Cosme failed to cooperate with counsel,
and that Mr. Cosme repeatedly made statements to the government
that the firm was representing him inadequately.  The Court of
Appeals denied that motion to withdraw in Document No. 67.

H7e6cos1

1   Again, however, that related to representations in the Court of

2   Appeals and is not applicable here.

3           As we've already discussed today, the same findings

4   are relevant to K&L Gates.  No notice of appearance has been

5   filed by the firm and the Court has no other indication that

6   the firm has been retained by Mr. Cosme.

7           With respect to Mr. Cosme's argument that there was

8   abbreviated time for him to review the presentence report,

9   counsel consented to the abbreviated time period.

10          With respect to Mr. Cosme's requests for hearings not

11  related to the sentencing, hearings with respect to the asset

12  forfeiture and alike, they are denied.

13          With respect to Mr. Cosme's arguments in these papers

14  with respect to Mr. DeMarco, to the extent these are motions,

15  they are denied.  Mr. Cosme notes and argues that Mr. DeMarco

16  conversed with the jurors.  The record will reflect that

17  Mr. Cosme informed the Court that a juror said good morning to

18  him.

19          Mr. Cosme notes on several occasions that on one

20  occasion in the courtroom he alleges that Mr. DeMarco was

21  "reeking of alcohol."  There is no evidence of that and the

22  Court did not observe anything that would lead the Court to

23  believe that that was true.

24          Mr. Cosme complains that Mr. DeMarco was late on an

25  occasion.  That is in fact true.  He called ahead and there was

H7e6cos1

1    no prejudice because of it because nothing happened.

2              Mr. Cosme makes various requests that the sentencing

3    be adjourned or stayed in light of his pending interlocutory

4    appeal.  Those motions are denied.

5              In sum, all of the motions contained in Mr. Cosme's

6    recent papers are denied.

7              Mr. DeMarco, have you and Mr. Cosme had adequate time

8    to review the presentence report?

9              MR. DeMARCO:  I believe he has, your Honor.  I

10   provided copies on several occasions to Mr. Cosme.

11             THE COURT:  Yes, sir.

12             Are there any objections that you wish to make to the

13   presentence report?

14             MR. DeMARCO:  Not as it is constituted today, your

15   Honor.

16             THE COURT:  Thank you.

17             I have read Mr. Cosme's objections and they are

18   denied.

19             Is there any reason the presentence report should not

20   be made part of the record?

21             MR. DeMARCO:  No, your Honor.

22             THE COURT:  Thank you.

23             With respect to the offense level computation, I

24   accept the findings of the presentence report set forth at

25   paragraph 58 through 64.  The government in its sentencing

H7e6cos1

1    memorandum argues for an adjustment for obstruction of justice.

2              Does the government wish to be heard on that matter?

3              MR. SOLOWIEJCZYK:  Your Honor, just briefly.  I don't

4    want to rehash things that we put in our papers, but the

5    findings that the Court would need to make is that the

6    testimony provided by Mr. Cosme at trial concerned material

7    matters and it was given with the willful intent to provide

8    false testimony rather than by confusion or mistake or faulty

9    memory.

10             Respectfully, your Honor, there are a host of examples

11   where Mr. Cosme during his testimony provided willfully false

12   testimony.  Just a few.  With respect to the CosmoDabi website,

13   which was discussed extensively during his direct testimony and

14   in his cross-examination, Mr. Cosme's testimony was that though

15   he knew of the web address, www.CosmoDabi.com, he had no

16   knowledge of the content of that website in December 2010 and

17   January 2011.  This was, your Honor, respectfully preposterous

18   and obviously facially and willfully false.  Mr. Cosme was

19   signing e-mails with the web address www.CosmoDabi.com at this

20   same time.  The notion that the company that he ran by himself

21   he was not aware of all the false claims made on that website

22   is farcical, your Honor, and it shows a willful intent to

23   mislead the jury.

24             There are countless other examples.  The assets that

25   CosmoDabi had under management, what Mr. Cosme intended to do

H7e6cos1

with the Ferrari.  Plaintiff purchased it to transport gold

solely, but there was testimony he was actually driving around

Long Island in that vehicle and using it for his personal use.

I could go on, your Honor, but there is more than an ample

record here to make the obstruction findings under the

guidelines because the testimony was very clearly willfully

false.

        THE COURT:  Thank you.

        Mr. DeMarco, do you wish to be heard on this item?

        MR. DeMARCO:  Your Honor, I object to the two-level

enhancement for the following reasons:  Mr. Cosme merely

exercised his right to testify in his own behalf.  The jury

heard his testimony and discredited it and convicted him of

both counts of the indictment.  What the Court has to remember

is that Mr. Cosme was testifying in 2017 about events that

occurred in 2010 through 2012.  I think much of his testimony

was due to a lack of memory, a lack of ability to recall, and

confusion on his behalf.  It wasn't an intentional obstruction

or perjury as the government alleges.  We couldn't to any

two-level enhancement.

        THE COURT:  Thank you.

        Anything else from the government on this?

        MR. SOLOWIEJCZYK:  Nothing further, your Honor.

        THE COURT:  Thank you.

        The Court finds that while Mr. Cosme indeed had the

H7e6cos1

1    right to go to trial and to testify in his own defense, in so

2    testifying he intended to give false testimony and in fact did

3    so not because of any confusion, negligence, lack of memory or

4    any other innocent explanation.  For example, Mr. Cosme

5    testified that he didn't know how the CosmoDabi website came

6    into existence and didn't have any idea about the content of

7    that website.  At the time, however, Mr. Cosme was the sole

8    person running CosmoDabi, and of course he did acknowledge on

9    the stand that he was the CEO and president of that entity.

10   Mr. Cosme testified on cross-examination that while he was

11   aware of the existence of the web address www.CosmoDabi.com, he

12   was not responsible for creating the content and indeed had no

13   knowledge of the content of that website in or about December

14   of 2012.

15          December of 2012 was at or about the time that

16   Mr. Cosme was in contact with the International School about

17   the fraudulent loan --

18          MR. SOLOWIEJCZYK:  Your Honor, my apologies.  I

19   believe it was December of 2010.

20          THE COURT:  I am sorry.  I can't even read my own

21   writing.  Thank you.

22          December of 2010 was at or about the time Mr. Cosme

23   was in contact with the International School and during the

24   time when he sent e-mails and various hard copy correspondence

25   to the school that included the CosmoDabi website in his

H7e6cos1

1    signature block.

2          In his testimony then in effect Mr. Cosme testified

3    that he didn't know that the content of the website that he had

4    included in his signature block in his e-mails and on the

5    letterhead of CosmoDabi when he was corresponding with the

6    International School.  Given that Mr. Cosme was the only person

7    at CosmoDabi, his denial of the knowledge of the contents of

8    the website is incredible and as I said I find it to have been

9    willfully false.  Certainly the contents of the CosmoDabi

10   website was material in this case because the website contained

11   numerous false representations with respect to the nature of

12   CosmoDabi's business, its clients, its assets under management,

13   and Mr. Cosme's prior employment that the International School

14   relied upon in deciding to provide Mr. Cosme with its $5.5

15   million deposit.

16         The CosmoDabi website also stated that Cosme had

17   assets under management in excess of $11 billion and Mr. Cosme

18   testified that he in fact did manage $11 billion of assets.  On

19   cross-examination, he acknowledged that perhaps it was slightly

20   less than the $11 million in assets under management.  The

21   evidence at trial, however, showed neither Mr. Cosme nor his

22   company controlled or managed anything close to $11 billion at

23   the time that CosmoDabi was making representations to the

24   International School and at the time when the $5.5 million

25   deposit was received from the International School.

H7e6cos1

1          Mr. Cosme also testified that the Ferrari he purchased

2     using International School funds was "exclusively set up to

3     transport gold," and that he was" using that particular car to

4     transport gold."  That is in the transcript at page 759.  Aside

5     from the fact that the claim is preposterous, Shirley

6     Goldberger, Mr. Cosme's aunt, testified at trial that she had

7     seen Mr. Cosme driving the Ferrari around Long Island as his

8     personal vehicle, including driving it to Ms. Goldberger's

9     mother's home.  That is at the transcript at page 565.

10          We recall at trial the government presented an

11     elaborate spreadsheet showing into which bank accounts the

12     International School's $5.5 million went and showing the

13     transfers from that bank account to other of Mr. Cosme's bank

14     account and transferred out those bank accounts to purchase

15     certain assets such as the cars and to fund his stay in Las

16     Vegas and his gambling debt at a Las Vegas casino.

17          Mr. Cosme testified on the stand that "As far as the

18     Las Vegas expenditures go, all of the calculations I would say

19     are incorrect.  None of them are verifiable.  From what I have

20     heard from this Venetian Palatso person that was here to

21     testify, and I could just say that all of that is in accurate.

22     All of the calculations are inaccurate.  Some of it is

23     accurate, like the stuff you see on the debit cards.  That

24     stuff is accurate.  And all of that money is mine own money.

25     It has nothing to do with any school money or any accounts that

H7e6cos1

1   the school money went in to my knowledge based on the tracing."

2   Transcript at 763.

3        The evidence at trial showed undeniably that the

4   International School's $5.5 million was wire transferred into

5   the CosmoDabi Chase account ending in 6625 on January 21, 2011.

6   At that time the account had a balance of $1,000.  Mr. Cosme

7   then transferred over $5 million of those funds to the

8   CosmoDabi Chase account ending in 6619 on January 25, 2011.

9   Mr. Cosme then began spending funds in Las Vegas using the 6619

10  account and the 6625 account in February 2011 through June 2011

11  for a total of amount of $87,386.  These were plainly

12  International School funds, and Mr. Cosme as the individual who

13  controlled these bank accounts certainly knew that.

14        Again, I find that this was willfully false testimony,

15  that it was material, and that it was not given as a result of

16  any confusion, negligence, lack of memory, or any other

17  innocent reason.  Accordingly, I find that because Mr. Cosme

18  testified willfully, falsely with respect to material matters,

19  paragraph 65 should reflect a two-point increase for

20  obstruction of justice.  That then makes paragraph 66 the

21  adjusted offense level 29 and paragraph 69 the total offense

22  level 29.

23        With respect to the defendant's criminal history, I

24  accept the findings of the presentence report set forth at

25  paragraph 70 through 75.

H7e6cos1

1          Counsel, as I mentioned, I have the government's

2     sentencing memorandum dated July 7.  I have Mr. DeMarco's

3     sentencing memorandum dated July 5.  I have a fax document

4     received July 3 that purports to be affidavits by Patricia

5     Tsien and Thomas Cleveland.  I also have another copy of those

6     documents and others received by fax July 8th, 2017.  I also

7     have a victim impact statement sent by the government on

8     July 3, which includes a letter from Dr. Penland dated July 1,

9     2017.

10          Are there any other written materials that I should be

11     looking at, counsel?

12          MR. DeMARCO:  Not my me, your Honor.

13          MR. SOLOWIEJCZYK:  No, your Honor.

14          THE COURT:  Mr. DeMarco, do you wish to speak on

15     behalf of Mr. Cosme?

16          MR. DeMARCO:  Yes, your Honor.  May I?

17          THE COURT:  Yes sir.

18          MR. DeMARCO:  I will be brief and add a few points,

19     your Honor, to the submission I filed with this Court.  I want

20     to point out several things.  Mr. Cosme is 51 years old today.

21     He has no criminal history and he has a lengthy employment

22     history.  For many years he was the principal in an employment

23     agency, Mar-El, and another one.  As the letters appended to my

24     submission indicate, he is a kind man.  He is generous to his

25     family.  He is devoted to his family and he is a good friend.

H7e6cos1

1      Now, your Honor, in preparing for sentencing, I do

2   research about other cases in the district and sentences

3   imposed on wire fraud cases.  I came across an interesting case

4   that was handled by Judge Rakoff.  There was a sentence imposed

5   by Judge Rakoff on November 2nd, 2016, and the case name is

6   *United States v. Andrew Caspersen*, 16 CR 414.  I just want to

7   compare and contrast Mr. Caspersen in that case to Mr. Cosme in

8   this case.  Now, all of the information that I am proffering to

9   this Court with respect to the *Caspersen* case was taken from

10   the government's sentencing submission in that case.  I believe

11   it is Document No. 32 that was filed prior to sentencing.

12      Now, Mr. Caspersen was 39 years old.  Mr. Cosme is 51

13   years old.  Mr. Caspersen was the son of a very well to do

14   family.  His father was a multi-millionaire.  Mr. Cosme was

15   raised by a single parent in Suffolk County.  Mr. Caspersen

16   attended Princeton undergrad and he got a JD from Harvard.

17   Mr. Cosme earned a few credits from Suffolk Community College.

18      From the 2014 to 2016 Caspersen ran a Ponzi-like

19   scheme, and to quote the terms used by the government they

20   described it as "sophisticated and elaborate fraud."  He bilked

21   dozens of investors of nearly $100 million.  He stole from

22   family, friends, college classmates, and abused the trust of

23   those who had trusted him.  Mr. Cosme stole $5.5 million from

24   TCIS.  Caspersen had a history of defrauding people.  In fact,

25   according to the government's sentencing submission in that

H7e6cos1

case, he had bilked his own mother of $1.2 previously; but she

decided since it was her son, she wasn't going to seek to have

him prosecuted.  This is Mr. Cosme's only criminal conviction.

There have been no allegations that he has engaged in this

conduct prior to these dealings with TCIS unlike Mr. Caspersen.

Mr. Caspersen pleaded guilty and the loss amount he

stipulated to was a loss amount greater than $25 million, but

the restitution he agreed to pay in that case was $36 million.

It was a sophisticated scheme by Mr. Caspersen versus a very

unsophisticated scheme here by Mr. Cosme, a bare bones website

that was relied upon by TCIS so they claim.  Mr. Caspersen was

sentenced by Judge Rakoff to four years, 48 months.  In that

case Caspersen also allegedly stole some identities of some of

the people he also defrauded.  Judge Rakoff sentenced

Mr. Caspersen to 48 months.  Four years in jail.  In this case

U.S. Probation is recommending a sentence of 94 months

imprisonment.

Now, I know your Honor is concerned about sentencing

parity.  The only difference that I can think of between

Mr. Caspersen and Mr. Cosme, which works against Mr. Cosme, is

the fact that he exercised his constitutional right to go to

trial and he exercised his right to testify at that trial.  The

loss amount was much less than Mr. Caspersen.  It was the only

time he has ever been accused of doing this type of act and yet

Probation is recommending a sentence almost twice as long as

H7e6cos1

1   what Mr. Caspersen received.  I just wanted to point that out

2   for your Honor for the sentence that you are considering.

3          Another thing that is troubling me about this case,

4   and with my deepest and sincerest condolences for the people at

5   TCIS, the folks from TCIS traveled from South Korea to New York

6   City to meet with Pat Tsien, Jay Peck, and ultimately

7   Mr. Cosme.  They spent a lot of time, a lot of money to travel

8   from South Korea to New York City to trace down their $5.5

9   million or the loan that they were seeking for that $5.5

10  million investment.  Had they used a fraction of that time,

11  your Honor, to exercise some due diligence, to check

12  references, to ask around, I submit we would probably not be

13  here today.

14         Also, what troubles me about this case, your Honor,

15  and when we're speaking about sentencing disparity, the

16  mastermind in my opinion based on everything I heard at this

17  trial and everything I read in discovery was Pat Tsien and Jay

18  Peck.  They were the people who initially contacted TCIS.  They

19  were the people who met with TCIS and Dr. Penland on Wall

20  Street.  They were the people who introduced the folks from

21  TCIS to Mr. Cosme.  They in my opinion masterminded this fraud

22  and Pat Tsien has never been charged.  Jay Peck has never been

23  charged.  But Mr. Cosme who is just a small piece to this fraud

24  was charged.

25         Your Honor, I am going to ask that you consider as I

H7e6cos1

1    requested in my sentencing memorandum imposing the mandatory

2    minimum of a 24-month sentence.  I think that is sufficient but

3    not greater than necessary for a 51-year-old man, who is before

4    this Court with his first conviction.

5              That's all I have to say, your Honor.  Thank you very

6    much.

7              THE COURT:  Thank you.

8              Mr. Cosme, do you wish to speak on your own behalf?

9              THE DEFENDANT:  I do, your Honor.

10             THE COURT:  Yes, sir.

11             THE DEFENDANT:  Should I stand or sit?

12             THE COURT:  Whatever you prefer, sir.

13             THE DEFENDANT:  Okay.  Thank you.

14             In regards to all the motions that you denied, I think

15   there is a lot of them.

16             THE COURT:  I agree with you there, sir.

17             THE DEFENDANT:  We agree on that.  That is fantastic

18   in one way.

19             All of the facts that you cited -- respectfully, all

20   of the facts that you cited, which I think were purged or

21   produced to you by the government and some other sources I

22   suppose -- government agencies, affidavits -- it seems to be a

23   variance between the actual evidence adduced at trial and all

24   of these facts that you include to support your bases for

25   denying the motions and having the conviction be credible in

H7e6cos1

1   addition to the variance in the numerical aspects of the case.

2   As an example Exhibit 911, an exhibit that was exhibited at

3   trial, the government's centerpiece allegation and the

4   conviction was all predicated off of the defendant not

5   investing $5.5 million in the entirety.

6        At trial we saw Government's Exhibit 911 illustrating

7   in excess of $5.5 million being invested or deposited into the

8   investment accounts of CosmoDabi and/or William Cosme.  That

9   variance correctly removes and disproves any criminal intent.

10  If the government's position in our view is Cosmo was supposed

11  to take this $5.5 million investment and then you look at the

12  accounts that they exhibited at trial, Exhibit 911, and that

13  spreadsheet illustrates $6 million in investments into those

14  investment accounts, such as JPM 4500 in the Scottrade account.

15  That is just a variance that disproves the government's entire

16  case or centerpiece allegation including the conviction.  So

17  that --

18        THE COURT:  Mr. Cosme, I am happy to listen to you,

19  but we're here today now for the sentencing proceeding.  We're

20  not here to argue any of the prior motions or going back over

21  that material.  So I will be happy to listen to you on whatever

22  you would like to say about sentencing, sir.

23        THE DEFENDANT:  Sure.  Your Honor, I don't believe I

24  was confused about what the scope and the nature of these

25  proceedings are today.  I believe that the scope and nature of

H7e6cos1

1    these proceedings are postconviction having to do with the

2    sentencing --

3              THE COURT:  Yes, sir.

4              THE DEFENDANT:  -- and the sentencing guidelines and

5    the computation --

6              THE COURT:  Yes, sir.

7              THE DEFENDANT:  -- of the alleged punishment, which

8    includes but is not limited to the forfeiture, which is a whole

9    other subject that I would like to discuss with you if I may.

10   So I am not trying to get off course and give up scope.  I

11   think the fact that there is such a variance and an

12   overwhelming variance in the evidence adduced at trial and the

13   evidence put into the PSR 1 and 2, meaning the revised and

14   originals, that I have not honestly had time to review with

15   counsel.  I mean we -- I am not sure what your perception is of

16   that, but I have not sat down with comp counsel and reviewed

17   the PSR 1 and PSR 2, the revisions of the sentencing

18   memorandum, nor have I sat with counsel during the PSI

19   interview or attempted Interview 1 and 2.  It wasn't something

20   that we completed.  I think those are significant issues in

21   addition to my not reviewing any and all of the objections that

22   the government put in after the PSR 1.  PSR 1 had some

23   objections by the government and there were, I would say, at

24   least 20.  So the whole document itself, as I stated in one of

25   my communications to you, 98 percent of it is inaccurate or

H7e6cos1

1    untruthful depending on how you look at it.

2            I think all of those things in aggregate add up to you

3    should take a second look at all of this stuff in detail.  I am

4    not trying to retry the case, but trying to take the evidence

5    adduced at trial looked most favorable -- in the light most

6    favorable to the government and correct it so I don't get stuck

7    with 22 years in jail or even two years in jail.  I think once

8    we figure it all out correctly, I think it will boil down to a

9    misunderstanding and a couple mistakes that the government

10   made.  Unfortunately it is here at sentencing for whatever

11   reason, but I think apart  of the sentencing pursuant to

12   criminal -- rules Of federal procedure Rule 32.2 includes but

13   is not limited the the defendant speaking on its own behalf in

14   regards to these issues that could impact the computation of

15   the Sentencing Guidelines.

16           So I think it is so significant and the variance is so

17   tremendous that we should absolutely take a serious look or

18   more serious look or a second look at all of these things

19   because none of the facts that were presented to you, your

20   Honor, are correct.  Even the record -- even the recitation of

21   the transcript about -- in one instance there is talk about

22   some Ferrari purchased in 2011 or 2012.  That particular

23   instance is one example of many.  That was after the client

24   defaulted and admitted that they defaulted off of their

25   contract, which is on the face of the contract.  The default

H7e6cos1

terms exist on the face of the contract.  And if we ever looked

at the contract in its entirety, which has not happened once in

all of these proceedings since 2012 to my knowledge, we would

see that the client was by far in excess in violation of all of

the terms and conditions of their contract.

Again, I am not trying to reargue it, but what is

being presented to me and being presented to counsel in regards

to all of these issues that affect or impact the computation of

the sentencing, once they are corrected there would be no need

for sentencing or no need for forfeiture in addition to the

forfeiture not even being authorized by Congress in regards to

Statute 982, the criminal forfeiture that was in the

preliminary sentence -- the preliminary forfeiture order, which

had content in it that made it a final forfeiture.  So if you

look at the statutes that the government put into that

particular document, the PFO, the preliminary forfeiture order,

Congress does not even authorize forfeiture for those

particular statutes.

And the most recent document that I have seen, legal

document, that I have seen was the final forfeiture is going to

be -- going to be pursuant to Section 981, which is the

civil -- judicial civil asset forfeiture, not a criminal

forfeiture, which contradicts the PFO, preliminary forfeiture

order, in addition to it contradicting the language in the

preliminary forfeiture order that says it is a final

H7e6cos1

forfeiture.  In addition to Congress not authorizing forfeiture

for wire fraud as an example in this case that did not affect a

financial institution.  Or the other charge aggravated identity

theft, 1028(A), Congress does not authorize forfeiture for that

either.  So it does authorize for 1028, but that is not what is

charged.

        So we have defects in the forfeiture pursuant to the

applicable or inapplicable statutes.  So we have that issue

which is part of the sentencing punishment computation.  There

is a money judgment.  It mentions a money judgment in there as

well.  Some of these statutes that the government is using in

these particular forfeiture documents do not even allow money

judgments, criminal forfeiture, or some other activity that the

government is wanting to respond to in addition to all of the

forfeiture being in violation until this day of CAFRA.  So

there is a whole bunch of stuff that I think needs to be looked

at that does affect the computation of the sentencing

guidelines and the money factor and the ultimate restitution.

        As far as the restitution goes, there is a document

out here.  It is Document 304-2.  That particular document,

Dr. Penland, who I believe is here today, testified in a court

of law in another tribunal that he received a loan from

CosmoDabi and he came to trial in March, last March, and told

everybody at trial that he never received a penny from

CosmoDabi.  So the variance is so significant.  Why would a

H7e6cos1

1    victim wanting to receive restitution to the tune of $11

2    million for the interest of the alleged crime of $5.5 million

3    in fraud come back to the United States and ask for that kind

4    of restitution when in another tribunal he absolutely in a

5    Court of law under oath said that he had received a loan from

6    CosmoDabi in Docket 304-2.  That particular issue is the

7    perjury in the case.

8           That particular issue is the fraud in the case.

9    Regardless of what the outcome at trial was, that particular

10   issue is a reality.  It is a fact.  He said it.  It is on

11   record.  He said it to get out of what it looks like a set of

12   series of criminal charges that he was charged with in South

13   Korea intrinsic to this particular transaction.  I think he did

14   it to get out of it and he lied in the Korean court and he lied

15   in the Southern District here and he lied to the FBI in 302

16   affidavits.  And the variance between all of this is so

17   significant that it is not even a fraud by the defendant.  The

18   defendant in this particular case is actually the victim

19   ironically as the record could show, as the evidence adduced at

20   trial can show.

21          So that is something I would ask for your Honor to

22   take a good second look at because if it is not looked at and

23   it is not corrected, then the defendant could actually end up

24   facing many years in jail when he doesn't even belong in jail,

25   when his victim belongs in jail, which is a possibility if you

H7e6cos1

take a look at that particular testimony of Mr. Penland, which

I presume was okayed and approved by his entire board.  So I

would ask your Honor to take a second look at that.

        I know we discussed that once before during trial week

and your Honor had mentioned that she would take a look at

that.  We just didn't get a chance for whatever reason to get

back to that issue, but I think maybe today we would get an

extension of time or an adjournment would be an excellent time

for us to take a serious look at that issue because it is so

significant.  It proves the government's case even if we looked

at it in a light most favorable to the government and based on

the evidence adduced at trial.  Interesting what we saw in

Exhibit 911, the entire $5.5 million loan investment, generated

$48 million in gross trade proceeds from the trading accounts

that the government did the allege trace on.  We looked at all

that stuff closely and it wouldn't take long.  It would change

the entirety and the outcome of these proceedings and change

the computation of the sentencing guidelines.

        THE COURT:  Yes, sir.  Thank you.

        THE DEFENDANT:  I wasn't finished.

        THE COURT:  Go ahead.

        THE DEFENDANT:  I also have with me a copy K&L Gates.

You mentioned you haven't seen anything produced to the Court

with K&L Gates' willingness to represent the defendant.  I

wanted you to have a copy of it.  It is fully executed and it

H7e6cos1

1   actually articulates the dates they will be ready, willing and

2   able to come into the case to represent me because they were

3   away for the past month on some other trials.  And it has been

4   tough because I was actually hospitalized in the past couple

5   days and I have not been getting any legal mails for whatever

6   reason.  Some of the mails in the system were diverted I

7   believe because the MDC or the jail was on lockdown or some

8   riots or violence going on.  So I wasn't able to really get on

9   the computers, which is limited anyway, or get on any of the

10  phones and communicate with you in the way I would normally do

11  it.  I couldn't get to Mr. DeMarco because I don't have his

12  e-mail hooked into my TRULINCS because he didn't accept it yet

13  for whatever reason.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H7ELCOS2

1          THE DEFENDANT:  And I had no phone communications with

2     Mr. DeMarco, and there's no way for me to communicate with him

3     anyway on the phone.  I can't leave a message.  All I can do is

4     try to call there and hope that he would respond or mail him

5     things and I tried to mail him and I had somebody drop mailings

6     off to him in his offices.  Maybe he wasn't there.  He refused

7     some of those letters that I dropped off.

8          So I have a host of reasons what I believe are

9     credible that would lend to us taking a really good look at

10    some of this stuff and maybe taking a second look at some of

11    this stuff so we could correct it and get to what the real

12    issue is.  And I really think based upon the evidence adduced

13    at trial and based on Mr. Hwang and Dr. Penland's testimony at

14    trial, I think that they verified themselves that they

15    committed the fraud.

16         As far as the website goes, you had mentioned

17    something about the website in regards to perjury.  The

18    website, the school official, Thomas Hwang, during his

19    testimony testifies that the website link or the website was

20    not given to him by me or by the defendant or by Omni or

21    Patricia Chen or Thomas Cleveland.  He testified exclusively

22    that that particular website link or address was something that

23    he found on his own research.  He did his own research on the

24    web and he found it on his own.  And if you looked at the

25    evidence that was exhibited at trial in regards to that

H7ELCOS2

1    particular web link, it wasn't even a website.  It was an

2    address.  It was a link.  It wasn't a website like

3    www.CosmoDabi.com.  It was an entirely different URL.

4         Now, a URL is not a website and a website is not a

5    URL.  And just because somebody makes reference to a website

6    address doesn't necessarily translate to it having the web

7    content that is associated with that web address.  And I think

8    that's where the government is really going down the wrong path

9    with that.  It's just I mean the testimony used at trial does

10   not match what the facts show.

11        And if we looked at the website graphics that the

12   government actually had in the 3500 and I believe that was

13   exhibited at trial, the dates, the date and time stamp on those

14   particular web shots don't even match the date of the

15   transaction.  But the government relies exclusively on the

16   website kind of being the genesis of this inducement of this

17   alleged fraud.  So if that's the case, why didn't the

18   government produce graphical websites of CosmoDabi.com with

19   dates that actually match the inducement period.

20        That being said, there was no inducement.  The

21   government has that evidence, then let's see it.  The burden

22   was not met based on that, based on the facts, based on what

23   was exhibited, based on the evidence adduced at trial.  So

24   there is a serious variance in that website issue that also is

25   derived from the school victim's testimony at trial.  And my

1   testimony or the defendant's testimony at trial is precisely

2   what I'm saying now.  It hasn't changed.  The evidence that was

3   adduced at trial basically showed there was somebody

4   communicating it.  There was a CosmoDabi.com website.  That's

5   not Mr. Cosme saying or having a Cosmo Dabi website.  A

6   reference to it does not mean he has it.  If you look at all

7   the communications and you look at all of the testimony that

8   was provided by the school officials, there was no direct

9   communication with the school from Mr. Cosme during that

10  alleged inducement period.

11       So not only was there no communications or direct

12  communications by Mr. Cosme at that time, there was also no

13  reference of any websites or any investments of $5.5 million

14  conditionally guaranteeing $55 million in return at the JFK

15  meeting.  That particular meeting, Dr. Penland and Dr. Hwang

16  testified that, you know, there was no guarantee of anything

17  and Mr. Cosme did not present any websites to them in any way,

18  shape, or form, or mention any websites to them, which was the

19  case.

20       And as far as witnesses go, I think Rule 32 allows

21  witnesses at sentencing, if I'm not mistaken, as long as

22  they're compliant to, I think, Rule 26.  So what I wanted to do

23  was have my witnesses ready, but I had no communications with

24  Mr. DeMarco and I was hospitalized a couple days prior to the

25  day of sentencing and the day after.

H7ELCOS2

1          THE COURT:  As I mentioned to you, sir, I've read both

2     of the affidavits.  I think it was a joint affidavit by

3     Ms. Chen and Mr. Cleveland.

4          THE DEFENDANT:  You've seen those.  And I wanted to I

5     guess touch a little bit on that.  I think the affidavits are

6     extremely important, but I think we also missed the boat on

7     getting those particular witnesses to trial.  And I thought it

8     would be more of a positive thing as it relates to the impact

9     of the sentencing guidelines to have those witnesses here.

10          And the issue I have with it now is the adjournment

11     that we had from the 12th to today was so fast.  There was not

12     enough time for me or counsel coming in to react.  I never

13     thought that you'd be able to adjourn the sentencing so

14     quickly.  I thought we'd get at least a week or two so we could

15     get ourselves together and get the witnesses and have some

16     witnesses present at this particular proceeding because I think

17     it would make a difference.  In addition to you having those

18     affidavits, I think there's some testimony by them based upon

19     what I've heard and some of the research and speaking to them

20     that could lend tremendously to what I'm saying to you in

21     regards to I believe that Dr. Penland's claim from the

22     beginning is the fraud here.

23          So I would like -- and I know you said no about this.

24     You kind of said no in regards to everything and you kind of

25     denied everything in regards to the adjournment.  But I think

H7ELCOS2

1     it's in the best interest of justice to actually give this a

2     second look.  Every once in a while, there's some credibility

3     at the 11th hour that could possibly turn things around.  It's

4     not a desperate ploy.  It's something that's based on facts and

5     the like looked at most favorable to the government.  And I

6     don't see why any reasonable judge -- and I respect your Honor

7     tremendously -- would not allow me some time to give the Court

8     an opportunity to review some of these things on a second look

9     in light of the seriousness of the nature of the charges and

10    the punishments that could be inflicted upon Mr. Cosme.

11              THE COURT:  Thank you, sir.

12              Does the government wish to be heard?

13              MR. SOLOWIEJCZYK:  Your Honor, just briefly, we just

14    want to have the record be clear that Mr. Cosme has reviewed

15    the PSR with counsel.  That was the one thing he said --

16              THE COURT:  Mr. DeMarco, did you wish to comment on

17    the remark about the presentence interview.  And I do recall

18    there was some back and forth and that Mr. Cosme had refused to

19    go and then we came to court and I informed Mr. Cosme that it

20    was for his own good and my understanding was that he then did

21    attend --

22              MR. DEMARCO:  That's right, Judge.

23              THE COURT:  -- and was somewhat cooperative, but not

24    entirely.

25              MR. DEMARCO:  Here's how it transpired.  When I went

H7ELCOS2

1    to do the initial presentence interview with Probation Officer

2    Kim, Mr. Cosme refused to take part in the interview without

3    counsel of choice.  He informed Officer Kim that I was not his

4    counsel of choice and that he would not sit for the interview

5    with me present and only with counsel of choice.

6         We then convened in court and your Honor gave a

7    deadline for Mr. Cosme to sit for the presentence interview.  I

8    had contacts with Mr. Kim, Officer Kim, and I indicated to him

9    that he should attempt, if he desired to do so -- Mr. Cosme has

10   not retained new counsel.  He has indicated to me in several

11   communications through others or directly that he would not sit

12   for the presentence interview.  I instructed Officer Kim that

13   should Mr. Cosme participate in the interview, he should not be

14   asked anything about the facts of this case or anything about

15   his criminal history, as is my normal practice at these

16   presentence interviews.  And Officer Kim was successful in

17   interviewing Mr. Cosme.

18        I did attempt to review the first disclosure with

19   Mr. Cosme, and he would have nothing of it.  I don't want to

20   get into the details of that meeting, but suffice it to say, he

21   would not allow me to review that first PSR with him.  I then

22   subsequently provided him several copies of the initial

23   disclosure, as well as a copy of the final disclosure with

24   probation's recommendations.  As you can see, Mr. Cosme did

25   review the PSR because he filed his own objections to the PSR.

H7ELCOS2

1          THE COURT:  Yes, which I noted that I have received

2   and read.

3          MR. DEMARCO:  It's important to note that between the

4   day of trial and today, Mr. Cosme has indicated to me

5   indirectly and directly that he really wanted nothing to do

6   with me as his counsel representing him in this case.  After my

7   attempt to review that initial disclosure with him, I decided

8   that it made no sense for me to attempt to do so again.  So in

9   the alternative, I provided him with copies of all the

10  submissions made by me, the government, and U.S. probation in

11  lieu of a personal meeting with him.  That just pretty much

12  details it.

13         THE COURT:  Yes, sir.  Thank you.

14         MR. SOLOWIEJCZYK:  Your Honor, just to add to that, it

15  appears clear on the record that Mr. Cosme did review the PSR,

16  as is shown by the fact that he submitted objections to the PSR

17  to your Honor.

18         THE COURT:  Yes, sir.

19         MR. SOLOWIEJCZYK:  So it does appear that we've

20  complied with the letter of the Court.

21         THE COURT:  Yes indeed.  I'm satisfied that Mr. Cosme

22  has reviewed the materials.

23         Does the government wish to be heard further?

24         MR. SOLOWIEJCZYK:  Yes, briefly, your Honor.  Your

25  Honor, the government is not going to rehash what was in our

H7ELCOS2

submission; just a couple of points to note for your Honor's

consideration before imposing sentence.

        I think what stands out about this case, your Honor,

is the brazen nature of the fraud.  This is not a case where

somebody made one mistake or two mistakes, was running a

legitimate business, was trying to invest money on behalf of

clients and somehow was led astray.  It's nothing of the sort.

Your Honor, this was a fraud from the outset.  Mr. Cosme lied

about who he really was, what his business really did, and the

entire -- the website, everything, it was all designed to dupe

an unsuspecting victim and that's what TCIS was in your case,

your Honor, respectfully.

        Mr. DeMarco spoke at length about the Caspersen case.

First of all, that's one case of many, many cases in this

district involving wire fraud.  Second of all, something that

does separate this case, your Honor, is the fact that this was

an unsophisticated victim by all accounts.  And Mr. Cosme

preyed on victims like TCIS, a school that, yes, they did not

do all of the due diligence.  But that in some ways is what's

so remarkable and what's particularly terrible about the fraud

that was perpetrated here, your Honor, is that Mr. Cosme looked

for somebody to dupe and he found them.  And they put their

trust in the wrong person, your Honor, obviously.

        It's clear that Mr. Cosme intended to commit fraud

from the outset.  As soon as he got the five and a half million

H7ELCOS2

dollars, he began to spend it on himself.  So this is not a
case of someone who had good intentions and then down the road
made some mistakes.  This was from the get-go he planned to
steal five and a half million dollars from an international
missionary school.  And that conduct, your Honor, respectfully,
warrants a sentence within the guidelines range because the
conduct is abhorrent.

          Something that obviously separates this case from the
Caspersen case is in Caspersen, the defendant, No. 1, took
responsibility ultimately for what he did.  This is a defendant
who to this day blames the victim and cannot accept the nature
of his conduct.  He lied at trial.  He continues to this day to
blame others for his own fraud.  And that goes to a number of
sentencing factors; but one factor it certainly goes to, your
Honor, is deterrence.  This is a defendant who needs to be
specifically deterred.  It also goes to protecting the public
from future crimes.  There is nothing about what's transpired
prior to this trial, during this trial, and during this
sentencing that would give anyone any comfort that Mr. Cosme
will not commit fraud again.

          Another obvious distinction between this case and the
Caspersen case, your Honor, is my understanding of the
Caspersen case is that that defendant had a crippling gambling
addiction that explained at least part of his conduct.  Here
there is no such explanation.  Mr. DeMarco in his sentencing

H7ELCOS2

submission mentions that the defendant is 51 years old.  This

was a grown man who decided to commit this crime.  It wasn't

somebody who was a young man who made a mistake.  And just

because the defendant will be older when he's released after

his sentence, whatever it may be, it's not going to protect or

prevent the fact that Mr. Cosme could commit fraud again.

Finally, another obvious distinction, your Honor, and

something that's very important as a relevant factor at

sentencing, and you're going to hear, I believe, from TCIS as

well, this fraud wreaked havoc on TCIS.  They had to stop

construction of the school, and they to go into their operating

funds.  And this school really came to the brink of ruin

because of Mr. Cosme's actions.  This was not a case where you

have sophisticated investors or financial institutions that

were defrauded.  Mr. Cosme's fraud really caused a very, very

serious harm to a school, a school whose sole goal was to

educate children in South Korea.

So, your Honor, the government respectfully submits

that when you take into account all of the 3553(a) factors, a

sentence within the guidelines range is warranted and necessary

in this case.

THE COURT:  Thank you.

Is there any victim here who wishes to be heard?

MR. BELL:  Your Honor, Dr. Penland is here.  He's

making his way up now.

H7ELCOS2

1          THE COURT:  Sir, would you state your name for the

2     court reporter, please.

3          MR. PENLAND:  Thomas James Penland.  Your Honor, thank

4     you for giving me the opportunity to be here again today in New

5     York and to thank you for the American justice system which

6     seeks to bring justice and righteousness around the world, not

7     limited to just this country, but to those who are mistreated

8     in other places.  And it's an honor to be an American citizen

9     and representing an international school with citizens from

10    over 25 different nations looking and observing and seeing what

11    happens when a crime occurs within this justice system in this

12    country.  So it's an honor to be here this afternoon in your

13    court.

14          I'm thankful for Paul Hastings firm which took our

15    case pro bono and represented us and worked with us to help us

16    to know what to do when we realized we had been abused and

17    taken advantage of and had been robbed.  And we were fortunate

18    that a parent in our community was a lawyer, an attorney who

19    had worked with Paul Hastings in Hong Kong and had connections

20    and friends and contacts in the New York office and they took

21    our case pro bono.  Otherwise, we would have spent a lot more

22    funds trying to represent ourselves against this situation and

23    so we're grateful to that.

24          And I'm grateful to the FBI and to all those who have

25    assisted us beyond -- outside of the areas of our knowledge or

H7ELCOS2

1    have expertise to know what to do.  And I even thank our

2    defense attorney, the defense attorney for his work in applying

3    due process in this court and allowing the defendant to be

4    represented and to have a chance to tell his story and his

5    perspective.

6              This is not about me.  It's about a school, Taejeon

7    Christian International School, TCIS.  And we view this in our

8    school as an education process for all to learn from.  It's

9    part of who we are.  It will be part of our history as a

10   school.  This happened to our school.  We didn't expect it to

11   happen.  We didn't plan it to happen.  I'm an educator for over

12   40 years.  I've been a teacher, middle school math and science.

13   I've coached teams.  I've been a principal in public schools

14   and in private schools in Malaysia and Korea and here in the

15   United States.  I never expected I'd be in federal court in New

16   York in a situation like this, but it happened.  And we

17   consider it an education process, something we can learn from

18   and that we can teach our students about, civics and due

19   process, and what happens when crimes are committed.

20             So I'm grateful today to be here to tell you about the

21   victims.  It seems like a lot of conversations have been about

22   Mr. Cosme, even his attempt to decide who is the victim.  But

23   I'm here to tell you TCIS is the victim.  Our school has

24   suffered greatly.  And this is a great school.  It was founded

25   in 1958, started by a group of missionaries to help educate

H7ELCOS2

1    their children in a country that had been colonized for 50

2    years and then the civil war occurred between warring parties

3    both within the country and international powers that

4    absolutely wreaked havoc and the land was nothing but a wreck

5    and the people were destitute.  And in 1958, these group of

6    people like them, these missionaries and others, came to help

7    Korea and they made a difference and it's part of the miracle.

8    In the Han we call it this thing that inspires people in the

9    21st century of what happened in South Korea and to that

10   country and that culture.  It's a story about you can come out

11   a winner and you can turn from ashes into something really you

12   can be proud of.  That's South Korea today.

13          And our parents, the original founders of our school,

14   were part of that story.  And they gave themselves generally to

15   help provide education for missionary children mainly, but also

16   for foreign children and for overseas Korean children who

17   traveled outside of the country and came back and did not fit

18   in the Korean system.  In 1958, it started as a boarding school

19   and it's retained that history of boarding school, that history

20   of a Christian tradition.

21          It is the second oldest international school in South

22   Korea.  It is reputable.  It is well-known.  It is

23   distinguished.  It has a great history.  There are great alumni

24   all over the world who are doing great work because of the

25   goodness of the education at TCIS.  It is high quality.  We

H7ELCOS2

1   were the second international school in South Korea to be

2   accredited by a regional association here in the United States.

3   The Western Association of Schools and Colleges accredits

4   schools in California and Hawaii, but also accredits most of

5   the international schools in east Asia.  We were the second

6   school; in 1971, we gained accreditation.

7           We were the first school to offer all three of the IB

8   programs in Korea -- the primary year program, the middle year

9   program, and the diploma program.  We've had a long

10  distinguished history of leading the way and providing quality

11  education.  And we just graduated 69 seniors this last year and

12  they earned over 4 million in U.S. dollars in merit

13  scholarships in universities around the world.  These young

14  people have a bright future and will contribute to good in our

15  world.

16          However, we're a unique international school.  If you

17  Google Christian and IB, you don't find it very much.  We're

18  not a secular school.  We're a faith based school.  We take

19  students in from all different faiths.  And those without a

20  practicing faith are welcome at our school.  We're unique.

21  We're not a CEO school.  We're not in a capital city.  Most of

22  our parents are researchers and scientists.  We're in the

23  science and technology center of South Korea and our parents

24  are professors.

25          I have parents in our school for years down through

H7ELCOS2

1   the 20 years I've been there who take out bank loans to pay the

2   tuition.  I think the picture is somehow these international

3   schools are full of these rich people that have all this

4   affluency, but that's not true about our school.  Not every

5   parent in our school has a lot of funds, and those are precious

6   funds that we were guarding and investing.

7            We're a not for profit school.  I make a salary.  I

8   have a contract with the board.  Our board are volunteers.

9   Every employee has a contract.  There's nobody taking or

10  skimming or taking more.  We reinvest it back in the school.

11  It's always been a not for profit.  It's known as a not for

12  profit school.

13           And to this day, we still scholarship missionary kids

14  at our school.  They're now Korean missionary kids who go all

15  over the world, whose parents go all over the school working at

16  NGOs as medical doctors, as people making a difference in

17  countries like Yemen, Sudan, Iraq, Kosovo, Azerbaijan,

18  Kazakhstan, Laos, Cambodia, China, Mongolia, and in North

19  Korea.  Those are the kids in the school.  Those are the

20  parents.  More than 30 students receive missionary kid

21  scholarships still.  That makes our budget tight.  We tie

22  10 percent of potential income by giving these seats and dorm

23  rooms up for these students.  That's the tradition of our

24  school.  We take pride in that.  That made us financially

25  challenged at many times in our life as a school.

H7ELCOS2

1          We trusted Mr. Cosme.  For various reasons, we chose

2     to trust him.  We gave him five and a half million dollars.

3     That was difficult.  That was hard.  That was in 2011.  The

4     damage has been severe.  Our whole community was traumatized.

5     We went in many different directions.  I called it a ripple

6     effect.  It affected the students.  The seniors didn't know if

7     they could graduate.  I told people make a plan B.  We have to

8     find investors.  I don't have the funding.  Parents crying is

9     my kid going to graduate.  Have I invested it all and lost it

10    at this point?  Teachers not knowing whether they're going to

11    have their jobs.  Subcontractors on the construction site,

12    Korean poor guy not knowing if he's going to get paid off or

13    not.  It created chaos everywhere.  These are the victims that

14    are silent that I'm speaking for today.  Our reputation was

15    damaged and soiled.  People questioned our school, the

16    management.

17          Sentencing, that's your job, your Honor.  I have no

18    comment on that.  I don't know what the rules are and what the

19    guidelines are or the history of cases.  I have no comment on

20    that.  But forfeiture of funds and restitution of the original,

21    at least the original 5.5 million, seems to be just and

22    reasonable at this point.  This is 2017, six years later.  We

23    pay interest on loans still that we took out to cover those

24    funds.

25          I was recently informed that the government's asset

H7ELCOS2

1   forfeiture group may decide not to return the school's money

2   until after the defendant's appeal process is over.  Your

3   Honor, that is simply not acceptable from our point of view.

4   The school has been through such an ordeal as a result of the

5   defendant's conduct.  We've waited almost six years for the

6   return of the money we feel rightfully belongs to us.  It was

7   our money.  We are depending on that money.  And to think that

8   we have to wait longer until the defendant is done litigating

9   his case, it's unjust.

10          Your Honor, I ask for any assistance that you can

11   provide in this regard to ensure that the money is returned as

12   promptly as possible to our school.  As I mentioned, the school

13   is waiting for return of those funds to repay expenses it

14   incurred on the campus relocation projects and which are paid

15   for interest bearing loans that TCIS carries to this day.

16   Further delay in returning the funds will continue to cost the

17   school significant money and interest.  If you would like, my

18   attorneys are here in the court and are able to speak further

19   to this point.

20          To Mr. Cosme, I encourage you to do the right thing,

21   sir.  Drop the appeal.  Work to bring restitution.  Do the

22   right thing.  Do the honorable thing.  Give the money back to

23   the school.  Help us put our school back in place.  You can

24   live a constructive life.  You can live a life that you can be

25   proud of from this point going forward.  Without doing that,

H7ELCOS2

1    it's the destructive process ongoing.

2              Thank you, your Honor.

3              THE COURT:  Thank you, sir.

4              Counsel, thank you for your assistance in this matter.

5    As you've heard, I have calculated the guidelines and certainly

6    take them into account.  The total offense level in my view

7    accurately reflects the nature and circumstances of the

8    offense.  With respect to the history and characteristics of

9    the defendant --

10             MR. BELL:  Very briefly, your Honor.

11             THE COURT:  Yes, sir.

12             MR. BELL:  Mr. Solowiejczyk and I, we're not sure as

13   to whether you have in recognizing that the figure is accurate

14   actually stated what the guidelines figure is.

15             THE COURT:  I think I did, but if we haven't, I'll do

16   it again.

17             MR. BELL:  Thank you, your Honor.

18             THE DEFENDANT:  Excuse me, your Honor.  Excuse me,

19   your Honor.

20             THE COURT:  Sir.

21             THE DEFENDANT:  Sorry to interrupt you.  Just on the

22   guidelines, sentencing guidelines, just for point of

23   clarification, I have not reviewed any guidelines or any plea

24   offers, one of which Martin Bell solicited me for going in pro

25   se state.  I have not reviewed any of that with any of the

H7ELCOS2

1    counsels in the case, nor has Mr. DeMarco, I believe, as I

2    recall, gone over any guidelines with me or any potential

3    pleas.

4              THE COURT:  Sir, the guidelines calculation was

5    contained in both copies of the presentence report which you

6    received.

7              As to pleas, Mr. Bell.

8              MR. BELL:  I'll note this on the record just given the

9    concerns about the *Lafler* and *Frye* decisions.  At no point over

10   the extended course of this litigation did our office make a

11   formal plea offer to Mr. Cosme.  I believe that there was a

12   point while Mr. Cosme was pro se and communicating frequently

13   with our office, whether we wanted him to or not, when we did

14   encourage Mr. Cosme to let us know if he was interested in

15   seeking a pretrial resolution since that was something now

16   within his province as a pro se litigant.  No positive answer

17   was given to that entreaty, and no formal plea offer was ever

18   made.

19             THE COURT:  Thank you.

20             THE DEFENDANT:  Your Honor, one more thing.  I'm

21   sorry, excuse me.  I did not finish my list of things on my

22   opportunity to speak.  So I thought it would be a good idea to

23   finish that before you had computed your --

24             THE COURT:  Okay.  Do you have a lot more, sir?

25             THE DEFENDANT:  I don't think it's a lot more.  It's

H7ELCOS2

1   less than the initial.

2              THE COURT:  All right.  Perhaps it would be better if

3   we didn't go over items we had talked about in the past.

4   Matters directly relating to sentencing are the most relevant

5   now.

6              THE DEFENDANT:  Sure.  I thought that all of my issues

7   raised impacted the sentencing computation.  But if you say it

8   did not, I respect your observation and I'll try to stick to

9   exactly what I feel will impact the computation for sentencing.

10             Dr. Penland mentioned something about money, wanting

11   the money back sooner than I guess the completion of the

12   appellate process.  I'm not sure what the status is because of

13   the mail issue that we had recently and the mishap with the

14   hospital thing recently.  There was mailings that were sent to

15   the MDC or the prison there that I had not received.  I was

16   told that.  And one of them was a mailing from the appellate

17   court in regards to 17 -- docket 17-59 CR U.S.A v. William

18   Cosme that was an interlocutory appeal which was filed

19   post-conviction, pre-final judgment, in regards to a refusal to

20   vacate or modify a injunction.

21             We're not sure what the government's position is when

22   it comes to preliminary injunctions or injunctions because

23   their PFO is titled as a PFO, preliminary forfeiture order, but

24   the contents is final order of forfeiture.  And then there's

25   some discrepancies in regards to the asset forfeiture statutes

H7ELCOS2

1    that they used which are inapplicable to the offenses charged.

2              So that being said, and to I guess address one of

3    Dr. Penland's references to the money, for the record, I would

4    consider paying Dr. Penland the original balance that he feels

5    he is owed with several conditions, if that was something that

6    we would talk about.  And we could have certainly gotten to

7    that sooner had he actually complied to his underlying

8    contract, contractual terms and conditions.

9              And the reason why I'm saying this is because, again,

10   the PSR has an elaborate amount of -- what I feel is an

11   elaborate amount of forfeiture and restitution and money

12   judgment in it.  So there is an ability to pay.  There is a

13   path for defendant to pay five point million -- 5.5 million or

14   10 million, whatever the number is that he feels he is entitled

15   to.  Under certain conditions, I think that could be negotiated

16   and/or worked out.  But for us to kind of take the appellate

17   process out of the equation, we would have to get to that

18   sooner, rather sooner than later.  So I'm not sure if we should

19   handle that immediately today or perhaps tomorrow.

20             THE COURT:  Sir, I've already denied the request for

21   an adjournment or a stay pending the interlocutory appeal.

22             THE DEFENDANT:  Right.  I'm a little confused on that

23   because I think the appellate court has jurisdiction over the

24   interlocutory appeal --

25             THE COURT:  I'm talking about this proceeding.  Your

H7ELCOS2

1    request to stay or adjourn this proceeding is denied, and the

2    basis of your request was the pendency of the interlocutory

3    appeal.  Next.

4              THE DEFENDANT:  Do we have the status of that

5    particular?

6              THE COURT:  I have no idea.  It's not my job to watch

7    the Court of Appeals, sir.

8              THE DEFENDANT:  Right, but the issue with that though

9    is -- and I agree and I respect that.  I respect your answer,

10   your Honor.  I just want to make sure we don't make a mistake

11   because this is a very critical stage of the proceedings.

12   We're at the tip of the final judgment here.  The issue seems

13   to be that if there is a interlocutory appeal that's pending in

14   the appellate court and they grant it, they'd actually docket

15   it, you know, the interlocutory appeal because it was a refusal

16   by the district court to vacate or modify a preliminary

17   injunction or an injunction.

18             THE COURT:  Then they'll tell me what they want me to

19   do.

20             THE DEFENDANT:  What I'm saying is if we knew now,

21   which we could know now, which I think we do know now, these

22   proceedings would be stayed anyway if it is under interlocutory

23   appeal.

24             THE COURT:  Next.

25             THE DEFENDANT:  Is that not true?

H7ELCOS2

1          THE COURT:  Next.

2          THE DEFENDANT:  All right.  Recidivism rate, I think

3     that is a interesting valid point to raise in sentencing.  I'm

4     not sure if I heard it, but I didn't -- I don't recall hearing

5     the word recidivism.  The likelihood of the defendant

6     committing crime ever again given the profile that the

7     defendant has, there are dozens and dozens of Second Circuit

8     cases that have a recidivism rate calculation of zero for

9     individuals with my profile.

10          THE COURT:  Yes, sir.  I understood Mr. DeMarco to be

11     making that argument.

12          THE DEFENDANT:  Okay.  And the PSR, you had mentioned

13     that in the PSR I made some objections, so obviously I have

14     seen the PSR.  If you looked at the submissions, I believe

15     those are only submissions A and B, not C, and I wasn't able to

16     get C to you.  And I wanted you to have C so we could have a

17     full view of that, in addition to waiting for counsel of choice

18     to review those particular objections with me because the

19     government had the benefit of three prosecutors or several

20     prosecutors objecting to 23 points of the original PSR; and I

21     had absolutely no counsel to review the PSR or the revisions or

22     the government's objections or enable us to detail out some of

23     the money judgment/restitution/unlawful final forfeiture that

24     I'm seeing here potentially occurring today.

25          THE COURT:  Next, Mr. Cosme.  The reason you didn't

H7ELCOS2

1    have more benefit of counsel is because you chose not to.  Next

2    item.

3              THE DEFENDANT:  Your Honor, that's incorrect.  The

4    characterization that you seem to believe is just incorrect.

5    There is no refusal whatsoever to have counsel review or me

6    deny the PSR meetings.  I met Mark DeMarco with the officer.

7    And it was a surprise meeting.  It wasn't scheduled.  All I

8    said to both of them was I invoke counsel of choice.  I need

9    counsel of choice to go over this PSR because it's a very

10   critical document and this case is very complex and that's who

11   I need to go over these particular papers with.

12             THE COURT:  We've been through this before, sir.  I

13   think we're repeating ourselves.  Next item, please.

14             THE DEFENDANT:  Your Honor, if you make mistakes,

15   respectfully, if someone makes a mistake 17 times, then it's a

16   mistake 17 times, right, whether it's me or someone else, it's

17   a mistake 17 times.  If we correct it one time, we don't get to

18   17, and this is what's happening in this case from the onset.

19   These characterizations are just incorrect, as the facts are,

20   and all of these objections that counsel Solowiejczyk mentioned

21   and some of this information that Dr. Penland mentioned, such

22   as the financial condition of the school.  He's asking you to

23   accelerate restitution so he can receive money earlier versus

24   later.  In my view, he's still not entitled to money.  However,

25   because of the school's situation, I would consider something

H7ELCOS2

1     like that under the right conditions, under the right

2     negotiation.

3              But as far as the sentencing goes, the financial

4     condition of the school prior to my ever getting involved with

5     that school was a disaster, and it wasn't presented that way to

6     me.  It was presented very differently than what we found in

7     these audits.  And that's one --

8              THE COURT:  Mr. Cosme, Dr. Penland was speaking of the

9     financial condition of the school after the school paid the

10    $5.5 million.  That's what he was talking about.

11             THE DEFENDANT:  Right.  If you recall, which I'm sure

12    you don't at the moment, but if you recall testimony testified

13    at trial in March that he was able to finish his project,

14    according to him, through his Christian friends with proceeds

15    and loan proceeds he didn't have to pay back.  So he doesn't --

16    my understanding was he got the money from donations or

17    whatever, Christian friends that helped him out, and he didn't

18    have to pay it back.

19             I agree after looking at the KPMG management letter

20    that there is substantial costs associated with that particular

21    construction project above and beyond the default date, which

22    is not even recognized here, which I'm not sure why.

23             THE COURT:  I think we need to move on, sir.

24             THE DEFENDANT:  Okay.  But do you agree that the

25    restitution is part of the sentencing --

H7ELCOS2

1          THE COURT:  Of course.

2          THE DEFENDANT:  -- it does, right.  So that's why I

3     raise that issue.  I raise that issue because I believe --

4          THE COURT:  Okay.  Let's go to the next issue, please,

5     sir.

6          THE DEFENDANT:  -- what is being presented there is

7     just not correct.

8          There is a issue of the sentencing memo.  I have not

9     seen a sentencing memo.  Is there one that I could see?

10          THE COURT:  I'm sorry, sir.  The government submitted

11     a sentencing memorandum, and Mr. DeMarco submitted a sentencing

12     memorandum.

13          THE DEFENDANT:  I don't remember seeing DeMarco's

14     sentencing memorandum.

15          MR. DEMARCO:  It was provided with the second

16     presentence report that you requested.

17          THE DEFENDANT:  Did we review that?  Was that reviewed

18     between us?

19          THE COURT:  Let's talk to the Court, please, sir.  I'm

20     waiting to --

21          MR. DEMARCO:  Sorry, your Honor.

22          THE COURT:  I'm waiting to hear the remainder of your

23     items.

24          THE DEFENDANT:  One moment, your Honor.

25          Dr. Penland mentioned Paul Hastings, a law firm named

H7ELCOS2

1    Paul Hastings that assisted him in -- on a pro bono basis in

2    handling this particular situation.  The evidence, your Honor,

3    based upon the 3500 material, the evidence looked at in the

4    light most favorable to the government shows that Paul Hastings

5    was aware that Dr. Penland was involved in criminal activity

6    and convicted of that criminal activity and it was intrinsic to

7    this --

8              THE COURT:  That's not relevant to this matter today,

9    sir.

10             THE DEFENDANT:  Your Honor, I think it goes to the

11   credibility of the victim.

12             THE COURT:  That has been judged by the jury, sir.

13   That's not an issue today.

14             THE DEFENDANT:  Your Honor, excuse me, your Honor, the

15   victim has elected to speak today at sentencing to an extent

16   that directly contradicts his testimony at trial.

17             THE COURT:  Okay.  I have in mind the trial testimony,

18   sir.  Go ahead.

19             THE DEFENDANT:  That will be it for now, your Honor.

20             THE COURT:  Thank you.

21             Counsel, as I've mentioned, I have calculated the

22   guidelines and have taken them into account.  Mr. Bell asked me

23   to repeat what the guidelines findings were.  I find that the

24   total offense level set forth in paragraph 69 should be 29.

25   That's because paragraph 65 should be plus two.  Paragraph 67

H7ELCOS2

should be 29.  And paragraph 69 should reflect a total offense
level of 29.

With a criminal history category of I, that makes the
guidelines range on Count One 87 to 108 months.  And the
guideline range on Count Two remains a mandatory and
consecutive 24 months.

Is that enough, Mr. Bell?

MR. BELL:  Yes, your Honor.  Thank you.

THE COURT:  With respect to the defendant's history
and characteristics, of course we know that Mr. Cosme is in
criminal history category I, as Mr. DeMarco has pointed out,
the lowest criminal history category.  I take that into account
and I take into account his kindness and supportiveness of his
family as set forth in Mr. DeMarco's submission and the letters
attached to it.  I also, however, take into account Mr. Cosme's
lack of remorse for the offense conduct.

With respect to the paragraph 2 factors, there is
certainly a need for a serious sentence here in light of the
seriousness of the offense and to provide just punishment.
This is particularly so in light of the brazenness of the
fraud, the grievous damage that this fraud did on TCIS, both
financial damage and psychological damage to the school
community and everyone associated with the school community.

It is also required here because the proceeds were
used for Mr. Cosme's personal enjoyment.  He bought not one,

H7ELCOS2

1  but several luxury automobiles.  He departed almost immediately

2  for Las Vegas and spent hundreds of thousands of dollars on

3  hotels, food and drink and gambling.  This is a serious crime

4  that deserves a serious punishment.

5       As always, with respect to paragraph B, there is a

6  need for a substantial sentence here in order to deter others

7  from criminal conduct like this and from preying on people like

8  TCIS.

9       With respect to paragraph C, as pointed out by the

10  government, there is a need here in light of Mr. Cosme's lack

11  of remorse to protect the public from further crimes of this

12  defendant.

13       The paragraph D factors are of very little relevance

14  here.  I have in mind the paragraph 3, four, and five factors.

15       With respect to paragraph C, the need to avoid

16  unwarranted sentencing disparities, I certainly take into

17  account what Mr. DeMarco has said about the Caspersen case.

18  However, I will note that there are differences between that

19  case and this case.  The victim here was an unsophisticated

20  investor, a not for profit, a particularly vulnerable victim.

21  And there was no justification for the offense conduct other

22  than pure simple personal greed.

23       Finally, with respect to paragraph 7, I take into

24  account the need to provide restitution, and I have in mind

25  what Dr. Penland said about restitution sooner rather than

H7ELCOS2

later.  However, I am dubious that Mr. Cosme will do anything

substantive to provide restitution despite his words here

today.  I hope he makes a liar out of me, but that is my view.

        Taking all of those factors into account, counsel, it

is my intention to impose a sentence of 87 months on Count One,

followed by the period of 24 months consecutive on Count Two,

for a total of 111 months.

        It is my intention to impose a period of three years

of supervised release on Count One and one year on Count Two to

run concurrently for a total period of three years.

        It's my intention to impose the recommended special

conditions, that is, the search condition, providing access to

requested financial information, not opening new credit

charges, etc., unless in compliance with the installment

payment schedule, and paying 15 percent of Mr. Cosme's gross

monthly income towards restitution.

        It is not my intention to impose a fine on the finding

that with the other financial penalties, Mr. Cosme can't afford

a fine.

        It is my intention to impose restitution in the amount

of $5,500,000, as set out in the order of restitution.

        With respect to forfeiture, I note the preliminary

order of forfeiture as to specific properties/money judgment

document No. 343, signed by the Court March 30, 2017, to the

extent it is required, it's the Court's intention to make that

H7ELCOS2

1    a final order.

2                MR. BELL:  Your Honor, we learned relatively recently

3    that the publication period referenced in the preliminary order

4    of forfeiture has not yet elapsed.  It will elapse within the

5    next approximately three weeks, at the conclusion of which we

6    will provide the Court with a final order of forfeiture for

7    your signature again referencing those assets listed --

8                THE COURT:  The same assets.

9                MR. BELL:  -- which include, of course, the cars and

10   the contents of the accounts.

11               THE COURT:  And the cash in the duffel bag.

12               MR. BELL:  The cash in the duffel bag, I think, your

13   Honor, has long been spent as a result of the stipulations

14   earlier in this case and went somewhere, I think, between

15   Mr. Cosme's fourth and ninth attorneys.

16               May I also address one small matter with respect to

17   this that Dr. Penland had raised?

18               THE COURT:  Yes, sir.

19               MR. BELL:  So, as your Honor is aware, forfeiture and

20   restitution have different purposes.  The purpose of

21   restitution is for the defendant to make the victim whole.  The

22   purpose of forfeiture is to separate the defendant from his ill

23   gotten gains and that money as a general matter goes to the

24   United States government in the general forfeiture fund.  There

25   is a process that the Department of Justice can and frequently

1    does activate which would allow the proceeds of that

2    forfeiture, the forfeiture being sort of automatic and complete

3    upon order, that would apply those to restitution.  And it is

4    our office's intention to request that main justice, which

5    makes those determinations, make that determination here.

6           The problem that Dr. Penland referenced earlier is

7    that they are loathe to do so prior to appeals being exhausted,

8    if only because they face the unpleasant possibility of an

9    appeal being released and the money already being out there.

10   As Dr. Penland referenced, the school here has undergone a

11   particular amount of suffering.  And we are sympathetic to

12   where the victims are here, just as we are mindful of why main

13   justice has its policy.

14          It's our intention working with Dr. Penland and the

15   school's counsel, Mr. Novack, who I think is here, to try to

16   help them negotiate this process with main justice.  If it's

17   possible for those funds to be returned to the school at a

18   sooner point, which is to say to have that process activated

19   and approved sooner, we'd love to see it happen and we will

20   help the school as best as we can.

21          THE COURT:  And it's certainly the Court's

22   recommendation that main justice acquiesce in that request.

23          MR. BELL:  Understood, your Honor, and we'll convey

24   that.

25          THE DEFENDANT:  Your Honor, one other thing.  Excuse

H7ELCOS2

1    me, your Honor.

2              THE COURT:  Sir.

3              THE DEFENDANT:  I do not consent to the forfeiture and

4    as you know and I just wanted to make a point of clarification

5    on the record that I do not consent to the final forfeiture

6    order that exists.  Are you aware that there's a PFO that had

7    language in it that referenced it being a or defined it or

8    deemed it as a final forfeiture order?  That being said, it

9    would be a premature federal forfeiture order not in compliance

10   with Rule 322 or the applicable asset forfeiture statutes.  So

11   I'm not sure where Martin Bell is going with this final

12   forfeiture discussion.  But from my understanding, you are

13   ordering restitution and there's discussions about forfeitures

14   and money judgments and as I stated earlier, the statutes that

15   the government elected to utilize to enforce this forfeiture

16   are inapplicable, not compliant, and inaccurate.

17             So is your understanding that they are or not?

18             THE COURT:  We've discussed this many times, sir.

19   I've noted your objection.

20             THE DEFENDANT:  What I'm looking for, your Honor, with

21   respect, is your opinion or just your opinion on if it's

22   compliant.

23             THE COURT:  We've done this many times.  Obviously, I

24   have found it to be compliant.  Otherwise, I wouldn't be doing

25   this.

H7ELCOS2

1        THE DEFENDANT:  Okay.

2        THE COURT:  To correct the record, I mistakenly said

3   that the preliminary forfeiture order was docket No. 343.  It

4   is in fact 345.

5        And finally, counsel, it's my intention to impose the

6   mandatory $200 special assessment.

7        Is there any reason, counsel, why such a sentence

8   should not be imposed?

9        MR. SOLOWIEJCZYK:  No, your Honor.

10        MR. DEMARCO:  No, your Honor.

11        THE COURT:  Thank you.

12        Mr. Cosme, you're sentenced, sir, to a period of 87

13   months on Count One, to be followed by a consecutive period of

14   24 months, for a total period of incarceration of 111 months.

15        Following that time you'll spend a period of three

16   years on supervised release, that is, three years on Count One

17   and one year on Count Two to run concurrently.

18        During the period of supervised release, you'll comply

19   with all of the standard terms and conditions of supervised

20   release.  Among them are that you not commit another federal,

21   state, or local crime; you not illegally possess a controlled

22   substance; and you not possess a firearm or other destructive

23   device.

24        In addition to those and all of the other standard

25   terms and conditions of supervised release, during that period

H7ELCOS2

you'll submit your person, residence, place of business,
vehicle, and any other computers as defined in 18 U.S.C.
Section 1030(e)(1), electronic communications, data storage
devices, and/or other media under your control to a search on
the basis that the probation officer has a reasonable belief
that contraband or evidence of a violation of the terms and
conditions of your release can be found there.  The search must
be conducted at a reasonable time and in a reasonable manner.
Failure to submit to such a search might be grounds for
revoking your supervised release.  It will be your obligation
to inform other residents of the premises or users of the
electronic devices that they might be subject to a search under
this condition.

In addition, sir, during that period you'll provide
the probation officer with access to any requested financial
information.  In addition, during that period you will not
incur any new credit charges or open any additional lines of
credit without the approval of the probation officer unless you
are in compliance with the installment payment schedule.

As I'll mention again a moment, during the period of
supervised release, you will pay 15 percent of your gross
monthly income towards satisfaction of the restitution amount.

As I mentioned, I do not impose a fine, but do impose
the restitution amount of $5,500,000.

The Court finds that the Taejeon Christian

H7ELCOS2

International School has suffered monetary losses compensable

under the Victim and Witness Protection Act in the amount of

$5,500,000.  Restitution payments are to be addressed to the

clerk of the court and sent to 500 Pearl Street, New York, New

York 10007.  From time to time the clerk of the court will

forward restitution payments to the Taejeon Christian

International School, 77 Yongsan 2-Ro, Yuseong, Gu, Daijeon

34035, Republic of Korea.

         Sir, if you are engaged in BOP non-UNICOR work, you'll

pay $25 per quarter toward the criminal financial penalties.

If you participate in the BOP's UNICOR program at a grade one

through four, you'll pay 50 percent of your monthly UNICOR

earnings toward the criminal financial penalties consistent

with BOP regulations at 28 C.F.R. Section 545.11.

         Following your release, sir, you'll pay 15 percent of

your gross monthly income towards satisfaction of the

restitution amounts.  Payments shall begin no later than 30

days after entry of judgment in this matter, and payments shall

be made monthly to the clerk of court as I've noted.

         As I've also noted, it is my intention to execute a

final order of forfeiture after the notice period which mirrors

the preliminary order of forfeiture as to specific

properties/money judgment, document No. 343.

         And finally, sir, I must impose and do impose the

mandatory $200 special assessment and that should be paid

H7ELCOS2

1    promptly.

2              It is my duty to inform you, sir, that unless you have

3    waived it, you have the right to appeal this sentence and you

4    might have the right to appeal in forma pauperis, which means

5    as a poor person, with the waiver of certain fees and expenses.

6              Mr. DeMarco, Mr. Cosme, did you wish a designation to

7    an area of the country?

8              MR. DEMARCO:  Northeast region, your Honor, to

9    facilitate family visits, please.

10             THE COURT:  It is the Court's recommendation that

11   Mr. Cosme be designated to a facility in the northeast region

12   to allow his family and friends to visit him.

13             Anything further, counsel?

14             MR. SOLOWIEJCZYK:  Your Honor, the government moves to

15   dismiss the underlying indictment and any other open counts.

16             THE COURT:  So ordered.

17             Anything else?

18             MR. DEMARCO:  No, thank you, your Honor.

19             THE DEFENDANT:  Your Honor, just one more thing, just

20   point of clarification again.  The defense does contest the

21   forfeitures and the restitution.

22             THE COURT:  Yes, sir.  I noted that in your

23   objections.

24             THE DEFENDANT:  And we move to apply for a forfeiture

25   hearing.

H7ELCOS2

1              THE COURT:  Too late.

2              THE DEFENDANT:  We mentioned it earlier, your Honor,

3    timely.

4              THE COURT:  In my preliminary statements, I noted that

5    to the extent you had requested any hearings, they were denied.

6              THE DEFENDANT:  Thank you, your Honor.

7              MR. BELL:  One housekeeping matter, your Honor.  You

8    made reference earlier to a number of correspondences, I think,

9    that you had received from Mr. Cosme.  Some of these we've

10   received, some of these we haven't.

11             THE COURT:  If you'll just wait there, I'm happy to

12   give them to you for your inspection.

13             MR. BELL:  I don't particularly want them, your Honor.

14   I'm just asking for completeness of the record that those be

15   docketed --

16             THE COURT:  Yes, sir.

17             MR. BELL:  -- in the inevitable appeal.

18             THE COURT:  Yes, sir.  Anything else?

19             MR. SOLOWIEJCZYK:  No, your Honor.

20             THE COURT:  Thank you.

21             Mr. DeMarco, thank you.  You have conducted yourself

22   with the utmost professionalism throughout this matter.

23             MR. DEMARCO:  Thank you, your Honor.

24             THE COURT:  Thank you, Mr. Marshal.

25             Good afternoon, Mr. Cosme.

H7ELCOS2

1          THE DEFENDANT:  Thank you, your Honor.

2                            o0o

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25